Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Adv. Case No. 23-01138-mg

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   CELSIUS NETWORK LIMITED,

14                 Plaintiff,

15            v.

16   STAKEHOUND SA,

17

18                 Defendant.

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20                 United States Bankruptcy Court

21                 One Bowling Green

22                 New York, NY  10004

23

24                 August 2, 2023

25                 11:03 AM

1    B E F O R E :

2    HON MARTIN GLENN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:   KS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Adversary proceeding: 23-01138-mg Celsius Network Limited v.

2   StakeHound SA Hybrid

3   HEARING re Plaintiff Celsius Network Limiteds Motion for an

4   Order Authorizing Alternative Service on Defendant

5   StakeHound SA Pursuant to Federal Rule of Civil Procedure

6   4(f)(3). (Doc## 9, 10, 13, 15 to 19)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   LOCKE LORD LLP

 4        Attorneys for StakeHound SA

 5        Brookfield Place 200 Vesey Street, 20th Floor

 6        New York, NY 10281

 7

 8   BY:  MARY STEPHANIE WICKOUSKI

 9

10   AKIN GUMP STRAUSS HAUER FELD, LLP

11        Attorneys for the Debtor

12        One Bryant Park

13        New York, NY 10036

14

15   BY:  MITCHELL HURLEY

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                    P R O C E E D I N G S

2             MR. HURLEY:  Mitch Hurley, with Akin Gump Strauss

3    Hauer Feld, on behalf of the Debtor as special litigation

4    counsel.

5             THE COURT:  All right.  So we're here in the

6    adversary proceeding, Celsius Network Limited v. StakeHound

7    SA.  It's 23-O1138.  It's in connection with the Celsius

8    motion for an order authorizing alternative service of the

9    Defendant.

10            MR. HURLEY:  Good morning, Your Honor.

11            THE COURT:  Good morning.

12            MR. HURLEY:  Mitch Hurley, with Akin Gump Strauss

13   Hauer Feld, special litigation counsel, on behalf of

14   Celsius.

15            Your Honor, this morning we're here on a very

16   narrow request for relief, which is permission to serve

17   StakeHound, which is a Swiss entity, by alternate means

18   under Rule 4(f)(3).

19            Your Honor, in considering a motion of this kind,

20   there are two overarching inquiries the Court has to make.

21   The first is whether it has discretion to order the proposed

22   form of alternative service, and the second is whether it

23   should exercise that discretion.  We submit that the answer

24   to both questions is clearly, yes, under the circumstances

25   of this case.

1              I want to start with the question of whether the

2      Court has discretion, and that question involves two further

3      inquiries.  One is the proposed formal alternative service,

4      prohibited by an international agreement.  Two, if the

5      answer to that question is no, is the proposed form of

6      service reasonably calculated to provide actual notice of

7      the complaint to the Defendant, so that it can appear and

8      respond?  We think the answer to those questions show

9      without a shadow of a doubt that the Court has discretion to

10     enter the relief that we're seeking.  And let me start with

11     a question of whether or not the proposed form of service is

12     prohibited by an international agreement.

13             Celsius has proposed two forms of alternative

14     service, both by email.  One is email to Albert Castellana,

15     who is the co-founder and CEO of StakeHound.  We understand

16     on information belief he is a Spanish citizen and lives in

17     Spain.  The other proposed method of service is delivery of

18     the complaint to StakeHound U.S. counsel, the Lockee Lord

19     firm, who is here at counsel's table.

20             Now, we submit neither of those forms of service,

21     Your Honor, is forbidden by an international agreement.  Let

22     me just start briefly with service through email to Mr.

23     Castellana.

24             It is the case that Switzerland -- again,

25     StakeHound is a Swiss company and it is the case that

Page 7

```
1    Switzerland has objected to Article 10 of The Hague

2    Convention -- Article 10 provides unless the nation objects

3    for service through postal channels.  Many cases, and we've

4    cited many of them to Your Honor in our papers, have found

5    that an objection by a nation to Article 10 to service

6    through postal channels does not encompass service via

7    email.  It doesn't count.

8              THE COURT:  Well, I know that the law in the

9    Southern District, the District Court, but none of which are

10   binding on me, but there's a split in the (indiscernible).

11   And I'll tell you, I found Judge Woods' opinion quite

12   persuasive, where he did not permit email service on China.

13             MR. HURLEY:  Yeah.  So, I guess two things there.

14             THE COURT:  So can you distinguish that, that

15   decision?

16             MR. HURLEY:  So, first of all, it is service in

17   China in the in Smart Study case that you're referring to.

18   And here we're talking about service in Switzerland.

19             THE COURT:  I understand.

20             MR. HURLEY:  The Smart Study case, Judge Woods

21   specifically pointed to evidence that hadn't been presented

22   to him in that case through affidavits of Chinese legal

23   specialists from Columbia University, where he found that

24   statements made by the Supreme People's Court of China

25   indicated that in China's case its intention was to object
```

1   to service by email, not just by postal channels.  There

2   hasn't been any evidence of that kind submitted here.

3           There have been numerous cases since Smart Study

4   was decided that have gone the other direction.  And, you

5   know, we submit those cases are better reason and we can

6   have an interesting debate about that, Your Honor.  And I'm

7   happy to discuss it further if you wish.

8           THE COURT:  Are there any cases that have

9   authorized email service to Switzerland?

10          MR. HURLEY:  There are.  We cited one case that

11  authorized email service to Switzerland in our papers from

12  the Southern District.  It is before Smart Study.  In

13  fairness, I think it's from 2007, but yes.

14          THE COURT:  Who was the judge.

15          MR. HURLEY:  I apologize, Your Honor.  I don't

16  have that at my fingertips.  But I can get it easily and

17  perhaps -- yeah, okay.  We'll get that information for you,

18  Your Honor.

19          I would submit, though, Your Honor doesn't have to

20  reach this question, which admittedly involves the split of

21  authority, because we have offered another proposed approach

22  to affecting service via alternate means on StakeHound, and

23  that is through StakeHound's U.S. counsel.

24          For the proposition that that form of service is

25  not forbidden by international agreement, we have no lesser

Page 9

1    an authority than the United States Supreme Court and

2    Volkswagen.  In that case, the United States Supreme Court

3    held that service of papers on a U.S. subsidiary of the

4    foreign defendant --

5              THE COURT:  I view serving a subsidiary as

6    entirely different than serving U.S. counsel.  It would

7    serve as a major impediment to seeking advice of counsel in

8    the U.S. if by virtue of hiring that counsel, you're

9    subjecting yourself to service through the counsel on that

10   ruling.  But that's the major -- and I haven't found the

11   cases that address that specific concern.

12             MR. HURLEY:  So, there actually is a case that we

13   cite, Your Honor, that addresses that exact concern.  And I

14   have the name of it right here.  It is the Paushok case,

15   which is a 2020 S.D.N.Y. case.  Very similar circumstances,

16   Your Honor; actually, one material difference that favors

17   our position.  In that case counsel appeared and contested

18   service and the Court found, effectively, service is about

19   notice.  It's not about gamesmanship.  It's just about

20   notice.  Is it possible for me to come to --

21             THE COURT:  Who was the judge?

22             MR. HURLEY:  Again, I don't have that information.

23   The site is 487 F. Supp. 3d 243, but we'll get that too.

24   And in a lengthy statement, which we block quoted in our

25   paper, said effectively, yeah, there's some awkwardness

Page 10

1    about the fact that counsel has appeared to contest service

2    in this case, and that means that service is going to be

3    available.  But that's basically what the Federal Rules

4    require because the inquiry --

5            THE COURT:  Well, you know, the case law involving

6    entirely domestic cases, there are cases that deal with

7    service on counsel.  And those cases focus on whether there

8    was actual or implied authority of counsel to accept

9    service.  And absent actual or implied authority to accept

10   service, they do not recognize service on counsel as

11   effective service.  So, that's in the purely domestic

12   context.  That's not in the international context.

13           But why should it not be allowed in the domestic

14   context but permitted in the international context?

15           MR. HURLEY:  So, we cited a number of cases, Your

16   Honor, that addressed this exact point that say,

17   effectively, the question is not whether the law firm has

18   been authorized by his client to accept service.  The

19   question is only whether, if the materials are transmitted

20   to that law firm, it is likely reasonably calculated to

21   result in notice to the client.

22           THE COURT:  So, let's assume for purposes of

23   discussion that I totally accept the proposition that Ms.

24   Wickouski received service, that that will provide notice to

25   StakeHound.  Okay?  But that doesn't get you quite there.

1          MR. HURLEY:  So, let me back up and I want to make

2     sure one thing is crystal clear.  This is not a case where

3     the U.S. law firm was retained expressly to respond to

4     dispute service of process.  This is not that case.

5          So, in this case, the Lockee Lord firm was

6     retained by StakeHound before we even filed the complaint.

7     They were retained by StakeHound, of course, long before we

8     filed our motion to affect an alternate form of service.  So

9     they were not retained for purposes of this motion here,

10    Your Honor.

11         They were retained previously.  I don't know

12    exactly when.  You saw the correspondence that we presented

13    to Your Honor about our pre-complaint filing communications.

14    Those communications indicated with crystal clarity that

15    Lockee Lord is in regular, perhaps even daily, contact with

16    its client.  There is absolutely zero doubt that if the

17    papers are delivered to Locke Lord, they will make their way

18    to StakeHound, and almost certainly already have.

19         We cited in our papers, Your Honor, cases that

20    find when you're talking about U.S. counsel, you can

21    actually presume because they're an officer of the Court,

22    that if they are directed to provide those papers to their

23    client, that they will do so.  So that second prong related

24    to whether or not Your Honor has discretion, we submit, is

25    overwhelmingly met here.

Page 12

1          So, not only is the form of service not prevented

2     by or permitted by international agreement.  It also is

3     crystal clear that it's going to result in actual notice.

4     And those are the points that courts look at when evaluating

5     whether they have discretion.

6          Now, I was going to move on to whether Your Honor

7     should exercise his discretion, but if there are other

8     questions you have --

9          THE COURT:  Go ahead.

10         MR. HURLEY:  Okay.  So, as I said, the second

11    inquiry after you've concluded that you have discretion to

12    order the alternative form of service is whether or not that

13    discretion should be exercised in the particular case.  And

14    we again submit that in this case, it clearly should be.

15         And with Your Honor's indulgence, I'd like to back

16    up and provide a little bit of background on StakeHound and

17    the nature of the dispute --

18         THE COURT:  Sure.

19         MR. HURLEY:  -- that we are dealing with here.

20         THE COURT:  Okay.

21         MR. HURLEY:  So, StakeHound is a company that was

22    organized relatively recently, our understanding, in or

23    around 2020, around an idea that StakeHound would be able to

24    provide liquidity to owners of Native tokens.  So that when

25    those Native token owners stake their tokens and those

1    tokens are earning rewards, but can't otherwise be used,

2    StakeHound was going to provide a product that would allow

3    them some liquidity so they could also invest in other DeFi

4    activities.

5            The way it would work was the customer would

6    provide a Native token to StakeHound.  StakeHound would

7    issue something called an ST token.  The Native token would

8    remain staked, earning rewards.  Those rewards would be

9    shared between StakeHound and the customer, and the customer

10   could then take the ST token and invest it in other

11   activities; DeFi, for instance.

12           In November of 2020 -- I'm sorry -- let me back up

13   -- the StakeHound and the stETH were provided on a one-to-

14   one basis, and the holder of the ST token was supposed to be

15   able to tender its ST token and get back its Native token on

16   demand.

17           THE COURT:  Ms. Wickouski, have a seat.  You'll

18   get plenty of chance to --

19           MS. WICKOUSKI:  Thank you.

20           THE COURT:  Go ahead.

21           MR. HURLEY:  In November of 2020, Jason Stone, who

22   Your Honor, is familiar with, was still running Celsius'

23   DeFi operation and he had a relationship with Mr.

24   Castellano, the founder of StakeHound, and reached out to

25   Mr. Castellano and agreed that Celsius would transfer the

1    nodes for about 25,000 Native ETH to StakeHound, and

2    StakeHound in issued the same number of stETH to Celsius,

3    with the understanding on Celsius' side --

4              THE COURT:  Let me let me stop --

5              MR. HURLEY:  Yeah, sure.

6              THE COURT:  Okay.  Assume for your argument today

7    --

8              MR. HURLEY:  Mm hmm.

9              THE COURT:  -- that I credit the allegations in

10   the adversary complaint, and subject to their being possibly

11   disputed, I would conclude that the facts would support the

12   exercise of personal jurisdiction over StakeHound.  Okay.

13   You clearly set out in great detail what you consider all of

14   StakeHound's contracts with the United States.

15             MR. HURLEY:  Those of which we're aware now.

16             THE COURT:  That you are aware of.  Okay.  So,

17   subject to their being possibly refuted, because the issue

18   of how you can test personal jurisdiction is -- there are

19   alternate routes, whatever -- but let's assume that I would

20   conclude as an initial matter that you've set out facts that

21   would support personal jurisdiction.  I would note that the

22   contract is actually with the UK parent, not with Celsius

23   LLC in the U.S.

24             But let's assume that I would find that there is

25   personal jurisdiction.  The issue then becomes service.

Page 15

1    Okay.  So I see a couple of issues that go beyond just

2    service.  What I read -- first off, I overrule your

3    objection and agree to accept the sur-reply that was filed.

4            You know, Ms. Wickouski's thrust of her argument

5    is about the exigent circumstances.

6            MR. HURLEY:  Mm hmm.

7            THE COURT:  Okay.  And to me, in reviewing the

8    complaint, I separate out the claims in the adversary

9    complaint to immediately recover assets that you believe

10   Celsius is entitled to recover, and the issue of the Swiss

11   arbitration.  And I'm just really focusing both of you about

12   this, because I'm really focused on the exigent

13   circumstances.

14           I mean, case law in the Southern District is split

15   about whether the plaintiff has to show what effort it made

16   to serve in accordance with The Hague Convention before you

17   move on to the alternative service, the 4(f)(3)   service.

18   Here, there doesn't appear to have been any effort.  So the

19   question is, what would excuse it?

20           What I really want to know, Mr. Hurley, is what

21   the status of the arbitration demand for the Swiss

22   arbitration is.  If there are any exigent circumstances, it

23   would be -- look, if -- and Ms. Wickouski can disagree with

24   this -- but if this were in a purely domestic context, I

25   think the law is abundantly clear that StakeHound, if it

Page 16

1    sought to compel -- if it filed an arbitration demand, would

2    violate the automatic stay.

3            Okay.  I'll listen to arguments about why not, but

4    I'm sort of starting with the presumption that would violate

5    the automatic stay.  How does one enforce the stay?  You

6    could do it with a contempt motion.  But a contempt motion

7    under 9014 has to be served in accordance with Rule 4.  It

8    would raise the whole problem about -- here, it would raise

9    the problem about service in Switzerland.

10           Okay.  To the extent that I would think there

11   would be -- if you've satisfied the exigent circumstances,

12   they've triggered the arbitration, the Swiss -- it's a

13   single -- the agreement provides for a single arbitrator,

14   and it's a dilemma for Celsius.  Does it respond to the

15   arbitration demand, even though it violates the automatic

16   stay?  So you'd have a decent argument about exigent

17   circumstances with respect to just that prod, violation of

18   the automatic stay.

19           With respect to getting your property, I have a

20   hard time seeing why you shouldn't go through The Hague

21   process to serve StakeHound in Switzerland.  Yes, it would

22   take some time.  But I don't see why.  You know, Celsius has

23   now proposed a disclosure statement and plan.  There's a

24   disclosure statement hearing.  It's a lot of money.  I

25   understand that.  But that could be litigated by the post-

1    confirmation Debtor, or a trust, or whatever.  Okay.  So I

2    see less of a reason why I would permit alternate service

3    with respect to those claims.  I mean, I would want to know

4    whether StakeHound would agree that it will not transfer any

5    of the assets, pending a decision in any arbitration, if

6    it's arbitrable.

7            But the violation of the automatic -- they

8    shouldn't have filed it.  They shouldn't have commenced

9    arbitration.  The question is how do you enforce that?

10   Normally you enforce it by motion, not by adversary

11   proceeding.  You're seeking for other relief that you would

12   have to do by adversary proceeding.

13           But focus on the exigent circumstances.  What is -

14   - can you tell me what the status of the arbitration demand,

15   when Celsius is required to respond, has an arbitrator been

16   selected, et cetera?

17           MR. HURLEY:  I can, Your Honor.  And I'll take

18   those in turn.  First exigent circumstances with respect to

19   the arbitration.

20           So the arbitration demand was filed in late April.

21   There was a deadline for an answer.  That deadline was in --

22   was May 25th.  On May 1st, after we got the demand, we sent

23   immediately sent them a letter and we said, you know, you

24   got to --

25           THE COURT:  I saw all that.

1            MR. HURLEY:  One of the things -- just addressing

2    a point you just made, Your Honor -- one of the things we

3    said is we disagree with you about everything, but are you

4    willing to freeze those assets so that they're available

5    whenever we get through this dispute during agreement or

6    judgment or whatever?  They ignored that.  We've made a very

7    similar request four times.  No agreement so far.  I'll come

8    back to that when I talk about the exigent circumstances

9    with respect to the assets.

10           But with respect to the stay --

11           THE COURT:  But tell me this.  If May 25th was the

12   deadline for an answer, did Celsius file an answer?

13           MR. HURLEY:  Celsius filed an answer limited

14   exclusively to raising the automatic stay as a bar to the

15   arbitration.  And we did that very deliberately because we

16   saw case law that suggested that if you do anything other in

17   the violating proceeding --

18           THE COURT:  You want to wait.

19           MR. HURLEY:  -- then show up and say you're not

20   allowed to do this, you can waive your rights.  Okay.

21           THE COURT:  So, what happened after May 25th?

22           MR. HURLEY:  So, after May 25th, there was some

23   back and forth about the initial question.  We suggested the

24   Swiss Arbitration Center in the first instance that they

25   shouldn't even select an arbitrator because of the existence

1    of the automatic stay.  Some letters were exchanged on that

2    point.  The Swiss Arbitration Center said, we're going to

3    select an arbitrator, and that jurisdictional question will

4    be for that arbitrator to decide in the future.  That

5    arbitrator hasn't been selected yet.  We expect it could

6    happen any moment.  Once the arbitrator is --

7              THE COURT:  Tell me what their procedure for

8    selection of an arbitrator?  Does each side get to propose

9    an arbitrator?

10             MR. HURLEY:  So, under the agreement, we had an

11   opportunity for the parties to try to agree on arbitration -

12   - on an arbitrator within a set period of time.  That period

13   of time elapsed.  So it is now to the Swiss Arbitration

14   Center to select on their own an arbitrator.

15             Once that arbitrator is selected, Your Honor,

16   that's when Celsius is going to be faced with this Hobson's

17   choice of do we participate and risk waiving our rights with

18   respect to the automatic stay?  Or do we ignore it and risk

19   whatever might happen in Switzerland if we don't attend.

20   And that, in our view, is precisely why when a stay

21   violation has been identified, in almost all cases some kind

22   of injunctive relief follows to say, stop.

23             And again, Your Honor, here, all we're asking for

24   is the right to serve.  They'll have plenty of opportunities

25   to argue to Your Honor whatever they want about the stay,

Page 20

```
 1    whatever relief they might seek with respect to the stay.

 2    Right now, all we want is the ability to serve the papers,

 3    so in the event -- and we plan to come back to Your Honor

 4    and seek provisional relief -- we can ask for it on a

 5    schedule where by the time Your Honor it and makes a

 6    decision, it won't be too late, because we had to make that

 7    Hobson's choice with respect to whether you participate or

 8    don't in the arbitration, for example.

 9              THE COURT:  So does the Swiss Arbitration Center

10    rules specify a timing?  I mean, what are the steps?  So

11    there -- say now the , so there.  Say now the Arbitration

12    Center is to select a single arbitrator --

13              MR. HURLEY:  Correct.

14              THE COURT:  -- do the Swiss Arbitration Center

15    rules specify timing for, you know, a deadline for when the

16    arbitration is to be concluded, briefing, or whatever

17    submission of evidence?  What does the Swiss Arbitration

18    Center rules provide?

19              MR. HURLEY:  So it has detailed rules, of which I

20    have some familiarity but not encyclopedic, certainly.  My

21    understanding is that once the arbitrator is selected, the

22    next step would be the arbitrator would contact the parties

23    and seek to establish a schedule of the kind that you're

24    describing, seek to get information about --

25              THE COURT:  (indiscernible) submits proposed terms
```

Page 21

1   of reference and, you know -- I haven't done Swiss

2   arbitration.  I did a bunch of our international ICC and

3   other tribunals.

4            MR. HURLEY:  Certainly, Your Honor.  And our

5   expectation is that if service takes as long as six months,

6   as it's undisputed, it could take that long to affect

7   service, and we can't invoke the power of this Court for six

8   months, there's an overwhelming risk that in that six-month

9   period, we are going to have to be faced with this Hobson's

10  choice.  Do we --

11           THE COURT:  That's why --

12           MR. HURLEY:  -- we participate or do we waive?

13           THE COURT:  (indiscernible) to say I'm keenly

14  focused on the filing of the arbitration demand and the

15  consequences of an arbitration going forward against the

16  wishes of Celsius.  If this was purely domestic, it would be

17  a violation of the automatic stay.  I see a real distinction

18  between the filing of the arbitration demand in the face of

19  the automatic stay, and whether or not the disputes are

20  arbitrable, because that's a much more difficult question.

21           MR. HURLEY:  And we're certainly not asking Your

22  Honor to reach that question today.

23           THE COURT:  And the -- it does seem to me that the

24  Debtor's insistence that StakeHound agree, in effect, to

25  freeze the assets, to prevent assets being transferred to

Page 22

1    Stone -- I understand about lost keys and all that.  But I

2    mean, look, I don't know the extent to which StakeHound is

3    good for, you know, meeting a judgment.  But if they

4    transfer assets -- if I deny your relief and they go ahead

5    and transfer assets and they're not there, they're going to

6    be facing a giant claim down the road.  They'd better

7    understand that.

8             MR. HURLEY:  Again, just as a reminder, for now,

9    we're not asking Your Honor to --

10            THE COURT:  I understand that --

11            MR. HURLEY:  -- to distribute assets --

12            THE COURT:  -- but look, I --

13            MR. HURLEY:  Yeah.

14            THE COURT:  Okay.  I'm focused on the exigent

15   circumstances.

16            MR. HURLEY:  Yeah.

17            THE COURT:  Let's assume I agree with you that

18   4(f)(3) gives me the discretion to authorize service through

19   alternate means on the service -- by service on their U.S.

20   counsel.  Put aside the email.  Okay.  I really don't have

21   any question that that will be -- that will satisfy due

22   process requirements for notice.

23            If the issue were approving alternative service

24   for the rest of the relief you're seeking, I'm not sure

25   about that.  I would say, go through The Hague process and

1    let's see where you are three or six months from now.  But I

2    think that the risk of dissipation of assets, and most

3    focused on the arbitration about Celsius having to arbitrate

4    just when it's embarking on approval of a disclosure

5    statement and confirmation of a plan, the distraction of

6    that, I think are exigent circumstances.  Okay.

7              MR. HURLEY:  Can I address the --

8              THE COURT:  Go ahead.

9              MR. HURLEY:  -- asset issue briefly?

10             THE COURT:  Yes.

11             MR. HURLEY:  Your Honor hit the nail on the head

12   with respect to the two issues we've been focused on, really

13   from the beginning.  You asked is StakeHound good for it?

14   Our understanding is the only assets that StakeHound has --

15   the only material assets -- 99 percent are the assets that

16   we claim Celsius gave to them.  Those assets are in the form

17   of Native ETH, Native MATIC and Native DOT worth about $90

18   million collectively at recent prices.

19             As I said, from the beginning, we've been very

20   focused on let's just reach an agreement so we're sure when

21   this is done those assets that we believe our Celsius'

22   customers' assets will be available to be distributed in

23   accordance with an agreement or with a judgment.

24             Despite having made that proposal multiple times,

25   Your Honor, the answer has always been no, which puts us in

1    very deep fear and concern, because they're not willing to

2    agree to that voluntarily, that they in fact intend to use

3    those assets to secrete those assets, to dissipate them.

4    And Your Honor knows --

5                 THE COURT:  Well, where do I derive that they

6    intend to do that?

7                 MR. HURLEY:  Well, in large measure because of

8    their refusal in the face --

9                 THE COURT:  Well, that's not --

10                MR. HURLEY:  -- of our request.

11                THE COURT:  That's not the same thing.  Do you

12   have -- have you offered any evidence that StakeHound

13   intends to use those assets?

14                MR. HURLEY:  The evidence is purely

15   circumstantial.

16                THE COURT:  Well, what -- I haven't seen the

17   circumstantial evidence.

18                MR. HURLEY:  Okay.  The circumstances are --

19                THE COURT:  What have you -- I mean, have you put

20   in your declaration?

21                MR. HURLEY:  The circumstance I'm about to

22   describe are pled in the complaint.  So --

23                THE COURT:  Well, the complaint is not evidence.

24                MR. HURLEY:  That's fair.  But the circumstances

25   that give us --

```
 1              THE COURT:  Can you put in a declaration by

 2    tomorrow that establishes the threat that StakeHound will

 3    dissipate the assets?

 4              MR. HURLEY:  A declaration by tomorrow?

 5              THE COURT:  Yes.

 6              MR. HURLEY:  I think that's possible that we could

 7    provide to you a declaration that --

 8              THE COURT:  Well, I'm just -- you know, you've

 9    said -- I read the complaint.

10              MR. HURLEY:  Yep.

11              THE COURT:  Complaints not evidence.

12              MR. HURLEY:  Yes.

13              THE COURT:  You know, are you prepared to back it

14    up with something that -- even circumstantial evidence that

15    -- not necessarily your declaration, but somebody's

16    declaration or one or more declarations that supports a real

17    threat to dissipation of assets?  I don't see it.

18              MR. HURLEY:  Well, I think it raises an

19    interesting question on, you know, what we need to show in

20    order to establish that the discretion to be exercised to

21    allow us to serve.  You know, we have identified the

22    circumstances that give us real concern, that we need to

23    invoke the power of the Court very swiftly.  We can't wait

24    three or six months.  We intend, if we are allowed to serve,

25    to bring a motion of that kind very, very promptly, to
```

1   describe for the Court the concerns we have in more detail.

2           For purposes of the instant motion, because it was

3   our understanding that by identifying the specter itself and

4   explaining why it is that we need to at least bring the

5   motion before Your Honor quickly and not wait three or six

6   months --

7           THE COURT:  I don't think --

8           MR. HURLEY:  -- would not be sufficient.

9           THE COURT:  -- that mere allegations satisfies

10  exigent circumstances.

11          MR. HURLEY:  It certainly wouldn't on a motion for

12  a preliminary junction.  That's true, Your Honor.  What

13  we're trying to explain to Your Honor, and with respect to -

14  -

15          THE COURT:  Well, the cases that I've read where

16  exigent circumstances, the issue actually dig into that

17  issue.  And other than the specter of allegations of risks,

18  things like that, I don't think you've set it out, other

19  than with respect to having to respond to an arbitration.

20  That seems to me, you've got the better side of that

21  argument.  But that in and of itself is exigent

22  circumstances.  I can't wait six months, because if you

23  don't appear and defend the arbitration, you may lose it.

24  You being Celsius, obviously.

25          MR. HURLEY:  And to the extent those exigent

1   circumstances justify service of the complaint, we would

2   submit that's sufficient.  We would still plan very

3   promptly, Your Honor, after service of the complaint, to

4   provide you with the papers that we believe will demonstrate

5   to you that these concerns are real and important and need

6   to be addressed right away with respect to the assets as

7   well.

8           I just -- I mean, can I give you a little flavor

9   of the position they're taking in Switzerland?

10          THE COURT:  Well, you've been negotiating.  Okay?

11  And I don't want to --

12          MR. HURLEY:  I --

13          THE COURT:  I'm not getting into that.

14          MR. HURLEY:  I mean in their actual demand for

15  arbitration.

16          THE COURT:  Okay.

17          MR. HURLEY:  Not negotiation.

18          THE COURT:  Go ahead.

19          MR. HURLEY:  Okay.  So, couple things that I think

20  are important to understand as content --

21          THE COURT:  I didn't see the -- was the demand

22  attached to your -- it took me to find Exhibit U, which was

23  the actual staking agreement, the StakeHound agreement.  It

24  didn't jump out at me, let me put it that way.

25          MR. HURLEY:  Oh.

1          THE COURT:  It was Exhibit U to your motion.

2          MR. HURLEY:  We will give you a better roadmap to

3    the documents in our -- in the future.  Apologies for that.

4    I actually don't think that we attached the demand.  So, if

5    that means Your Honor doesn't want me to describe their

6    position, I will halt, but --

7          THE COURT:  Go ahead.

8          MR. HURLEY:  Okay.  So there is -- the 25,000 ETH

9    that was provided in January of 2021, Celsius provided

10   another 35,000 ETH in February.  In April, Celsius provided

11   about what's worth now about $40 million worth of MATIC and

12   DOT to StakeHound and got back STE tokens in return for all

13   that.

14          In May, this catastrophe happens that Your Honor

15   has heard about.  This is what I think Mr. Kwasteniet

16   referred to in the first day as like the muffin in the

17   window that we can see it but we can't get it.

18          StakeHound, or it's agent, Fireblocks, lost the

19   BLS keys for that 35,000 ETH, worth about $70 million now

20   with rewards.  I understand that that's -- at least

21   currently, that $35,000 ETH can never be retrieved.

22          In this case, StakeHound has been taking the

23   position initially that that meant that Celsius can only get

24   back a pro rata share of the 25,000 that wasn't lost.  Since

25   we own about 95 percent of any stETH that was ever issued,

1    you know, that's still 95 percent of the 25,000.

2            In the arbitration that they filed, Your Honor,

3    they are now arguing that what we're really entitled to is

4    only the number --

5            THE COURT:  I didn't see any arbitration demand.

6    That's not attached to your affidavit, is it?

7            MR. HURLEY:  That is true.  We certainly will

8    supply it.  You know, we can supply in connection with our

9    next set of papers.  But they're arguing -- and I'm sure

10   they're -- I don't think this is going to be disputed by the

11   other side -- that they're only required to return to us the

12   Native ETH tokens.  Of the 25,000-ish plus rewards that they

13   have, they're only required to return to us Native tokens

14   equal to the U.S. dollar value of ST tokens.

15           So, ST tokens, because they or their agent lost

16   35,000 of them basically have no value now.  They're worth.

17   $10 each.  So all 25,000 of EST tokens, over 2,700 --

18           THE COURT:  Okay.  And if you arbitrate it or

19   litigate it, you're going to dispute that.

20           MR. HURLEY:  Right.  Okay.

21           THE COURT:  (indiscernible)

22           MR. HURLEY:  So, that's the position they're

23   taking, that they, because of their mistakes --

24           THE COURT:  The fact that they've taken that

25   position doesn't establish -- it wouldn't establish

```
 1    irreparable harm for an injunction.  That's their position.

 2    That's their legal position.  Yours is to the contrary.  l

 3             MR. HURLEY:  One other fact.  After they filed

 4    their demand for arbitration, we sent them a letter and

 5    said, send us back our $40 million worth of MATIC and DOT.

 6    There wasn't any loss of tokens.  There's never -- you know,

 7    that they got this justification they claimed --

 8             THE COURT:  Did they ever respond --

 9             THE COURT:  -- that doesn't exist.  They never

10    responded.  I've talked to them on multiple occasions.

11    Nobody has ever offered me a single justification, other

12    than they're holding it hostage.  That's what we're dealing

13    with in this case is a situation where --

14             THE COURT:  The only thing that's holding you

15    hostage, I'd say, served by The Hague Convention.

16             MR. HURLEY:  My concern, Your Honor, is really --

17    it's for Celsius' customers.  I refer to it as Celsius

18    coins.  These are Celsius customers' coins.  Ninety --

19             THE COURT:  Well, you shouldn't have given them --

20    you shouldn't have transferred the stuff to them.  Look, the

21    fact --

22             MR. HURLEY:  Understood, Your Honor.

23             THE COURT:  -- that it's Celsius' customers' coins

24    doesn't mean that you get to bypass the rules.

25             MR. HURLEY:  It doesn't.  But we would like an
```

Page 31

1   opportunity in the near term to show to you that it's

2   appropriate to make sure those coins don't get dissipated

3   while the case is proceeding.  That that's really all we're

4   arguing with respect to the service motion.

5           THE COURT:  You don't -- do you have the

6   arbitration demand with you?

7           MR. HURLEY:  I don't think we have we have it with

8   us.  We could get it to you very promptly.

9           THE COURT:  Let me hear from Ms. Wickouski now.

10  I'll give you a chance --

11          MR. HURLEY:  Okay.  Thank you, Your Honor.

12          MS. WICKOUSKI:  Good morning, Your Honor.  For the

13  record, Stephanie Wickouski, from Locke Lord.

14          Plaintiff's counsel has made so many factual

15  allegations, testimony of counsel.  I don't even know where

16  to start, other than to say this is not a trial on a TRO.

17  The issue  here is --

18          THE COURT:  Did you -- if this -- do you agree

19  that if your client was in the U.S., they violated the

20  automatic stay?  They would have violated the automatic stay

21  by demanding arbitration?  Yes, or no?

22          MS. WICKOUSKI:  No.

23          THE COURT:  Why.

24          MS. WICKOUSKI:  Because --

25          THE COURT:  It's contrary to every case I've ever

| | |
|---|---|
| 1 | -- that I've personally handled myself.  How do you think |
| 2 | that they didn't by --  If they were in the United States |
| 3 | and they had sent a demand, if they had triggered the |
| 4 | arbitration, why wouldn't that violate the automatic stay? |
| 5 | MS. WICKOUSKI:  Well, I think -- when I approached |
| 6 | this issue for the first time when I first got this case, |
| 7 | which was very, very recently, my immediate reaction was |
| 8 | this violates the automatic state.  That's beyond per |
| 9 | adventure.  And then when I investigated, when I looked at |
| 10 | the arbitration complaint, when I understood more of the |
| 11 | facts -- |
| 12 | THE COURT:  It wouldn't matter what's in the |
| 13 | demand, okay?  Whatever -- I don't have the demand, okay? |
| 14 | But whatever is in there, just the fact of filing that |
| 15 | violated the automatic stay.  Yes, or no? |
| 16 | MS. WICKOUSKI:  No.  Because there is an open |
| 17 | question as to whether it involved -- whether it could have |
| 18 | been brought pre-petition. |
| 19 | THE COURT:  Wouldn't matter if it could be brought |
| 20 | pre-petition.  Once the petition's filed, you can't do |
| 21 | anything to trigger the arbitration.  It may be ultimately |
| 22 | the dispute is arbitrable.  If any case -- do you have -- |
| 23 | can you cite me any case that would support the proposition |
| 24 | that if StakeHound was in the U.S., they could go ahead and |
| 25 | demand arbitration in the face of the automatic stay?  Any |

1   case?

2          MS. WICKOUSKI:  I don't have a case.  But I think

3   the issue that Your Honor is raising, which is that the --

4   there is a threshold issue here as to whether the stay

5   applies or whether it should be modified by the Court to

6   allow the arbitration to continue --

7          THE COURT:  That would be --

8          MS. WICKOUSKI:  -- on (indiscernible) objection --

9          THE COURT:  Okay.

10          MS. WICKOUSKI:  -- is a threshold issue.

11          THE COURT:  Yeah, I get you.  To all of you...

12          MS. WICKOUSKI:  And it's an issue that we're very

13   anxious to --

14          THE COURT:  Stop.  Let me cite one of my prior

15   opinions to you in 571 BR 80 (Bankr. S.D.N.Y. 2017) in M F

16   Global.  What that decision does is recounts -- that was the

17   sixth opinion that I wrote just over the issue of

18   arbitration, where I found that the Bermuda insurers

19   violated the automatic stay and the Barton Doctrine when

20   they commenced arbitration -- sought to commence arbitration

21   in Bermuda.

22          The decision at 571 B.R. was the ultimate decision

23   when I said yes, it's arbitrable.  We finally got to it

24   after five opinions before that.  Okay.  So it may be that

25   your client would prevail, that the dispute with Celsius is

1    arbitrable.  Okay?  But it's what you did -- what they did

2    to get to it being arbitrable.  Okay.  It may ultimately be

3    arbitrable.  That can only be -- I can only determine that

4    if this case goes forward.  Okay.

5           I do distinguish between the arbitration and the

6    claims for turnover, et cetera.  Okay.  I do think that an

7    agreement from your client to freeze the assets until all

8    this gets resolved is important.  But you know, it may well

9    be that it is an arbitrable dispute.  I can't -- I'm not

10   deciding that now.  It wouldn't make any difference.  It

11   didn't make any difference in MF Global.  It took the sixth

12   opinion to finally determine that it was arbitrable.

13           MS. WICKOUSKI:  We're very anxious to get to the

14   resolution of whether this is arbitrable.  And Your Honor --

15   well, first of all, with respect to -- and this was -- I

16   cannot go back and dispute and respond to every single piece

17   of factual allegation that my opposing counsel has made,

18   except to say that his characterization we vigorously

19   dispute.

20           StakeHound doesn't believe these are Celsius'

21   tokens.  And this is not a custodial agreement.  But that's

22   a merits issue that's not before the Court.

23           THE COURT:  I agree.

24           MS. WICKOUSKI:  This is not a TRO hearing right

25   now.  This is not a trial in the case.  However, the issue

Page 35

1    of arbitration, I think, really, we are anxious to have the

2    question -- in my view --

3            THE COURT:  Accept service of process and make a

4    motion to compel arbitration.

5            MS. WICKOUSKI:  Well, without getting into the

6    conversations -- and I think Mr. Lombardi referenced or

7    alluded to this in his email to the Court at 1:00 AM this

8    morning that the counsel had been in discussions -- were in

9    discussions several hours --

10           THE COURT:  Actually, I didn't even read -- I

11   didn't read that email, so...

12           MS. WICKOUSKI:  Obviously, we've been in

13   discussions and I'm --

14           THE COURT:  Even today, this morning.

15           MS. WICKOUSKI:  Even this morning.  But you know,

16   we're not there yet in terms of having this resolved.  But

17   in my view -- I'd like to address some of the Court's

18   questions with respect to what's happening in the

19   arbitration, because I would like to clarify what is going

20   on in that and what is expected to occur?

21           THE COURT:  Let me ask you this.  Do you expect

22   the Arbitration Center to select an arbitrator any day now?

23           MS. WICKOUSKI:  I don't know.  They could.  I do

24   know that I've been told that it's past the point where --

25   the parties had a deadline to submit a name jointly that

Page 36

1    came and went.  I understand that StakeHound Swiss counsel

2    also, even after the deadline, asked Celsius' counsel if

3    they wanted to have the opportunity to select someone

4    jointly.  That time has passed.  But what I understand is

5    once an arbitrator is appointed, then the first thing he

6    does is ask the parties to have a conference and agree on a

7    schedule and --

8            THE COURT:  So let's assume that Celsius

9    respectfully declines because the arbitration violates the

10   automatic stay.  What happens then?

11           MS. WICKOUSKI:  I don't know.  But I can say that

12   that StakeHound would certainly be willing to work with

13   Celsius on a schedule that would postpone any substantive

14   matters or briefing until after this Court decides the

15   threshold issues, which would include jurisdiction, personal

16   jurisdiction, and arbitrability.  But that all assumes that

17   proper service is made, which I think is not just a

18   technical matter.  I think this is really critical.

19           THE COURT:  Why isn't -- why doesn't the

20   arbitration demand and the soon to be appointed arbitrator

21   create the exigent circumstances that justify alternative

22   service?  This is not -- what was involved was the issue of

23   does Celsius recover the property from StakeHound.

24           MS. WICKOUSKI:  Mm hmm.

25           THE COURT:  I would be more inclined to say go

Page 37

```
 1    follow the normal process of triggering your adversary -- of

 2    obtaining jurisdiction.  Look, you may wind up disputing the

 3    existence of personal jurisdiction.  It does seem to me they

 4    went out of their way in their complaint to establish all

 5    the indicia that would support the exercise of personal

 6    jurisdiction.  The issue for now -- and you'd potentially

 7    have the ability to contest that.  The issue for now is

 8    alternative service.  Okay.

 9             Exigent circumstances, those cases that I've read

10    that require some showing of what did you do to try and

11    follow The Hague process, it would seem to me that where

12    your client sent the demand for arbitration triggered this

13    process in violation of the automatic stay would create the

14    exigent circumstances that could justify a Court exercising

15    discretion to permit this alternate form of service.

16             MS. WICKOUSKI:  Well, I certainly understand that

17    concern.  It seems to me that the -- Celsius' claim that the

18    automatic stay was violated, we haven't had due process on

19    that issue.  We haven't had a chance to brief it.  We

20    haven't had a chance to make our arguments to the Court.  So

21    it's conclusory -- it's the exigent circumstances being

22    argued assumes that Celsius will prevail on that claim, for

23    which we haven't yet been properly served.  And so it's

24    really putting the cart before the horse.

25             I think that in the Smart Study case, it said that
```

```
 1     where the service under The Hague Convention is mandatory,

 2     there's -- and for Rule 4(f)(3), there's not an exigent

 3     circumstances exception.  And I would also offer --

 4               THE COURT:  There isn't?  Why?

 5               MS. WICKOUSKI:  Well --

 6               THE COURT:  Why -- let's assume for plain purposes

 7     of our discussion that filing the arbitration demand

 8     violated the automatic stay.  The process goes forward in

 9     the Swiss Arbitral Tribunal.  They're about to appoint an

10     arbitrator.  It puts Celsius in the position of, what are

11     the consequences if we don't participate?

12               MS. WICKOUSKI:  Mm hmm.

13               THE COURT:  That, to me, just seems to me to be

14     the exigent circumstances.  Three to six months to go

15     through The Hague process to serve; it could be all over by

16     then.  If Celsius stands on its rights and says, this

17     arbitration is invalid, we will not participate, they run a

18     very substantial risk of a default judgment being entered

19     against them in the arbitration.  That's exigent

20     circumstances, to me.

21               MS. WICKOUSKI:  I think it would be if there was -

22     - if that was really likely to happen, because the Swiss

23     arbitration was being prosecuted aggressively or accelerated

24     or moving forward on that timetable.

25               THE COURT:  Once the arbitrator is appointed, they
```

1    have no control over what the arbitrator is going to do.

2              MS. WICKOUSKI:  Well, I think -- and it's --

3              THE COURT:  You're trying to shut the door on any

4    relief by the Debtor for a violation of the automatic stay.

5    I'm distinguishing that from an action for turnover of

6    assets and stuff like that that's in the complaint.

7              MS. WICKOUSKI:  Your Honor, I think, in fact, we

8    would -- we would want the issue of arbitrability to be

9    decided by this Court before anything significant or

10   substantive happens in the arbitration.

11             THE COURT:  Let me just tell you.  If your client.

12   agrees to accept service of the summons and complaint, if

13   you want to file a motion to compel arbitration, you can do

14   that promptly and I'll decide it promptly.  If the complaint

15   was served -- were deemed served today because your client -

16   - you accepted -- you were authorized to accept service of

17   the summons and complaint and you filed a motion to compel

18   arbitration next week, you'd get a hearing in a -- you know,

19   two, three weeks.  It isn't going to linger, I'll tell you

20   that.

21             But two things would have to happen.  Your client

22   would have to agree to accept service, have you accept

23   service, or it would accept service, and it would agree,

24   pending the outcome of a motion to compel arbitration, it

25   will freeze the assets in place.  You can put words into it.

Page 40

1    I'm not -- I'm using that generically.  With Mr. Stone, you

2    know it's a more complicated negotiation as to what he

3    wouldn't do with assets in the meantime.  But you'd get that

4    resolved fairly quickly.

5              MS. WICKOUSKI:  Understood, Your Honor.

6              THE COURT:  Okay.

7              MS. WICKOUSKI:  I think our concern and our

8    response is that the freezing of the assets essentially is

9    the imposition of a TRO, even for -- I mean, for which we

10   haven't yet been properly served and we haven't had a chance

11   to respond.  So it is putting -- it is making a decision on

12   the merits by essentially saying accepting Celsius'

13   testimony of counsel that these are their assets and we --

14             THE COURT:  Look, I think.  I don't know what --

15             MS. WICKOUSKI:  There's been no evidence.

16             THE COURT:  I don't know what StakeHound does with

17   assets in the ordinary course of its business.  What I see

18   as the greatest risk is if they wind up turning stuff over

19   to Stone, which has been a long dispute pending in this

20   court.

21             I have a feeling, Ms. Wickouski, you and Mr.

22   Hurley could agree on appropriate parameters for what

23   StakeHound could do with the assets.  Okay?  I can just tell

24   you, it took a long time for Mr. Hurley and Stone's counsel

25   to work out what the arrangements would be, just in the

Page 41

1    litigation here.  It happened, though.  Okay.

2          I really think that -- I'm not trying to hamstring

3    StakeHound in the ordinary conduct of its business.  Okay?

4    But I don't want to find out if I conclude that the Court --

5    that serviced, alternative service is approved and the case

6    goes forward, that StakeHound just transferred everything to

7    Mr. Stone, or elsewhere.

8          MS. WICKOUSKI:  I'm certain that StakeHound is not

9    going to transfer anything to Mr. Stone.  But with Your

10   Honor's instruction and views on this, I would need some

11   time to speak to our client to try to propose a construct

12   under which they would be willing to accept service.  It's

13   just not something that I can --

14         THE COURT:  I'm not expecting you to do it as you

15   stand there now.

16         MS. WICKOUSKI:  Yes.  I'm good, but I'm not that

17   good.

18         THE COURT:  No, I don't -- you know, I don't

19   expect you to do it now, but by Monday, I would.

20         MS. WICKOUSKI:  Certainly, Your Honor.  I could

21   meet that timetable.

22         THE COURT:  And then, so assuming that you're

23   authorized to accept service, work out with Mr. Hurley,

24   because I assume you will make a motion to compel

25   arbitration.  Work out a schedule with Mr. Hurley for a

Page 42

1    motion in response and reply, and can get an argument date

2    pretty quickly from my courtroom deputy.  And I'm certainly

3    prepared to proceed in that fashion.

4           But it presupposes that service has been accepted

5    and we move forward from there.  I mean, you know, I give

6    you the example of MF Global.  It was painful in six

7    opinions before we ultimately got to the decision where I

8    compelled arbitration in Bermuda.

9           MS. WICKOUSKI:  Your Honor, I really --

10          THE COURT:  And all I can say is there it was the

11   insurers --

12          MS. WICKOUSKI:  Yes.

13          THE COURT:  -- it was foreign insurers.  I'll skip

14   some of the steps.  They wound up with substantial sanctions

15   for violating the Barton Doctrine and violating the

16   automatic stay.  I think that if it turned out that the

17   dispute is arbitrable, there's a question of timing.

18          Celsius is going through approval of a disclosure

19   statement, and they hope, planned confirmation.  I've given

20   them dates for a confirmation hearing in October, early

21   October.  You know, I think it's pretty clear that they

22   would be substantially distracted by having to arbitrate or

23   litigate these issues while plan confirmation is going on.

24          And I really -- I've said this right at the start

25   -- I  mean, I really view the allegations in the complaint,

Page 43

1   the counts in the complaint for turnover, is very different

2   than the automatic stay violation by triggering the

3   arbitration.  I don't know.  And you know, Mr. Hurley may

4   have some very good arguments why this is not arbitrable.

5   And you will have made good arguments why it is arbitrable.

6   You know, I have the -- here is the Exhibit U, with

7   Paragraph 10, is the arbitration agreement.  Paragraph 9 is

8   Swiss governing law.  And Paragraph 10 is the arbitration

9   clause.  So I'm very wary of it.

10           MS. WICKOUSKI:  Your Honor, this has been

11   extremely helpful for me, and also on behalf of our client,

12   I want to thank the Court for allowing us the opportunity

13   for an accelerated briefing schedule, because we very much

14   do want to have the issue of arbitrability resolved.

15           And I think with the additional time that the

16   Court is allowing us to Monday, I feel we'll be able to

17   revert back with a structure.

18           THE COURT:  All right.  Just bear with me a

19   minute.  All right, I'm -- let me hear from Mr. Hurley

20   before I --

21           MS. WICKOUSKI:  Thank you, Your Honor.

22           MR. HURLEY:  Thank you, Your Honor.  I'll just

23   answer a couple of questions you asked before.  We actually

24   did provide a copy of the arbitration demand.  It's Exhibit

25   I to my declaration.  Apologies for not having that at my

1    fingertips before.

2            I referenced a case where email service was

3    allowed in Switzerland.  It's William-Sonoma v.

4    Friendfinder.

5            THE COURT:  I'm sorry.  Defendant's name?

6            MR. HURLEY:  William-Sonoma v. Friendfinder, 2007

7    WL 1140639.  And that's 2007, Judge Jeffrey White.  And you

8    asked who the judge was in the Paushok case.

9            THE COURT:  Yes.

10           MR. HURLEY:  That was Judge Rakoff.  One point I

11   wanted to make, you asked about StakeHound being allowed to

12   engage in assorted businesses.  StakeHound doesn't have any

13   business now.  They have suspended their platform.  They're

14   not doing anything other than they have this litigation

15   against Fireblocks in Israel.  That's all they're doing.

16   They don't have any operations.

17           So I just want to make sure I understand what --

18   where we've arrived here, Your Honor.  If I understand

19   correctly, you're suggesting that the parties should try by

20   Monday to reach agreement that involves its acceptance of

21   service.

22           THE COURT:  Acceptance of service, scheduling --

23           MR. HURLEY:  Freeze of the assets.

24           THE COURT:  -- and a motion to compel arbitration.

25           MR. HURLEY:  A briefing schedule and a freezing of

1     assets during that period of time.

2          THE COURT:  When I say -- and I want to be clear -

3     - freezing of assets, I'm going to leave it -- that may be

4     too broad a statement.

5          MR. HURLEY:  An agreement that the assets won't be

6     dissipated during the period of the briefing.

7          THE COURT:  You know, with Mr. Stone, there were -

8     - and I'm not saying that the same kind of agreement is

9     appropriate -- but Mr. Stone, he was permitted to carry on

10    some BIT trading and business activity --

11         MR. HURLEY:  Right.

12         THE COURT:  -- you worked out --

13         MR. HURLEY:  In this case, the assets are all

14    staked, so they are getting some income.  But there's -- I

15    don't believe there's any other movement that would have to

16    happen.  So I understand.  I think it's a really sensible

17    resolution.  I will, you know, I guess, point out that

18    that's an outcome we've really at Celsius been trying to get

19    to for a while.  So we have to at least contemplate the

20    possibility that we're not going to get there on Monday.

21    I'm going to do everything I can to get there.  If we can't,

22    how do we...?

23         THE COURT:  Here is what I'm proposing.  This

24    hearing will be adjourned until 2:00 PM on Monday.  Okay.  I

25    will -- I have something in the morning, but I have nothing

1     in the afternoon.  I will hear whatever further limited

2     argument each of you wishes to make.  I would hope that you

3     can come to an agreement.  You know, when I -- I hope you

4     can come to an agreement how to proceed.

5              Look, assuming that Ms. Wickouski agrees to accept

6     service, I'm not even sure you can talk about a response to

7     the complaint.  I'm not even sure that an answer to this

8     complaint is going to be needed right away.  It does seem to

9     me that the major issue is going to be whether the dispute

10    is arbitrable or not.  Okay.

11             You can discuss about what -- when would a

12    response to the complaint be required is to accept service,

13    work out a briefing schedule with respect to the motion to

14    compel arbitration.  You'll get a hearing date fairly

15    promptly.

16             MR. HURLEY:  And it may be that in conjunction

17    with that, Your Honor, we would propose that other issues be

18    briefed at the same time, so that Your Honor would be in a

19    position potentially to make a decision on some of the

20    issues that we touched on today.

21             THE COURT:  What other issues are you talking

22    about?

23             MR. HURLEY:  Well, with respect to, for instance,

24    I mean, this -- while we're here, the arbitration is

25    continuing, and if we're talking about three-week briefings.

1              THE COURT:  Well, let -- I just -- on that point,

2      you discussed with Ms. Wickouski what happens to the

3      arbitration while this goes on.  I'm not deciding the issue.

4      It sure looks like a pretty cut and dried issue of violation

5      of the automatic stay.  This is exactly what happened in MF

6      Global.  There was the plan injunction.  They'd already

7      confirmed the plan, but the plan injunction was in effect.

8      It violated -- I found that it violated both the Barton

9      Doctrine and the stay in triggering -- by going -- you know,

10     filing the arbitration demand.

11             Actually, what they did was they asked Bermuda

12     Court to order the arbitration.  The arbitration hadn't

13     actually started.  Here, it's one step further.  The

14     arbitration has already been demanded.  So yeah, talk about

15     all of that.

16             MR. HURLEY:  Okay.  And what we're contemplating

17     here is a brief period that we'll try to negotiate with

18     respect to the stay and with respect to -- I won't use the

19     word freezing, but you know what I'm talking about when I

20     refer to --

21             THE COURT:  Right.

22             MR. HURLEY:  We want to be in a position where,

23     you know, at the end of that period of time, we have to come

24     back to Your Honor again and say we need some emergency

25     relief, that you have all the information in front of you

1    that you need to decide that kind of an application.

2              THE COURT:  Well, the only thing I would say is I

3    don't know that I have all that information.  The complaint

4    is hearsay.

5              MR. HURLEY:  Correct.

6              THE COURT:  I don't have declarations.  I know

7    what allegations you made in the complaint.

8              MR. HURLEY:  Correct.  And so, what I'm proposing

9    is that maybe during this same period of time, we could make

10   some additional submissions with respect to that kind of

11   information, so that you're in a position, if we get to the

12   point where you can answer the question, with a fuller

13   record.

14             THE COURT:  See what you all -- I'm not agreeing

15   to something without knowing what it is that you're

16   proposing.

17             MR. HURLEY:  Understood.  I just want to give you

18   a heads up that that's something we would propose.

19             THE COURT:  All right.  I'll see you on Monday at

20   2:00.

21             MR. HURLEY:  Thank you, Your Honor.

22             THE COURT:  Ms. Wickouski, is there anything else

23   you wanted to add before --

24             MS. WICKOUSKI:  Your Honor, the only thing I

25   wanted to add -- and just so that no one is surprised by

1     this -- my understanding is that -- and I cringe a little

2     bit when I hear the word freezing because to me --

3              THE COURT:  I'm sorry.  I didn't hear that.

4              MS. WICKOUSKI:  Oh, I cringe a little bit when I

5     hear the word freezing of assets, because it suggests

6     voluntarily submitting to an injunction against using any of

7     one's property.  And I think that what we would have in mind

8     and in fact -- and I don't think I'm disclosing anything --

9     we've been willing to propose and discuss -- is some

10    freezing, if you will, that has exceptions for materiality.

11             THE COURT:  Let me suggest this.

12             MS. WICKOUSKI:  Ordinary course.

13             THE COURT:  Ask Mr. Hurley for a copy of the

14    injunction that was entered in the Stone matter.  It's got

15    all sorts of exceptions.  And look at that.

16             MS. WICKOUSKI:  Thank you, Your Honor.  That's --

17             THE COURT:  It may not be -- look, I don't have it

18    clearly in all the terms and it took a while for Mr. Hurley

19    and Stone's counsel to work that out, but they did.

20             MS. WICKOUSKI:  Understood.  Understood.  Yeah, I

21    will do that.  Because I think, you know, the -- no one in

22    this context would agree to a blanket 100 percent

23    unconditional freeze without their due process.  But to put

24    some -- to put things in status quo (indiscernible) --

25             THE COURT:  I'm using it as a -- and I've said it

1    already.  When I say freeze --

2              MS. WICKOUSKI:  Yes.

3              THE COURT:  -- I'm using it very generically and

4    not the specific terms of what...  In Stone, they agreed.

5    Ultimately, it was agreed what the terms of that would be.

6    I think it may have been modified once along the way.

7              MS. WICKOUSKI:  Understood.

8              THE COURT:  So I didn't -- I approved what was

9    negotiated.  I don't -- let me -- I just -- as I sit here

10   now, I don't know enough about the business of your client

11   to know what would be appropriate relief and not.  I'm not -

12   - okay?

13             MS. WICKOUSKI:  I understand.  Well, thank you,

14   Your Honor.  And mostly, I raised this just so that no one

15   is surprised, because I think my marching orders are clear.

16   But I want to make sure that I'm hearing it the same way

17   everyone else is, and the way Your Honor has --

18             THE COURT:  Okay.

19             MS. WICKOUSKI:  -- has enunciated.

20             THE COURT:  I'll see you all on Monday at 2:00.

21             MS. WICKOUSKI:  Thank you, Your Honor.

22             THE COURT:  Okay.  All right.

23             MR. HURLEY:  Thanks, Your Honor.

24             (Whereupon these proceedings were concluded at

25   12:12 PM)

Page 51

1                     C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  August 3, 2023