Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   Adv. Case No. 23-01138-mg

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   CELSIUS NETWORK LLC,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  CELSIUS NETWORK LIMITED,

13              Plaintiff,

14          v.

15  STAKEHOUND SA,

16              Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18              United States Bankruptcy Court

19              One Bowling Green

20              New York, NY  10004

21

22              August 7, 2023

23              1:59 PM

24

25

Page 2

```
1    B E F O R E :

2    HON MARTIN GLENN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:   KS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    HEARING re Adversary proceeding: 23-01138-mg Celsius Network

2    Limited v. StakeHound SA

3    Hybrid Hearing RE: Plaintiff Celsius Network Limiteds Motion

4    for an Order Authorizing Alternative Service on

5    Defendant StakeHound SA Pursuant to Federal Rule of Civil

6    Procedure 4(f)(3). (Doc## 9, 10, 13, 15 to 20)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    AKIN GUMP STRAUSS HAUER FELD, LLP

 4         Attorneys for the Plaintiff Celsius Network Limited

 5         One Bryant Park

 6         New York, NY 10036

 7

 8    BY:  MITCHELL HURLEY

 9

10    LOCKE LORD LLP

11         Attorneys for Defendant, StakeHound SA

12         Brookfield Place, 200 Vesey Street, 20th Floor

13         New York, NY 10281

14

15    BY:  MARY STEPHANIE WICKOUSKI

16

17    ALSO PRESENT TELEPHONICALLY:

18    ANDREA AMULIC

19    DEAN CHAPMAN

20    AARON COLODNY

21    SEAN ANDREW FEENER

22    SAMUEL P. HERSHEY

23    NICHOLAS LOMBARDI

24    GREGORY F. PESCE

25    ELIZABETH SCOTT
```

Page 5

1   DAVID TURETSKY

2   KEITH WOFFORD

3   CHRISTOPHER COCO

4   THOMAS DIFIORE

5   SCOTT DUFFY

6   DREW DUFFY

7   UDAY GORREPATI

8   MIRA HAQQANI

9   TAYLOR HARRISON

10   KEITH NOYES

11   MASON PALISSERY

12   MARK ROBINSON

13   CAROLINE WARREN

14   ANDREW YOON

15   KAILA ZAHARIS

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2            CLERK:  All rise.

 3            AUTOMATED VOICE:  Recording in progress.

 4            THE COURT:  Please be seated.  All right.  Good

 5     afternoon.  Let me just say preliminarily that my law clerk,

 6     Dan Slemmer, is here.  He's not working on this matter.

 7     He's going to working, after he completes his clerkship,

 8     with Akin Gump so he is not had anything to do with this.

 9     My other two clerks are not here today so he's banging on

10     the door and then sitting there but he has not worked --

11     will not work on the matter.

12            All right.  So I have the two letters, Ms.

13     Wickouski, your letter and Mr. Hurley's letter a little

14     while ago in response.  Mr. Hurley, why don't you first tell

15     you where you see things are at this point.  This is your

16     case.

17            MR. HURLEY:  Good afternoon, Your Honor.  Mitch

18     Hurley with the Akin Gump special litigation counsel for

19     Celsius.

20            Really just as we laid out in the letter, Your

21     Honor, we agree that it's going to make sense for the

22     parties to meet and confer over an appropriate schedule,

23     including with respect to things like briefing, exactly

24     what's going to be briefed, when the hearing is going to be,

25     the nature of the hearing itself.  We have reached an
```

Page 7

1    impasse as Your Honor can see with respect to certain other

2    matters, including things like the notion that, you know,

3    there would be declarations submitted in support of the

4    motion of no evidence at the actual hearing which I

5    understand -- to me, meant the declarations can be submitted

6    at the hearing.  There wouldn't be cross.

7            THE COURT:  Well, let me just -- let me say, my

8    procedure is, declarations for direct live cross-

9    examination.

10           MR. HURLEY:  Right.  And --

11           THE COURT:  In other words (indiscernible), if --

12   Ms. Wickouski, if your clients are outside the United

13   States, you would confer with Mr. Hurley and I would

14   consider having testify over Zoom rather than having them

15   travel to the United States, but they'd be subject to cross-

16   examination.  That's the procedure that was actually

17   followed the adversary proceeding that you handling where we

18   had three witnesses, two here and one from Israel.

19           MS. WICKOUSKI:  Thank you, Your Honor.

20   (indiscernible)

21           THE COURT:  But there would be cross -- they would

22   available for -- it doesn't -- maybe you won't want to

23   cross-examine, but they have to be available for cross-

24   examination.

25           MS. WICKOUSKI:  Yes (indiscernible).

Page 8

1           MR. HURLEY:  There are other proposed restrictions

2       on steps that Celsius would certainly take to protect its

3       rights in the event service were completed in the ordinary

4       course.  A variety of other things that have gotten the way

5       of us reaching agreement today.  It doesn't mean it's

6       impossible.  I agree.  It doesn't mean it's impossible.  We

7       have, however, Your Honor -- last week, we talked about

8       exigency, especially related to the arbitration in

9       Switzerland, and we would submit that exigency has gotten

10      that much more exigent since we were last here because in

11      fact the day after we were here, the Swiss arbitration

12      center appointed an arbitrator which means that Celsius is

13      going to be faced with that Hobson's choice in the very near

14      term.

15          THE COURT:  Let me address that.  Even before I

16      saw your letter, Mr. Hurley, that indicated that an

17      arbitrator had been selected so it appeared to be soon but

18      it was not -- I wrote a note to myself that I think that one

19      of the conditions would have to be a joint letter from the

20      two of you to the arbitrator or the arbitration center

21      indicating that -- requesting a delay in moving forward with

22      the arbitration and indicating that a proceeding is ongoing

23      in the bankruptcy court in the Southern District and

24      indicated that it would be -- the parties expect that it

25      will be handled expeditiously.  But, Ms. Wickouski, I want

1    to be crystal clear.

2            MS. WICKOUSKI:  Your Honor, we would unilaterally

3    agree to that regardless of the outcome of the -- of Your

4    Honor's ruling today on alternative of service.  I think

5    that that actually satisfies the exigency issue but we

6    (indiscernible) our representation regardless of --

7            THE COURT:  Okay.  But I understand you've made

8    the representation, but I want a joint letter.  We'll see

9    how the -- where this ends up today.  But I would want a

10   joint letter to the arbitration center, essentially, laying

11   that out.  I mean, it -- I indicated at the last hearing

12   that I viewed the arbitration as satisfying the exigent

13   circumstances that would be required for the Court to

14   exercise rule 4(f)(3).  This is just heightens that point.

15           MR. HURLEY:  In terms of letter, Your Honor, I

16   think the devil's really in the details.  What have been

17   proposed so far by StakeHound is a letter asking the

18   arbitrator effectively to adjourn the conference until

19   September 15th.  We had made a proposal that I think is --

20   sounds materially identical to what Your Honor just

21   identified.  We made a proposal this morning in our markup

22   that we sent back to StakeHound.  You know, obviously, there

23   was some delay.  I'm not laying it at anyone's feet.  But we

24   provided that proposal in the last few hours so we haven't

25   seen a specific response to that proposal.

Page 10

```
 1              But I would certainly hope that we would be able

 2      to work out instructions that make sense to both sides so

 3      that Celsius doesn't have any concerns that even its

 4      instructions, for instance, might be taken as participating

 5      or indicating --

 6              THE COURT:  Well, you could put an appropriate

 7      disclaimer and -- in that -- in the letter that by

 8      responding.  I just -- it just -- when I saw that an

 9      arbitrator had appointed, it heightened the concern that I

10      expressed that the last hearing.  That's the exigent

11      circumstance.  Let me leave it at that.

12              I think -- you know, the other thing, Mr. Hurley,

13      you know, no two cases are the same, but it took you a while

14      to be able to work out the details of the arrangements with

15      Stone.  I wouldn't expect that, you know, you got a draft.

16      You sent back a draft.  I'm fine with the notion that that

17      may take a week or something like that to work out those

18      details, and I just use that as kind of a rough idea if

19      you've working diligently to try and resolve it.  I didn't

20      see -- frankly, when I reviewed the two letters, it didn't

21      seem to me that anything was a show stopper, that both of

22      you proceeding in good faith were more likely than not to be

23      able to work out those important details.  They are

24      important.  And it's something that -- you know, I think

25      Celsius is entitled to some assurance that this isn't going
```

Page 11

1    to get dragged out for weeks and in the meantime, assets are

2    dissipated, okay.

3            But, again, you know, to say that nothing appeared

4    to be a show stopper doesn't mean you'll be able to

5    successfully reach an agreement on it, but it looked to me

6    that you're both sort of operating in the range of -- what I

7    would consider, range of reasonableness.  So, yeah, you'll

8    negotiate hard.  You'll ultimately be able to work out those

9    details.

10           MR. HURLEY:  I think you're generally correct

11   about nothing being a show stopper, Your Honor.  What I

12   think as one of the major issues that's separated us so far

13   is something I mentioned at the last hearing, which is that

14   Celsius has its own motion practice that it thinks is very

15   important to bring before Your Honor in a reasonable time

16   frame.  That doesn't mean we couldn't negotiate the

17   specifics about how that would be (indiscernible).

18           THE COURT:  What's the motion practice that you

19   would bring?

20           MR. HURLEY:  So it is with respect to preservation

21   of assets while the case is ongoing and having an

22   opportunity to present to Your Honor what we think would be

23   evidence that could persuade and get you over the hump with

24   respect to the issue that was clearly troubling you at the

25   last hearing.  We think we can do that.  We want to --

1           THE COURT:  Just so we're clear on the record.

2    What issue do you think that was bothering me last time?

3           MR. HURLEY:  Well, there may have been more than

4    one.  But the one that I heard you focused on, Your Honor,

5    was whether there was evidence that there's any imminent

6    threat that substantial assets were going to be dissipated

7    by StakeHound in the -- I guess -- in the near future.  That

8    was what I heard Your Honor sort of balking on.

9           There may be other issues and obviously in a

10   motion like that, there are many complex issues that you

11   have to get into and we think we have good support on our

12   favor on all of them, but that was the issue that I had sort

13   of heard Your Honor focused on.  But if I had been mistaken,

14   obviously, I'd welcome any clarification.

15          And so, you know, again, I'd be happy to discuss

16   with the other said ways to do this that makes sense in

17   terms of timing, maybe in terms of sequencing, having a

18   negotiation.  That would perfectly make sense.  We just

19   haven't gotten there yet.  Provided that as you said Celsius

20   has assurance that we have some more time to try to get

21   there and that there won't be dissipation while that

22   (indiscernible) is being undertaken, it certainly would be

23   acceptable to Celsius to continue that work.

24          I think it would be helpful and actually it

25   started -- had understood the first time I read StakeHound's

Page 13

1    letter, the sort of second half of it, it actually struck me

2    that StakeHound was saying the hearing today was mooted

3    because we accept service.  I don't think that's actually

4    the case and we had a conversation with counsel before this

5    hearing started.  It's really we accept service on the

6    following condition -- the conditions that identified in the

7    letter and those aren't acceptable to us.

8             I think it would be helpful if service could

9    simply be effective at this point, either because they

10   accept it or because the motion is granted.  Celsius will

11   absolutely negotiate in good faith even if that were to

12   occur to try to come up with a schedule that makes sense,

13   not just to us but to Your Honor, because of course you're

14   going to have a chance to review it and weigh in on whether

15   you think the proposal is sensible.

16            So our submission would be that would be helpful

17   and it would move things forward and it certainly would not

18   slow down Celsius' interest in and willingness to engage on

19   what the schedule should be and how it should look which

20   ultimately Your Honor will have to decide --

21            THE COURT:  Okay.  Well, let me hear from Ms.

22   Wickouski.

23            MS. WICKOUSKI:  Your Honor, I think that our --

24   and I know the Court doesn't prefer a trial by letters and

25   apologies for that.  We've on the verge of a hearing with a

Page 14

1    short time frame and I felt it was important to

2    (indiscernible) the Court what we had done and what our

3    position was and what we're willing to do.  And I think -- I

4    haven't had -- because I read it on my iPhone -- quite the

5    chance to process Mr. Hurley's letter, but, say, as a

6    threshold matter, it's Mr. Hurley's motion.  If he wants to

7    request a ruling on the motion, I have no issue with that.

8    The Court obviously can decide.

9            With the additional fact that I think what I've

10   heard the Court say at the hearing last week was that the

11   exigent circumstance was the prospect that the arbitration

12   move forward to even the point of expenditure of resources

13   or a judgment that would really create real harm because of

14   the, if you will, punitive violation of the automatic stay.

15           I spoke to our client about that and they are

16   willing, unilaterally, regardless of the Court's ruling

17   today -- regardless of whether we have an agreement with

18   Celsius -- they are willing to propose a standstill at least

19   until the Court can consider our motion to compel

20   arbitration.  And offer stands if it's -- if it should be a

21   joint letter, and I understand the need for a joint letter

22   because I respect the fact that Celsius needs to preserve

23   its jurisdiction arguments in Switzerland the same way we

24   want to preserve our arguments and defenses in this court.

25   So we would certainly work with them on a joint letter.

1            THE COURT:  Let me cut through this, okay.  The

2    preferred course from my standpoint would be that you tell

3    me that you're authorized to accept service on the summons

4    and complaint by email, which is what was proposed in the

5    letter and that Mr. Hurley effect that service today.  And

6    then the two of you -- these are important points that are

7    raised in these letters.  I don't doubt any of that -- that

8    you continue to try and iron out those details and you agree

9    on a motion briefing schedule on your motion to compel

10   arbitration.

11            I think that motion should -- I am concerned about

12   what the timing of Celsius having to proceed -- in other

13   words, if I were to lift the stay, permit you -- and compel

14   arbitration, this scheduling of that is of some concern for

15   me because the disclosure statement hearing is this week and

16   I've given Celsius's counsel the dates for confirmation

17   hearing assuming the disclosure statement is completed.

18   And, frankly, the notion of their having to prepare for and

19   push forward with an arbitration while -- you know, I think

20   the disclosure statement hearing is this week.  The

21   confirmation dates are in early October.  I don't remember

22   the precise dates at this point.  I think you'd have to

23   discuss that.

24            So assuming that the Court were to lift the stay,

25   okay, and I do think -- I've suggested this last time and

1    it's addressed in both of your letters about what the

2    appropriate parameters -- I expressed concern about the

3    dissipation of assets in the meantime, particularly you told

4    me that it's not really operating other than this litigation

5    or -- I don't know whether it's the litigation or

6    arbitration in Israel and it's like there's ongoing ordinary

7    day-to-day business.

8              But while you obviously disagree, the two of you,

9    about exactly what that should be, I do think that -- it

10   struck me as more likely than not that with a week in

11   negotiations you'll work out those details -- you know

12   confer with your clients and all that.

13             The alternative is, if you leave today not

14   prepared to say that you're authorized to accept service, I

15   will rule on 4(f)(3) and I will tell Mr. Hurley that he can

16   bring on an urgent motion for a temporary restraining order

17   for violation of the automatic stay.  You know, I laid it on

18   the table last time.  I don't know whether you read more

19   than just the one MF Global opinion that I cited.  It was

20   the sixth in a string of them, but if you read the first

21   five, you'd find out that it actually resulted in

22   substantial sanctions against the Bermuda insurer that

23   violated the automatic stay and violated the Barton Doctrine

24   before it got six opinions in to what it probably wanted

25   from the start was to compel arbitration.

1           So we'll sequence this in order.  If Mr. Hurley

2    wants to bring on on shortened notice an application to

3    enjoin StakeHound for proceeding with the arbitration, we'll

4    hear it this week, and if he wants to seek sanctions for

5    violating the automatic stay, he can ask for that as well.

6    And when I get finished in the next few week probably with

7    the TRO and then a preliminary injunction about it, then

8    maybe we'll get to any motion you want to make to compel

9    arbitration, but that's going to be the order.

10          And I don't do -- I don't say that to be punitive.

11   I mean, I think that -- I would much prefer that this

12   proceed in what I consider to be the ordinary fashion which

13   is, accept service, you negotiate these -- negotiate a

14   schedule, work out the details if you can't -- you know, if

15   there are couple of things that need to be ironed out on --

16   to make sure assets aren't dissipated, think you'll work

17   that out.  If I have to, I'll do that.

18          But I'm not -- the suggestion that was in your

19   letter about putting this off.  This is a status conference

20   and, you know, next week we'll come back and we'll consider

21   -- that isn't going to happen.

22          MS. WICKOUSKI:  Understood.

23          THE COURT:  So you're leaving today one way or the

24   other.  You're either telling me you're authorized to accept

25   service and you'll get served today and I'll send you off

Page 18

1    and you'll work out these other details.  Otherwise, I'll

2    rule and if I rule alternative service under 4(f)(3), Mr.

3    Hurley can bring an emergency application for a TRO.

4    They'll be heard on very short notice and we'll have a

5    preliminary injunction hearing.  At some point, you know,

6    you'll get to the issue of -- this is exactly what happened

7    in MF Global.  It took them months before they finally

8    understood what this was all about, okay, and if you want to

9    go through that exercise, be my guest.

10           MS. WICKOUSKI:  Your Honor, we are willing to not

11   oppose the acceptance of service.

12           THE COURT:  Okay.

13           MS. WICKOUSKI:  And we appreciate the Court's

14   willingness to consider a motion to compel arbitration and

15   also other motion with respect to threshold issues, and I

16   think this really should go in order.  I mean --

17           THE COURT:  What do you consider the threshold

18   issues that you're talking about?

19           MS. WICKOUSKI:  Well, you know, the TRO is

20   interesting because it's a bit of a chicken and egg problem

21   because in order to defend the -- in order to

22   (indiscernible) the TRO request or defend it, it necessarily

23   involves a consideration of the merits and in arguments --

24           THE COURT:  It doesn't.  It doesn't.  If you

25   violated the automatic stay -- if your client violated the

1   automatic stay, if I order alternative service under 4(f)(3)

2   -- if that's out of the way -- you know, I said it about as

3   close to definitely as possible last time.  This is a

4   violation of the automatic stay.

5           MS. WICKOUSKI:  Your Honor, I -- maybe I was -- I

6   misspoke.  I was unclear.  With respect to the automatic

7   stay, that was not what I -- I will concede that the Court

8   has the power, inherent power, sua sponte, to issue an order

9   enforcing the automatic stay regardless.  I mean, you could

10  order that the Swiss arbitration is stayed.

11          THE COURT:  I'm not going to do it without -- I

12  don't have papers in front me.  I'm not doing it sua sponte,

13  okay, but it might be a day or, you know, two.  I mean,

14  because I don't think it's going to take Akin very long to

15  make an emergency application for a TRO and put in an

16  affidavit that supports what (indiscernible) pretty obvious

17  from the pleadings from the first hearing we had.

18          MS. WICKOUSKI:  We're willing -- I mean, our

19  client is offering -- regardless of the outcome of this

20  hearing, they are prepared unilaterally to stand still the

21  Swiss arbitration and to advise the arbitrator of that.

22  That's not the TRO that I am talking about and focusing on.

23  It's the -- Celsius's (indiscernible) demand that all assets

24  of StakeHound be shut down and frozen immediately.  And I

25  think there's no -- you know, there's been no papers.

Page 20

1    There's been no showing of harm.  They are able to monitor

2    the tokens.  There's no evidence of any untoward activity

3    going on, and I'm also --

4             THE COURT:  I'm not ready to grant that relief

5    without seeing any evidentiary showing that that relief is -

6    - and you'll have an opportunity to oppose it.

7             MR. HURLEY:  Okay.

8             MS. WICKOUSKI:  And --

9             THE COURT:  That's where I think -- I mean, this

10   is what we went through with Stone and it took a -- you

11   know, it took a while to get to an agreement but they got

12   there, okay, and that's why I think you'll get to an

13   agreement.

14            MS. WICKOUSKI:  Well, and that's all I'm asking

15   for.  That's all we want.  We want our day in court.  This

16   has been completely proceeded with the testimony of counsel

17   that something bad is going on.  We completely disagree with

18   that and we want out day in court, a chance to refute those

19   arguments.

20            THE COURT:  I don't think they -- just tell you my

21   mindset.  I don't believe they've made any creditable

22   showing at this point of dissipation of assets that would

23   justify an asset freeze.  It doesn't say they can't make

24   that showing.  I'm concerned that -- I think you told me

25   they have no real ongoing business.  They've got this

Page 21

1    arbitration or -- is it a litigation or arbitration in

2    Israel?

3              MS. WICKOUSKI:  Well, it's a litigation and this

4    is important because the litigation really seeks to

5    preserves assets, ironically, assets that Celsius --

6              THE COURT:  This is the Fireblocks managed to lose

7    the --

8              MS. WICKOUSKI:  Yes.  And so --

9              THE COURT:  -- private key.

10             MS. WICKOUSKI:  In everybody's -- think it's in

11   both Celsius and our client's interest to make sure that

12   that litigation is preserved.  It's affirmative litigation.

13   Make sure that that goes forward and is not prejudiced in

14   any way.  And one concern that we have is that -- I mean, we

15   want to make sure that we're not disclosing to the adverse

16   party.  And I say adverse party, it's adverse both to

17   Celsius and to StakeHound that we're not disclosing our

18   litigation strategy by, you know reverse engineering they

19   can figure out by the breakdown in legal fees, the breakdown

20   in court costs, what's really going on and what we're

21   planning to do.  And I think that's very important that in

22   these talks that proceed, we do so under an NDA or some

23   assurance of confidentiality with the Debtor, but I've no

24   reason to believe that they wouldn't agree to that, but I'm

25   just saying, we have to get that in place.  And I would see

Page 22

1    that being a subject of discussion --

2            THE COURT:  Have you talked with Mr. Hurley about

3    that?

4            MS. WICKOUSKI:  I haven't talked about that yet,

5    but that would be something that we'd plan to discuss.

6            THE COURT:  Well, there is little that I know

7    about the issues about Fireblocks and StakeHound certainly

8    suggest to me that you -- that Celsius and StakeHound share

9    an interest in recovery.  Whether you can get a recovery is

10   a different issue.  But, you know, it's certainly sounded

11   like you shared an interest that would support a common

12   interest, agreement or something like that.

13           MS. WICKOUSKI:  Yes.  I mean, that's right.  And

14   that is an action --

15           THE COURT:  But that's something you'd have to

16   talk about with --

17           THE COURT:  MS. WICKOUSKI:  Yes.  And that is an

18   action that benefits both parties so I think -- I hope I've

19   answered Your Honor's question with respect to service.

20           THE COURT:  Just so we're clear.  You're

21   unequivocally telling the Court that you are authorized to

22   accept service of the summons and complaint in the adversary

23   proceeding that Celsius filed.  Is that correct?

24           MS. WICKOUSKI:  Yes.

25           THE COURT:  Okay.  Go ahead.  I just wanted -- I

1    didn't want any ambiguity about what I'm being told.

2                MS. WICKOUSKI:  And, Your Honor, I would ask for

3    clarification with respect to go forward with respect to a

4    scheduling order.  You know, we would like -- you know, we

5    intend or we do want to proceed in the framework that Your

6    Honor outlined last week with respect to motion to compel

7    arbitration.  It would be -- I mean, we should urge that

8    that's a threshold issue that should be decided,

9    particularly since I think the parameters of this is that

10   we're going to do a joint letter so that the Swiss

11   arbitration is no longer an immediate concern, but we'll

12   wait until the resolution of the arbitrability issue.

13                Yeah.  I think --

14                THE COURT:  Let me hear what Mr. Hurley's reaction

15   to that is.  Mr. Hurley.  Well, you cleared one hurdle.

16                MR. HURLEY:  Thank you for the clarification.  I

17   can cross number one off my list so I think that issue is

18   now crystal clear.  I don't have much to add.

19                Only for, you know, the avoidance of any, you

20   know, conceivable misunderstanding, we don't necessarily

21   concede we're on the same side in terms of Fireblocks or

22   that it's Fireblocks' fault.

23                THE COURT:  Well, you may say it's either --

24   either or both of their faults --

25                MR. HURLEY:  Correct.  Just wanted to make that

Page 24

1    crystal clear.

2             THE COURT:  I would assume that.

3             MR. HURLEY:  In terms of confidentiality, we'll

4    certainly consider anything proposed.  We haven't heard a

5    proposal.  At this time, I'm not sure I completely follow

6    the logic of what was being suggested but we'll listen to

7    anything in good faith.

8             THE COURT:  The one reaction I had to it was, you

9    try and work that out.  It's something that I wanted to

10   delve into.  Let's put it that way.  I mean, there's certain

11   things that do need to be disclosed.  I mean, that didn't

12   seem -- what the strategy about litigation in Israel is is

13   not one of them.

14            MR. HURLEY:  And I guess finally just

15   housekeeping, Your Honor, in terms of when you'd like to

16   hear from us or see us again.  I don't know if you had a

17   date in mind.

18            THE COURT:  You know, if everything went smoothly

19   and you didn't need to see me again, that's fine.  But if

20   you need to see me, you'll get to see me soon.  You know,

21   you tell me.

22            MR. HURLEY:  All right.  And I guess in the

23   meantime -- my understanding anyway is that we do have the

24   assurance required that there won't be dissipation at least

25   until we come back to the Court while we try to work out the

Page 25

1    stipulation.

2            THE COURT:  Can you put some parameters around

3    dissipation?  You know, it strikes me unreasonable to say,

4    StakeHound can't transfer a dollar until we work out the

5    remaining details, but you ought to -- maybe the two of you

6    ought to step out in the hall and see whether you can just

7    work out some very preliminary parameter that's going to

8    cover for a relatively short time until you can try and work

9    out something in more depth.  Is that --

10           MS. WICKOUSKI:  Yes, Your Honor.  I --

11           THE COURT:  Go ahead -- you have to -- just

12   identify yourself so we have a clear record.

13           MS. WICKOUSKI:  This is, for the record, Stephanie

14   Wickouski again.  At the risk of sounding too parochial and

15   it's not just about me.  But it's very hard for me as

16   counsel to agree that a client shouldn't pay any of their

17   lawyers their July legal bills.  So I think that, you know,

18   an overall thing that --

19           THE COURT:  Could you just -- do me a favor.  The

20   two of you go out, see if you can work out some short-term

21   agreement.  Look, you don't want to have egg on your face.

22   I don't want to have egg on my face.  I don't want to find

23   out that in the next week they transferred millions of

24   dollars --

25           MS. WICKOUSKI:  Understood.  Understood.

1          THE COURT:  Okay?  And I'm not -- when I use the

2    millions, I'm not saying that that's the parameter.  But you

3    understand?  I don't think you want to find yourself in the

4    position -- sometimes lawyers find themselves in the

5    position where clients do things that -- totally unexpected

6    to the lawyer.

7          MS. WICKOUSKI:  Understood.  Understood, Your

8    Honor.

9          THE COURT:  Okay.

10          MS. WICKOUSKI:  And it would be important to know

11    what time frame because this is something I have to take

12    back to our client and it's different if we're talking about

13    a week or if we're talking about a month so.  I assume we're

14    talking about a week.

15          THE COURT:  On which point?

16          MR. HURLEY:  To try and work out the stipulation,

17    I think is -- correct?  Is that right, Ms. Wickouski?

18          MS. WICKOUSKI:  Yes, that's what I thought we were

19    --

20          THE COURT:  I would say a week and not a month.

21    You know, sometimes a week, sometime -- very rarely a week

22    will stretch into two weeks because you got to communicate

23    with a client outside the United States.  But what I have in

24    mind is the -- kind of the -- I would expect at the minimum

25    a status letter within a week to find out where things are,

Page 27

1   you know, so you -- are you -- have you reached an

2   agreement, are you close to reaching an agreement.

3           MR. HURLEY:  And it's really with that period of

4   time in mind, Your Honor, that I thought it might be

5   reasonable just to have, you know, the assurance -- blanket

6   --

7           THE COURT:  Why don't you go out and talk to each

8   other.  The rest of us will spin our wheels while you're

9   doing that, okay?

10          AUTOMATED VOICE:  Recording stopped.

11          CLERK:  All right.  I'm going back on the record,

12  Judge.

13          AUTOMATED VOICE:  Recording in progress.

14          THE COURT:  Go ahead.

15          MR. HURLEY:  Mitch Hurley again.  Thanks for the

16  break.  I really just came in to tell you that it looks

17  probably there's going to have to be some communication

18  directly with StakeHound so maybe it makes sense

19  (indiscernible) for the -- I don't know how long it would be

20  -- doable that -- so you guys aren't just sitting here

21  waiting for us.  It's going to take a little longer than we

22  had thought.

23          THE COURT:  Yeah.  Go ahead.  Just identify

24  yourself.

25          MS. WICKOUSKI:  Your Honor, I apologize. Stephanie

```
 1    Wickouski for the record.  I apologize, Your Honor, for the

 2    delay.

 3                 THE COURT:  No. That's not something you have to

 4    apologize (indiscernible).

 5                 MS. WICKOUSKI:  And it's because I think -- I

 6    understand the principle but there's some technical issues

 7    that I want to make sure that I get the client's

 8    authorization --

 9                 THE COURT:  I agree completely.  Let me look at my

10    -- just bear with me, okay?  I used to have clients.  Why

11    don't we have a three o'clock tomorrow Zoom hearing, okay?

12    Does that work for you, Ms. Wickouski?

13                 MS. WICKOUSKI:  Yes, Your Honor.

14                 THE COURT:  All right.  Mr. Hurley?

15                 MR. HURLEY:  Yes.  And, Your Honor, this is just

16    to report back on --

17                 THE COURT:  Yes.

18                 MR. HURLEY:  Yeah.  That would work very well.

19    Thank you.

20                 THE COURT:  We'll do it.  So I have

21    (indiscernible) matters in the morning and then I have one

22    short one at four o'clock so if we do a three o'clock, we're

23    -- is that okay?  Three o'clock?

24                 MR. HURLEY:  Three o'clock works.  Thank you.

25                 THE COURT:  Okay.  Deanna will send you the link
```

Page 29

1    for Zoom.  Okay?  All right.  I hope you can get this -- you

2    know, I don't think you can everything done but at least get

3    it passed.  All right.  So you're authorized.  Mr. Hurley,

4    you're authorized to serve the summons and complaint on

5    StakeHound by serving Ms. Wickouski by email.  Is that

6    correct, Ms. Wickouski?

7              MS. WICKOUSKI:  Yes, Your Honor.

8              THE COURT:  Okay.  And let's see where we go from

9    that.  Okay?

10             MR. HURLEY:  Thank you, Your Honor.

11             THE COURT:  All right.  We're adjourned.  Thank

12   you very much.

13             (Whereupon these proceedings were concluded at

14   2:32 PM)

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T I O N

 2

 3      I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  August 9, 2023
```