Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

*Special Litigation Counsel for Debtors and
Plaintiff Celsius Network Limited*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
|        Debtors. | Jointly Administered |
| CELSIUS NETWORK LIMITED, | |
|        Plaintiff, | Adversary Proceeding No. 23-01138 (MG) |
|        v. | |
| STAKEHOUND SA, | **FIRST AMENDED ADVERSARY COMPLAINT** |
|        Defendant. | |

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

Plaintiff Celsius Network Limited ("Plaintiff" or "Celsius") by and through its undersigned counsel, brings this action against Defendant StakeHound SA ("StakeHound" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action seeking equitable relief and money damages based on StakeHound's

> a.  failure to turn over to Celsius property worth in excess of $150 million, and
>
> b.  knowing violation of Section 362 of the United States Bankruptcy Code by commencing an arbitration against Celsius after StakeHound was confronted with its breaches of duty to Celsius.

StakeHound should be required to turn over Celsius' property, withdraw its arbitration against Celsius in violation of the automatic stay, disgorge amounts by which it has been unjustly enriched, and pay actual and exemplary damages, sanctions and attorneys' fees for its ongoing willful and inequitable misconduct.

2.      In or around late 2020, StakeHound sought to launch a business providing liquidity to customers who own "staked" Native Tokens, or who wish to stake Native Tokens.[2] As discussed below, however, the only customer StakeHound ever had of any significance was Celsius, and virtually all of the Native Tokens ever provided to StakeHound—including virtually all of the Native Tokens that StakeHound currently is wrongfully withholding—were provided to StakeHound by Celsius.

3.      Staked Native Tokens can earn substantial interest and other Rewards, but cannot be deployed in other decentralized finance investments or otherwise used for as long as they remain

---

[2] Capitalized terms undefined in the "Nature of the Action" section have the meaning ascribed elsewhere.

staked.  In exchange for controlling the validator nodes for its customers' staked Native Tokens, StakeHound issued to its customers (almost exclusively Celsius) so-called "stTokens," which Celsius was supposed to be able to deploy in other investments, and present to StakeHound when it wished to exchange the stTokens for its Native Tokens (plus Rewards).

4.      Despite due demand, however, StakeHound has failed and refused to return, or otherwise provide, to Celsius vast sums of Native Tokens in exchange for stTokens.  Upon information and belief, StakeHound has no current business or operations of any kind, other than holding and collecting rewards on Native Tokens, the overwhelming majority of which were supplied by Celsius.

5.      When confronted with its failure to fulfill its obligations and other duties, StakeHound willfully violated the automatic stay.  Despite its knowledge of the pendency of these bankruptcy cases, StakeHound commenced a (legally void) arbitration proceeding against Celsius seeking declaratory relief in Switzerland.  StakeHound since has ignored Celsius' demand that StakeHound cease violating the stay by its prosecution of the Arbitration.  On August 3, 2023, the Swiss Arbitration Centre purported to appoint an arbitrator (the "Putative Arbitrator") in the void arbitration.  At this Court's direction, the parties sent a joint request to the Putative Arbitrator on August 11, 2023, but StakeHound has not withdrawn the arbitration and no response has yet been made to the Putative Arbitrator's inquiry to the parties on August 18, 2023 regarding whether the arbitration proceedings would be suspended.

6.      The number and value of the tokens at issue is substantial.  Celsius entrusted to StakeHound (i) in January 2021, the nodes for approximately 25,000 staked native ETH (with Rewards, worth more than $50 million at recent prices) that Celsius previously had staked in November 2020, and (ii) in February 2021, approximately 35,000 native ETH which were then

staked by StakeHound (with Rewards, worth more than $70 million at recent prices).  These staked native ETH tokens were locked and unavailable for withdrawal by anyone until the occurrence of a long-awaited "Upgrade" to the Ethereum blockchain, an event which happened on or around April 12, 2023.  In April 2021, Celsius also entrusted to StakeHound 40,000,000 (40 million) native MATIC tokens (worth over $30 million at recent prices) and 66,000 native Polka DOT ("DOT") tokens (worth more than $300,000 at recent prices) for staking.

7.      Virtually all of the native tokens in StakeHound's control were supplied by Celsius. In its Arbitration demand, discussed below, StakeHound alleges that about 96% of the stETH ever minted by StakeHound is held by Celsius.  Upon information and belief, 100% of the MATIC and DOT in StakeHound's control was provided to StakeHound by Celsius.

8.      StakeHound continues to wrongfully withhold or otherwise deprive Celsius of possession of all of these valuable Native Tokens.  On October 23, 2022, while the ETH was still locked, Celsius warned StakeHound to remain vigilant against any attempts by Jason Stone to seize Celsius' ETH upon occurrence of the Upgrade.  Stone is the former U.S. based CEO of Celsius KeyFi, and it was through Stone's friendship with StakeHound's co-founder, Albert Castellana, that Celsius originally was introduced to StakeHound.  Celsius later sought to confirm that StakeHound was making necessary preparations to safeguard and turn over the native ETH to Celsius' estates in exchange for stTokens as soon as the native ETH unlocked.  According to StakeHound, however, because keys associated with the 35,000 Celsius ETH (plus Rewards) allegedly had been misplaced by StakeHound or its agent, StakeHound not only was relieved of its obligation to return those tokens, StakeHound also was no longer required to return the 25,000 Celsius ETH (plus Rewards) in their entirety.

9.      Celsius promptly explained that StakeHound was mistaken, but offered to discuss a resolution of the parties' disputes provided that StakeHound took reasonable steps to ensure that the native ETH (plus Rewards) would remain secure and available for distribution in accordance with any later judgment or other resolution.  StakeHound ignored Celsius' overture.  On or around April 24, 2023, without any prior notice or warning, StakeHound commenced arbitration proceedings against Celsius in Switzerland seeking declaratory relief, despite StakeHound's knowledge of the pendency of these bankruptcy cases.

10.     In its demand for arbitration, StakeHound went even further than it had in prior correspondence, arguing that StakeHound "has ___no obligation___ to exchange native ETH" for the stTokens that StakeHound previously issued to Celsius, thus threatening to permanently deprive Celsius and its creditors of native ETH worth more than $50 million, in addition to the more than $70 million worth of native ETH associated with the keys StakeHound has reported as missing. This bears repeating:  In the void Swiss arbitration, StakeHound contends that it is entitled to keep essentially all of the 25,000 ETH (plus Rewards) transferred to it by Celsius—and reap a $50 million windfall—all due to StakeHound's own negligence in failing to safeguard the keys for another 35,000 ETH (plus Rewards) supplied by Celsius.

11.     On May 1, 2023, Celsius reminded StakeHound that the arbitration violated the automatic stay and demanded its withdrawal.  StakeHound ignored Celsius' May 1, 2023 demand entirely.  On May 25, 2023, as its right under the relevant agreements, Celsius demanded that StakeHound immediately return the native MATIC and DOT tokens that Celsius provided to StakeHound in April 2021 (plus Rewards) in exchange for the corresponding stTokens issued by StakeHound.  In breach of the parties' agreements, StakeHound has not returned any of the native MATIC and DOT tokens, or even acknowledged Celsius' letter.  Collectively, the MATIC, DOT

and ETH tokens that rightfully belong to Celsius, and that StakeHound has failed to return, are worth at least in excess of $150 million.

12.     Celsius is entitled to a declaration that StakeHound's commencement and prosecution of the Arbitration violates Bankruptcy Code Section 362 and is therefore void, an order enjoining StakeHound from continuing the Arbitration, and an award of attorneys' fees and other sanctions in connection with StakeHound's disregard of the automatic stay.  Celsius also is entitled to turnover and an accounting pursuant to Bankruptcy Code Section 542 of the substantial property being wrongfully withheld by StakeHound, compensation for any diminution in value of that property, as well as a declaration pursuant to Bankruptcy Code Section 502(d) disallowing any future proof of claim by StakeHound unless and until StakeHound's other obligations arising under the Code are satisfied.  Celsius also seeks an award of damages, disgorgement, imposition of a constructive trust, and other equitable relief associated with StakeHund's myriad breaches of duty.

## PARTIES

13.     Plaintiff Celsius is a private limited company incorporated under the laws of England and Wales with its principal place of business located at The Harley Building, 77-79 New Cavendish Street, London, U.K. W1W 6XB.

14.     Defendant StakeHound is a private limited company incorporated under the laws of Switzerland with its registered offices c/o MN Associés, Place de Longemalle 1, 1204 Genève, Switzerland.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a); (b); and (e) and the *Amended Standing Order of Reference* M10-468 of the United States District Court for the Southern District of New York (the "Southern District of

New York") dated February 1, 2012 referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under, arising in, or related to a case under title 11 of the United States Code (the "Bankruptcy Code") issued pursuant to 28 U.S.C. § 157.

16.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A); (E); (G); and (O).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

17.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under, arises in and relates to cases commenced under the Bankruptcy Code.

18.     Though its business is now apparently defunct, StakeHound has purposefully availed itself of the privilege of conducting activities within the United States, and its contacts with the forum give rise to, or are related to Celsius' claims.  For example, upon information and belief, StakeHound sought to solicit interest in its services amongst persons located in the United States, one of the largest markets for ETH and other digital assets.  StakeHound's website is maintained in English (which is not one of the four national languages of Switzerland) and on information and belief does not include any options for any of the four national languages of Switzerland.  StakeHound also conducted a significant amount of its messaging and advertising in English on Twitter, which both operates and is headquartered in the United States and whose greatest number of users are in the United States.  The level of Twitter activity was such that StakeHound's Twitter account operated as a de facto marketing arm for StakeHound, including by

providing digital forms through Twitter and soliciting job applications, questions and information from users.

19.     In addition to its heavy use and reliance on Twitter as a marketing arm, StakeHound maintained an account on YouTube—a video sharing and social media platform headquartered in California—and posted a series of videos where Albert Castellana, StakeHound's CEO—who on information and belief is a Spanish citizen—hosted discussions with cryptocurrency professionals and stated ***at the beginning of each video*** that "thanks to StakeHound, you'll be able to ***trade a one to one representation of any proof-of-stake token on Uniswap*** or borrow against it on tools like Aave or Cream."  Uniswap is headquartered in New York.

20.     Upon information and belief, StakeHound's website was at all relevant times highly interactive and allowed customers to 1) access and download StakeHound's terms and conditions; 2) interact and contact sales representatives and 3) register cryptocurrency wallets and ETH.  On further information and belief and during all relevant times not only did StakeHound make no attempt to block U.S. IP addresses to its website, but also its website was hosted on a U.S. based server with a U.S. based IP address by a U.S. based company, Cloudfare, Inc.  StakeHound directly linked to its Twitter feed and YouTube account on its website.

21.     Upon information and belief, StakeHound employs no Swiss employees, owns no real property in Switzerland, and does not conduct business in Switzerland.  Upon information and belief StakeHound does not otherwise have the assets necessary to restore Celsius to its prior position before StakeHound's inequitable conduct.   Upon further information and belief, substantially all of StakeHound's purported assets are in the form of cryptocurrency—which is actually Celsius's cryptocurrency—and these assets are highly liquid, highly concealable, and highly able to be transferred in a matter of microseconds.   Upon information and belief,

StakeHound currently does not operate, does not generate income and does not have a positive cash flow.  Upon information and belief, StakeHound's assets are dwarfed by its liabilities.

22.    Upon information and belief, Celsius personnel were located in the United States when they communicated with StakeHound concerning the transactions from which Celsius' claims arise and when those personnel participated in negotiating related agreements among the parties.  Celsius further believes that the contracts at issue were executed by Celsius personnel located in the United States.  Moreover, many of the transactions at issue in this action involve Ethereum.  Validator nodes for the Ethereum blockchain provide the basis for interest, fees and other rewards (collectively, "Rewards") and to further grow the blockchain (providing more value for holders of ETH), which are the major incentive for individuals and entities to buy and stake their ETH.  Without nodes and validation, ETH would hold no value.  There are approximately 6.850 nodes on the Ethereum blockchain, and a plurality (approximately 43%),[3] are located in the United States.

23.    Upon information and belief, StakeHound has at least one and possibly more accounts with staked.us ("Staked.us"), a U.S.-based entity for the purposes of sending, receiving, and facilitating the staking of cryptocurrency.  StakeHound's Staked.us account was used to effectuate the transfer of the November 2020 Staked ETH from Celsius to StakeHound, at least, and may have been involved in the other transactions at issue in this action.

24.    StakeHound engaged in a series of specific targeted acts with individuals and cryptocurrency businesses in New York and the United States that were designed to purposefully avail itself of the protections and benefits of the United States, and did so for multiple years.  For

---

[3] Approximately 14% of nodes are hosted in Germany, and no other nation has more than 5% of the total amount of nodes.  Therefore, the nodes located in the United States represent a substantial plurality of all nodes globally.  Switzerland hosts approximately 1.7% of Nodes.  *See* www.ethernodes.org/countries (last accessed July 11, 2023 at 10:15 p.m. EDT).

example, from the time period of around September 2020 through at least June 2022 and possibly into August 2022, StakeHound engaged in frequent, persistent and targeted communications with numerous U.S.-based Celsius personnel at different Celsius entities via phone, zoom, and email with the explicit and deliberate purpose of engaging and partnering with a business, Celsius, that had access to U.S. customers and markets. In making contacts with Celsius personnel, StakeHound did not give significance or meaning to the different corporate entities at Celsius other than for the purposes of due diligence in connection with legal requirements, and StakeHound understood that it was dealing with Celsius as a whole and desired to benefit from Celsius' enterprise as a whole.

25.     In addition to its multi-year relationship with Celsius and as a regular practice, StakeHound targeted and availed itself of the benefits of the U.S. forum. For example, StakeHound specifically created stTokens for deployment on "DeFi" platforms, and expressly identifies in its terms of use DeFi platforms organized or with significant operations in the United States, such as Uniswap and Curve. StakeHound also engaged in active business discussions with several U.S. based cryptocurrency entities in connection with its business relationship with Celsius. For example, on information and belief, in October 2020, Albert Castellana, through U.S. based Jason Stone, was introduced to Rosario Pabst (who on information and belief is a resident of Texas) and Robert Viglione (who on information and belief is a resident of Puerto Rico) both of Horizen Labs, Inc. ("Horizen Labs"). Horizen Labs is a U.S. Based company that on information and belief has its principal place of business in Austin, Texas and is a company that designs web 3.0 tools that enable programmable blockchains. StakeHound stated they wanted to "have a call and discuss what we could do together. We are currently defining our roadmap for 2021, especially the listings and platforms to integrate with" and StakeHound engaged in

discussions to expand its business with Horizen Labs as part of its dealings with Celsius to derive a benefit from the U.S. market.

26.    On information and belief, StakeHound reached out to and engaged and negotiated with at least two more U.S. cryptocurrency business during the course of its dealing with Celsius. *First*, throughout the end of 2020, StakeHound engaged in negotiations with Bison Trails, a U.S.-based entity that designed and operated a blockchain infrastructure program that allowed users to run infrastructure on multiple blockchains for the purpose of enabling services like cryptocurrency staking.  Upon information and belief, StakeHound engaged with Bison Trails for the purposes of integrating Bison Trail's eth2 product into StakeHound's business, and StakeHound and Celsius executed a non-disclosure agreement to gain access to Bison Trail's data room.  Bison Trails was ultimately acquired by Coinbase around January 2021.  *Second*, StakeHound also negotiated with and had discussions about partnering with Totle, Inc. ("Totle"), a U.S.-based entity that on information and belief has its principal place of business in Michigan, and exchanged emails and communicated with its CEO, David Bleznak, who is U.S.-based.  Totle is in the business of aggregating decentralized exchanges and asset providers for the purpose of allowing access to liquidity for DeFi assets and the conversion and transferring of tokens.

27.    In addition to the agreements, on information and belief, StakeHound also engaged in discussions with Celsius in marketing deals and other joint ventures, and on or around November 23, 2020 (the day before Mr. Stone staked the November 2020 ETH), Mr. Castellana wrote to Celsius personnel that "we are happy to commit to exclusively doing co-marketing campaigns with

Celsius and really focus our efforts on growing this relationship by pushing Celsius to be our main onboarding flow for individual users."

## **BACKGROUND**

### A.    **StakeHound's Former Business**

28.    StakeHound is a private limited company.  Until it shut down its operations in June, 2021, StakeHound was primarily engaged in the business of staking native digital assets and holding the nodes for staked native digital assets, such as ETH, MATIC and DOT ("Native Tokens"), using public staking providers.  The staked Native Tokens are used to validate transactions on the associated blockchain, and in exchange earn interest, fees and other Rewards. Celsius and a handful of other StakeHound customers entrusted their Native Tokens to StakeHound and StakeHound minted and issued to its customers stTokens ("stTokens"), allowing the customer (in theory) to use the stTokens as liquidity in the DeFi ecosystem.  For example, StakeHound provided Celsius with the same number of stETH tokens as Celsius' staked native ETH tokens (plus periodic Rewards), the same number of stMATIC tokens as Celsius' staked native MATIC tokens (plus periodic Rewards) and the same number of stDOT tokens as Celsius' staked native DOT tokens (plus periodic Rewards).  Celsius has the right to Native Tokens from StakeHound on a one-to-one basis by tendering its stTokens.

29.    The only customer StakeHound ever had of any significance was Celsius, as StakeHound itself appears to acknowledge.  For example, StakeHound alleges in its void Arbitration that Celsius holds 96% of all stETH ever minted by StakeHound in exchange for native ETH.  And on information and belief, all of the native MATIC and DOT (100%) ever provided to StakeHound was provided by Celsius.

30.    Prior to ceasing its business in June, 2021, Celsius had substantial operations in the United States, and a substantial portion of Celsius' coins were loaned by U.S. customers.  Celsius

was also registered with the U.S. Treasury's Financial Crimes Enforcement Network bureau as a money services business. Celsius ultimately filed its chapter 11 petition in the United States. StakeHound derived substantial benefits from its business relationship with Celsius, including because Celsius is and was StakeHound's largest customer (by far). It is not unreasonable for StakeHound to be subject to the jurisdiction of this Court for these claims, which flow directly from StakeHound's relationship with Celsius.

**B.**    **Stone Introduces Celsius to StakeHound in 2020**

31.    Prior to Celsius becoming a customer of StakeHound, Mr. Stone (who is based in the U.S.), and the CEO of StakeHound, Mr. Castellana, were on friendly terms and had previously discussed potential dealings in the cryptocurrency business. On information and belief and prior to and leading up to the execution of the SSA (defined herein) that related to the staking of certain of the ETH, Mr. Castellana discussed potential transactions with Mr. Stone, as well as with Celsius' then-General Counsel and CCO, Jeremie Beaudry and with co-founder and then CEO of Celsius Network LLC, Alex Mashinsky. Upon information and belief, Messrs. Stone, Beaudry and Mashinsky all were located in New York when these discussions occurred.

**C.**    **Celsius Entrusts November 2020 Staked ETH to StakeHound**

32.    In connection with those discussions, Celsius determined to provide keys to nodes associated with a substantial amount of ETH previously staked by Celsius. Celsius had staked those coins on or around November 24, 2020. On that date, Mr. Stone transferred (or caused to be transferred) 25,000 ETH owned by Celsius to a wallet with the address 0x3fb9d44bc83d0da2902e6230aed42fc219f8a426 (the "0x3fb9 Wallet"). Through five different transfers executed over the next several hours, a total of 24,960[4] ETH (the "November 2020 Staked

---

[4] ETH must be staked in multiples of 32. It is unclear, however, why Mr. Stone staked 24,960 ETH rather than 24,992 ETH, a figure that also is divisible by 32.

ETH") from the 0x3fb9 Wallet was transferred to an ETH2 deposit contract with the address 0x00000000219ab540356cBB839Cbe05303d7705Fa (the "Deposit Smart Contract") to accrue interest and Rewards.

33.     At the time, all ETH transferred to the Deposit Smart Contract, including the November 2020 Staked ETH, was locked and unavailable for withdraw pending completion of an ongoing upgrade to the Ethereum blockchain (the "Upgrade").[5]  Celsius provided the nodes for the November 2020 Staked ETH to StakeHound in exchange for an equal number of stETH (plus stETH associated with rewards to be earned on the native ETH) with the expectation that Celsius could demand the native ETH on a one-to-one basis for stETH once the native ETH became available after the Upgrade.

34.     StakeHound engaged in significant contact with the United States and Celsius assets and personnel to effect the transactions at issue here.  StakeHound required Celsius to onboard with its compliance partner, Altcoinomy.  As part of this process, StakeHound and Altcoinomy specifically asked whether Celsius was regulated in the U.S. or the U.K.  Celsius advised that it was registered as a money services business with FinCEN, but that it had only a pending application with the U.K.'s Financial Conduct Authority.  Celsius also specifically informed StakeHound that it provided services in New York through PrimeTrust LLC, which held a BitLicense required for operation in New York.  Furthermore, Celsius confirmed that the persons named on the certificate of incumbency of Celsius Network, Inc. (a U.S. organized entity) were authorized signers on behalf of Celsius Network, Inc., those persons being Alex Mashinsky, Shlomi Daniel Leon and Harumi Urata-Thompson, all U.S. based personnel.

---

[5] The Upgrade is sometimes referred to in the Ethereum community as the "Shapella" or "Shanghai" Upgrade.

35.     On or about January 20, 2021, Celsius, through Mr. Mashinsky—who on information and belief was in New York at the time and e-signed from New York—and StakeHound, through Mr. Castellana, entered into the Staking Services Agreement (the "SSA"). Under the SSA, Celsius agreed to provide StakeHound with the nodes for the November 2020 Staked ETH in exchange for the same number of stETH (plus stETH associated with Rewards to be earned on the native ETH).  Specifically, the SSA provides that stETH issued by StakeHound in exchange for the transfer of the nodes to the November 2020 Staked ETH are a "one to one representation of a [native] token staked by StakeHound on its platform."

36.     Significantly, this transaction was directly connected to the U.S. forum. StakeHound and Celsius both had accounts with Staked.us, which on information and belief is a U.S. based corporation that provides non-custodial staking infrastructure whose customers consist of primarily institutional cryptocurrency businesses.  Because the November 2020 Staked ETH was locked, the associated nodes needed to be transferred to StakeHound.  The nature of Staked.us's system meant that the validator keys could not be provided directly to StakeHound. Instead, Celsius provided the private keys for the Celsius wallet from which the November 2020 Staked ETH was sent to the staking contract.  In exchange, StakeHound issued the same number of stETH to Celsius.  StakeHound then asked Staked.us to assign nodes for the November 2020 Staked ETH to StakeHound's account, admin@stakehound.com, such that StakeHound could assume access to the November 2020 Staked ETH.  Staked.us proceeded to do so on or around January 26, 2021.  Hence, on information and belief, the actual transfer of the nodes for the November 2020 Staked ETH took place in the U.S., between a Celsius account in the U.S. and a StakeHound account in the U.S., and was effected by U.S. entities at the explicit direction by StakeHound to parties located in the U.S. forum.

37.     Moreover, Celsius had previously informed StakeHound's compliance partner, Altcoinomy that "all digital asset transactions are screened through Chainalysis." Chainalysis is a New York blockchain analysis firm that provides a multitude of blockchain analytics services.

**D.     Celsius Entrusts Another 35,000 ETH to StakeHound**

38.     In February 2021, Celsius provided an additional approximately 35,000 native ETH (the "February 2021 Staked ETH") to StakeHound. As with the November 2020 Staked ETH, StakeHound was to provide Celsius with the same number of stETH as the number of February 2021 Staked ETH, plus earned Rewards, to use for liquidity. At all times Celsius was entitled to obtain Native ETH (plus Rewards) by tendering its stETH on a one-to-one basis.

**E.     Celsius Entrusts MATIC and DOT to StakeHound**

39.     On or around April 21, 2021, Celsius and StakeHound entered into a Revenue Sharing Agreement (the "RSA") setting forth the terms of revenue sharing whereby StakeHound would issue stTokens to earn Rewards in exchange for Native Tokens provided by Celsius and the sharing of Rewards earned on those Native Tokens.

40.     On or around April 21, 2021, Celsius and StakeHound entered into a term sheet (the "MATIC Term Sheet") whereby Celsius transferred 40,000,000 native MATIC tokens pursuant to the RSA. In turn, StakeHound was required to issue 40,000,000 stMATIC to Celsius, with periodic additions as the native MATIC earned Rewards. On or around April 27, 2021, Celsius and StakeHound entered into a term sheet (the "DOT Term Sheet" together with the MATIC Term Sheet, the "Term Sheets") whereby Celsius agreed to transfer 66,000 native DOT tokens pursuant to the RSA. In turn, StakeHound was required to issue 66,000 stDOT tokens to Celsius, with periodic additions as the native DOT earned Rewards.

41.     Pursuant to the RSA, Celsius was entitled to exchange its stMATIC and stDOT "at any time" after the lockup period for the Native Tokens and "25% of the Net Reward generated

by the Native Tokens brought in by the Client to StakeHound for the purpose of Staking."  See RSA §§ 2.3; 2.7 ("In the absence of any specific lockup period (during which the stTokens cannot be exchanged into Native Tokens), such exchange shall be available to [Celsius] at any time (subject to the applicable processing time of such exchange)."  In an April 19, 2021 email, StakeHound's Castellana confirmed that "*you can send MATIC and get stMATIC at a 1 to 1 ratio at any time.  You can do vice versa also ….*"

## F.    StakeHound Loses 35,000 ETH and Ceases All Business and Operations

42.    According to StakeHound, on or around May 2, 2021, private keys associated with the February 2021 Staked ETH were misplaced.  Upon information and belief, StakeHound sharded the private keys and entrusted one of the shards to Fireblocks without backing up the shard.[6]  Apparently Fireblocks, StakeHound's agent for providing coin security, then destroyed the shard and could not recover it, which in turn rendered the associated ETH—more than 35,000—unrecoverable.  While Fireblocks may indeed have substantial liability associated with the key incident, StakeHound's failure to return the February 2021 Staked ETH to Celsius, regardless of the explanation, represents a clear breach of StakeHound's duties to Celsius.

43.    Subsequently, on or about June 22, 2021, StakeHound suspended its platform Stakehound.com, discontinued offering its staking services to new users, and filed a lawsuit against Fireblocks in Israel.  According to StakeHound itself, "due to the Key Management Incident, on 22 June 2021, StakeHound had to suspend the operation of the Platform in order to devote its full attention to the recovery of the loss. In particular, in view of the severity of the Incident, StakeHound halted its liquid staking activities with immediate effect."  StakeHound has expressly

---

[6] "Sharding" refers to a database portioning technique used by blockchain companies to split the company network into smaller partitions, known as "shards."  Each shard is comprised of its own data, making it distinctive and independent when compared to other shards.

alleged, in other words, that it no longer engages in any business operations, and that its sole activity is pressing a lawsuit against Fireblocks.

## G.    **StakeHound Refuses Celsius' Demand For ETH, Declares Contract "At an End"**

44.    In October 2022, Celsius wrote StakeHound in connection with Celsius' then pending bankruptcy adversary proceeding against Mr. Stone, the former DeFi executive who had led Celsius' dealings with StakeHound. Concerned that Mr. Stone might wrongfully have retained related confidential information, Celsius urged StakeHound to take precautions to prevent Mr. Stone from seizing any of Celsius' ETH after the Upgrade occurred.[7]  The Celsius letter included the Celsius bankruptcy case caption, and specifically indicated the native ETH constitutes "valuable property in which the estates of Celsius Network LLC and its affiliates (collectively, "Celsius") in the above-referenced bankruptcy case have a property interest."

45.    In response, StakeHound agreed it would cooperate with Celsius in preventing any misappropriation by Mr. Stone. StakeHound claimed, however, that as a result of the May key incident, StakeHound no longer was obligated to return ETH to Celsius in exchange for stETH on a one-to-one basis, not even the November 2020 Staked ETH with respect to which StakeHound still maintained the necessary withdrawal keys.  StakeHound wrote that its "position may change if matters are resolved with Fireblocks, until then any exchange would be at less than parity." StakeHound also indicated it was considering intervening in the adversary proceeding pending against Mr. Stone in this Court.

46.    In a letter dated April 10, 2023, Celsius explained that "StakeHound's dispute with Fireblocks in no way limits or otherwise modifies StakeHound's obligations to Celsius" and demanded that StakeHound confirm in writing that it would: "(i) immediately upon its unlocking,

---

[7] In a response to Celsius' November 14, 2022 motion for a preliminary injunction, Stone declared under oath that neither he nor KeyFi retained private keys necessary to withdraw Celsius' staked ETH.

transfer the Assets to a new wallet and (ii) thereafter, without excuse or delay, transfer the Assets

to Celsius in exchange for the stETH previously provided by StakeHound to Celsius." Celsius

again referenced these bankruptcy proceedings, and warned that StakeHound's failure to turnover

the assets would result in "substantial liability under the Bankruptcy Code."

47.    In a response dated April 11, 2023, StakeHound rejected Celsius' due demand.

StakeHound also advised that it would not release any ETH to Celsius unless Celsius agreed to (i)

give up any and all claim to or associated with the 35,000 ETH lost by StakeHound, and (ii) accept

only a "pro-rata" share of the November 2020 Staked ETH rather than the "one-to-one" exchange

of stETH to which it had agreed.

48.    StakeHound went on to contend that "the Staking services agreement [sic]

terminates on the vote to unlock (or at the latest on the unlock event)," an event that occurred on

April 12, 2023. Hence, according to StakeHound, as of April 12, 2023, "the Staking Services

Agreement is now at an end."

49.    Celsius wrote back on April 17, 2023, offering to engage in efforts to resolve the

parties' disputes without costly and time consuming litigation provided that StakeHound, among

other things, agreed in the meantime not to dissipate any of the ETH at issue. StakeHound

indicated via email that it would respond to Celsius' April 17 overture but did not do so. Instead,

and in rank violation of the Automatic Stay, StakeHound purported to commence arbitration

against Celsius in Switzerland.

**H.    StakeHound Starts Void Arbitration in Switzerland, Seeks $50 Million Windfall**

50.    As noted, Celsius advised StakeHound of the pendency of these cases over a period

of months beginning in October 2022, and StakeHound's counsel specifically referenced these

proceedings, and Celsius' potential claims against StakeHound under the Bankruptcy Code, in his

correspondence with Celsius.

51.     Nevertheless, in a knowing and willful violation of Section 362 of the Bankruptcy Code, on or around April 24, 2023, StakeHound purported to commence arbitration against Celsius seeking a declaration that StakeHound is entitled to keep Celsius' ETH.  Incredibly, StakeHound even references the fact that Celsius is in U.S. bankruptcy proceedings in the body of its arbitration demand.

52.     Even more shockingly, StakeHound seeks to turn its own catastrophic error relating to Celsius 35,000 lost ETH into a $50 million windfall for itself.  According to StakeHound, it is only required to return to Celsius native ETH of the same fiat value as the stETH that Celsius currently holds, not one ETH for one stETH, as the parties agreed.  However, stETH is all but worthless, including because StakeHound (and/or StakeHound's agent) lost more than 60% of the native ETH Celsius supplied to StakeHound.

53.     If StakeHound's absurd position were accepted, as a result of its own catastrophic error, StakeHound would be allowed to keep the November 2020 ETH for itself, resulting in a $50 million payday for Mr. Castellana.  Needless to say, such a result would constitute a gross miscarriage of justice for Celsius' creditors, and would be antithetical to the purposes of the Bankruptcy Code.

**I.      StakeHound Refuses to Withdraw the Arbitration in the Face of the Automatic Stay**

54.     As noted, StakeHound had been on actual notice of Celsius' bankruptcy for many months before it filed its void arbitration demand in late April 2023.  Nevertheless, by letter dated May 1, 2023, Celsius reminded StakeHound of the pendency of Celsius' bankruptcy, and demanded its withdrawal in accordance with the automatic stay:

> As StakeHound is or should be well aware, including based on its substantial communications with Celsius over the past six months, Celsius is a debtor in a pending bankruptcy case [the filing of which] operates as an automatic stay of, among other things, the commencement of legal proceedings against the debtor and any act to exercise control over property of the debtor's estate ….

> Please be advised that … the Swiss Arbitration … is a clear violation of the Automatic Stay and a legal nullity.  Moreover, because the filing was made willfully with full knowledge of Celsius'[] bankruptcy case, Celsius is entitled to recover all actual damages incurred as well as punitive damages.

> Celsius hereby demands that StakeHound cease and desist from taking any further action to advance the Swiss Arbitration and withdraw the Swiss Arbitration in full.

55.    StakeHound ignored Celsius May 1, 2023 letter and has not withdrawn the Arbitration Notice.  Notwithstanding StakeHound's knowing violation of the automatic stay, Celsius continued to try to negotiate a consensual resolution including by offering a standstill of all litigation and arbitration and an agreement to ensure no dissipation of assets while the parties seek to consensually resolve all claims.  No such agreement has been reached.

**J.**    **StakeHound Brazenly Holds "Hostage" $40 Million Worth of MATIC and DOT**

56.    As alleged above, Celsius entrusted 40,000,000 native MATIC and 66,000 native DOT tokens to StakeHound in April, 2021.  At recent prices, those coins were worth approximately $40 million.

57.    On May 25, 2023 (the "May 25 Letter") at 2:57 p.m. EDT, Celsius wrote StakeHound, tendered its corresponding stTokens, and demanded the transfer of all of Celsius' native MATIC tokens and all Rewards, net Rewards and revenue share, and all Celsius' native DOT tokens and all Rewards, net Rewards and revenue share.

58.    In the same letter, Celsius demanded that StakeHound provide all "data and reports setting out the relevant information" that Celsius "may need" for "the calculation of the Revenue

Share and the assessment of the performance by StakeHound of its services" under the RSA and

Term Sheets.  *See* RSA § 2.6.  StakeHound has not provided this information, which it is required

to do "upon request" of Celsius.  *See id.*

59.     StakeHound entirely ignored Celsius' May 25 Letter.  It has neither returned

Celsius' MATIC and DOT, nor attempted to offer even a threadbare excuse for failing to do so.

60.     During a hearing before the Court on August 2, 2023, in the presence of

StakeHound's U.S. counsel, Celsius noted on the record that StakeHound never had even tried to

justify retaining Celsius' MATIC and DOT, and contended that StakeHound simply was holding

those coins "hostage" in order to gain leverage in this litigation.  Neither during that hearing, at a

subsequent hearing on August 7, 2023, or at any other time, has StakeHound made any effort to

rebut Celsius' characterization, or justify its wrongful retention of property that is worth tens of

millions of dollars and that is indisputably due to Celsius.

### FIRST CAUSE OF ACTION

(11 U.S.C. § 362:  Violation of the Automatic Stay)

61.     Plaintiff repeats and realleges the preceding allegations as if more fully set forth

herein.

62.     On July 13, 2022, the Debtors filed their voluntary petitions for relief under chapter

11 of the Bankruptcy Code (the "Petition Date").

63.     Upon the filing of the petition, the automatic stay under section 362(a) became

immediately operative and barred and continues to bar (i) the commencement of a judicial,

administrative or other action or proceeding against the Debtors that could have been commenced

before the Petition Date and (ii) any act to exercise control over property of the Debtors' estate.

64.     StakeHound was on actual notice of the pendency of these proceedings beginning

in October 2022 at the latest.  Celsius warned StakeHound that its failure to turnover estate

property would result in significant liability under the bankruptcy code, including in letters dated April 10 and 17, 2023. Nevertheless, on or about April 24, 2023, in knowing and willful violation of the automatic stay, StakeHound commenced the Arbitration.

65.    The Arbitration seeks, among other things, a declaration that its pre-petition suspension of its platform following the StakeHound BLS Incident does not breach the SSA, as well as other declaratory relief regarding the proper meaning and interpretation of the SSA and the StakeHound Terms and Conditions. This Arbitration is an action or proceeding that could have been commenced before the Petition Date.

66.    Furthermore, the Arbitration, seeks an adjudication of Celsius' rights in and to the November 2020 Staked ETH, and relating to the loss by StakeHound and its agent of the February 2021 Staked ETH, and is an act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

67.    In addition, StakeHound seeks to recover potentially substantial sums from Celsius in connection with the Arbitration (in addition to eliminating Celsius' claims relating to the lost and wrongfully withheld ETH). Among other things, StakeHound demands an:

> order that Celsius Network Limited bear all costs of these arbitral proceedings, including the Sole Arbitrator's fees and expenses, the Swiss Arbitration Centre's costs, the expenses and costs of witnesses and/or experts, as well as the costs incurred by StakeHound SA, such as but not limited to attorney's fees, in-house costs and out-of-pocket expenses related to these proceedings, plus interest at a rate of 5% from the date of the final award until full and final payment.

68.    In short, the commencement of the Arbitration was a crystal clear violation of the automatic stay, as is StakeHound's continuation of the Arbitration despite Celsius' demands for its withdrawal.

69.     For example, on May 1, 2023, Celsius reminded StakeHound that the Arbitration was a legal nullity and that the commencement and prosecution of the Arbitration was a violation of the automatic stay and that failure to cease and desist the prosecution of the Arbitration could lead to an award of compensatory and punitive damages against StakeHound.

70.     Notwithstanding this express notice, StakeHound has refused to withdraw the Arbitration.

71.     On May 25, 2023, Celsius filed an answer in the Arbitration solely limited to contesting the jurisdiction of the panel.

72.     On August 3, 2023, the Swiss Arbitration Centre appointed an arbitrator.   On August 11, 2023, the Parties submitted a joint letter consistent with proceedings before this Court. A copy of the joint letter is attached as Exhibit A.  On August 18, 2023, the putative sole arbitrator appointed by the Swiss Arbitration Centre emailed the parties to acknowledge receipt of the August 11, 2023 joint letter and seek further direction from StakeHound and the parties.  A copy of the August 18, 2023 email is attached as Exhibit B.  StakeHound has not responded to the August 18, 2023 email.

73.     Absent an order enjoining StakeHound from its continued violation of the automatic stay, Celsius risks significant and irreparable harm from the continuation of the Arbitration, including the risk of waiving rights to which it is entitled under the Bankruptcy Code by participating in a proceeding barred by the automatic stay, or leaving its fate to be decided in arbitration without its participation.  StakeHound has engaged in  a rank violation of the provision of Bankruptcy Code that is specifically designed to ensure debtors are not faced with this sort of Hobson's choice.

74.    Celsius is entitled to a judgment (i) declaring any and all actions taken by StakeHound in commencing and prosecuting the Arbitration to be void and a legal nullity; (ii) enjoining StakeHound from continuing, prosecuting, or in any way participating in arbitration proceedings against Celsius; and (iii) awarding actual damages, punitive damages and sanctions against StakeHound, including but not limited to all costs incurred by Celsius in connection with the Arbitration.

## SECOND CAUSE OF ACTION

(11 U.S.C. § 542(b):  Turnover of the November 2020 Staked ETH, February 2021 Staked ETH, Native MATIC, and Native DOT as a Debt that is Property of the Estate)

75.    Plaintiff repeats and realleges the preceding allegations as if more fully set forth herein.

76.    The November 2020 Staked ETH (and Rewards), February 2021 Staked ETH (and Rewards), the Native MATIC (and Rewards) and the Native DOT (and Rewards) can be used, sold or leased by Celsius under section 363 of the Bankruptcy Code and is of more than inconsequential value and benefit to the estate.

77.    Pursuant to Section 542(b) of the Bankruptcy Code, the November 2020 Staked ETH (and Rewards), February 2021 Staked ETH, Native MATIC, and Native DOT (and the associated Rewards of each) are debts owed to the Estate and are "matured, payable on demand, or payable on order."  As such, they must be turned over to the Debtor.

78.    Celsius is entitled to turnover of the November 2020 Staked ETH (and Rewards), February 2021 Staked ETH (and Rewards), the Native MATIC (and Rewards) and the Native DOT (and Rewards) pursuant to section 542(b) of the Bankruptcy Code, or recovery of an equivalent judgment for the value of the property of the estate.

## THIRD CAUSE OF ACTION

(11 U.S.C. § 542(e):  Turnover and Accounting of Documents Related to the Debtor's Property)

79.    StakeHound is in the possession of and holds recorded information, including books, documents, records, and/or papers relating to Celsius' property or financial affairs.  Among other things, StakeHound is in the possession of information concerning the amount and location of the native ETH transferred to its control by Celsius, including operative wallets, and reward information.  StakeHound also has recorded information of the kind referenced in Section 542(e) concerning the MATIC and DOT transferred to StakeHound's control by Celsius.

80.    Celsius is entitled to turnover from StakeHound of such recorded information, including books, documents, records, and papers.  Despite Celsius' demand, StakeHound has failed and refused to turnover any such information.  Celsius seeks an order requiring StakeHound to turnover this information without further delay, and an award of damages, costs and attorneys' fees arising from StakeHound's willful refusal to do so.

## FOURTH CAUSE OF ACTION

(11 U.S.C. § 502(d):  Declaratory Judgment that Any Claims of StakeHound Should be Disallowed)

81.    Plaintiff repeats and realleges the preceding allegations as if more fully set forth herein.

82.    StakeHound is an entity from which property of the estate is recoverable under section 542 of the Bankruptcy Code.

83.    There is a live case or controversy concerning that property.

84.    A party's claim shall be disallowed if it is in possession of property of the estate that is recoverable under section 542 of the Bankruptcy Code.  Upon information and belief, StakeHound has not yet filed a proof of claim.  Notably, however, in its void Arbitration demand,

StakeHound asks the Arbitrator to award potentially substantial sums against Celsius, and in Stakehound's favor, seeking an:

> order that Celsius Network Limited bear all costs of these arbitral proceedings, including the Sole Arbitrator's fees and expenses, the Swiss Arbitration Centre's costs, the expenses and costs of witnesses and/or experts, as well as the costs incurred by StakeHound SA, such as but not limited to attorney's fees, in-house costs and out-of-pocket expenses related to these proceedings, plus interest at a rate of 5% from the date of the final award until full and final payment.

85.     Celsius does not concede that any such relief is or could be permissible, or that if such relief was granted, StakeHound would be entitled to recover it against Celsius.  Nevertheless, StakeHound apparently is intent on pursuing a claim against Celsius in some form.  If it does, it necessarily would be required to seek to proceed against Celsius pursuant to the bankruptcy code via a proof of claim.

86.     As a result, Plaintiff seeks a declaratory judgment holding that any proof of claim that StakeHound may seek to file shall be disallowed, including, without limitation, based on StakeHound's failure to turn over to the estate all property to which Celsius is entitled pursuant to section 542 of the Bankruptcy Code.

## FIFTH CAUSE OF ACTION

(Breach of Contract)

87.     Plaintiff repeats and realleges the preceding allegations as if more fully set forth herein.

88.     Celsius provided StakeHound with Native Tokens, and/or keys for validator nodes associated with Native Tokens, including the November 2020 Staked ETH, the February 2021 Staked ETH, MATIC and DOT (collectively, and including accumulated Rewards, the "Celsius

Native Tokens") in connection with agreements entered into with StakeHound, including the SSA

and the RSA (collectively the "Agreements").

89.    Celsius duly tendered its stETH to StakeHound, but StakeHound has wrongfully

refused to perform its obligations to tender Celsius Native Tokens or their equivalent, in violation

of the Agreements.  StakeHound continues to wrongfully hold all of the native ETH transferred to

its control by StakeHound, though certain of the ETH is not currently retrievable due to the

catastrophic loss by StakeHound and/or its agent of associated security keys.

90.    On May 25, 2023, Celsius demanded return of its native MATIC and DOT tokens

in exchange for stMATIC and stDOT as provided under the RSA.  Despite the passing of nearly

three months, StakeHound has not turned over any of the native MATIC and DOT tokens to

Celsius, has ignored Celsius' demand letter, and has never even tried to justify its retention of the

MATIC and DOT tokens, which were worth approximately $40 million at recent prices.  Upon

information and belief, knowing it has no justification for doing so, StakeHound is withholding

Celsius' MATIC and DOT in an effort to gain leverage against Celsius in this litigation.

91.    Celsius has fully performed all of its obligations under the Agreements.

92.    Celsius is entitled to the remedy of damages and/or specific performance.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

93.    Plaintiff repeats and realleges the preceding allegations as if more fully set forth

herein.

94.    Celsius asserts this claim for unjust enrichment in the alternative to its claim for

breach of contract.

95.     In its April 12, 2023 letter, the Defendant contended that the Staking Services Agreement "terminates upon the vote to unlock (or at the latest on the unlock event)," which occurred on April 12, 2023.  The Defendant further contended in its April 12, 2023 letter that, as a result, "the Staking Services Agreement is now at an end."

96.     According to Defendant, in other words, no contract any longer exists in respect of StakeHound's continuing wrongful retention of ETH that should have been turned over to Celsius many months ago.

97.     StakeHound has been unjustly enriched by its continuing wrongful retention of the ETH transferred to it by Celsius, and the rewards generated by that ETH, at the expense of Celsius and its creditors.  It would be against equity and good conscience to permit StakeHound to retain such ETH and rewards, which should be ordered disgorged.

## SEVENTH CAUSE OF ACTION

### (Conversion)

98.     Plaintiff repeats and realleges the preceding allegations as if more fully set forth herein.

99.     Plaintiff holds a possessory right and interest in the Native Tokens.

100.     Defendants has exercised dominion over the Native Tokens and interfered with it in derogation the plaintiff's rights.

101.     Plaintiff is entitled to replevin of the Native Tokens.

102.     Alternatively, Defendant has interfered with the Native Tokens in such a way as to deprive the Plaintiff of all value in the Native Tokens and as such is entitled to trover.

## EIGHTH CAUSE OF ACTION

(Imposition of a Constructive Trust)

103.     Plaintiff repeats and realleges the preceding allegations as if more fully set forth herein.

104.     Celsius and StakeHound had a mutual and confidential relationship.

105.     StakeHound expressly and in the alternative impliedly promised to Celsius that StakeHound would stake Celsius' Native Tokens to earn Rewards on those tokens and that a portion of those Rewards would be paid to Celsius and that Celsius could redeem Staked Tokens for Native Tokens on a 1:1 ratio.

106.     StakeHound transferred its Native Tokens to Celsius in reliance on that promise.

107.     StakeHound has refused to perform its promise and as a result has been unjustly enriched.  Permitting StakeHound to retain the Native Tokens and Rewards would unjustly enrich StakeHound.

108.     As a result, Plaintiff is entitled to the imposition of a constructive trust on the Native Tokens and Rewards.

109.     Alternatively, Plaintiff is entitled to the imposition of an equitable lien on the Native Tokens and Rewards.

## NINTH CAUSE OF ACTION

(Accounting of Profits)

110.     Plaintiff repeats and realleges the preceding allegations as if more fully set forth herein.

111.    Celsius entrusted StakeHound with property, the Native Tokens, and with that entrustment an obligation of accounting for the business and profits was imposed upon StakeHound.

112.    Absent enforcement of this obligation of accounting, Celsius has no adequate remedy at law.

113.    Celsius has made a demand for accounting, which StakeHound has ignored.

114.    Accordingly, StakeHound is obligated to provide a complete accounting to Celsius of all Native Tokens and associated Rewards earned or provided at any time, the proceeds of any such coins, and all activities in which StakeHound engaged in connection with the possession and control of the Native Tokens are Rewards.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request as follows:

a)    Judgment in favor of Plaintiff and against Defendant on all causes of action;

b)    Declaring StakeHound's commencement and prosecution of the Arbitration void *ab initio*;

c)    Temporarily and permanently enjoining StakeHound from continuing the Arbitration;

d)    Turnover of the November 2020 Staked ETH, February 2021 Staked ETH, the 40 million MATIC, the 66,000 DOT and the Rewards associated with all of the preceding property as a debt that is property of the estate and that is matured, payable on demand, or payable on order.

e)    Turnover of the any recorded information, including books, documents, records, and papers, relating to the Debtor's property,  or financial affairs.

f)      Declaratory judgment that any proof of claim StakeHound may attempt to file shall be disallowed based on, among other things, StakeHound's failure to turn over all property of the Debtors' estates in its possession;

g)      Awarding Celsius equitable relief in the form of specific performance of the Agreements by directing StakeHound to transfer all native ETH, MATIC and DOT tokens to Celsius on a 1 to 1 basis for the corresponding number of stTokens that were, or should have been, minted and issued to Celsius with respect to native principal tokens and rewards earned;

h)      Alternatively, equitable recission of the Agreements;

i)      Awarding Celsius actual damages for StakeHound's breaches of duty in an amount to be proved at trial;

j)      Ordering StakeHound to disgorge all proceeds, profits, property and value by which it was unjustly enriched;

k)      Requiring the Defendants to provide an accounting of all of the Celsius Native Tokens and Rewards;

l)      Imposing a constructive trust on the Celsius Native Tokens and their proceeds in favor of Celsius as beneficiary;

m)      Awarding actual damages to Celsius for StakeHound's breach of the automatic stay in an amount to be proved at trial;

n)      Awarding punitive damages to Celsius for StakeHound's breach of the automatic stay;

o)      Awarding punitive damages to Celsius for the willful refusal to turnover Celsius' Native Tokens;

p)      Awarding pre and post-judgment interest at the maximum amount permitted by law;

q)      Awarding actual or in the alternative reasonable attorneys' fees, costs and expenses in an amount to be proved at trial; and

r)      Awarding all other relief that this Court deems just and proper.

Dated:       August 22, 2023
             New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

By:   */s/ Mitchell P. Hurley*
      Mitchell P. Hurley
      Dean L. Chapman Jr.
      One Bryant Park
      New York, New York 10036
      Telephone: (212) 872-1000
      Facsimile: (212) 872-1002
      mhurley@akingump.com
      dchapman@akingump.com

      Elizabeth D. Scott (admitted *pro hac vice*)
      Nicholas R. Lombardi (admitted *pro hac vice*)
      2300 N. Field Street, Suite 1800
      Dallas, TX 75201
      Telephone: (214) 969-2800
      Facsimile: (214) 969-4343
      edscott@akingump.com
      nlombardi@akingump.com

      *Special Litigation Counsel for Debtors and
      Plaintiff Celsius Network Limited*