**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | Jointly Administered |
| CELSIUS NETWORK LIMITED, | |
| Plaintiff, | Adversary Proceeding |
| v. | No. 23-01138 (MG) |
| STAKEHOUND SA, | |
| Defendant. | |

**<u>MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>**

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## PRELIMINARY STATEMENT

A temporary restraining order and preliminary injunction preventing (i) dissipation by StakeHound of assets due to Celsius and (ii) violations of the automatic stay is urgently required to prevent further irreparable injury to Celsius.  Celsius' claims against StakeHound are overwhelmingly likely to succeed, and justify an order ensuring that StakeHound's ability to pay any judgment entered in Celsius favor will not be further diminished while this matter is pending.

StakeHound is a defunct company that used to provide liquidity to customers (mainly Celsius) by issuing so-called "st tokens" in exchange for native tokens (such as ETH, MATIC and DOT).  StakeHound issued the same number of st tokens to its customer as the native tokens supplied by the customer, and the customer had the right to redeem the st tokens for native tokens on a "one-to-one" basis.  In or around January 2021, Celsius supplied StakeHound with nodes for about 25,000 native ETH (for the same number of stETH), and in or around February, 2021, Celsius supplied StakeHound an additional approximately 35,000 native ETH (for the same number of stETH).  It is undisputed that in May, 2021, Stakehound, or its agent, lost the keys necessary to retrieve the 35,000 ETH supplied to it by Celsius, and ceased its operations in June of 2021.

Celsius demanded return of the 25,000 native ETH (plus rewards) that StakeHound did not lose, but StakeHound refused.  Rather than even discuss its position (as Celsius offered repeatedly offered to do), StakeHound launched a pre-emptive arbitration against Celsius, in rank violation of the automatic stay.  StakeHound alleges in its void arbitration demand that, as a consequence of its own catastrophic error in May, 2021, StakeHound no longer is required to exchange native ETH for stETH on a one-to-one basis.  StakeHound contends instead that it need

only provide ETH of the same "value" as stETH.  Since stETH is essentially worthless, including because of StakeHound (or its agent's) loss of keys, StakeHound effectively contends that it gets to keep the other 25,000 native ETH supplied to StakeHound by Celsius.  If accepted, that theory would result in a massive, $50 million windfall for StakeHound and Albert Castellana, StakeHound's co-founder, and a crony of Jason Stone (who introduced Celsius to StakeHound in the first place), all as a result of the disastrous mistake made by StakeHound or its agent in 2021.

Fortunately, this attempted money-grab by StakeHound and Castellana is utterly at odds with StakeHound's actual duties to Celsius, which require it to turnover the 25,000 ETH to Celsius without further delay.  In addition, StakeHound is holding approximately $40 million of Celsius' native MATIC and  DOT tokens "hostage," without any even purported excuse or justification, and despite Celsius' due demand.  Notably, Celsius was the only customer of any significance that StakeHound ever had, and virtually all of the assets currently in StakeHound's control were provided to StakeHound by Celsius (including at least 96% of the native ETH and 100% of the MATIC and DOT).  Collectively, these assets are worth around $90 million at recent prices, but their value is dwarfed by the more than $160 million debt that StakeHound owes to Celsius.

Celsius brings this motion to ensure that the assets now in StakeHound's control – virtually all of which were provided to it by Celsius – will still be there to satisfy a judgment at the end of this case, and to head off any further violations of the automatic stay.  StakeHound argues that no freezing order is necessary, supposedly because no material dissipation of assets in its control is imminent.  In reality, StakeHound itself has proposed dissipating Celsius' assets ***at the rate of as much as $50,000 <u>per day</u> or more (and potentially much more) over the course of just the next few weeks***.  In other words, absent an injunction, according to StakeHound itself,

3

StakeHound easily could spend 3% to 5% of the property before the September 27, 2023 hearing on Celsius' motion for a preliminary injunction, and half or more of the assets in the next year alone.

And for what?  StakeHound admits it has no operations, and never has identified any material expense associated with its defunct business that could justify any spending.  Instead, StakeHound plans to spend these sums on legal fees, including in its litigation and arbitration *against Celsius*.  The case law is crystal clear, however, that where a freezing order is otherwise appropriate, the defendant is not entitled to a "carve-out" to pay its legal fees, even in criminal cases.  No exception should be made for Celsius in this civil matter.  If some truly urgent expense arises, including in connection with the Israeli litigation, it can be addressed through the notice and objection process included in Celsius' proposed restraining order and injunction.

And to the extent StakeHound's litigaton costs *against Celsius* are mounting, StakeHound has only itself to blame.  Celsius has long sought to negotiate, not litigate, with StakeHound, expressly in an effort to save needless legal fees for both sides.  But at every turn, StakeHound ignored or refused Celsius' overtures.  Instead, StakeHound chose to adopt scorched earth litigation tactics, including by (i) filing an arbitration demand against Celsius in rank violation of the automatic stay, (ii) requiring full briefing and two hearings on Celsius' Rule 4(f)(3) motion before finally agreeing to accept service of the adversary complaint in this action, (iii) failing to discharge its meet and confer obligations in good faith in connection with the scheduling and preservation stipulation in this case, requiring a time consuming and expensive exchange of letters to the court[2] and (iv) holding $40 million worth of Celsius' assets "hostage" to gain leverage over Celsius in this dispute.  Limiting any freezing order to provide a war chest

---

[2] *See* Hurley Dec. Ex. L

4

for Castellana and StakeHound would only reward their uber-aggressive approach to this matter, and, no doubt, encourage more such tactics going forward.

As discussed below, the merits of Celsius claims are crystal clear, and there can be no doubt that StakeHound's ability to satisfy a judgment in this matter will be only further reduced absent entry of an injunction. Celsius therefore respectfully requests that the Court enter an order (a) restraining and enjoining StakeHound from transferring, selling or otherwise disposing of assets, subject to the notice and objection process provided in Celsius' proposed order, and (b) requiring Celsius immediately to respond to the arbitrator's August 18, 2023 inquiry in the manner provided in the proposed order.

## STATEMENT OF FACTS

### A.    StakeHound's Former Business

StakeHound is a company incorporated under the laws of Switzerland.[3]  Until it shut down its operations in June, 2021, StakeHound was primarily engaged in the business of staking native digital assets and holding the nodes for staked native digital assets, such as ETH, MATIC and DOT ("Native Tokens").[4]  StakeHound minted and issued (mainly to Celsius) st tokens ("stTokens"), allowing Celsius (in theory) to use the stTokens as liquidity in the DeFi ecosystem.[5]  StakeHound alleges in its void Arbitration that Celsius holds 96% of all stETH ever minted by StakeHound in exchange for native ETH, meaning that at least 96% of the native ETH in StakeHound's possession were provided by Celsius[6]  The property in StakeHound's

---

[3] See Hurley Dec., Ex. A at ¶ 4.
[4] Hurley Decl., Ex. A at ¶ 10–12.
[5] Man Decl., Ex. B at 25 ("Platform of StakeHound SA, a private limited company incorporated in Switzerland.")
[6] *See* Hurley Decl., Ex. A at ¶ 21.

possession (which is a fraction of StakeHound's debts to Celsius) sometimes is referred to herein as the "Subject Property."

### B.    At Jason Stone's Suggestion, Celsius Entrusts ETH to StakeHound

In 2020, Jason Stone friend of StakeHound co-founder and current CEO, Albert Castellana. introduced StakeHound to Celsius.[7]  In November, 2020, on its own, Celsius had staked nearly 25,000 Celsius ETH by transferring it to the ETH2 deposit contract (the "November 2020 Staked ETH").  At the time, all ETH transferred to the Deposit Smart Contract, including the November 2020 Staked ETH, was locked and unavailable for withdraw pending completion of an ongoing upgrade to the Ethereum blockchain (the "Upgrade").[8]

Celsius determined to provide keys to the nodes associated with the November 2020 Staked ETH to StakeHound in exchange for an equal number of stETH.[9]  On or around January 20, 2021, Celsius and StakeHound entered into the Staking Services Agreement (the "SSA"). Under the SSA, Celsius agreed to provide StakeHound with the nodes for the November 2020 Staked ETH in exchange for the same number of stETH (plus stETH associated with Rewards to be earned on the native ETH).[10]  Specifically, the SSA provides that stETH issued by StakeHound in exchange for the transfer of the nodes to the November 2020 Staked ETH are a "one to one representation of a [native] token staked by StakeHound on its platform."[11]

In February 2021, Celsius provided an additional approximately 35,000 native ETH (the "February 2021 Staked ETH") to StakeHound.  As with the November 2020 Staked ETH,

---

[7] *See* Man Decl. at ¶ 7.

[8] *See* Man Decl. at ¶ 9

[9] *See* Man Decl. at ¶ 12.

[10] *See* Man Decl. at ¶ 11.

[11] *See* Man Decl. at ¶ 11; Man Decl., Ex. B at 1 ("Whereas StakeHound offers the service of issuing staked tokens ('StakedToken') a one to one representation of a token staked by StakeHound on its platform 'stakehound.com' . . . .").

StakeHound was to provide Celsius with the same number of stETH as the number of February 2021 Staked ETH, plus earned Rewards, to use for liquidity.[12]  And in fact, StakeHound did issue stETH to StakeHound in the same number as the February 2021 Staked ETH.[13]

### C.    Celsius Transfers MATIC and DOT to StakeHound

On or around April 21, 2021, Celsius and StakeHound entered into a Revenue Sharing Agreement (the "RSA").[14]  On or around April 21, 2021, Celsius and StakeHound entered into a term sheet (the "MATIC Term Sheet") whereby Celsius transferred 40,000,000 native MATIC tokens pursuant to the RSA.[15]  In turn, StakeHound was required to issue 40,000,000 stMATIC to Celsius, with periodic additions as the native MATIC earned Rewards.  On or around April 27, 2021, Celsius and StakeHound entered into a term sheet (the "DOT Term Sheet"[16] together with the MATIC Term Sheet, the "Term Sheets") whereby Celsius agreed to transfer 66,000 native DOT tokens pursuant to the RSA.  In turn, StakeHound was required to issue 66,000 stDOT tokens to Celsius, with periodic additions as the native DOT earned Rewards.[17]  Pursuant to the RSA, Celsius was entitled to exchange its stMATIC and stDOT "at any time"[18] after the lockup period for the Native Tokens and "25% of the Net Reward generated by the Native Tokens brought in by the Client to StakeHound for the purpose of Staking."[19]  In an April 19, 2021

---

[12] *See* Man Decl. at ¶ 13.

[13] *See* Man Decl. at ¶ 13.

[14] *See* Man Decl. at ¶ 14.

[15] *See* Man Decl. at ¶ 15.

[16] *See* Man Decl. at ¶ 17.

[17] *See* Man Decl. at ¶ 17.

[18] *See* Man Dec. at ¶¶ 16, 20; *see also* Man Decl. Ex. C at § 2.7.

[19] *See* Man Decl. Ex. C at §§ 2.3; 2.7 ("In the absence of any specific lockup period (during which the stTokens cannot be exchanged into Native Tokens), such exchange shall be available to [Celsius] at any time (subject to the applicable processing time of such exchange).").

email, StakeHound's Castellana confirmed that "*you can send MATIC and get stMATIC at a 1 to 1 ratio at any time. You can do vice versa also ....*"[20]

### D.    StakeHound Loses 35,000 ETH and Ceases All Business and Operations

According to StakeHound, on or around May 2, 2021, private keys associated with the February 2021 Staked ETH were misplaced,[21] rendering Celsius' 35,000 ETH (plus rewards) "irretrievably lost."[22] .  StakeHound claims that its agent, Fireblocks was negligent in losing the keys, but there can be no doubt StakeHound also is liable to Celsius for the error.[23]  StakeHound alleges in its void arbitration that, "due to" its loss of keys in May 2021, "on 22 June 2021, StakeHound had to suspend the operation of the Platform in order to devote its full attention to the recovery of the loss.  In particular, in view of the severity of the Incident, StakeHound halted its liquid staking activities with immediate effect."[24]

### E.    StakeHound Refuses to Honor Agreement to Transfer Native ETH

In October 2022, Celsius wrote StakeHound in connection with Celsius' then pending bankruptcy adversary proceeding against Mr. Stone, the former DeFi executive who had led Celsius' dealings with StakeHound.[25]   Concerned that Mr. Stone might wrongfully have retained related confidential information, Celsius urged StakeHound to take precautions to prevent Mr. Stone from seizing any of Celsius' ETH after the Upgrade occurred.[26]  The Celsius letter included the Celsius bankruptcy case caption, and specifically indicated the native ETH

---

[20] *See* Man Decl. at ¶ 16; *see also* Man Decl. Ex. E.

[21] *See* Man Decl. at ¶ 18.

[22]  *See* Hurley Decl. Ex. E.

[23] *See* StakeHound, Fireblocks ETH 2.0 Key Management Incident, StakeHound Website (June 22, 2021), https://stakehound.com/blog-post/fireblocks-eth-2-key-management-incident/.

[24] *See* Hurley Decl. Ex. A at ¶ 24.

[25] *See* Hurley Decl. Ex. B.

[26] In a response to Celsius' November 14, 2022 motion for a preliminary injunction, Stone declared under oath that neither he nor KeyFi retained private keys necessary to withdraw Celsius' staked ETH.

constitutes "valuable property in which the estates of Celsius Network LLC and its affiliates (collectively, "Celsius") in the above-referenced bankruptcy case have a property interest."[27]

StakeHound's response was vague concerning its duty to return Celsius' tokens.[28]  On April 10, 2023, Celsius demanded that StakeHound confirm in writing that it would transfer the November 2020 Staked ETH as soon as possible after the Upgrade.[29]  Celsius warned that StakeHound's failure to turnover the assets would result in "substantial liability under the Bankruptcy Code."[30]   StakeHound rejected Celsius' due demand on April 11, 2023. StakeHound went on to contend that "the Staking services agreement [sic] terminates on the vote to unlock (or at the latest on the unlock event),"[31] an event that occurred on April 12, 2023. Hence, according to StakeHound, as of April 12, 2023, "the Staking Services Agreement is now at an end."[32]  Celsius wrote back on April 17, 2023 proposing to discuss the parties' disputes to try to avoid costly and time consuming litigation.  StakeHound ignored Celsius' overture.[33]

### F.    StakeHound Willfully Violates Automatic Stay

Instead, and in rank violation of the Automatic Stay, StakeHound purported to commence arbitration against Celsius in Switzerland, and sought to turn its own catastrophic error relating to Celsius 35,000 lost ETH into a $50 million windfall for itself.  According to StakeHound, it is only required to return to Celsius native ETH of the same fiat value as the stETH that Celsius currently holds, not one ETH for one stETH, as the parties agreed.[34]   Since stETH is all but

---

[27] See Hurley Decl. Ex. B.

[28] See Hurley Decl. Ex. C.

[29] See Hurley Decl. Ex. D.

[30] See Hurley Decl. Ex. D ("We represent Celsius Network Limited . . . in connection with the above-referenced adversary proceeding . . ..").

[31] See Hurley Decl. Ex. E.

[32] See Hurley Decl. Ex. E.

[33] See Hurley Decl. Ex. F.

[34] See Hurley Decl. Ex. E.

worthless, StakeHound's "theory" would allow StakeHound and Castellana to keep more than 25,000 Celsius ETH.[35]   On May 1, 2023, Celsius reminded StakeHound of the automatic stay and demanded withdrawal of the arbitration.[36]   In the same letter, Celsius again proposed that the parties meet to discuss a negotiated resolution.  StakeHound again ignored Celsius' overture.

### G.    StakeHound Holds "Hostage" $40 Million Worth of MATIC and DOT

On May 25, 2023, Celsius wrote StakeHound, demanded return of its native MATIC and DOT, and tendered its corresponding stTokens.[37]   StakeHound entirely ignored Celsius' May 25 letter, has notreturned Celsius' MATIC and DOT, nor offered even a threadbare excuse for failing to do so.  During a hearing before the Court on August 2, 2023, Celsius noted on the record that StakeHound never had even tried to justify retaining Celsius' MATIC and DOT, and contended that StakeHound simply was holding those coins "hostage" in order to gain leverage in this litigation.[38]   Neither during that hearing, or at a subsequent hearings on August 7, 2023, August 8, 2023 and August 22, 2023, or at any other time, has StakeHound made any effort to rebut Celsius' characterization, or justify its wrongful retention of MATIC and DOT.

### G.    StakeHound Tactics Continue to Multiply Costs

Before filing this adversary proceeding, Celsius again sought a standstill agreement to permit the parties to discuss a commercial resolution, which Celsius believed would "be more cost- and time-effective than proceeding with litigation without at least first trying to reach a compromise."[39]   StakeHound refused.  After Celsius filed its adversary complaint, Celsius asked StakeHound to accept service through its U.S., U.K. or Swiss lawyers.  StakeHound refused.

---

[35] *See* Man Decl. at ¶ 21; *see also* Man Decl. Ex. H.
[36] *See* Hurley Decl. Ex. H.
[37] Hurley Decl. Ex. I.
[38] *See* Hr'g. Tr. 30:3-13 (Aug. 2, 2023).
[39] Hurley Decl. Ex. J

Before finally agreeing to accept service, StakeHound required full briefing on Celsius' Rule

4(f)(3) motion, and two hearings before the Court. Thereafter, StakeHound failed to meet and

confer in good faith in an effort to negotiate a scheduling order, instead prematurely requiring the

submission of letters to the Court that were expensive and time-consuming to prepare, and that

could have been avoided (or at least limited) by engaging in good faith in the meet and confer

process. Despite repeated demands, StakeHound continues to hold Celsius' MATIC and DOT

without justification or excuse, and has ignored Celsius' proposal that StakeHound appropriately

respond to the arbitrator's August 18, 2023 inquiry, resulting in Celsius having to litigate both

issues. These and StakeHound's other aggressive (and in some cases simply inexplicable)

choices have made this dispute substantially more expensive than it needed to be.

## ARGUMENT

### I.    STAKEHOUND SHOULD BE RESTAINED AND ENJOINED FROM CONTINUING THE VOID SWISS ARBITRATION PROCEEDING

Injunctive relief is required in connection with StakeHound's violation of the automatic

stay. StakeHound commenced arbitration against Celsius in Switzerland on or around April 24,

2023, a time when StakeHound knew Celsius' bankruptcy had been pending for more than nine

months. As the Court already has observed, StakeHound's conduct constitutes a manifest

violation of the automatic stay. 11 U.S.C. 362(a)(1) & (a)(3); *see also* Aug. 2 Tr. ("Once the

petition is filed, you can't do anything to trigger the arbitration."); Aug. 7 Tr. at 19 ("I said it

about as close to definitely as possible last time. This is a violation of the automatic stay."); Aug.

22, 2023 Order ECF No. 29 at 1 ("Contempt and sanctions are available for such a violation.").

Pursuant to Section 105(a) of the Bankruptcy Code, StakeHound should be enjoined from

pursuing the Arbitration. In the context of injunctions, Section 105(a) is to be "construed

liberally to enjoin suits that might impede the reorganization process" or "process of

liquidation." *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988)). A plaintiff does not need to demonstrate irreparable harm to be awarded injunctive relief under section 105, *id.* but the risk of such harm certainly exists here.  On August 11, 2023, consistent with this Court's remarks, the parties sent a joint request asking the arbitrator.[40]   Nevertheless, until the arbitration actually is withdrawn, there is a risk that the arbitrator will seek to require Celsius to make a Hobson's choice between risking an adverse award, or waiver of its rights under Section 362(a).  Celsius submits that StakeHound should be required to withdraw the Arbitration, and in the interim, respond to the arbitrator as provided in Celsius' proposed order.

## II.   STAKEHOUND SHOULD BE REQUIRED TO PRESERVE THE ASSETS AT ISSUE IN THIS LITIGATION PENDING ITS RESOLUTION

It is well-settled that bankruptcy courts may issue so called "freezing injunctions" to preserve assets for the debtor's estate.  *In re Soundview Elite Ltd.*, 543 B.R. 78, 122 (Bankr. S.D.N.Y. 2016) (granting a freezing injunction because the trustee was "attempting to marshal the [] estate's assets for the benefit of its creditors, and to protect those creditors from efforts to dissipate property" even when that property "may technically not yet be estate property").  The purpose of a preliminary injunction is to "preserv[e] the status quo pending resolution of the underlying action . . . ." *Brenntag*, 175 F.3d at 249.  To obtain such an order, the plaintiff must either show

(i)     "he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest" or

(ii)     "irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

---

[40] *See* Hurley Decl. Ex. J.

*MF Global*, 562 B.R. at 64; *see also New York ex rel. Schneiderman v. Actavis*, 787 F.3d 638,

650 (2d Cir. 2015) (quoting *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)).

Both tests are readily satisfied here.

### A.  Celsius Will Face Imminent, Irreparable Harm Absent Injunctive Relief

### 1.  Any Asset Dissipation Will Further Reduce Celsius' Recovery

StakeHound is deeply insolvent, and unless the Subject Property is preserved during the

course of this litigation, StakeHound's ability to satisfy a judgment in favor of Celsius will be

further and severely reduced.  The property in StakeHound's possession – virtually all of which

was supplied by Celsius – is worth approximately $90 million, while Celsius claims against

StakeHound are in excess of $160 million.  As a result of its loss of Celsius' February 2021

Staked ETH, StakeHound expressly alleges that it had to shutter its operations to focus solely on

its lawsuit against Fireblocks:

> Due to the Key Management Incident, on 22 June 2021, StakeHound
> had to suspend the operation of the Platform in order to devote its
> full attention to the recovery of the loss.  In particular, in view of the
> severity of the Incident, StakeHound halted its liquid staking
> activities with immediate effect.

*See* Hurley Decl. Ex. A at ¶ 24.  Indeed, the fundamental premise of StakeHound's void

arbitration demand is that it no longer has assets sufficient to satisfy the claims of Celsius .  *Id.* at

¶ 9 (alleging that "an exchange as requested by [Celsius] is currently not possible, given the

limited availability of the ETHs [sic]").

This is exactly the kind of circumstance that justifies entry of a freezing order.  A

fundamental aim of a preliminary injunction is to preserve the status quo until the courts can

decide the merits of the case.  When a defendant has "no other sources of income or cash on

hand" such that it may not be able to make the plaintiff whole, courts recognize that "a

substantial threat of irreparable harm exists" justifying awarding a preliminary injunction *III*

13

*Finance Ltd. v. The Aegis Consumer Funding Group, Inc.*, No. 99 CIV. 2579, 1999 WL 461808,

*6 (S.D.N.Y. July 2, 1999).[41]  When a plaintiff can demonstrate that the defendant is insolvent or

otherwise unable to pay, courts find that irreparable harm exists absent an injunction.  *See e.g.,*

*Xiotech Corp. v. Express Data Prod. Corp.*, No. 6:13-CV-861 MAD TWD, 2013 WL 4425130, at

*3 (N.D.N.Y. Aug. 14, 2013) ("The Second Circuit has held that an exception exists to this

general rule and that the finding of irreparable harm may lie in connection with an action for

money damages where the claim involves an obligation owed by an insolvent or a party on the

brink of insolvency"); *Castle Creek Tech. Partners, LLC v. CellPoint Inc.*, No. 02 CIV. 6662

(GEL), 2002 WL 31958696, at *3 (S.D.N.Y. Dec. 9, 2002) (granting injunction based on

showing that "it is possible the defendant will not be able to pay damages at the conclusion of the

litigation"); *Netwolves Corp. v. Sullivan*, No. 00 CIV. 8943 (AGS), 2001 WL 492463, at *11

(S.D.N.Y. May 9, 2001) (same).

### 2.  Absent an Injunction StakeHound Will Materially Dissipate Assets

Unless the Court enters a TRO and injunction, StakeHound will materially dissipate the

only assets available to satisfy a Celsius judgment in this case.  Celsius has long sought an asset

preservation agreement from StakeHound to permit settlement discussions, but its overtures were

always ignored.   On August 1, 2023, after Celsius filed its motion for service pursuant to Rule

4(f)(3), StakeHound finally offered to enter into a preservation agreement, but proposed a *$5

million* "carve-out" to be usable by it for ***any purpose over the course of the 90 day briefing***

---

[41] Celsius seeks both legal and equitable relief in this adversary proceeding.  *Balenciaga Am., Inc. v. Dollinger*, No.
10 CIV. 2912 (LTS), 2010 WL 3952850, at *7 (S.D.N.Y. Oct. 8, 2010) ("[W]here plaintiffs seek both equitable and
legal relief in relation to specific funds, a court retains it equitable power to freeze assets"); *Quantum Corporate
Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*, 144 F.Supp.2d 241, 249–50 & n. 9 (S.D.N.Y. 2001)
(same); *Wishnatzki Nathel, Inc. v. H.P. Island–Wide, Inc.*, 2000 WL 1610790, at *1, (S.D.N.Y. October 27, 2000)
(same).

*period then under discussion*.[42]  On August 18, 2023, StakeHound submitted a stipulation to the

court that would have allowed it the freedom – *during a period of just 3 to 4 weeks – to spend*

*$825,000 on legal fees, and $250,000 on so-called business expenses (even though*

*StakeHound admits it no longer is in business)*, plus unlimited additional amounts subject to a

notice and objection protocol with Celsius.[43]

        During the 18 to 23 business day period proposed, StakeHound would be spending the

equivalent *of at least between about $42,000 and about $54,000 per day* (or between about

$250,000 and about $325,000 per week).  **In addition,** StakeHound proposed having free hand to

use the Subject Property to fund "all required administrative fees and costs (including court fees)

associated with" the litigations in which it is engaged.  *See* Hurley Decl. Ex. K at ¶ 6.  Without

explanation, StakeHound indicated during a telephone call with Celsius that administrative costs

for the Israeli litigation alone could be as much as $2 million or more.  *See* Hurley Decl. ¶ 14.  **In**

**addition,** StakeHound apparently contemplates spending still more of the Subject Property

during the briefing period, proposing to spend unlimited additional sums during the next few

weeks, subject only to a notice and objection process.[44]  Based on these estimates, StakeHound

could spend in excess of 3%, and perhaps far more, of the Subject Property before we even

arrive at the hearing on Celsius' injunction motion next month. and the dispute were to carry on

for one year (a very short period for resolving the merits of any significant litigation or

---

[42] *See* Hurley Decl. at ¶ 15.

[43] *See* Hurley Decl. Ex. K at ¶ 6.  During the August 22, 2023 hearing StakeHound suggested the near seven figure "no-notice" fund was meant to cover costs into October.   But in its August 18, 2023 letter to the Court, StakeHound said the amount was "for the two to three week period" it proposed for briefing StakeHound's motion, plus the seven day "tail" StakeHound proposed in the event Celsius thereafter moved for an injunction.  *See id.* at 2 & , ¶ 5

[44] *See* Hurley Decl. Ex. K at ¶ 5.

arbitration), using StakeHound's estimates, it could easily spend 30% to 50% of the Subject

Assets in that period of time, all at the further expense of Celsius and its creditors. [45]

### 3.  The Subject Assets Should Not Be Used to Pay StakeHound's Legal Bills

StakeHound has no need for material assets to run its business, because StakeHound has

no business, as it now admits.  Instead, StakeHound proposes to access potentially millions of

dollars' worth of the Subject Assets to fund its various litigations, including its arbitration and

litigation directly against Celsius.  But the caselaw is crystal clear in this circuit that a party

subject to a freezing injunction has no such right, not even in a criminal case.  *See, e.g.*, *In re*

*MarketXT Holdings Corp.*, 376 B.R. 390, 424 (Bankr. S.D.N.Y. 2007) (denying motion to access

frozen funds to pay legal fees to prohibit "any further depletion of the restrained funds" which

already were insufficient to satisfy the plaintiff's claims, and observing that "courts have

generally not recognized a constitutional right to counsel unless a party's physical liberty is

jeopardized"); *see also SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997) (freezing funds before

trial and denying defendant access to the funds for legal expenses); *SEC v. Credit Bancorp Ltd.*,

2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010) (similar).

The Court should not make an exception for StakeHound here which is in willful

contempt of the automatic stay, and may well be liable for substantial sanctions in addition to its

other liabilities.  Much of the litigation expense StakeHound seeks to pay appears to result

directly from the uber-aggressive tactics StakeHound has adopted versus Celsius.  Dating back to

April, 2023, Celsius sought repeatedly to engage StakeHound in a discussion of a commercial

---

[45] Finally, courts routinely recognize the particular importance of freezing injunctions in cases involving digital assets.  *Hikmatullaev v. Villa*, No. 23-CV-22338, 2023 WL 4373225, at *3 (S.D. Fla. June 28, 2023) (granting TRO freezing digital assets, and noting "the speed with which cryptocurrency transactions are made as well as the anonymous nature of those transactions" justifies maintaining "the status quo to avoid dissipation.") *see also Jacobo v. Doe*, No. 1:22-cv-00672-DAD-BAK(BAM), 2022 WL 2052637, at *3 (E.D. Cal. June 7, 2022); *see also Gaponyuk v. Alferov*, No. 223CV01317KJMJDP, 2023 WL 4670043, at *2 (E.D. Cal. July 20, 2023).

resolution of the parties' disputes rather than resort to litigation. StakeHound refused, and instead filed the Swiss arbitration, in rank violation of the automatic stay. Celsius still did not launch U.S. litigation, instead seeking a standstill and asset preservation agreement to permit the parties to negotiate. StakeHound was not interested. After filing its adversary complaint in this case, Celsius asked all three of StakeHound's law firms – its U.S. counsel, its UK counsel and its Swiss counsel – to accept service and save the parties the time and expense of litigation, all refused or ignored Celsius' request. StakeHound finally agreed to accept service, but only after full briefing and two hearings on Celsius' motion for service pursuant to Rule 4(f)(3). StakeHound also has failed to engage adequately in good faith meet and confer efforts, and is holding substantial Celsius assets "hostage" without excuse. Allowing a carve-out to pay legal fees under these circumstances simply would reward StakeHound and its advisors for the scorched earth strategy they adopted in this matter, and encourage more of the same.

Certainly, there is no justification for a carve out for the period between now and the September 27, 2023 hearing on the parties' motions, which is only a few weeks away. Law firms are paid in arrears, and it is not uncommon for lawyers to be paid many weeks (and sometimes months) after providing services to clients, as this Court is no doubt aware. Moreover, under the order proposed by Celsius, if truly urgent expenses relating to the Israel litigation were to arise between now and September 27, 2023, StakeHound would be able to avail itself of the notice and objection process included in Celsius' proposed order.

### B. Celsius is Overwhelmingly Likely to Succeed on the Merits of its Claims

To establish a likelihood of success on the merits, a movant "'need not show that success is an absolute certainty.'" *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith,* 849 F.2d 80, 82 (2d Cir. 1988)). On the contrary, a preliminary

injunction may issue even if the movant's likelihood of success on the merits is unclear, *Dong*, 2018 WL 1445573, at *5, provided that the movant demonstrates the existence of "'serious questions going to the merits of its claims to make them fair ground for litigation.'" *New York ex rel. Schneiderman v. Actavis*, 787 F.3d 638, 650 (2d Cir. 2015) (quoting Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011)). Nor must the movant demonstrate a likelihood of success on the merits of every one of its claims; just one will do. *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) ("a likelihood of success on the merits of at least one of [movant's] claims" sufficient for injunction). This standard is easily satisfied here.

### 1. Celsius' Claim for Violation of the Automatic Stay is Irrefutable

This is an open and shut case for willful violation of the automatic stay. Celsius filed its bankruptcy petition on July 12, 2022. StakeHound has been on notice that Celsius is in bankruptcy since at least October 24, 2022, and Celsius advised StakeHound on multiple occasions that StakeHound's refusal to turnover property to Celsius could result in substantial liability under the bankruptcy code. Nevertheless, in flagrant disregard of Section 362(a), StakeHound commenced its void arbitration against Celsius in Switzerland, and refused Celsius' demands for its withdrawal based on the automatic stay. As the Court already has observed, "[t]his is a violation of the automatic stay." *See* Aug. 7 Tr. at 19; *see also* August 22, 2023 Sched. Order [ECF No. 29] at 1 ("The pleadings to date support Celsius' contention that StakeHound violated the automatic stay.").

### 2. Celsius is Overwhelmingly Likely to Succeed on MATIC and DOT Claims

Celsius' success with respect to its MATIC and DOT claims is assured. Indeed, StakeHound never has contested Celsius' right to the immediate return of these tokens, which are worth approximately $40 million at recent prices, and StakeHound has all but admitted it is

18

holding these tokens "hostage" to gain leverage over Celsius in this litigation.  Tr. of Aug. 2, 2023 Hr'g at 30:3–15.

These facts support Celsius' turnover and other claims.  Section 542(b) of the bankruptcy code provides that "an entity that owes a debt that is property of the estate and that is matured … shall pay such debt to … the trustee."  11 U.S.C. 542(b).  Debts owing to the debtor under a contract constitute property of the estate for purposes of Section 542(b) where it has been established that the contracting party was unconditionally liable under the contract's terms."  *Off. Comm of Unsec'd Cr. v. Bahrain Islamic Bank In re Arcapita Bank B.S.C.(c)*, 628 B.R. 414, 478 (Bankr. S.D.N.Y. 2021) (hereinafter, "*Arcapita I*") (citing *In re MF Glob. Inc.*, 531 B.R. 424, 437–38 (Bankr. S.D.N.Y. 2015)).  Here, the RSA requires StakeHound to return to Celsius its native MATIC and DOT in exchange for stMATIC and stDOT when tendered by Celsius.  It is undisputed that Celsius tendered all of its stMATIC and stDOT tokens on May 25, 2023, and that StakeHound has failed and refused to provide Celsius' native tokens in exchange, and has no excuse for its failure.  No more is required to sustain Celsius' claim for turnover of the MATIC and DOT.  *See Celsius Network Ltd. v. Stone (In re Celsius Network LLC)*, No. 22-10964 (MG), 2022 WL 17541051, at *9 (Bankr. S.D.N.Y. Dec. 8, 2022) ("[T]he subject of the claim (assets and proceeds of assets) matches the statutory section on which it is premised, section 542(a), and the allegations refer to two distinct assets (or their proceeds) that moved through a particular wallet during a particular time frame. Defendants cited caselaw is not useful to their argument.").

Indeed, the fact that StakeHound continues to hold the MATIC and DOT at all is shocking.  Celsius submits that the Court not only should enter a freezing injunction with respect to these assets, it should caution StakeHound that it will be sanctioned if StakeHound continues to hold these valuable assets without excuse or justification.

### 3.  StakeHound's Claim to Celsius' ETH is Absurd, and Cannot be Sustained

When Celsius agreed to provide ETH to StakeHound, it did so with the express

understanding that Celsius would be permitted to redeem its native ETH on a "one-to-one" basis

for stETH.  StakeHound now claims, however, that as a result of the loss by StakeHound (or its

agent) of the 35,000 Celsius February 2021 Staked Eth, StakeHound no longer has to return the

25,000 Celsius' November 2020 Staked ETH.  StakeHound's bid for a $50 million windfall

cannot be sustained.

The greed and audacity of StakeHound's position is genuinely shocking.  Fortunately, it

is also utterly inconsistent with the parties' understanding.  As noted, StakeHound marketed its

stTokens as a "one to one" representations of their native counterparts.  For example,

StakeHound's website explained that "[o]nce StakeHound receives your asset, they create a copy,

called stETH, ***which is simply a wrapped asset representing the original.*** … Once you receive

the wrapped or stETH, you can freely do whatever you want with it while getting the rewards

without any lock-up."[46] In another section of its website, StakeHound again emphasizes that

"stETH is a wrapped token with a 1:1 representation of the user's underlying ETH."[47]   Mr.

Castellana repeatedly assured via Youtube video that, "thanks to StakeHound, you'll be able to

trade a one-to-one representation of any [native] token,"[48] and tweeted that with ETH one can

"buy it directly on Uniswap . . . or Exchange 1:1 ratio through us."[49]

---

[46] *See* https://stakehound.com/blog-post/your-guide-to-liquid-staking/ (archived on December 9, 2020) (available at Wayback Machine https://web.archive.org/web/20201207091626/https://stakehound.com/blog-post/your-guide-to-liquid-staking/).

[47] *See* https://stakehound.com/blog-post/how-to-profit-from-eth-2-0-staking-rewards/ (archived on December 9, 2020) (available at Wayback Machine https://web.archive.org/web/20201209091232/https://stakehound.com/blog-post/how-to-profit-from-eth-2-0-staking-rewards/).

[48] *See* https://www.youtube.com/@StakeHound/videos e.g., StakeHound #1 AMA session: The Future of Staking and DeFi with Piers Ridyard, CEO of Radix (available at https://www.youtube.com/watch?v=tXuyy6_NVaY).

[49] https://twitter.com/stakedTokens/status/1368829026291183617

The written SSA between Celsius and StakeHound likewise provides that StakeHound offers staked tokens ('StakedToken'*), a one to one representation*" of the native tokens provided by the customer.[50]   When Celsius transferred ETH to StakeHound in January, 2021 pursuant to the SSA, StakeHound agreed to "instantly mint and issue to Celsius stETH in the equivalent amount."[51]   And in fact, in exchange for Celsius' native ETH, StakeHound minted and issued to Celsius exactly the same number of stETH, on the same "one to one" basis.[52]   The parties acknowledged that Celsius' native ETH would not be available "for a period of about two years" until "the Ethereum community will vote to unlock them."[53]   Thereafter, Celsius was entitled to exchange "its stETH against [native] ETH."[54]

StakeHound's current contention, that it only is required to return native ETH of the same fiat value as stETH, is inconsistent with the parties' agreement, StakeHound's numerous contrary representations concerning the nature of its service, and industry practice.   As just one example, Section 7 of the SSA provides expressly that, prior to the Upgrade (when native ETH would become "available" for withdrawal), Celsius had the right to "deliver to StakeHound the full amount of stETH corresponding to the [native ETH supplied by Celsius]," instruct StakeHound's agent, Coincover, "to burn the private key" and terminate the SSA.[55]   Since Celsius was supposed to retain its own copy of the private key, Section 7 provided for Celsius to obtain return of 100% of its ETH, plus rewards, in exchange for the same number of stETH.   In other words,

---

[50] *See* Man Decl. at ¶ 11.

[51] *See* Man Decl. Ex. B at § 1.3.

[52] *See* Man Decl. at ¶ 12.

[53] *See* Man Decl. Ex. B at § 1.4.

[54] *See* Man Decl. Ex. B at § 1.8.

[55] *See* Man Decl. Ex. B at § 7.

Section 7 confirms yet again that stETH entitles the bearer to return of exactly the same *number* of stETH, without reference to fiat value.

StakeHound's brand new, litigation-inspired spin also runs counter to how other participants in the liquid staking industry do business. For example, LIDO (which issues its own "stETH" receipt tokens) and Rocketpool (which issues "RETH" tokens), like StakeHound, take Native Tokens from users and mint and issue their own tokens in the same number in return ("Receipt Tokens"). Those Receipt Tokens lack any intrinsic value, just like StakeHound's stETH, but provide the holder right of exchange for the same number of Native Tokens, just like StakeHound's stETH. The customer is then permitted to exchange its Receipt Token for its Native Token on a "one-to-one basis," just as Celsius is entitled to do pursuant to the SSA. And this is just common sense. Otherwise the customer would simply be transferring a native token with intrinsic value for a token issued by the staking provider with no intrinsic value. That is not what Celsius agreed to, or what any commercially reasonable party would ever agree to.

StakeHound's failure to provide native ETH to Celsius on a one-to-one basis when Celsius tendered its stETH in the same number represents a clear cut claim for turnover under Section 542(b) of the bankruptcy code. A turnover claims requires proof of four elements: (i) the property is in the possession, custody or control of a noncustodial third party; (ii) the property constitutes property of the estate; (iii) the property is of the type that the trustee could use, sell or lease pursuant to section 363 or that the debtor could exempt under section 544; and (iv) the property is not of inconsequential value or benefit to the estate. *See, e.g., Kramer v. Mahia (In re Khan),* No. 10-46901-ess, 2014 WL 4956676, at *22 (Bankr. E.D.N.Y. Sept. 30, 2014).

Even StakeHound must concede that the Subject Property is (i) in StakeHound's possession, (iii) of the type that Celsius could use, sell or lease pursuant to section 363, and (iv)

not of inconsequential value.  The Subject Property also (ii) constitutes property of the estate.

"Property" is "given the broadest possible interpretation" under the bankruptcy code.  *MF Global*

531 B.R. at 438.  "Debts owing to the debtor under a contract constitute property of the estate for

purposes of Section 542(b) where it has been established that the contracting party was

unconditionally liable under the contract's terms."  *Off. Comm of Unsec'd Cr. v. Bahrain Islamic*

*Bank In re Arcapita Bank B.S.C.(c)*, 628 B.R. 414, 478 (Bankr. S.D.N.Y. 2021) (hereinafter,

"*Arcapita I*") (citing *In re MF Glob. Inc.*, 531 B.R. 424, 437–38 (Bankr. S.D.N.Y. 2015)).

StakeHound's debt to Celsius became unconditionally due when Celsius tendered its stETH.

StakeHound's refusal to satisfy that debt gives rise to turnover liability.

Celsius also is highly likely to succeed on its claim for breach of contract.  Under Swiss

law, which governs the SSA, to determine the content of a contract, the court first inquires about

the existence of the real common intent of the parties.  The court inquires to find a true "meeting

of the minds"; or what the parties *actually* wanted.  To the extent that an actual common intent of

the parties can be proven and no specified form is required to conclude a contract this subjective

interpretation takes precedence over any oral statement or any written instrument.  Swiss law

explicitly states that "the true and common intention of the parties must be ascertained without

dwelling on any inexact expressions or designations they may have used either in error or by way

of disguising the true nature of the agreement."  *See* Dasser Decl. at ¶ 5.

If there is any doubt as to the subjective common intent, a Swiss court will carry out an

objective interpretation, applying the "trust principle" (the "principe de la confiance" or

"Vertrauensprinzip").  The court considers how "a fair and reasonable party" would have

understood the use of the contract's words the conduct of the parties in good faith.  When the

wording is unclear, the court also evaluates factors such as the conduct of the parties prior to

execution and the negotiation history, the purpose of the contract and the interests of the parties, the place, time and other circumstances surrounding the conclusion of the contract, and prior custom and use.

As discussed above, the text of the SSA makes crystal clear that the parties agreed to exchange native ETH and stETH on a "one to one basis." And if there were any doubt, Swiss law would revert to the "trust principle," asking how a "fair and reasonable person" would interpret the agreement, including based on factors such as the "purpose" of the SSA, the "interests of the parties" and relevant custom and use. No "fair and reasonable person" ever would conclude that the SSA entitles StakeHound to keep $50 million worth of tokens provided to it by Celsius, based on the loss by StakeHound (or its agent) of another $70 million worth of Celsius tokens. Significantly, moreover, under Swiss law, the primary remedy for a breach of contract is specific performance, though the creditor has the option to choose damages if it wishes. *See* Dasser Decl. at ¶ 11.

As noted, StakeHound contends that the SSA is at an end. In addition to its breach of contract claim, Celsius alleges a number claims arising under New York common law, including unjust enrichment, conversion and constructive trust.[56] Celsius submits that StakeHound's conduct in wrongfully refusing to provide to Celsius its native ETH, MATIC and DOT plainly gives rise to liability under each species of claim. *See Cruz v. McAneney*, 31 A.D.3d 54, 59, 816 N.Y.S.2d 486, 490–91 (2006) (unjust enrichment exists where defendant has unfairly profited at

---

[56] Celsius submits that New York law should govern any common law claims because New York is the jurisdiction with "greatest interest" in having its laws apply given (i) Celsius personnel negotiated the transactions from New York (with their counterparty, Mr. Casetallano, negotiating from Spain), and (ii) to the extent any cryptocurrency transaction can be identified as occurring "somewhere," the current evidence suggests that the staking of the November 2020 Staked ETH occurred through a New York intermediary and between New York accounts. *See generally Lawrence v. TPG Cap. Mgmt. (In re Hellas Telecommunications (Luxembourg) II SCA)*, 535 B.R. 543 (Bankr. S.D.N.Y. 2015).

expense of plaintiff and it would be against equity and good conscience to permit defendant to retain property); *Shi v. Le*, No. 21CV1361ARRCLP, 2022 WL 1085420, at *7 (E.D.N.Y. Mar. 2, 2022), *report and recommendation adopted*, No. 21CV1361ARRCLP, 2022 WL 896963 (E.D.N.Y. Mar. 28, 2022) (defendant that intentionally and without authority, assumes or exercises control over plaintiff's property, even where original possession lawful, is liable for conversion) (citation omitted);  *Winklevoss Cap. Fund, LLC v. Shrem*, 351 F. Supp. 3d 710, 720 (S.D.N.Y. 2019) (Rakoff, J.) (constructive trust appropriate where party establishes relationship of confidence or trust, an express or implied promise, a transfer made in reliance on that promise, and unjust enrichment).

### C.  The Equities and Public Interest Tilt Strongly in Celsius' Favor

The equities strongly support Celsius' requested relief. Celsius primarily seeks to preserve the status quo by preventing StakeHound from dissipating Subject Property during the course of the case. Safeguarding assets from dissipation so that they can be available for the benefit of Celsius' creditors is manifestly equitable, and in the public interest. *See, e.g., In re Calpine Corp.,* 365 B.R. 401, 413 (S.D.N.Y. 2007). For its part, StakeHound would suffer no cognizable harm from an injunction freezing assets that should be transferred to Celsius. StakeHound has no business or operations of any kind, as it expressly alleged in its void arbitration, and to the extent any truly urgent expense were to arise while the injunction is in effect, the proposed order would afford StakeHound a notice and objection process concerning proposed expenditures.  Under the circumstances, the equities overwhelmingly favor freezing the Subject Property to ensure that it remains available for disposition at the conclusion of these proceedings.

## CONCLUSION

For the foregoing reasons, Celsius respectfully requests that the Court (i) enter an order substantially in the form attached hereto as Exhibit A and (ii) grant such other and further relief as the Court may deem proper.[57]

Dated:      August 23, 2023
            New York, New York

                              AKIN, GUMP, STRAUSS, HAUER & FELD LLP

                              By:    */s/ Mitchell P. Hurley*
                                     Mitchell P. Hurley
                                     Dean L. Chapman Jr.
                                     One Bryant Park
                                     New York, New York 10036
                                     Telephone: (212) 872-1000
                                     Facsimile: (212) 872-1002
                                     mhurley@akingump.com
                                     dchapman@akingump.com

                                     Elizabeth D. Scott (admitted *pro hac vice*)
                                     Nicholas R. Lombardi (admitted *pro hac vice*)
                                     2300 N. Field Street, Suite 1800
                                     Dallas, TX 75201
                                     Telephone: (214) 969-2800
                                     Facsimile: (214) 969-4343
                                     edscott@akingump.com
                                     nlombardi@akingump.com

                                     *Special Litigation Counsel for Debtors and Plaintiff Celsius Network Limited*

---

[57] Bankruptcy Rule 7065 provides that "a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)." Fed. R. Bankr. P. 7065. Celsius submits no enhanced risk to StakeHound exists and respectfully requests waiver of the bond requirement in accordance with the "general rule" in this district. *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 595 (Bankr. S.D.N.Y. 2009).