# Exhibit A

UNDER THE

SWISS RULES OF INTERNATIONAL ARBITRATION OF THE SWISS ARBITRATION CENTRE

_____

**STAKEHOUND SA**
**(Switzerland)**

"the Claimant"

**vs.**

**CELSIUS NETWORK LIMITED**
**(United Kingdom)**

"the Respondent"

_____

# Notice of Arbitration

24 April 2023

_____

Counsel for the Claimant:

Schellenberg Wittmer Ltd
Löwenstrasse 19 / P.O. Box 2201
8021 Zurich / Switzerland
T +41 44 215 5252
www.swlegal.com



# Table of Contents

| | | |
|---|---|---|
| I. | INTRODUCTION | 3 |
| II. | THE PARTIES AND THEIR REPRESENTATIVES | 3 |
| A. | The Claimant | 3 |
| B. | The Respondent | 4 |
| III. | NATURE OF THE DISPUTE | 5 |
| A. | Introduction | 5 |
| B. | The relevant agreement and terms | 6 |
| C. | StakeHound had to suspend the operation of its Platform due to a Key Management Incident by Fireblocks, the custody service provider chosen by the Respondent | 7 |
| D. | The Respondent unjustifiably demands the exchange of its stETH for the same number of ETH | 8 |
| IV. | PROCEDURAL MATTERS | 9 |
| A. | Arbitration Agreement | 9 |
| B. | Place of the arbitration | 10 |
| C. | Number and appointment of arbitrators | 10 |
| D. | Language of the arbitration | 10 |
| E. | Applicable law | 10 |
| F. | Registration fee | 10 |
| V. | PRAYERS FOR RELIEF | 11 |

In accordance with Article 3 of the Swiss Rules of International Arbitration of the Swiss Arbitration Centre in force as from 1 June 2021 (the "**Swiss Rules**"), StakeHound SA ("**StakeHound**" or the "**Claimant**") respectfully submits this Notice of Arbitration ("**NoA**") against Celsius Network Limited ("**Celsius**" or the "**Respondent**" and, together with StakeHound, the "**Parties**") and requests that the dispute set out herein be referred to arbitration under the Swiss Rules.

## I.    INTRODUCTION

1   The scope of this submission is limited to the information required pursuant to Article 3(3) of the Swiss Rules. The Claimant expressly reserves the right to further substantiate its factual and legal submissions at a later stage of these arbitration proceedings.

2   Exhibits filed by the Claimant are numbered in the sequence of referral in this submission and are preceded by the letter "C".

3   Unless otherwise defined, capitalized terms shall have the same meaning attributed to them under the SSA (as defined below).

## II.   THE PARTIES AND THEIR REPRESENTATIVES

### A.    The Claimant

4   The Claimant, StakeHound, is a company incorporated under the laws of Switzerland. It designs, develops, provides and operates a platform for technical and IT services. The Claimant's contact details are as follows:

StakeHound SA
Place de Longemalle 1
c/o MN & Associés SA
1204 Geneva

5   The Claimant is represented in this arbitration by:

**Schellenberg Wittmer**
Dr Stefan Leimgruber
Mr Benjamin Gottlieb
Ms Nadine Wipf

Löwenstrasse 19
P.O. Box 2201
CH-8021 Zurich / Switzerland

Tel:     +41 44 215 52 52
Fax:     +41 44 215 52 00
E-Mail:  stefan.leimgruber@swlegal.ch
         benjamin.gottlieb@swlegal.ch
         nadine.wipf@swlegal.ch

6   Any correspondence, notices or decisions relating to this arbitration should be sent to the (electronic) address(es) set out in paragraph 5 above, which are valid addresses for service for the purpose of this arbitration.

## B.     The Respondent

7   The Respondent, Celsius, is a company incorporated under the laws of the United Kingdom. It designs and develops application software. The Respondent's contact details are as follows:

Celsius Network Limited
The Harley Building
77-79 New Cavendish Street
W1W 8XB London / United Kingdom

8   In the correspondence leading up to the dispute and exchanged prior to this Notice of Arbitration, the Respondent was represented by:

**Akin Gump Strauss Hauer & Feld LLP**
Mr Mitchell P. Hurley

One Bryant Park
Bank of America Tower
New York, NY 10036 / USA

Tel:     +1 212 872 1000
Fax:     +1 212 872 1002
E-Mail:  mhurley@akingump.com

### III.   NATURE OF THE DISPUTE

### A.   Introduction

9   This matter concerns a crypto dispute between the Parties.

10  StakeHound operates the currently suspended online platform "stakehound.com" ("**Platform**"), which was soft launched in October 2020. The Platform facilitates so-called liquid staking.

11  Staking is a process in which cryptocurrency holders volunteer to lock their crypto assets for a set period of time to help support the operation of a blockchain. The staked assets are used to validate transactions on the blockchain. In return for staking crypto assets, their holders receive a share of the transaction fees or newly created cryptocurrencies ("**Staking Rewards**"). Essentially, staking is a way of earning passive income from crypto assets.

12  However, by staking crypto assets, their holders cannot trade them and therefore cannot take advantage of the market volatility; nor can the holders use the crypto assets as collateral for loans. In other words, the assets are illiquid for the time they are staked. This disadvantage of staking is addressed by the so-called liquid staking.

13  In the liquid staking process, the service provider issues a tokenised representation of a particular cryptocurrency (wrapped token) in exchange for that same cryptocurrency (native token). The service provider then stakes the native tokens and, in accordance with the applicable terms, distributes Staking Rewards to the holders of wrapped tokens. At the same time, the holders of wrapped tokens can use and trade these tokens in peer-to-peer financial networks, the so-called decentralised finance ecosystem, thereby minimising the disadvantages of traditional staking. Hence the term, "liquid staking".

14  In 2020, the Respondent had staked 25,436.51849 ETH[1]. These ETH were locked until the launch of the upgraded blockchain Ethereum 2 ("**Locked ETH**"), the date of which was uncertain at the time. The Respondent was interested in StakeHound's Platform to make use of liquid staking.

---

[1]   ETH means Ether, the native cryptocurrency of the Ethereum blockchain.

**B.      The relevant agreement and terms**

15   On 20 January 2021, a few months after the Platform's soft launch, the Parties entered into the Staking Services Agreement ("**SSA**"). Pursuant to section 1.1 SSA, the StakeHound Services Terms and Conditions ("**SSTC**"), which were attached to the SSA as Exhibit B, form an integral part of and fully apply to the SSA.[2]

16   Based on the SSA, the Respondent shared the private keys with StakeHound which would give access to the Locked ETH (section 1.2 SSA). In exchange, StakeHound generated, i.e. minted, and issued to the Respondent wrapped tokens called Staked ETH ("**stETH**") at an exchange rate of 1:1 with the Locked ETH (section 1.3 SSA). In section 1.3 SSA, the Parties expressly agreed that StakeHound alone owns the Locked ETH which it received from the Respondent. StakeHound remains the sole owner also after the Unlock Event, as defined in the subsequent paragraph.

17   In section 1.4 SSA, the Parties acknowledged that the Locked ETH would remain locked until the Ethereum 2 launch ("**Termination Date**" or "**Unlock Event**"). In view of the Unlock Event, the Parties agreed as follows (section 1.5 SSA):

> "*Upon the Termination Date, the Parties agree that StakeHound will transfer the **Locked ETH plus the staking rewards and fees** obtained throughout the period since the Effective Date ("Assets"), **owned by StakeHound**, to a new wallet setup on its appointed custodian ("Wallet") and Celsius will, for no reason whatsoever and under no circumstances, remove, entirely or partially, the Assets with its copy of the private key prior to such transfer, or prevent StakeHound to transfer the Assets by any other means.*"

(Emphasis added)

18   Moreover, section 1.8 SSA provides that:

> "*Following the successful transfer of the Assets in the StakeHound's Wallet, Celsius shall be entitled to exchange, **upon availability**, its stETH against ETH through StakeHound's Platform **in accordance with the StakeHound Services Terms and Conditions**. […].*"

(Emphasis added)

19   As stipulated in section 1.8 SSA, purchasing ETH in exchange for stETH by the Respondent from StakeHound after the Unlock Event is subject to the SSTC, which in section 1.2 provide as follows:

---

[2]   **Exhibit C-001**, Staking Services Agreement dated 20 January 2021.

> "*Subject to satisfactory completion of the KYC/AML due diligence process,* **the User**, *holder of Staked Token(s),* **may buy upon availability** *Native Token(s) with his Staked Token(s),* **at the same value in the equivalent crypto currency**.
>
> *[…]*
>
> *The Platform, related materials, the payment processing and other tasks are provided on an "as is", "with all faults" and "as available" basis. […]* **the Company makes no** *representations or warranties […] including, without limitation […] (b) any* **warranty that the Platform**, *related materials, the payment processing or other tasks will meet Users' requirements,* **will always be available**, *accessible, uninterrupted, timely, secure, operate without error, or will contain any particular features or functionality […].*"

(Emphasis added)

20   On 2 February 2021, the Respondent transferred an additional 35,000 ETH to StakeHound. This transfer was made under and in accordance with the SSTC and not pursuant to the SSA. In application of section 1.1 SSTC, StakeHound minted and issued the Respondent stETH in the same number in exchange.

21   The Respondent holds approx. 96% of the total supply of stETH, making the Respondent the Platform's largest user.

C.  **StakeHound had to suspend the operation of its Platform due to a Key Management Incident by Fireblocks, the custody service provider chosen by the Respondent**

22   Since, at the time, the Respondent was going to be the first large user of the Platform, it was intimately involved in setting up the security protocols for the secure storage of the cryptographic keys to the Locked ETH prior to the conclusion of the SSA. In particular, the Respondent introduced StakeHound to the company Fireblocks, a blockchain security service provider for moving, storing and issuing digital assets, and insisted that Fireblocks be the security custodian for StakeHound and its Platform. The Respondent further insisted that the keys to the Locked ETH would be split and partially held by StakeHound and Fireblocks, instead of having just one key holder.

23   On 2 May 2021, Fireblocks informed StakeHound that 38,178 ETH, that is approx. 60% of the total of StakeHound's ETH, may no longer be accessible because Fireblocks failed to secure the cryptographic private keys ("**Key Management Incident**"). StakeHound informed the Respondent about this the next day, and asked for its support in order to present a united front against Fireblocks, but to no avail. Unfortunately, StakeHound's attempts to resolve

|  |  |
|---|---|
|  | the issue with Fireblocks were unsuccessful, and StakeHound was compelled to initiate legal proceedings against Fireblocks, which are currently ongoing. |
| 24 | Due to the Key Management Incident, on 22 June 2021, StakeHound had to suspend the operation of the Platform in order to devote its full attention to the recovery of the loss. In particular, in view of the severity of the Incident, StakeHound halted its liquid staking activities with immediate effect ("**Suspension**"). This is in line with the SSTC, which provide as follows: |

> "**2. Termination and access restriction**
>
> […]
>
> The **Company may suspend** an account or a transfer of StakedTokens temporarily and **access to the Platform** or stop any transaction **immediately at any time, without notice, at its sole discretion**."
>
> (Emphasis added)

**D.    The Respondent unjustifiably demands the exchange of its stETH for the same number of ETH**

|  |  |
|---|---|
| 25 | On 12 April 2023, the Unlock Event occurred. |
| 26 | Despite the Key Management Incident and the resulting ongoing Suspension, on 10 and 17 April 2023, the Respondent demanded StakeHound to exchange the stETH it obtained under the SSA for a corresponding number of ETH. In pre-trial exchanges, the Respondent alleged that a failure to immediately turnover the Locked ETH plus Staking Rewards after they are unlocked would give rise to substantial liability under the US bankruptcy code and insinuated that it might take legal action against StakeHound in US courts. |
| 27 | Unsurprisingly and in view of the clear provisions of the SSA and the SSTC, the Respondent failed to specify any legal basis for its unjustified liability threats, let alone to explain why any other forum should have jurisdiction over the Parties' dispute. In fact, the unequivocal, contractually agreed and binding arbitration agreement between the Parties (cf. *infra*, section IV.A) prevails. |
| 28 | As to the Respondent's demand to exchange its stETH for a corresponding number of ETH, the Respondent fails to recognise that, pursuant to section 1.8 SSA and 1.2 SSTC (cited *supra*, paras. 18-19), it only has a right to purchase ETH in exchange for stETH "*upon availability*." As explained on several occasions in pre-trial correspondence, an exchange as requested by the Respondent is currently not possible, given the limited availability of the |

ETHs and the ongoing suspension of the Platform. StakeHound therefore has no obligation to exchange ETH for the Respondent's stETH.

29  In any event, the Respondent misconceives that, if and when StakeHound has any obligation to exchange in accordance with section 1.8 SSA and 1.2 SSTC, the exchange rate will not be at any ratio other than that set by the respective values of ETH and stETH at the time of exchange. This follows from section 1.2 SSTC (cited *supra*, para. 19), which provides that an exchange occurs depending on the *value* of the relevant cryptocurrency, not the *number* of tokens. The Respondent would thus not necessarily be entitled to 1 ETH in exchange for 1 stETH.

30  In view of the Respondent's unjustified demands and the implied threat to initiate US proceedings despite the Parties' Swiss arbitration agreement, StakeHound is compelled to file this Notice of Arbitration with the declaratory prayers for relief sought therein (*infra*, para. 39). The requested declaratory relief will clarify the legal position of StakeHound, is suitable to resolve the Parties' dispute as it will create legal certainty, and thus serves a practical purpose.

## IV.  PROCEDURAL MATTERS

### A.  Arbitration Agreement

31  This Notice of Arbitration is based on the arbitration agreement ("**Arbitration Agreement**") contained in section 10 SSA, which provides as follows:

> "*Any dispute, controversy or claim arising out of or in relation to this contract, including the validity, invalidity, breach or termination thereof, shall be settled by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these Rules.*
>
> *The number of arbitrators shall be one;*
>
> *The seat of the arbitration shall be in Geneva;*
>
> *The arbitral proceedings shall be conducted in English.*"

32  The SSTC contain a virtually identical arbitration clause in section 3a.

### B. Place of the arbitration

33  In accordance with the Arbitration Agreement, the place of the arbitration is Geneva, Switzerland.

### C. Number and appointment of arbitrators

34  Pursuant to the Arbitration Agreement, the dispute shall be resolved by a sole arbitrator.

35  The Claimant will seek to agree with the Respondent on a sole arbitrator in accordance with Article 10(1) of the Swiss Rules.

### D. Language of the arbitration

36  The Arbitration Agreement provides that the language of the arbitration shall be English.

### E. Applicable law

37  Section 9 SSA provides as follows:

> "*This Agreement shall be construed in accordance with the laws of Switzerland.*"

### F. Registration fee

38  In accordance with Article 3(3)(i) of and Appendix B to the Swiss Rules, the Claimant has transferred the registration fee of CHF 8,000 to the Swiss Arbitration Centre.[3]

---

[3] **Exhibit C-002**, Wire confirmation receipt dated 24 April 2023.

## V.  PRAYERS FOR RELIEF

39   For the reasons set out in this Notice of Arbitration and any further factual and legal submissions that will be made in the course of these arbitral proceedings, the Claimant requests that the Sole Arbitrator shall:

   (1)   declare that StakeHound SA's suspension of its crypto trading platform "stakehound.com" due to its security custodian Fireblock's failure to secure the cryptographic keys for approx. 60% of StakeHound SA's Ether tokens (ETH), which is the native cryptocurrency for the Ethereum blockchain and network, does not breach the Staking Services Agreement dated 20 January 2021, including the StakeHound Services Terms and Conditions;

   (2)   declare that StakeHound SA is not obliged vis-à-vis Celsius Network Limited to exchange tokens called "stETH", which were minted and issued by StakeHound SA, for ETH for the duration of the suspension of the operation of the platform "stakehound.com";

   (3)   declare that under the Staking Services Agreement dated 20 January 2021 and the StakeHound Services Terms and Conditions, ETH is exchanged for stETH at the ratio set by the respective values of ETH and stETH at the time of such exchange;

   (4)   order that Celsius Network Limited bear all costs of these arbitral proceedings, including the Sole Arbitrator's fees and expenses, the Swiss Arbitration Centre's costs, the expenses and costs of witnesses and/or experts, as well as the costs incurred by StakeHound SA, such as but not limited to attorney's fees, in-house costs and out-of-pocket expenses related to these proceedings, plus interest at a rate of 5% from the date of the final award until full and final payment;

   (5)   order such other relief as the Sole Arbitrator may deem just and appropriate.

40   The Claimant reserves the right to amend, supplement and correct its prayers for relief in the course of these arbitral proceedings, as may be warranted by the circumstances and as far as permissible under the applicable procedural rules.

* * * * *

Respectfully submitted for and on behalf of the Claimant

_____

Schellenberg Wittmer

Stefan Leimgruber
Benjamin Gottlieb
Nadine Wipf

Exhibits as per separate list