# Exhibit D

# Revenue Sharing Agreement

This Revenue Sharing Agreement (the "Agreement") is made on April 21, 2021 (the "Effective Date") between:

StakeHound SA, incorporated under Swiss law, having its registered offices c/o MN Associés, Place de Longemalle 1, 1204 Genève, Switzerland

("StakeHound")

and

Celsius Network Limited, 1 Bartholomew Lane, London, UK EC2N 2AX

("Client")

StakeHound and the Client are each referred to as a "Party" and together as the "Parties".

WHEREAS

A.  StakeHound offers the service of issuing staked tokens ("stToken(s)"), a one to one representation of a token staked by StakeHound on its platform "stakehound.com" (the "Platform") that distributes, at its sole discretion, staking rewards to stToken holders on a daily schedule. StakeHound is operating the nodes, allowing the stToken holders to use such a token in the decentralized finance ("DeFi") ecosystem.

B.  The Client intends to provide StakeHound with crypto assets that can be used natively to perform a service to a protocol in exchange for a reward (the "Native Tokens") in order for StakeHound to stake them. In exchange, StakeHound will issue stTokens to the Client.

C.  The Parties intend to share the net revenue generated by the Native Tokens brought in by the Client.

D.  This Agreement sets out the terms of the revenue sharing and the rights and obligations of the Parties in relation thereto.

NOW, THEREFORE, the Parties hereby agree as follows:

1. Definitions

'Net Reward' means the total staking rewards of the Native Tokens minus the rewards to be distributed to the users and minus the external costs of operating the system by StakeHound, mainly compliance, custody, staking and transaction fees (where any such deductions are distributed on a pro-rata basis across all StakeHound's staking rewards).

'Native Token(s)' means any crypto asset that can be used natively to perform a service to a protocol in exchange for a reward. Among others, some examples of Native tokens are those used in the Proof-of-Stake blockchains such as ETH2.0 or XEM; masternode protocols such as DASH or XZC; and protocols that use such tokens to ensure the proper function of the protocol, such as REN or MATIC.

'Platform' means the platform of StakeHound to issue Staked Token(s) available at the following website: https://stakehound.com.

'Revenue Share' means the revenue shared between the Client and StakeHound, of the Net Reward generated by the Native Tokens brought in by the Client to StakeHound for the purpose of Staking.

'Reward(s)' means the yield generated by staking the Native Tokens.

'stToken(s)' means staked token(s) issued by StakeHound.

'Staking' means locking crypto assets for a certain period of time and where these locked assets are used to achieve consensus, to secure the network and ensure the validity of every new transaction. Staking allows stTokens holders to earn passive income with their cryptocurrencies.

'Token(s)' means a digital representation of value on a shared distributed ledger that is owned and secured using cryptography to ensure its authenticity and prevent modification or tampering without the owner's consent.

2. Revenue Sharing

2.1    The Parties acknowledge that the StakeHound Services Terms and Conditions available on the Platform fully apply to this Agreement (see Exhibit B, which forms an integral part of this Agreement). In the event of any conflict or inconsistency between the terms and conditions of this Agreement and any terms or conditions set forth in the StakeHound Services Terms and Conditions, the terms and conditions set forth in this Agreement shall prevail.

2.2    The Client may from time to time, in its sole discretion, provide StakeHound with Native Tokens in order for StakeHound to stake them and operate the nodes on the Platform. In exchange StakeHound will issue stTokens to the Client.

2.3    StakeHound hereby agrees to share 25% of the Net Reward generated by the Native Tokens brought in by the Client to StakeHound for the purpose of Staking.

2.4    a) If a stToken holder unwraps stTokens in exchange of Native Tokens on the Platform, irrespective if such stTokens have been acquired through the Client or not, the base amount of the Revenue Share will be adjusted proportionally, based on the total number

of that specific token being held by StakeHound and the amount of Native Tokens being unwrapped.

b) If the Client unwraps stTokens in exchange of Native Tokens on the Platform, the Client will not be entitled to any Revenue Share or any other kind of compensation whatsoever for those tokens.

2.5    The Revenue Share will be paid in stToken on a monthly basis to ensure that there are no unexpected costs that may change the reward distribution.

2.6    For the calculation of the Revenue Share, and the assessment of the performance by StakeHound of its services hereunder, StakeHound shall provide Client, on a quarterly basis and upon request, data and reports setting out the relevant information Client may need to complete such assessments. Stakehound undertakes to provide clear, complete, accurate and not misleading information and documentation in such regard.

2.7    The delivery of any Native Tokens by Client to StakeHound shall be pursuant to both Parties executing a term sheet essentially in the form attached hereto as Exhibit A ("Term Sheet") setting out the type and number of Native Tokens to be transferred to StakeHound, and any specific terms (if any) applicable to the provision of the services in connection with such Native Tokens. In the absence of any specific lockup period (during which the stTokens cannot be exchanged into Native Tokens), such exchange shall be available to Client at any time (subject to the applicable processing time of such exchange).

3. Representations and Warranties

3.1    Each Party makes each of the representations and warranties set forth below to the other Party and each of its representatives at the time of entering into this Agreement and throughout the duration of this Agreement:

   i)      it has the requisite power and authority to enter into this Agreement and perform its obligations under this Agreement;

   ii)     it is duly formed under the jurisdiction of its formation, validly existing and in good standing with all requisite power and authority;

   iii)    No approval, authorization, consent or other order of, permit, qualification, license or decree from, and no filing, registration or recording with, any governmental authority or court having jurisdiction over a Party or any of its affiliates is required for the performance by such Party of its obligations under this Agreement.

3.2    StakeHound undertakes to perform its staking services and operate its Platform with due expertise and care, maintain the safety of its assets, in particular the Native Tokens , and always operate in accordance with the rules of the applicable protocols and networks, and with all applicable laws and regulations.

3.3    Except as expressly set out in this Agreement, StakeHound makes no representations, warranties or conditions, express, implied, or imposed by statute or by law and expressly disclaims, to the maximum extent permitted by law, all other representations,

warranties or conditions, express, implied or imposed by statute, by law or otherwise including any warranties of merchantability, fitness for a particular purpose, and non-infringement.

4    . Indemnification

4.1    To the fullest extent permitted by applicable law, each Party (the "Indemnifying Party") will indemnify, defend and hold harmless the other Party (the "Indemnified Party") and its respective past, present and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns from and against all actual and threatened claims, lawsuits, demands, actions, investigations (whether formal or informal), liabilities, obligations, judgments, damages, penalties, interests, fees, losses, expenses (including attorneys' fees and expenses), and costs (including, without limitation, court costs, costs of settlement, and costs of pursuing indemnification and insurance), of every kind and nature whatsoever, claimed by third parties including governmental authorities, whether known or unknown, foreseen or unforeseen, matured or unmatured, or suspected or unsuspected, in law or equity, whether in tort, contract, or otherwise arising from or relating to: (i) Indemnifying Party's breach of its responsibilities or obligations under this Agreement, (ii) any inaccuracy in any representation or warranty of Indemnifying Party; and/or (iii) any act or omission of Indemnifying Party that is negligent, unlawful or constitutes willful misconduct. For avoidance of doubt, nothing contained herein shall limit or restrict the Indemnified Party's right to maintain or recover any amounts in connection with any action or claim based upon intentional misstatement, fraudulent misrepresentation, gross negligence or deceit.  Indemnified Party reserves the right to exercise sole control over the defense, at Indemnifying Party expense, of any claim subject to indemnification as above.

5. Confidentiality

5.1    "Confidential Information" means all non-public information, in any form, that one Party or anyone on its behalf (the "Disclosing Party") may disclose, provide or give access to the other Party or anyone on its behalf (the "Receiving Party"). The Parties hereto each undertake that they will not at any time hereafter divulge or communicate to any person (other than where relevant to their officers, employees or professional advisers whose position makes it necessary to know the same) any Confidential Information or make any use of the Confidential Information of the Disclosing Party other than for the purpose of performing its obligations under this Agreement. Confidential Information shall include the Parties' business or affairs and the content of this Agreement, except for such information that:

(i)    was known or used by the Receiving Party or its affiliates prior to its date of disclosure to the Receiving Party as demonstrated by legally admissible evidence available to the Receiving Party or its affiliates;

(ii)    either before or after the date of the disclosure to the Receiving Party is lawfully disclosed to the Receiving Party or its affiliates by sources other than the Risclosing Party rightfully in possession of the Confidential Information and not in breach of any confidentiality obligation;

(iii)   either before or after the date of the disclosure to the Receiving Party becomes published or otherwise part of the public domain through no fault or omission on the part of the Receiving Party or its affiliates;

(iv)   is independently developed by or for the Receiving Party or its affiliates without reference to or in reliance upon the Confidential Information as demonstrated by competent written records; or

(v)   is required to be disclosed by the Receiving Party to comply with applicable laws or regulations or to defend or prosecute litigation, provided that the Receiving Party provides prior written notice of such disclosure to the Disclosing Party and takes reasonable and lawful actions to avoid or minimize the degree of such disclosure.

5.2   The provisions of this Section 4 shall survive the termination of this Agreement.

6   . Non-solicitation

During the term of this Agreement and for a period of twelve (12) months following its termination, the Parties shall not make any attempt to employ or otherwise solicit any of the other Party's personnel, whether on behalf of itself or a third party, without the prior written consent of that Party, which may be given or withheld at such Party's sole discretion.

7. Entry into force and Termination

7.1   The Agreement is effective as of the Effective Date and is concluded for an indefinite period of time.

7.2   Each Party may terminate this Agreement at any time with a prior written notice of 30 days to the other Party. The termination of this Agreement shall not affect any outstanding payment obligation between the Parties, nor Client's ability to continue to hold, use and exchange any stTokens against Native Tokens via the Platform, in accordance with the StakeHound Services Terms and Conditions. Sections 4 to 10 of this Agreement shall continue to apply, regardless of termination of this Agreement.

8. Miscellaneous

8.1 No Agency; No Third Party Beneficiaries

Nothing in this Agreement and no action taken by the Parties pursuant to this Agreement shall constitute, or be deemed to constitute, either Party the agent of the other Party for any purpose. No Party has, pursuant to this Agreement, any authority or power to bind or to contract in the name of the other Party. This Agreement does not create any third party beneficiary rights in any person. In particular and for sake of clarity, StakeHound is not acting as a custodian or managing funds of third parties, as it is the owner of the Assets.

8.2 Notices

Any notice or communication required or permitted under this Agreement shall be sufficiently given if delivered in person or by email to the relevant Party's contact person:

The contact person for StakeHound is: Albert Castellana, CEO
email: albert@stakehound.com.

The contact persons for the Client are:
    (i)      Roni Cohen Pavon, CRO – email Roni@celsius.network
    (ii)     Ron Sabo, Head of Research – email ron.sabo@celsius.network

### 8.3 Assignment

Neither Party may assign or transfer the responsibilities or agreement made without the prior written consent of the non-assigning Party, which approval shall not be unreasonably withheld.

### 8.4 Amendment

None of the terms or provisions of this Agreement may be amended, supplemented or otherwise modified except by a written instrument executed by the Parties.

### 8.5 Entire Agreement

This Agreement together with appendices constitute the whole and only agreement between the Parties and supersedes and extinguishes any prior agreements, undertakings and arrangements of any nature whatsoever whether or not in writing relating thereto.

### 8.6 Severability

If any provision or any portion of any provision contained in the Agreement is invalid, illegal or unenforceable, the remaining provisions, and if a portion of any provision is unenforceable, the remaining portion of such provision shall, nevertheless, remain in full force and effect. The Parties undertake to negotiate in good faith with a view to replace such invalid, illegal or unenforceable provision or part thereof with another provision not so invalid, illegal or unenforceable with the same or similar effect.

### 8.7 No Waiver

The failure by any Party to this Agreement to enforce at any time or for any period of time any provision of this Agreement shall not be construed as a waiver of such provision or of the right of such Party thereafter to enforce each and every such provision of this Agreement.

### 9. Governing Law

This Agreement shall be construed in accordance with the laws of Switzerland.

### 10. Arbitration

Any dispute, controversy or claim arising out of or in relation to this contract, including the validity, invalidity, breach or termination thereof, shall be settled by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these Rules.

The number of arbitrators shall be one;

The seat of the arbitration shall be in Geneva;

The arbitral proceedings shall be conducted in English.

This Agreement is made in two (2) original copies.

DocuSigned by:

*Albert Castellana*

BB64000244204DE

Albert Castellana, CEO
For and on behalf of StakeHound SA

DocuSigned by:

*Roni Cohen Pavon*

C988F4BD9B5D482

Roni Cohen Pavon, CRO
For and on behalf of Celsius Network Limited

EXHIBIT A
**Term Sheet**

This Term Sheet is entered into pursuant to that certain Revenue Sharing Agreement dated 21 April 2021 ("**Agreement**") by and between Celsius Network Limited ("**Celsius**") and StakeHound SA ("**StakeHound**") to regulate the delivery of those certain Native Tokens set out below by Celsius to StakeHound for the provision by StakeHound of the services as set out in the Agreement:

| | |
|---|---|
| **Token Type:** | |
| **Number of Tokens:** | |
| Celsius Token wallet address: | |
| **Stakehound Token wallet address:** | |
| **Lockup period:** | € No<br>€ Yes:_____ |
| **Agreed termination date:** | € No<br>€ Yes:_____ |
| **StakedToken Network  :** | |
| **Celsius StakedToken wallet address:** | |
| **Special terms (if any):** | |

_____

**Albert Castellana, CEO**
For and on behalf of **StakeHound SA**


_____


_____

For and on behalf of **Celsius Network Limited**

## EXHIBIT B

## STAKEHOUND SERVICES TERMS AND CONDITIONS

The following definitions and rules of interpretation apply in these Terms and Conditions.

### Definitions.

**'Blockchain'** means a distributed ledger technology (DLT) in the form of a growing list of records called blocks that are linked using cryptography. Each block contains a cryptographic hash of the previous block, a timestamp and a transaction data.

**'Company'** means StakeHound SA, a company incorporated under Swiss law with its registered offices at Place Longemalle 1, c/o MN & Associés, 1204 Geneva, Switzerland.

**'Company Parties'** shall mean the Company's respective past, present and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns.

**'DAO'** means a decentralized autonomous organization, in other words an organization represented by rules encoded on the blockchain and controlled by the organization members.

**'DeFi'** means decentralized finance protocols such as Uniswap, Aave, Curve or Synthetix.

**'Dispute'** shall mean any dispute, controversy or claim arising out of, relating to or in connection with this Agreement, including with respect to the formation, applicability, breach, termination, validity or enforceability thereof.

**'Eligible User'** as such term is defined under Exhibit C.

**'FINMA Guidelines on ICO'** shall mean the Swiss Financial market Supervisory Authority (FINMA) Guidelines for enquiries regarding the regulatory framework for initial coin offerings and the Stable coins framework "**Supplement to the Guidelines**" dated September 11th 2019.

**'KYC'** and **'AML'** mean 'Know Your Customer', (KYC), and 'Anti-Money Laundering', (AML), and these refer to the required due diligence checks which all financial intermediaries are required to carry out on any person or entity wishing to transfer funds.

**'Platform'** means the platform of the Company to issue Staked Token(s) available at the following website: https://stakehound.com.

**'Proof of Stake (PoS)'** means the verification of the authenticity of transactions by producing and validating new blocks without the need of a centralized third party through the process of Staking. Every Proof of Stake Blockchain has a specific set of rules for its Validators.

**'Restricted Countries'** shall mean any jurisdiction into which the release, publication, circulation and distribution, of the Staked Token is excluded, directly or indirectly, as further described in Appendix A.

**'Restricted Person(s)'** shall mean any person located or domiciled, including without limitation, any corporation or partnership created or organized in or under the relevant applicable laws, of the Restricted Countries who are not allowed to use the Services of the Platform.

**'Reward(s)'** means the yearly yield generated by liquidity mining with Native Tokens holdings locked in custody.

**'Services'** as such term is defined under article 1 hereunder.

**'Staked Token(s)'** means token(s) issued by the Company.

**'Native Token(s)'** means any crypto asset that can be used natively to perform a service to a protocol in exchange for a reward. Among others, some examples of Native Tokens are those used in the Proof-of-Stake blockchains such as ETH2.0 or XEM; masternode protocols such as DASH or XZC; and protocols that use such tokens to ensure the proper function of the protocol, such as REN or MATIC.

**'Staking/Stake'** means locking crypto assets for a certain period of time and where these locked assets are used to achieve consensus, to secure the network and ensure the validity of every new transaction. Staking allows users to earn passive income with their cryptocurrencies.

**'Token(s)'** means a digital representation of value on a shared distributed ledger that is owned and secured using cryptography to ensure its authenticity and prevent modification or tampering without the owner's consent.

**'Validator(s)'** means those who Stake their coins and who are rewarded with new coins from the network for locking their assets and providing services to the Blockchain. Validators that Stake larger amounts of coins have a higher chance of being chosen as the next Validator.

**'User or You/Your'** means a person using the Service of the Company through the Platform under these Terms and Conditions..

**'Us', 'Our'** or **'We'** refers to the Company as defined above.

***

These Terms govern the Services and the use of the Platform of StakeHound SA, a private limited company incorporated in Switzerland, whose registered office is rue Place Longemalle 1, c/o MN & Associés SA, 1204 Geneva, with a share capital of CHF 100'000.- divided into 10'000'000 registered shares of CHF 0.01.- each.

In order to use our Services, you must read, accept and agree to be bound by these Terms and Conditions at all times. These Terms take effect when you click an "**I have read, understood and hereby agree with the Terms**" button, check box or other indicator of agreement presented with these Terms. By using our Services, you will be bound by these Terms and all terms incorporated by reference.

If you have any questions relating to these Terms, please contact us at hello@stakehound.com before you click to accept them.

You and the Company agree as follows:

1. **Services of the Company**

In order to benefit from the Services, the User should own Native Token(s) or Staked Token(s) and must register on the Platform subject to a KYC/AML due diligence process as described under article 2 of these Terms and Conditions.

The Services of the Platform are as follows:

1.  <u>Staking</u>

Subject to satisfactory completion of the KYC/AML due diligence process, the User will use the service of staking of the Platform by sending his Native Token(s) as a payment to the Company. Upon receipt of the Native Token(s), the Company will instantly mint and issue

Staked Token(s) and operate the nodes, allowing the User to use such Token in the DeFi ecosystem. For the avoidance of doubt, the Company will have the ownership of the Native Token, as the latter is used to pay the Staking Services of the Company.

The Native Token owned by the Company might generate Reward over time. The Company, at its sole discretion, can allocate part of the Reward to the User, holder of Staked Token(s). If the Company allocates some of the Reward to the User, the latter can, at its sole discretion and upon demand, donate a portion of his Reward to a Liquidity DAO.

Additional information to illustrate the use of the Staked Token are provided on the Platform. However, the information on the Platform is for information purposes only and **may be updated or amended at any time by the Company**. Only these Terms and Conditions contain the Services conditions and are contractually binding. When deciding to use the Services, the User shall rely on these Terms and Conditions, not the Platform.

1.    Purchasing Native Tokens

Subject to satisfactory completion of the KYC/AML due diligence process, the User, holder of Staked Token(s), may buy upon availability Native Token(s) with his Staked Token(s), at the same value in the equivalent crypto currency.

Users agree to use the Platform and any related material and request Services, at their own and sole risk.

The Platform, related materials, the payment processing and other tasks are provided on an "as is", "with all faults" and "as available" basis. Users expressly agree that the use of the Platform, related materials, the payment processing and other tasks are at their sole risk. To the fullest extent permitted by applicable law, the Company makes no representations or warranties of any kind, express or implied, as to the operation of the Platform, related materials, the payment processing or other tasks, and disclaims any and all representations or warranties of any kind, express or implied, including without limitation: (a) any implied warranties of merchantability, fitness for a particular purpose, title, or non-infringement; (b) any warranty that the Platform, related materials, the payment processing or other tasks will meet Users' requirements, will always be available, accessible, uninterrupted, timely, secure, operate without error, or will contain any particular features or functionality; (c) any warranty that the information, content, materials, or submissions included on the Platform will be as represented by Users that the tasks are lawful, or that Users will perform as promised or to Users' satisfaction; or (d) any implied warranty arising from course of dealing or usage of trade.

**1.    KYC/AML Requirements**

The use of the Services may be prohibited in certain jurisdictions and it is your sole responsibility as a User to ascertain whether the use of the Services is allowed in the jurisdictions in which you live or do business. However, if you live and/or operate in a Restricted Country as described under Exhibit A, you may not pass the KYC/AML checks.

The Company uses the services of a KYC/AML provider for the purposes of carrying out the internationally required KYC and AML checks on all Users of the Platform. In turn, in accordance with legislation, the KYC/AML provider requires different levels of information and a slightly different procedure depending on the total value in Swiss Francs being transacted and whether you are an individual or a corporation, a Swiss resident or not. The different tiers of value are as described below:

    i.    Tier 1 is a value up to CHF 3'000.- and requires you to provide your full name, home address, nationality, email, phone number, proof of address, passport or other acceptable photo id, banking details, crypto address (if any), and the completion of Form A which is the internationally recognised 'Declaration of Ultimate Beneficial Owner of Funds'.

    ii.    Tier 2 is a value of CHF 3'000.- up to CHF15'000.- which requires you to provide the same information as Tier 1 plus, if you are a corporation, corporate documents and completion of Form K (indicating persons with an ownership interest of 25% or more), and, if you are a Swiss individual or corporation, a video conference.

    iii.    Tier 3 is a value of CHF 15'000.- up to CHF 100'000.- which requires you to provide the same information as Tier 2 plus proof of fiat and/or crypto funds, proof of residence for Swiss Individuals and video conference for non-Swiss individuals and corporations.

    iv.    Tier 4 is a value of CHF 100'000.- up to CHF1'000'000.- same as Tier 3.

    v.    Tier 5 is a value in excess of CHF 1'000'000.- which requires you to provide the same information as Tier 4 plus a physical meeting if you are an individual, or if you are a corporation with shareholders.

**1.**    **Specifications of Staked Tokens**

By using our Services, you acknowledge that you understand and have no objection to the following specifications of the Staked Tokens:

a.    <u>Payment Token</u>. The Staked Tokens are considered under Swiss laws and regulation as cryptocurrencies and qualify, from a Swiss regulatory and legal perspective, as a "payment token" as such term is defined in the FINMA Guidelines on ICO.

The Company is currently seeking to obtain a no-action letter from FINMA confirming that the Staked Tokens are not subject to the Swiss Banking and Financial laws, including the Federal Act on Collective Investment Schemes and the Federal Act on Financial Market Infrastructure.

The Staked Tokens provides with no right comparable to the ones of a share, bond, participation rights, structured products, mutual fund/collective investment schemes/investment fund, derivatives or other type of securities under Swiss law. The Staked Tokens and the Company are not subject to the authorization or supervision by the FINMA.

b.    <u>AMLA.</u> The Staked Tokens should qualify as a payment token and is thus subject to the Anti-Money Laundering Act (AMLA). In this regards, the Company has mandated a Swiss financial intermediary subject to AML (the KYC/AML Provider, as later defined) to perform KYC verifications prior to issuing the Staked Token.

c.    <u>No Representations and Warranties</u>. The Company does not make any representations or warranties, express or implied, including, without limitation, any warranties of title or implied warranties of merchantability or fitness for a particular purpose with respect to the Staked Tokens or their utility, or the ability of anyone to purchase or use the Staked Tokens. Without limiting the foregoing, the Company does not represent or warrant that the process of Staking or purchasing the Staked Tokens will be uninterrupted or error-free or that the Staked Tokens are reliable and error-free.

If you did not understand any of the concepts identified in these Terms and Conditions, please contact us at <mark>hello@stakehound.com</mark> before agreeing to the Terms and Conditions. By agreeing to the Terms and Conditions, you confirm that you understood any and all concepts described in these Terms and Conditions to your satisfaction.

1.    **No Rights Created**

The Native Tokens or the Staked Tokens: (a) does not provide you with rights of any form with respect to the Company or its revenues or assets, including, but not limited to, any dividend, voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property), or other financial or legal rights; (b) is not a loan to the Company; and (c) does not provide you with any ownership or other interest in the Company.

The Company retains all right, title and interest in all of Company's intellectual property, including, without limitation, inventions, ideas, concepts, code, discoveries, processes, marks, methods, software, compositions, formulae, techniques, information and data, whether or not patentable, copyrightable or protectable in trademark, and any trademarks, copyright or patents based thereon. You may not use any of Company's intellectual property for any reason without Company's prior written consent.

1.    **Acknowledgment and Assumption of Risks**

You expressly acknowledge that you have carefully reviewed, understand and assume the risks associated with the Services and the use of the Staked Tokens or Native Tokens purchased from the Company, as disclosed and explained in **Exhibit B**. If you have any questions regarding these risks, please contact us at hello@stakehound.com. BY USING OUR SERVICES, YOU EXPRESSLY ACKNOWLEDGE AND ASSUME THESE RISKS.

1.    **Security**

   a.   Your Security. If your private key(s) or other access credentials are lost, you may lose access to your Staked Tokens or Native Tokens purchased from the Company. We are not responsible for any such losses. You will implement reasonable and appropriate measures designed to secure access to (i) any device connected with the email address associated with your account, (ii) private keys required to access your Staked Tokens or Native Tokens purchased from the Company and (iii) your username, password and any other login or identifying credentials. In the event that you are no longer in possession of your private keys or any device associated with your account or you are not able to provide your login or identifying credentials, you may lose all of your Staked Tokens or Native Tokens purchased from the Company and/or access to your account. The Company is under no obligation to recover any lost Staked Tokens or Native Tokens purchased from the Company.

   b.   Additional Information. You undertake to provide us, or our KYC/AML provider, immediately upon request, with any information we deem to be required to maintain compliance with any federal, state, local, domestic or foreign law, regulation or policy, including any "Know Your Customer" requirements and policies. Such information may include a passport, driver's license, utility bill, photograph of you, government identification cards, or sworn statements, and we or our KYC/AML provider may keep a copy of such information.

   c.   Your Information. We may use aggregate statistical information about your activity for marketing or any other purpose in our sole discretion. However, we will not release your personally-identifying information to any third party without your consent, except as not prohibited by law or as set forth in these Terms and Conditions, all of which you have agreed to.

   d.   KYC Process. You accept that you will receive your Staked Tokens or Native Tokens only after having successfully passed through our KYC process under the Swiss Anti-Money Laundering Act of October 10, 1997 ("**AMLA**") as further described in Section2. This means that the Staked Tokens will not be issued until you have passed through this screening successfully. If you fail to pass the KYC screening you will not receive

your Staked Tokens. No payment will be accepted by the Company until you have fulfilled all the requirements of the KYC process.

**1.      Personal Information**

We may determine, in our sole discretion, that it is necessary to obtain certain information about you in order to comply with applicable law or regulation in connection with the use of the Services. You agree to provide us such information promptly upon request and acknowledge that we may refuse to provide Services to you until you provide such requested information.

Please refer to our Privacy Policy and Cookie Policy of our Platform for information about how we collect, use and share your information.

**1.      Representations and Warranties**

By using our Services, you represent and warrant that:

(a) You have read and understood these Terms (including all Exhibits to which these Terms also apply);

(b) You are not a Restricted Person as such term is defined under **Exhibit A**;

(c) You are an Eligible User as such term is defined under **Exhibit B**;

(d) You have the necessary authority and consent to accept these Terms and Conditions, to enter into a binding agreement with the Company and to perform the obligations set out herein;

(e) The acceptance of these Terms and the entry into a binding agreement with the Company shall not result in any breach of, be in conflict with, or constitute a material default under: (i) any provision of the User's constitutional or organizational documents (in the case of a corporate entity including, without limitation. any company or partnership); (ii) any provision of any judgment, decree or order imposed on the User by any court or governmental or regulatory authority; and/or (iii) any material agreement, obligation, duty or commitment to which the User is a party or by which the User is bound or (d) any laws, regulations or rules applicable to User;

(f) The execution and delivery of, and performance under these Terms and Conditions require no approval or other action from any governmental authority or person other than you;

(g) You have all requisite power and authority to execute and deliver these Terms and Conditions and to carry out and perform your obligations under these Terms and Conditions;

(h) If you are an individual, you are at least 18 years old and of sufficient legal age and capacity to use the Services;

(i) If you are an entity, the User is duly organized, validly existing and in good standing under the laws of its domiciliary jurisdiction and each jurisdiction where it conducts business;

(j) You have sufficient knowledge and experience in business matters, including a sufficient understanding of blockchain or cryptographic tokens and other digital assets, smart contracts, storage mechanisms (such as digital or token wallets), staking, PoS protocols, blockchain-based software systems and blockchain technology, to be able to evaluate the risks and merits of your decision to use our Services including but not limited, to the matters set forth in these Terms and Conditions, and are able to bear the risks thereof;

(k) You understand that the Staked Tokens or the Native Tokens purchase from the Company confer only the right to use a cryptocurrency and confer no other rights of any form with respect to the Company or its corporate affiliates, including, but not limited to, any dividend, voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property), or other  financial or legal rights;

(l) You understand, acknowledge and assume the risks associated with the use of Services and of the Staked Tokens or the Native Tokens purchased from the Company, as explained and disclosed in **Exhibit B** and that you are able to bear such risks;

(m) To the extent required by applicable law, you comply with AMLA, any other applicable anti-money laundering rules including, but not limited to (a) any applicable money laundering statutes of all jurisdictions in which you are located, resident, organized or operate, and the rules and regulations thereunder, and/or (b) any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental authority to which you are subject;

(n) You will provide to the Company, or to its KYC/AML provider, immediately upon request, information and documents that Company, in our sole discretion, deems necessary or appropriate in order to maintain compliance with any federal, state, local, domestic or foreign law, regulation or policy, including any "Know Your Customer" requirements and policies or any judicial process. Such information or documents may include but are not limited to, passports, driver's licenses, utility bills, photographs, government identification cards or sworn statements, or, if you are an entity, proof of legal existence such as a government-issued certificate of incorporation or notarized formation documents, and we, or our nominee, may keep a copy of such information and disclose such information and documents in order to comply with applicable laws, regulations, rules or agreements. You acknowledge that the Company may refuse to issue the Staked Tokens to you until such requested information is provided;

(o) You agree not to allow anyone to use your wallet or share your user credentials with any other person for the purpose of facilitating their unauthorized access to the Platform. If you do share your user credentials with anyone we will consider their activities to have been authorized by you. You alone are responsible for any acts or omissions that occur through the use of your user credentials. We reserve the right to suspend or block your access to the Platform upon suspicion of any unauthorized access or use, or any attempted access or use, by anyone associated with your user credentials.


1.    **Indemnification**

(a) To the fullest extent permitted by applicable law, you will indemnify, defend and hold harmless the Company and our respective past, present and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns from and against all actual and threatened claims, lawsuits, demands, actions, investigations (whether formal or informal), liabilities, obligations, judgments, damages, penalties, interests, fees, losses, expenses (including attorneys' fees and expenses), and costs (including, without limitation, court costs, costs of settlement, and costs of pursuing indemnification and insurance), of every kind and nature whatsoever, whether claimed by the Company Parties or third parties including governmental authorities, whether known or unknown, foreseen or unforeseen, matured or unmatured, or suspected or unsuspected, in law or equity, whether in tort, contract, or otherwise arising from or relating to: (i) your use of the Services or of the Staked Tokens in violation of these Terms or any other applicable terms, (ii) your responsibilities or obligations under these Terms, (iii) your violation of these Terms or any other applicable terms, (iv) any inaccuracy in any representation or warranty of the User; and/or (v) any act or omission of the User that is negligent, unlawful or constitutes willful misconduct. For avoidance of doubt, nothing contained herein shall limit or restrict the Company Parties'

right to maintain or recover any amounts in connection with any action or claim based upon intentional misstatement, fraudulent misrepresentation, gross negligence or deceit.

(b) The Company reserves the right to exercise sole control over the defense, at your expense, of any claim subject to indemnification under Section 9(a). This indemnity is in addition to, and not in lieu of, any other indemnities set forth in a written agreement between you and the Company.

## 1.    Disclaimers

The Company expressly disclaims any and all responsibility for any direct or consequential loss or damage of any kind whatsoever arising directly or indirectly from *(i)* reliance on any information contained in the Platform, *(ii)* any error, omission or inaccuracy in any such information or *(iii)* any action resulting from such information.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS OTHERWISE SPECIFIED IN WRITING BY US, (A) THE STAKED TOKENS ARE ISSUED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, AND WE EXPRESSLY DISCLAIM ALL WARRANTIES AND REPRESENTATIONS RELATING TO THE STAKED TOKENS (WHETHER EXPRESS OR IMPLIED), INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT, WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE; (B) WE DO NOT REPRESENT OR WARRANT THAT THE STAKED TOKENS ARE RELIABLE, CURRENT, ERROR-FREE, OR DEFECT-FREE, MEET YOUR REQUIREMENTS, OR THAT ANY DEFECTS WILL BE CORRECTED; AND (C) WE CANNOT AND DO NOT REPRESENT OR WARRANT THAT THE STAKED TOKENS OR THE DELIVERY MECHANISM FOR THE STAKED TOKENS ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

YOU UNDERSTAND THAT TOKENS AND DISTRIBUTED LEDGER TECHNOLOGY ARE NEW AND UNTESTED TECHNOLOGIES OUTSIDE OF OUR CONTROL AND ADVERSE CHANGES IN MARKET FORCES OR TECHNOLOGY WILL EXCUSE OUR PERFORMANCE UNDER THESE TERMS.

TRANSACTIONS USING DISTRIBUTED LEDGER TECHNOLOGY, SUCH AS THOSE INVOLVING THE STAKED TOKEN, ARE AT RISK TO MULTIPLE POTENTIAL FAILURES, INCLUDING HIGH NETWORK VOLUME, COMPUTER FAILURE, DISTRIBUTED LEDGER FAILURE OF ANY KIND, USER FAILURE, COIN THEFT, AND NETWORK HACKING. WE ARE NOT RESPONSIBLE FOR ANY LOSS OF DATA, COINS, HARDWARE OR SOFTWARE RESULTING FROM ANY TYPES OF FAILURES, THEFT, OR HACK.

## 1.    Limitation of Liability

   a.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW: (I) IN NO EVENT WILL THE COMPANY OR ANY OF THE COMPANY PARTIES BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY LOSSES OR DAMAGES OF ANY KIND (INCLUDING, BUT NOT LIMITED TO, WHERE RELATED TO LOSS OF REVENUE, INCOME OR PROFITS, DIMINUTION OF VALUE, LOSS OF USE OR DATA, LOSS OR DEPLETION OF GOODWILL, LOSS OF BUSINESS OPPORTUNITY, LOSS OF CONTRACT, DAMAGES FOR BUSINESS

INTERRUPTION, LOSS OF ANTICIPATED SAVINGS, OR THE LIKE) ARISING OUT OF OR IN ANY WAY RELATED TO THE USE OF STAKED TOKEN OR OTHERWISE RELATED TO THESE TERMS AND CONDITIONS, REGARDLESS OF THE FORM OF ACTION, WHETHER BASED IN CONTRACT, TORT (INCLUDING, BUT NOT LIMITED TO, SIMPLE NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), OR ANY OTHER LEGAL OR EQUITABLE THEORY (EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE); AND (II) IN NO EVENT WILL THE AGGREGATE LIABILITY OF COMPANY AND THE COMPANY PARTIES (JOINTLY), WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), OR OTHER THEORY, ARISING OUT OF OR RELATING TO THESE TERMS OR THE USE OF OR INABILITY TO USE THE STAKED TOKEN, EXCEED THE AMOUNT YOU PAY OUR SERVICES.

b.  THE LIMITATIONS SET FORTH IN THIS SECTION 11 (a) WILL NOT LIMIT OR EXCLUDE LIABILITY FOR THE GROSS NEGLIGENCE, FRAUD OR INTENTIONAL, WILLFUL OR RECKLESS MISCONDUCT OF THE COMPANY.

**1.    Release**

To the fullest extent permitted by applicable law, you release the Company Parties from responsibility, liability, claims, demands, and/or damages (direct and indirect) of every kind and nature, known and unknown (including, but not limited to, claims of negligence), arising out of or related to disputes between you and the acts or omissions of third parties.

YOU EXPRESSLY WAIVE ANY RIGHTS YOU MAY HAVE UNDER ANY OTHER STATUTE OR COMMON LAW PRINCIPLES THAT WOULD OTHERWISE LIMIT THE COVERAGE OF THIS RELEASE TO INCLUDE ONLY THOSE CLAIMS WHICH YOU MAY KNOW OR SUSPECT TO EXIST IN YOUR FAVOR AT THE TIME OF AGREEING TO THIS RELEASE.

**1.    Data Protection**

We collect personal data from a variety of sources which include personal data you give us directly, for instance upon an information request in accordance with Section 2 of these Terms and Conditions, or that we collect automatically or form other sources.

Please refer to our Privacy Policy and Cookie Policy for further information.

**2.    Termination and access restriction**

If a User fails, or the Company suspects that a User has failed to comply with any of the provisions of these Terms and Conditions, or any applicable laws or regulations, the Company may at its sole discretion, without notice immediately terminate the User's right to access the Platform and/or its account. The User shall remain liable for all amounts due under its account on the Platform to the Company.

Users may delete their account on the Platform at any time.

The Company may suspend an account or a transfer of StakedTokens temporarily and access to the Platform or stop any transaction immediately at any time, without notice, at its sole discretion.

The Company reserves the right to deny, deactivate, or terminate a User's transaction for any reason at its own discretion.

**3.    Dispute Resolution; Arbitration**

PLEASE READ THE FOLLOWING SECTION CAREFULLY BECAUSE IT CONTAINS CERTAIN PROVISIONS, SUCH AS A BINDING ARBITRATION SECTION AND CLASS ACTION WAIVER, WHICH AFFECT YOUR LEGAL RIGHTS. THIS CLAUSE REQUIRES YOU TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH THE COMPANY AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM US.

a.  Binding Arbitration. Any dispute, controversy or claim arising out of or in connection with these Terms and Conditions, including the validity, invalidity, breach or termination thereof, shall be decided by arbitration pursuant to the International Arbitration Rules of the Swiss Chamber of Commerce ("Rules") in force at the date at which the notification of arbitration is formally deposited in accordance with the Rules. The number of arbitrators shall be one. The seat of the arbitration shall be in Geneva. The arbitral proceedings shall be conducted in English. The arbitration award shall be final and binding on the Parties.

b.  No Class Arbitrations, Class Actions or Representative Actions. Any dispute arising out of or related to these Terms and Conditions is personal to you and the Company and will not be brought as a class arbitration, class action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a dispute as a representative of another individual or group of individuals. Further, a dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or on behalf of any other individual or group of individuals.

c.  Notice; Informal Dispute Resolution. Each Party will notify the other Party in writing of any dispute within thirty (30) days of the date it arises, so that the Parties can attempt in good faith to resolve the dispute informally. Notice to the Company shall be sent by e-mail to the Company at hello@stakehound.com. Notice to you shall be sent to any address you provide to us in writing in a notice. Your notice must include (i) your name, postal address, email address and telephone number, (ii) a description in reasonable detail of the nature or basis of the dispute, and (iii) the specific relief that you are seeking. If you and the Company cannot agree how to resolve the dispute within thirty (30) days after the date that the notice is received by the applicable Party, then either you or the Company may, as appropriate and in accordance with this Section 15, commence an arbitration proceeding.

d.  Governing Law and Venue. These Terms and Conditions shall be governed in all respects, including as to validity, interpretation and effect, by the laws of Switzerland, without giving effect to its principles or rules of conflict of laws, to the extent such principles or rules are not mandatorily applicable by statute and would permit or require the application of the laws of another jurisdiction.

**4.    Miscellaneous**

a.  Assignment. You shall not assign these Terms and Conditions without the prior written consent of the Company. Any assignment or transfer in violation of this Section 16 (a) will be void. The Company may assign these Terms to an affiliate. Subject to the foregoing, these Terms, and the rights and obligations of the Parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. Any purported assignment in violation of this provision shall be void.

b.  Entire Agreement. These Terms and Conditions, including the Exhibits below and the materials incorporated herein by reference, constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous agreements and

understandings, both written and oral, between the Parties with respect to the subject matter hereof, including, without limitation, any public or other statements or presentations made by any Company Party about the Services. To the extent any of the exhibits or materials incorporated by reference contradict anything contained in these Terms and Conditions, the provisions of these Terms and Conditions shall prevail. No Party shall be liable or bound to other Party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein or therein.

c.  Severability. If any provision of these Terms and Conditions is determined by a court of competent jurisdiction to be invalid, inoperative or unenforceable for any reason, the provision shall be modified to make it valid and, to the extent possible, effectuate the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

d.  Modification of Terms and Conditions. We may modify these Terms and Conditions at any time by, at our sole discretion, posting a revised version on the Platform, other channels we make available or, only if you have provided us with an email address, by email. The modified provisions will become effective upon posting or the date indicated in the posting, or if we notify you by email, as stated in the email. It is your responsibility to check the Platform and other channels regularly for modifications. Your continued use of the Services after any modification become effective constitutes your acceptance of the modification. Please contact us by email at hello@stakehound.com if you do not accept any modifications. We last modified these Terms on the date listed at the beginning of these Terms and Conditions.

e.  No Waivers. The failure by the Company to exercise or enforce any right or provision of these Terms and Conditions will not constitute a present or future waiver of such right or provision nor limit the Company's right to enforce such right or provision at a later time. All waivers by the Company must be unequivocal and in writing to be effective.

f.  No Partnership; No Agency; No Third Party Beneficiaries. Nothing in these Terms and Conditions and no action taken by the Parties shall constitute, or be deemed to constitute, a partnership, association, joint venture or other co-operative entity between the Parties. Nothing in these Terms and no action taken by the Parties pursuant to these Terms shall constitute, or be deemed constitute, either Party the agent of the other Party for any purpose. No Party has, pursuant to these Terms, any authority or power to bind or to contract in the name of the other Party. These Terms do not create any third party beneficiary rights in any person.

g.  Electronic Communications. You agree and consent to receive electronically all communications, agreements, documents, receipts, notices and disclosures (collectively "**Communications**") that the Company provides in connection with the Services. You agree that the Company may provide these communications to you by posting them on the Platform, by emailing them to you at the email address you provide and/or by sending an SMS or text message to a mobile phone number that you provide. Your carrier's normal, messaging, data and other rates and fees may apply to any mobile communications. You should maintain copies of electronic communications by printing a paper copy or saving an electronic copy. You may withdraw your consent to receive electronic communications by sending a withdrawal notice to hello@stakehound.com. If you decline or withdraw consent to receive electronic communications, the Company may suspend or terminate your ability to use the Services.

Force majeure. You understand and agree that the Company shall not be liable and disclaims all liability to you in connection with any force majeure event, including acts of God, change of legislation because tokens are new and not regulated, labour disputes or other industrial disturbances, electrical, telecommunications, hardware, software or other utility failures,

software or smart contract bugs or weaknesses, earthquakes, storms, or other nature-related events, blockages, embargoes, riots, acts or orders of government, acts of terrorism or war, technological change, changes in interest rates or other monetary conditions, and, for the avoidance of doubt, changes to any blockchain-related protocol.

## Exhibit A

### GENERAL RESTRICTIONS

The Staked Tokens are issued to owners of Native Tokens in Switzerland and in certain jurisdictions - other than Switzerland - provided that such issuance is not subject to specific limitations under such applicable laws and complies with the requirements of such applicable laws.

Persons who are in possession of these Terms and Conditions are expressly required to inform themselves about applicable laws and regulations as well as to observe and comply with such restrictions. These Terms and Conditions may not be communicated, used for or in connection with any offer to, or solicitation by, anyone in any jurisdiction or in any circumstances in which such offer or solicitation is not authorized or is unlawful.

These Terms and Conditions are not for release, publication, circulation and distribution, and do not constitute or form a part of any offer or solicitation to use the Services, directly or indirectly, in or into the United States (including its territories and dependencies, any state of the United States and the District of Columbia), Australia, North Korea, Iran, Myanmar, Afghanistan, Angola, Aruba, Bangladesh, Belarus, Benin, Bhutan, Bolivia, Botswana, Brunei Darussalam, Burkina Faso, Bosnia, Burundi, Cambodia, Cameroon, Cape Verde, Central Africa republic, Chad, Comorros, Congo, Congo Democratic republic, Cuba, Cote d'Ivoire, Djibouti, Dominica, Ecuador, El Salvador, Equatorial Guinea, Eritrea, Ethiopia, Gabon, Gambia, Ghana, Guatemala, Guyana, Guinea, Guinea Bissau, Haiti, Honduras, Iraq, Jordan, Kenya, Kyrgyz Republic, Laos People's Republic, Lesotho, Liberia, Libya, Madagascar, Malawi, Mali, Mauritania, Micronesia, Moldova, Mongolia, Mozambique, Nauru, Nepal, New Caledonia, Nicaragua, Niger, Nigeria, Niue, Oman, Pakistan, Palestinian Areas, Papua New Guinea, Republic of China, Reunion, Rwanda, Samoa, Sao Tome and Principe, Senegal, Sierra Leone, Somalia, South Korea, South Georgia, Sudan, Sri Lanka, Suriname, Syria, Swaziland, Tajikistan, Tanzania, Timor, Togo, Tonga, Tunisia, Turkmenistan, Uganda, USA, Uzbekistan, Venezuela, Western Sahara, Yemen, Zambia, Zimbabwe or any jurisdiction into which the same would be unlawful (the "**Restricted Countries**").

In particular, these Terms and Conditions do not constitute or form a part of any offer or solicitation to use the Services of the Platform in the Restricted Countries. The list of such Restricted Countries is not exhaustive and may be adapted at any time. Moreover, the Platform (as such term is later defined) may contain additional restricted countries and other restrictions.

Residents, citizens and/or green card holders for the USA, or a person located or domiciled, including without limitation, any corporation or partnership created or organized in or under the relevant applicable laws, of the Restricted Countries shall not use or attempt to use the Services ("**Restricted Person(s)**"). Restricted Persons that use the Services of the Platform by providing false or inaccurate information about their citizenship, residency and/or nationality shall be in breach of these Terms and Conditions and shall indemnify the Company in respect of any damages and/or loses suffered due to this breach in accordance with the indemnification provisions set out in these Terms and Conditions.

Users should not construe anything in these Terms and Conditions as legal, business or tax advice. Each User should consult its own advisors as needed to make its decision and to determine whether it is legally permitted to use the Services of the Platform under applicable laws and regulations.

### Exhibit B

**Certain Risks Relating to the Use of Services and the Staked Tokens or the Native Tokens purchased by the Company (the "Tokens" for the purpose of the Exhibit B)**

**By using the Services of the Company through the Platform, you expressly acknowledge, understand and assume the following risks as well as all other risks associated with the use of the Tokens (including those not included below):**

1. ***Blockchain Risk***

   Because the Tokens are based on the PoS Blockchain, any malfunction, breakdown or abandonment of such protocol may have a material adverse effect on the Tokens. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to the Tokens by rendering ineffective the cryptographic consensus mechanism that underpins PoS protocol. You acknowledge that PoS blockchain is prone to periodic congestion during which transactions can be delayed or lost.

2. ***Source Code Risks***

   The source code underpinning the Tokens may contain flaws, bugs, defects or inconsistencies that could compromise the predictability, usability, functionality, stability and security of the Tokens. The Company will attempt to perform quality assurance and audit procedures to ensure the source code accurately reflects the Tokens intended operation, though there can be no guarantee that any errors are identified or the source code will be error-free. In addition, source code modifications or updates may lead to unexpected or unintended outcomes that may adversely affect the functionality of the Tokens. Source code modifications that constitute upgrades may be required in connection with the development of the Tokens, and your failure to participate in any such upgrades may result in the loss of some or all Token functionality.

3. ***Risk of Hacking and Security Weakness***

   The Tokens may be subject to expropriation and or/theft. Hackers or other malicious groups or organizations may attempt to interfere with the Tokens in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. Furthermore, there is the risk that Tokens may contain intentional or unintentional bugs or weaknesses which may negatively affect the Tokens or result in the loss of your Tokens, the loss of your ability to access or control your Tokens. In the event of such a software bug or weakness, there may be no remedy and holders of the Tokens are not guaranteed any remedy or compensation.

4.    ***Risk of Losing Access to the Staked Tokens Due to Loss of Private Key(s)***

The Tokens purchased by you may be held in a digital wallet, which requires a private key, or a combination of private keys, for access. Accordingly, in case of loss of requisite private key(s) associated with your digital wallet, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet or vault service you use, may be able to misappropriate your Tokens. Company is not responsible for any such losses.

5.    ***Risk of Invalid Wallet***

It is your responsibility to ensure that the digital wallet address provided to the Company for the receipt of the Tokens is capable of accepting all types and categories of Native Tokens. The Company is not responsible if your wallet is not capable of accepting the Tokens issued by the Company. You assume all responsibility with respect to the foregoing, and the Company accepts no liability whatsoever for wallets that do not accept the Tokens issued by the Company.

6.    ***Risk of Slashing***

You duly acknowledge that the Tokens can be subject to slashing which may result to a permanent and total loss of value of such Token in the market. You assume all responsibility with respect to the foregoing, and the Company accepts no liability whatsoever in relation to the consequence of the Tokens being subject to slashing.

7.    ***Market Value***

The market value of Tokens may be derived from the continued willingness of market participants to exchange fiat currency or digital assets for Tokens, which may result in the potential for permanent and total loss of value of such Token in the market.

8.    ***Risks Associated with Uncertain Regulatory Framework***

The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether governmental authorities will regulate such technologies. It is likewise difficult to predict how or whether any governmental authority may make changes to existing laws, regulations and/or rules that will affect cryptographic tokens, digital assets, staking, yield farming, blockchain technology and its applications. Such changes could negatively impact the Tokens in various ways, including, for example, through a determination that the Tokens are regulated financial instruments that require registration. The Company may cease the distribution of the Tokens or cease operations in a jurisdiction in the event that governmental actions make it unlawful or commercially undesirable to continue to do so.

9.    ***Risks of Government Action***

The industry in which the Company operates is new, and may be subject to heightened oversight and scrutiny, including investigations or enforcement actions. There can be no assurance that governmental authorities will not examine the operations of Company and/or pursue enforcement actions against the Company. Such governmental activities may or may not be the result of targeting the Company in particular. All of this may subject the Company to judgments, settlements, fines or penalties, or cause the Company to restructure its operations and activities or to cease offering certain products or services, all of which could harm the Company's reputation

or lead to higher operational costs, which may in turn have a material adverse effect on the Tokens.

10. **Risks Arising from Taxation**

The tax characterization of the Tokens is uncertain. You must seek your own tax advice in connection with purchasing the Tokens, which may result in adverse tax consequences to you, including withholding taxes, income taxes and tax reporting requirements.

11. **Legal Risks**

Federal, state and even international laws, regulations and/or rules applicable to technology industries, including but not limited to those regarding the blockchain technology may impact or constrain the design, implementation and operation of the Tokens.

12. **Unanticipated Risks**

Cryptographic coins such as the Tokens are a new and untested technology. In addition to the risks included in this **Exhibit B**, there are other risks associated with the use of the Tokens, including those that the Company cannot anticipate. Such risks may further materialize as unanticipated variations or combinations of the risks discussed in this **Exhibit B**.

**Exhibit C**

**Eligible User**

Initially, all Users are "**Eligible User**" except the following:

- a User whose acquisition of Staked Tokens or Native Tokens purchased from the Company would cause a breach of the law or requirements of any country or governmental authority, including anti-money laundering regulations or conventions;

- a User that (i) is subject of economic or financial sanctions or trade embargoes administered or enforced by any country or government, including, but not limited to, those administered by the Swiss Secretariat of Economic Affairs (SECO) or any equivalent foreign (i.e. non-Swiss authority), (ii) is located, organized or resident in Iran, North Korea, Syria, the Crimea Region or any other country or territory that is the subject of country-wide or territory-wide Sanctions, (iii) is listed in any Sanctions-related list of sanctioned persons, (iv) is a citizen or resident of, or located in, a geographic area that is subject to Swiss, EEA Member States or other sovereign country sanctions or embargoes, (vi) listed on the European Commission's consolidated list of Restrictive measures in force, (vii) listed on the French *Direction du Trésor* summary table of restrictive measures by country, (viii) listed on the United States Department of Treasury's OFAC website, is directly or indirectly owned or controlled by any person or persons described in the foregoing clauses (i) through (viii) and/or (ix) is otherwise a party with which Company is prohibited from dealing with under applicable laws;

- a User that is *(i)* a citizen or resident of a geographic area in which access to the Platform is prohibited by any applicable law, decree, regulation, treaty, or administrative act, *(ii)* a citizen or resident of, or located in, a geographic area that is subject to U.S. or other sovereign country sanctions or embargoes;

- a User who acts, directly or indirectly, for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior

foreign political figure[1] unless the Company, after being specifically notified by the User in writing that it is such a person, conducts further due diligence, and determines that the purchase is permitted;

- a User or an entity acting as trustee, agent, representative or nominee for a purchase that is a foreign shell bank[2];

- a User, or a User that is an entity acting as trustee, agent, representative or nominee for a person, who is a citizen of or resident or domiciled in the USA, Japan, the Republic of Korea or the People's Republic of China or purchasing Coins from a location in the USA, the Republic of Korea or the People's Republic of China ;

- a User, or User that is an entity acting as trustee, agent, representative or nominee for, a "U.S. Person" (within the meaning of " Regulation S" of the Securities Act 1933 under U.S. law);  and

- a User is a Restricted Person.

---

[1] Senior foreign political figure means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party or a senior executive of a foreign government-owned corporation. In addition a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws. A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[2] Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate