**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted *pro hac vice*)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CELSIUS NETWORK LLC, *et al.*,[1]<br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |
| CELSIUS NETWORK LIMITED,<br>　　　　　　　　　Plaintiff<br>　　　　v.<br>STAKEHOUND SA,<br>　　　　　　　　　Defendant | Adversary Proceeding<br>No. 23-01138 (MG) |

**DEFENDANT STAKEHOUND, S.A.'s OBJECTION TO PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

JURISDICTION AND VENUE ........................................................................................2

PRELIMINARY STATEMENT .......................................................................................3

BACKGROUND FACTS ..................................................................................................4

OBJECTION .....................................................................................................................10

   I.     The Motion Should be Denied Because Plaintiff Has Not Met the Standards
        Promulgated by the Second Circuit. ..............................................................10

    A.    Legal Standard ................................................................................................10

    B.    The Plaintiff Has Not Shown a Likelihood of Success on the Merits or
        Raised any Serious Questions Going to the Merits, and Thus the Motion
        Fails. ..............................................................................................................12

       a.    A Showing of Likelihood of Success on Plaintiff's Automatic Stay Claims
           Alone Does Not Entitle Plaintiff to a TRO ...............................................12

       b.    Plaintiff has Neither Shown a Likelihood of Success on the Merits of its
           Ownership-based Claims nor Raised a Serious Question Going to the
           Merits ........................................................................................................13

    C.    No Irreparable Harm Will Come to Plaintiff in the Absence of a TRO. ...................14

    D.    The Balance of the Equities and the Hardships Favor the Defendant. ......................16

    E.    A TRO is Not in the Public Interest Under the Circumstances. ...............................17

   II.    The Declarations Submitted by Plaintiff are not Competent Evidence in
        Support of the Motion. .....................................................................................18

CONCLUSION ...................................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Commc'ns Corp. v. The American Channel, et al. (In re Adelphia Commc'ns Corp.)*,
  2006 WL 1529357 (Bankr. S.D.N.Y. June 5, 2006)................................................10

*Am. Civil Liberties Union v. Clapper*,
  785 F.3d 787 (2d Cir. 2015)....................................................................................11

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
  784 F.3d 887 (2d Cir. 2015)....................................................................................11

*Bragg v. Jordan*,
  2023 U.S. Dist. LEXIS 68644 (S.D.N.Y. Apr. 19, 2023)..................................11, 14

*Eastern Air Lines v. Rolleston*,
  111 B.R. 423 (Bankr. S.D.N.Y. 1990) .....................................................................11

*EC v. Credit Bancorp Ltd.*,
  2010 WL 768944 (S.D.N.Y. Mar. 8, 2010) .............................................................17

*Emons Indus., Inc. v. Liberty Mut. Ins. Co.*,
  749 F. Supp. 1289 (S.D.N.Y. 1990).........................................................................17

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009).....................................................................................14

*Fei H.K. Co. v. GlobalFoundries, Inc.*,
  2020 U.S. Dist. LEXIS 54183 (S.D.N.Y. Mar. 25, 2020) .......................................15

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999).................................................................................................15

*Hanniford v. City of Poughkeepsie*,
  2022 WL 17325762 (S.D.N.Y. Nov. 29, 2022)........................................................19

*Helio Logistics, Inc. v. Mehta*,
  2023 U.S. Dist. LEXIS 18787 (S.D.N.Y Feb. 3, 2023).....................................11, 14

*Hilton v. U.S. Bank (In re Hilton)*,
  544 B.R. 1 (Bankr. N.D.N.Y. 2016) .........................................................................19

*Jamaica Ash & Rubbish Removal Co. v. Ferguson*,
  85 F. Supp. 2d 174 (E.D.N.Y. 2000) .......................................................................19

*KDH Consulting Group LLC v. Iterative Capital Mgmt. L.P.*,
    2020 U.S. Dist. LEXIS 88706 (S.D.N.Y. May 20, 2020)......................................................15

*In re MarketXT Holdings Corp.*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ...................................................................................17

*Morse/Diesel, Inc. v. Fidelity & Depsoite Co. of Maryland*,
    122 F.R.D. 447 (S.D.N.Y 1988) ............................................................................................21

*Oneida Nation of New York v. Cuomo*,
    645 F.3d 154 (2d Cir. 2011)...................................................................................................11

*Pierce v. F.R. Tripler & Co.*,
    955 F.2d 820 (2nd Cir. 1992).................................................................................................21

*Raucci v. Town of Rotterdam*,
    902 F.2d 1050 (2d Cir. 1990).................................................................................................19

*Rx USA Wholesale, Inc. v. Dep't of Health & Human Servs.*,
    467 F. Supp. 2d 285 (E.D.N.Y. 2006) ...................................................................................12

*Scheinman v. Glass & Braus*,
    2019 U.S. Dist. LEXIS 149977 (D. Conn. Sept. 4, 2019) .....................................................15

*SEC v. Bremont*,
    954 F. Supp. 726 (S.D.N.Y. 1997) ........................................................................................17

*Smith v. S.E.C.*,
    653 F.3d 121 (2d Cir. 2011)...................................................................................................17

*In re Soundview Elite Ltd.*,
    543 B.R. 78 (Bankr. S.D.N.Y. 2016) .....................................................................................17

*SymQuest Grp., Inc. v. Canon U.S.A., Inc.*,
    2015 U.S. Dist. LEXIS 114898 (E.D.N.Y. Aug. 7, 2015)......................................................12

*Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*,
    149 F. Supp. 3d 376 (E.D.N.Y. 2016) ...................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...................................................................................................................11

*In re WorldCom, Inc.*,
    No. 02-13533 (AJG), 2007 WL 1836599. (Bankr. S.D.N.Y. June 26, 2007) ........................21

**Statutes and Rules**

Federal Rules of Bankruptcy Procedure Rule 7012.........................................................................2

Federal Rules of Bankruptcy Procedure Rule 7065 ........................................................................10

Federal Rules of Civil Procedure Rule 12 ....................................................................................2

Federal Rules of Civil Procedure Rule 65 ..................................................................................10

Federal Rules of Evidence Rule 408 .......................................................................................20, 21

Federal Rules of Evidence Rule 602 ...........................................................................................19

Defendant StakeHound S.A. ("***StakeHound***") hereby files this objection (this "***Objection***") to Plaintiff Celsius Network Limited's ("***CNL***") *Motion for Temporary Restraining Order and Preliminary Injunction* [ECF No. 39] (the "***Motion***").  Contemporaneously herewith, StakeHound submits the *Declaration of Albert Castellano Lluís* in support of this Objection.  In further support of its Objection, StakeHound respectfully states as follows:

## **INTRODUCTION**

1.      Plaintiff CNL is suffering from a case of "buyer's remorse."  As explained in greater detail below, CNL entered into a series of transactions and agreements with Defendant StakeHound wherein CNL transferred to StakeHound certain native digital assets, and received back certain corresponding wrapped digital assets.  Based on subsequent events, the value of the wrapped assets declined.  CNL wanted to reclaim the value of the original native digital assets, but had no right under the relevant agreements to recover these native tokens, or to be paid the current value of such native tokens.

2.      In essence, CNL made investment decisions that it now regrets based on subsequent market developments.  But rather than accept the outcome as the consequences of its own investment choices, CNL hopes to unwind these transactions altogether.  CNL now argues that it "entrusted" the native tokens to StakeHound, that it is entitled to the return of these tokens on demand, and that these tokens are presently assets of CNL's bankruptcy estate.  Faced with StakeHound's assertion of ownership rights in the native tokens, CNL loudly complains that StakeHound is absconding with estate property.  CNL not only seeks to take back the native tokens; it now requests injunctive relief blocking StakeHound from accessing any portion of this property—even for purposes of funding necessary operating expenses and paying legal fees and costs to defend itself in pending litigation.  CNL takes this position even though it also continues to hold and retain the wrapped tokens.

3.      In making these arguments, CNL ignores and essentially seeks to override the governing language of the parties' agreements.  Those agreements expressly provide that the native tokens transferred to StakeHound are property of StakeHound.  Nothing in these agreements supports CNL's contention that the native tokens are held for CNL's benefit in any kind of fiduciary capacity.  By arguing for the return of the native tokens, CNL asks this Court to re-write the parties' agreements.  The plain language of the agreements demonstrates that CNL's claim to the staked tokens is without a contractual basis.

4.      Faced with these challenges to its position—and further constrained by the language in the agreements requiring all disputes between the parties to be arbitrated in Switzerland—CNL labors to litigate the underlying issues in this Court.  In furtherance of those efforts, CNL now asks this court for emergency and preliminary injunctive relief.  But given the plain language of the parties' agreements, CNL cannot come close to demonstrating a likelihood of success on the merits of the claims implicated by such injunctive relief.  And as will be explained below, the declarations and other evidence marshalled by CNL do not demonstrate irreparable harm either.  The balance of hardships and public interest likewise cut in StakeHound's favor.  For all of these reasons, CNL has failed to meet its burden for emergency or preliminary injunctive relief.  The Motion should be denied in all respects.

## JURISDICTION AND VENUE

5.      StakeHound does not consent, expressly or impliedly, to this Court's subject matter jurisdiction over the claims at issue in the *First Amended Adversary Complaint*, filed at ECF. No. 31 (the "***Complaint***"), or this Court's personal jurisdiction over StakeHound.  By filing this Objection, StakeHound does not waive, and StakeHound hereby expressly preserves, all defenses it may plead pursuant to Rule 12 of the Federal Rules of Civil Procedure (the "***FRCP***") (made applicable to these proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure) prior

to answering the Complaint or otherwise, including but not limited to the absence of personal jurisdiction over StakeHound.  StakeHound does not consent to entry of final orders or judgment by this Court.

## PRELIMINARY STATEMENT

6.      Plaintiff's goals in pursuing this adversary proceeding are clear: to avoid litigating in the contractually-agreed Swiss forum, and to reframe the claims so as to avoid the governing terms of the parties' underlying agreements.   That's because the terms of the contracts couldn't be clearer in defeating the entire premise of this adversary proceeding: when the Plaintiff transferred Native Tokens (defined below) to StakeHound, it transferred to StakeHound all rights of ownership in and to such Native Tokens in full under the terms of the agreements between the parties.  *To put it plainly, it is CNL that is seeking to appropriate StakeHound's property, and not StakeHound interfering with assets of the bankruptcy estate.*

7.      Even in the face of this clear contractual language, the Plaintiff now seeks an order that would impose the most draconian restrictions on StakeHound's use of its own assets before any court or tribunal has had a chance to rule on the rightful ownership of those assets, the issue at the very core of the parties' disputes.  Without a shred of evidence to support its claims that StakeHound intends to "dissipate" assets, Plaintiff would have this Court choke off StakeHound's ability to mount a defense in this adversary proceeding, to pursue affirmative litigation in Israel following a key-loss event of which CNL is well aware (and a successful result in which would redound to CNL's benefit), and to continue funding the ongoing costs of operating the very nodes on which the Staked Tokens are staked.  And CNL asks for such extraordinary relief in the face of a proposal by StakeHound to consensually hold the Native Tokens and related rewards, subject to appropriate carve-outs for these expenses, until the Court can rule on the initial briefing on StakeHound's motion to compel arbitration.

8.     A temporary restraining order is extraordinary relief, and such extraordinary relief is not warranted here.  As will be shown below and on the facts of this case, the Motion fails on each and every prong of the TRO inquiry.  StakeHound recognizes the critical importance of resolving the disputes between the parties.  That is why it has agreed to pause the Swiss arbitration and proposed reasonable terms under which it would agree to hold the Staked Tokens and related rewards while this Court rules on the threshold issue of arbitrability in the agreed-upon Swiss forum.  In light of the reasonable standstill arrangements proposed by StakeHound and the complete lack of competent evidence of imminent dissipation or loss to CNL, the Plaintiff simply cannot meet the high bar imposed by courts in the Second Circuit to warrant the grant of a TRO.  Accordingly, the Motion must be denied.

## BACKGROUND FACTS

9.     StakeHound is a private *société anonyme* incorporated under the laws of Switzerland with registered offices at Place de Longemalle 1, c/o MN & Associés SA, 1204 in Geneva, Switzerland.  StakeHound operates the currently suspended online platform "onboarding.stakehound.com" (the "*Platform*"), which was launched in October 2020.  The Platform facilitates liquid staking.  Staking is a process in which cryptocurrency holders volunteer to lock their crypto assets ("*Native Tokens*") to support the operation of a Proof of Stake blockchain.  Once staked, the Native Tokens are used to validate transactions on the network.  In return for staking Native tokens, their holders receive a share of the transaction fees or newly created cryptocurrencies ("*Staking Rewards*").  *See Castellana Declaration, ¶ 5, 6.*

10.     However, when crypto assets are staked, they cannot be traded and therefore a holder may not take advantage of market fluctuations or use the crypto assets as collateral for loans.  In other words, the assets are illiquid for the time they are staked.  This disadvantage of staking is addressed by liquid staking.  *See Castellana Declaration, ¶ 7.*

11.     In the liquid staking process, the service provider or protocol issues a tokenized representation of a particular cryptocurrency, or a wrapped token ("***stToken***") in exchange for that same cryptocurrency (Native Token).  The service provider or protocol then stakes the Native Tokens and, in accordance with the applicable terms, distributes Staking Rewards to the holders of stTokens.  At the same time, the holders of wrapped tokens can use and trade these wrapped tokens in peer-to-peer financial networks, the so-called decentralized finance ecosystem, thereby minimizing the disadvantages of traditional staking.  Hence, these transactions are described as "liquid staking." *See Castellana Declaration, ¶ 8.*

12.     StakeHound's terms and conditions define two main services: the possibility for a customer to sell Native Tokens to and buy stTokens from StakeHound; and the possibility for a customer to sell stTokens to and to buy Native Tokens from StakeHound. The terms for these two services are not the same, since they don't have the same implications, for instance, while StakeHound can control the creation of the stTokens, it can't control it for the Native Tokens. Although it was anticipated that there would be a continuing exchange of Native Tokens and stTokens, StakeHound's legal framework made clear that StakeHound would not permit redemption of the native tokens, themselves.  The native tokens held by StakeHound had to be at all times be owned by StakeHound. *See Castellana Declaration, ¶ 9.*

13.     In order to remain compliant and in view of the evolving regulatory landscape, StakeHound implemented very strict "know your customer"/anti-money laundering ("***KYC/AML***") requirements from the beginning.  These strict requirements are reflected in the SSTC. *See Castellana Declaration, ¶ 11.*

14.     StakeHound's CEO was introduced to CNL, and specifically Jason Stone, by Reuben Yap from Zcoin around August/September 2020.  CNL, through Jason Stone and Roni

Cohen-Pavon, initially asked to remain the owner of any Native Tokens that CNL would transfer to StakeHound, which StakeHound would not agree to. Accordingly, CNL expressly agreed that StakeHound would be the sole owner of any Native Tokens transferred by CNL to StakeHound, and that commercial understanding was set forth in the written agreements between the parties. *See Castellana Declaration, ¶* 13, 16, 17.

15.    CNL exclusively wanted us to work with Fireblocks, Inc., an Israeli blockchain security provider for moving, storing and issuing digital assets. Jason Stone subsequently introduced StakeHound to Fireblocks. Upon CNL's insistence, StakeHound eventually agreed to enter into a new security custodian agreement with Fireblocks. Moreover, after multiple conversations where CNL was trying to remain in control of the Native Tokens in one way or another, CNL requested that the storage of the withdrawal key for the Native Tokens be split between StakeHound and Fireblocks, to reduce the risk of theft and lost keys. Again, StakeHound honored CNL's request. Fireblocks was never an agent for StakeHound. Fireblocks had no right to represent StakeHound; it simply held keys and provided secure wallet functionality. *See Castellana Declaration, ¶* 18–20.

16.    While the initial negotiations between the Parties were ongoing, in late November 2020, the ETH2 locking event occurred, allowing ETH token holders to stake their tokens until the launch of the upgraded blockchain Ethereum 2. At the time, without StakeHound's knowledge, CNL decided to stake approx. 25,000 ETH of its own accord on 24 November 2020. At that time, negotiations between StakeHound and CNL had been ongoing for months, but the parties had not yet signed a definitive agreement. CNL then approached StakeHound and asked to exchange these approx. 25,000 ETH (now locked and accruing staking rewards) (the "***Locked ETH***") for staked

ETH ("***stETH***") via the Platform so they may be deployed in the DeFi while earning Staking Rewards.  *See Castellana Declaration, ¶ 22–23.*

17.     It was not StakeHound's standard practice to accept already staked tokens.  This led to the negotiation of the SSA, which was negotiated between the end of November 2020 and 20 January 2021, when it was signed.  Both parties were represented by lawyers.  During the negotiations of the SSA, the issue of ownership of and control over the Native Tokens arose again, when Yarden Noy, CNL's outside counsel and later Head of Regulation, proposed a clause 1.9 by which StakeHound would have granted CNL a "*first priority lien in and to the Assets*".  StakeHound did not accept this change and the proposed clause was deleted from all further drafts and the executed version of the SSA.  Indeed, StakeHound was very firm and repeated several times that it would only conclude the SSA if it would obtain the sole ownership of the Locked ETH, for the same reasons as previously explained to CNL.  CNL finally understood this and expressly accepted that StakeHound would be the sole owner of the Locked ETH.  This agreement is reflected in the explicit wording of the SSA, which provides in Clause 1.3 that "*StakeHound will have the legal ownership of those Locked ETH.*"  *See Castellana Declaration, ¶ 24, 26–27.*

18.     Apart from the fact that the Native Tokens which StakeHound was to receive under the SSA were already staked, it was the intention of the Parties to apply the standard terms and conditions as they had been discussed among the parties.  Accordingly, the StakeHound Services Terms and Conditions were expressly included in the SSA and made an integral part of the agreement.  Clause 1.1 of the SSTC states: "For the avoidance of doubt [StakeHound] will have the ownership of the Native Token, as the latter is used to pay the Staking Services of the Company."  *See Castellana Declaration, ¶ 28.*

19.     On 23 January 2021, CNL shared the private keys with StakeHound which would give access to the Locked ETH pursuant to section 1.2 of the SSA. In return, StakeHound generated, i.e. minted, and issued to CNL stETH at the exchange rate of 1:1 with the Locked ETH pursuant to section 1.3 of the SSA.  Subsequently, on 2 February 2021, CNL transferred an additional 35,000 ETH solely pursuant to the SSTC.  In return, StakeHound minted and issued 35,000 stETH to CNL immediately thereafter. *See Castellana Declaration, ¶ 29–30.*

20.     Following the successful transfers of ETH, the parties discussed entry of a revenue sharing agreement related to Staking Rewards, which resulted in execution of the Revenue Sharing Agreement dated 21 April 2021 ("***RSA***").  Like the SSA, the RSA incorporated fully the SSTC. Each party was represented by the same lawyers as during the previous negotiation of the SSA. Under the RSA, on 27 April 2021, CNL transferred 40 million MATIC to StakeHound and in return received 40 million stMATIC.  Moreover, CNL transferred 66,000 DOT to StakeHound and in return received 66,000 stDOT on 28 April 2021.  As was the case with the native tokens for the ETH, StakeHound retained ownership at all times of the native tokens for the MATIC and the DOT. *See Castellana Declaration, ¶ 31–32.*

21.     On 2 May 2021, Fireblocks informed StakeHound that 38,178 ETH, or 60% of the total of StakeHound's ETH, may no longer be accessible because Fireblocks failed to secure their crypto-graphic private keys ("***Key Management Incident***").  StakeHound then initiated legal proceedings in Israel against Fireblocks in order to restore the balance of the available Native Tokens and stTokens on the Platform. These proceedings are currently ongoing.  Due to the Key Management Incident, on 22 June 2021, StakeHound halted its liquid staking activities with immediate effect (the "***Suspension***") in line with the SSTC. *See Castellana Declaration, ¶ 33–34.*

22.    The Suspension is ongoing and StakeHound currently does not exchange stTokens such as stETH, stMATIC and stDOT for Native Tokens.  StakeHound continues to generate revenue by staking the Native Tokens it owns and receiving Staking Rewards, of which it keeps a percentage after paying costs.  Notably, this has been the business model since before the Key Management Incident.  The Native Tokens which StakeHound has staked currently generate Staking Rewards of approximately $300,000 per month, depending on the price fluctuations and activity levels on the networks.  *See Castellana Declaration, ¶ 36–37.*

23.    Prior to CNL filing the Motion, StakeHound engaged with CNL in good faith regarding the terms under which StakeHound would agree (i) not to dissipate Native Tokens and/or Staking Rewards, and (ii) to stay the Swiss arbitration, in each case, until the Court ruled on the threshold issue of arbitrability of the parties' disputes in the agreed-upon Swiss forum.  On August 7, 2023, StakeHound agreed to accept service of the summons and the complaint on the understanding that the parties would negotiate a stipulation regarding these issues.

24.    In order to facilitate those negotiations, on August 8, 2023, StakeHound agreed to a one-week total freeze on its use of Staked Tokens and Rewards, subject to giving prior notice to CNL of extraordinary circumstances necessitating use of Staked Tokens and Rewards and CNL's opportunity to object to such use.  *See ECF No. 25.*  StakeHound subsequently agreed to extend that agreement to August 22, 2023.[2]  Over the course of this stipulated asset hold, StakeHound made numerous offers to CNL to continue to hold the Native Tokens and Staking Rewards until the Court could rule on its motion to compel arbitration, subject to reasonable carve-outs for ordinary course expenses and legal fees.

---

[2] *See* ECF No. 26, Letter from StakeHound ("To facilitate the Court's deliberation and to minimize any concern about an intervening change in the status quo, StakeHound will extend the stipulation entered by the parties at ECF No. 25 until such time as the Court may enter an order in accordance with the procedure outlined here.").  The Court later entered such an order on August 22, 2023.  *See* ECF No. 30.

25.     Counterproposals received from CNL were unactionable for several reasons, including because they included inadequate carve-outs for amounts necessary to fund StakeHound's legal and ongoing business expenses.  All of StakeHound's offers were rebuffed by CNL, which sought restrictions well in excess of what it is entitled to under the terms of the applicable agreements and out of proportion with the needs of the case.

26.     Over the period beginning August 8, 2023, when StakeHound first agreed with CNL to a total freeze on its use of Staked Tokens and Rewards, through and including the hearing scheduled for September 27, 2023 (the "**September 27 Hearing**"), StakeHound estimates that its legal fees will total $1,500,000 and ordinary course expenses will total $500,000.  StakeHound must also be permitted to incur court costs in the Fireblocks litigation if and as assessed without restriction in order to continue to bring its claims there.  On August 11, 2023, the parties sent a joint letter to the Swiss arbitrator requesting that he does "not take or require any further activity in connection with the Arbitration until further order of the Bankruptcy Court, or until jointly instructed by the parties, neither party to unreasonably withhold such instruction."  *See Castellana Declaration*, ¶ 40.

## OBJECTION

### I.     The Motion Should be Denied Because Plaintiff Has Not Met the Standards Promulgated by the Second Circuit.

#### A.     Legal Standard

27.     The standards for issuance of a temporary restraining order are not materially different from the standards for issuance of an injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7065 of the Federal Rules of Bankruptcy Procedure, Bankruptcy Rule 7065. *See Adelphia Commc'ns Corp. v. The American Channel, et al. (In re Adelphia Commc'ns Corp.)*, 2006 WL 1529357, at *4 (Bankr.

S.D.N.Y. June 5, 2006); *Eastern Air Lines v. Rolleston,* 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990). Injunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief. *Helio Logistics, Inc. v. Mehta*, 2023 U.S. Dist. LEXIS 18787, at *6 (S.D.N.Y Feb. 3, 2023).

28.     The Second Circuit has explained that a party seeking a preliminary injunction must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable injury, (3) the balance of hardships tips in his favor, and (4) that the public interest would not be disserved by the issuance of an injunction. *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). Alternatively, a movant may "show irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (internal citations and quotations omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.") (citations omitted).  In either event, where a party seeking a temporary restraining order fails to establish a likelihood of success on the merits, there is no need to address the other prongs of the analysis. *See Bragg v. Jordan,* 2023 U.S. Dist. LEXIS 68644, at *15 (S.D.N.Y. Apr. 19, 2023) (quoting *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)).

**B.  The Plaintiff Has Not Shown a Likelihood of Success on the Merits or Raised any Serious Questions Going to the Merits, and Thus the Motion Fails.**

*a.  A Showing of Likelihood of Success on Plaintiff's Automatic Stay Claims Alone Does Not Entitle Plaintiff to a TRO*

29.     As a preliminary matter, Plaintiff attempts to justify a sweeping TRO with respect to StakeHound's native tokens subject to competing claims of ownership, while primarily focusing on CNL's perceived likelihood of succeeding on its stay violation claims.  In so doing, Plaintiff clearly hopes to avoid the substantive weakness of its claims to ownership of the native tokens (more about that below), and to bolster its TRO Motion with what it perceives as a strong stay violation case.  This tactical maneuvering misses the mark.

30.     The TRO proposed by the Plaintiff is all about the Native Tokens, themselves.  And any consideration of the likelihood of success on the merits must, by definition, pertain to the competing claims to these Native Tokens.  CNL's proposed restrictions on the Native Tokens would make no sense as a remedy for the claimed stay violation.  Surely, whatever damages CNL may claim for a stay violation, it will not be necessary to hold tens of millions of dollars of assets in suspense to satisfy those damages.

31.     Here, Plaintiff should not be allowed to bootstrap the highly restrictive relief it seeks on StakeHound's use of assets on the likelihood of success of an entirely unrelated claim for violation of the automatic stay.  The automatic stay claim differs dramatically from the Plaintiff's other claims related to interpretation of the underlying agreements, which the Court itself has acknowledged.  *See* Aug. 2 H'rg Tr., 42:24–43:1–3.[3]  Accordingly, even if the Court determines that Plaintiff has shown a likelihood of success on the merits of its automatic stay claims, the Court should not grant the Motion on that basis alone.

---

[3] COURT: "…And I really -- I've said this right at the start I mean, I really view the allegations in the complaint, the counts in the complaint for turnover, is very different than the automatic stay violation by triggering the arbitration."

    b.  *Plaintiff has Neither Shown a Likelihood of Success on the Merits of its Ownership-based Claims nor Raised a Serious Question Going to the Merits*

32. A likelihood of success is not a mere chance of success; rather, a movant must show that there is more than a fifty-fifty chance of succeeding on the merits. *SymQuest Grp., Inc. v. Canon U.S.A., Inc.*, 2015 U.S. Dist. LEXIS 114898, at *1 (E.D.N.Y. Aug. 7, 2015) (quoting *Rx USA Wholesale, Inc. v. Dep't of Health & Human Servs.*, 467 F. Supp. 2d 285 (E.D.N.Y. 2006)). The Motion here falls far short of meeting that high burden.

33. The terms of the SSA (with respect to the Locked ETH) and the SSTC (with respect to the Unlocked ETH, DOT and MATIC) could not be clearer that, upon CNL's staking of the Native Tokens with StakeHound, StakeHound took ownership of such Native Tokens. *See* SSA, §§ 1.3, 1.5; SSTC. There can be no serious question of that fact, and there is no record evidence that the plain language of the agreements reflects anything but the clear intent of the parties. Plaintiff even seems to acknowledge as much: on the eve of their filing the Motion, Plaintiff added numerous extra-contractual claims to the complaint, including unjust enrichment and imposition of a constructive trust. Confronted with the stark reality that their claims are untenable under the plain language of the underlying agreements, Plaintiff would have this Court grant it relief on equitable grounds instead. But such relief is not available where, as here, there is an adequate remedy at law—in the form of money damages and related relief that the Plaintiff is free to pursue in the Swiss Arbitration.

34. Plaintiff repeatedly argues that the Native Tokens it staked with StakeHound are property of the bankruptcy estate, and that this Court has the power to freeze estate property. *See* ECF No. 34, pp. 9, 12, 23. But this is a mere *ipse dixit*—unsupported by any record evidence or legal argument. What Plaintiff really seeks, then, is rescission of the SSA, SSTC and RSA to try to avoid the express terms of the deal it struck with StakeHound. But it can't plead that claim,

because StakeHound has abided by the terms of the applicable agreements to the letter at every

turn, including when it suspended operation of its platform and declined to CNL's stTokens for

StakeHound's Native Tokens.  *See* SSA, § 1.8; SSTC.  Plaintiff loudly protests that the Native

Tokens always belonged to CNL, and were merely "entrusted" to StakeHound.  *See* ECF No. 34

p. 6.  But vehemence is not a substitute for evidence.  The plain language of the parties' agreements

defeats the Plaintiff's claims, and the Plaintiff can offer no other competent record evidence to the

contrary.  In short, the Plaintiff is more likely than not to *lose* this case, and that fact by itself

defeats any entitlement to a TRO or preliminary injunction.  *See Bragg,* 2023 U.S. Dist. LEXIS

68644, at *15.

### C.      No Irreparable Harm Will Come to Plaintiff in the Absence of a TRO.

35.      Though the Motion fails to clear even the initial hurdle of showing a likelihood of

success on the merits—which should end the inquiry—StakeHound will nevertheless demonstrate

that CNL fails the remaining prongs of the TRO inquiry, as well.  To satisfy the irreparable harm

requirement, Plaintiff must demonstrate that, absent a preliminary injunction, it will suffer an

injury that is neither "remote nor speculative," but actual and imminent, and one that cannot be

remedied if a court waits until the end of trial to resolve the harm.  *See Helio Logistics, Inc.,* 2023

U.S. Dist. LEXIS 18787, at *6–7 (citing *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d

110, 118 (2d Cir. 2009).

36.      First, as noted above, Plaintiff may not colorably claim that any irreparable harm

will accrue in the absence of a TRO restraining continuation of the Swiss arbitration, as the parties

have agreed by joint letter to the Swiss arbitrator that no further action will take place in the Swiss

arbitration until the Court rules on that motion.[4]  Moreover, the Court has already set a briefing

---

[4] CNL quibbles with the substance of the correspondence to the arbitrator, but this is not a live issue.  StakeHound has
advised the arbitrator that no further action should take place in the Arbitration until this Court has had an opportunity

schedule on StakeHound's motion to compel arbitration, which the parties have agreed will be decided as a threshold matter before proceeding further in Switzerland. There is simply no action to enjoin at this time, and accordingly there is no risk of irreparable harm to the Plaintiff.

37.     As to Plaintiff's stated fear of asset dissipation, even if the Plaintiff's concerns regarding dissipation were more than "remote and speculative," or supported by a shred of competent evidence, the Second Circuit has interpreted "irreparable harm" as an "injury for which a monetary award cannot be adequate compensation," and has therefore declined to issue preliminary injunctions when money damages offer adequate compensation. *See Scheinman v. Glass & Braus*, 2019 U.S. Dist. LEXIS 149977, at *2 (D. Conn. Sept. 4, 2019). The assets at issue here, the Native Tokens and Staking Rewards, are valuable assets that can otherwise be reduced to a dollar amount, and accordingly, were CNL to prevail on its claims, money damages would provide an adequate remedy.

38.     Plaintiff's arguments regarding collectability are similarly unavailing. Courts consider collectability only where a movant can provide "competent evidence" demonstrating that a defendant is insolvent or will otherwise avoid collection efforts.[5] *Fei H.K. Co. v. GlobalFoundries, Inc.*, 2020 U.S. Dist. LEXIS 54183, at *1 (S.D.N.Y. Mar. 25, 2020). "The standard for demonstrating insolvency is high" and requires "more than allegations of the defendant's weak financial condition." *See KDH Consulting Group LLC v. Iterative Capital Mgmt. L.P.*, 2020 U.S. Dist. LEXIS 88706, at *7 (S.D.N.Y. May 20, 2020). Plaintiff's mere allegations of StakeHound's insolvency in the Motion are not competent evidence, and Plaintiff

---

to rule on the threshold issues, and StakeHound will take any further action that may be required to fulfill this commitment.
[5] Some courts in this circuit have called into doubt the continued viability of the insolvency exception. *See KDH Consulting Group LLC,* 2020 U.S. Dist. LEXIS 88706, at *7 n.7 ("The Court notes that some recent cases have cast doubt on whether the "insolvency exception" to the prohibition on money damages is still valid."); *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.,* 149 F. Supp. 3d 376, 393 (E.D.N.Y. 2016) (citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999)).

has submitted nothing but conclusory statements to suggest financial distress. *See, e.g.*, CP/Extell Parcel I, L.P. v. Cuomo, 394 Fed.Appx. 779 (2010) (holding that to grant a preliminary injunction based on conclusory assertions that defendant might spend disputed escrow funds and later become insolvent "would push the standard for injunctive relief beyond its reasonable limit."). Far from competent evidence in support of it claims, Plaintiff's "approximate" calculations presuppose, without any court having decided the matter and in the face of clear contractual language to the contrary, that StakeHound owes a large debt to CNL on account of its claims.

39.    What's more, StakeHound has at each stage of these proceedings participated in good faith negotiations regarding terms under which it would be willing to hold the Native Tokens and rewards during the initial briefing period, even going as far as to agree to a complete freeze while negotiations over a longer-term arrangement proceed. *See* ECF No. 25. These terms include a complete freeze subject to notice and objection procedures for sale or transfer under extraordinary circumstances and reasonable carve-outs representing a fraction of the amounts CNL claims are at issue here to allow StakeHound to fund legal and ordinary course business expenses. *See Castellana Declaration,* ¶ 38, 39. The Plaintiff has rejected all of StakeHound's offers, and instead has escalated legal spend and wasted court resources on the present fight over a TRO, a result that redounds to no one's benefit.

> **D.    The Balance of the Equities and the Hardships Favor the Defendant.**

40.    Imposition of CNL's requested TRO at this stage will undermine StakeHound's ability to mount a defense in this adversary proceeding and its ability to prosecute its affirmative claims against Fireblocks in Israel, a lawsuit that, if successful, would redound to the benefit of both StakeHound and CNL alike. CNL's unsubstantiated fears of asset dissipation must give way to the hardship that would accrue to StakeHound if its right to effective counsel were undermined by draconian restrictions on its right to use its own assets. And while the singular case cited by

Plaintiff in support of its argument "safeguarding assets from dissipation so that they can be available for the benefit of Celsius' creditors" does not clearly stand for that proposition, the proposition itself is also irrelevant where, as here, there has been no determination that the disputed assets are property of the estate.[6]

### E.    A TRO is Not in the Public Interest Under the Circumstances.

41.    Plaintiff expends little ink in its Motion as to why a temporary restraining order serves the public interest in this case.  StakeHound submits that freezing its assets would undermine its right to be represented by counsel in these proceedings, a right that should be available to all litigants.  Courts in the Second Circuit recognize that the relationship between a client and the attorney of his or her choice is one that should not be readily disrupted.  *See Emons Indus., Inc. v. Liberty Mut. Ins. Co.*, 749 F. Supp. 1289 (S.D.N.Y. 1990) (collecting cases).  Forcing StakeHound into a position where it cannot meet its legal expenses is a clear violation of this important mandate, and accordingly the public interest is not served by granting CNL's requested form of TRO in this case.  The cases Plaintiff cites to contravene this argument all involve allegations of wrongdoing, none of which are present here. Cf. *In re MarketXT Holdings Corp.*, 376 B.R. 390, 424 (Bankr. S.D.N.Y. 2007) (denying use of restrained funds for legal bills where funds were obtained through actual fraudulent transfer and grounds existed to enter preliminary injunction); *SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997) (denying use of frozen funds for legal bills where funds were obtained through violations of securities laws); *EC v. Credit Bancorp Ltd.*, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010) (denying use of frozen funds for legal bills

---

[6] Plaintiff's citation to *In re Soundview Elite Ltd.,* 543 B.R. 78, 122 (Bankr. S.D.N.Y. 2016) for the proposition that courts may enter "freezing injunctions" to preserve assets for the debtor's estate "even when that property 'may technically not yet be estate property'" is misleading.  In *Soundview*, the court granted a "freezing" injunction where it had *already determined* that the trustee seeking the return of an investment from a related party was entitled to recover, and only the quantum of such discovery remained to be decided.  Here, by contrast, there has been no determination by this Court or any other that CNL is entitled to recover, or that the disputed assets belong to CNL.  To the contrary, the record evidence assemble to date demonstrates that these assets belong to StakeHound.

where funds were obtained through securities fraud).  In the latter two cases, funds were not subject

to a preliminary injunction but to an "asset freeze" imposed following violations of securities laws,

which requires that the SEC "show either a likelihood of success on the merits, or that an inference

can be drawn that the party has violated the federal securities laws." *Smith v. S.E.C.*, 653 F.3d 121,

128 (2d Cir. 2011).  These cases have no relevance or applicability to a scenario where ownership

of the underlying assets is in dispute, and the language of the relevant agreements and other record

evidence support *StakeHound*'s claims of ownership.

## II.    The Declarations Submitted by Plaintiff are not Competent Evidence in Support of the Motion.

42.    The Plaintiff's Motion is replete with overstatements and misstatements

unsupported by competent record evidence.  For example, Plaintiff makes no attempt to

substantiate its claims that StakeHound's business is "defunct," that StakeHound is "deeply

insolvent" (as noted above), and that "there can be no doubt StakeHound also is liable to Celsius

for the error" that led to the Fireblocks incident, just to name a few.  These unsubstantiated

allegations are also refuted by the competent testimony of StakeHound's declarant, Albert

Castellana.  Unlike the Plaintiff's declarants, Mr. Castellana's testimony is informed by personal

knowledge.  And trying to raise the specter that StakeHound's CEO is somehow a "crony" in

league with Mr. Stone is an *ad hominem* attack and cheap shot that similarly finds no basis in the

facts.  Despite hundreds of pages of proffered "evidence," Plaintiff is no closer to showing there

is any "real threat to dissipation of assets" than it was at the very first hearing in this adversary

proceeding.  *See* Aug. 2 Hr'g Transcript, 25:13–17.[7]  Where is the admissible proof for these bold

and inflammatory statements?  Again, it must be emphasized, vehemence is not evidence.  Neither

---

[7] THE COURT: "You know, are you prepared to back it up with something that -- even circumstantial evidence that -- not necessarily your declaration, but somebody's declaration or one or more declarations that supports a real threat to dissipation of assets? I don't see it."

is the testimony of counsel, notwithstanding the repeated efforts by Plaintiff's counsel to treat statements he made during oral arguments as "admitted" or "uncontested" to the extent not specifically refuted during the same oral argument. This view of evidence and procedure is deeply misguided, as unrebutted argument can never amount to adjudicated fact. *See Hanniford v. City of Poughkeepsie*, 2022 WL 17325762, at *2 n.2 (S.D.N.Y. Nov. 29, 2022) (noting that statements of counsel were "not evidence"); *Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174, 182 (E.D.N.Y. 2000) ("[A]n attorney's statement or argument is not evidence.") (citing *Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1059 (2d Cir. 1990)).

43.    What's more, all three declarations submitted by Plaintiff are either infirm as an evidentiary matter or of no relevance or use to Plaintiff's case. For example, Plaintiff bases its claim that "100% of the MATIC and DOT" currently in StakeHound's control "were provided to StakeHound by Celsius" on the "knowledge" of Richard Man as set forth in his declaration. *See* Man Declaration, ECF No. 36, ¶ 18. Mr. Man joined Celsius in February 2022, which is almost a year or more after the transfers of MATIC, DOT and ETH about which he purports to testify. A witness may testify to a matter only if evidence is introduced to sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602. It is hard to imagine how Mr. Man could have personal knowledge to testify about facts that predate his tenure at CNL by so long. Testimony by affiants without personal knowledge should be stricken. *Hilton v. U.S. Bank (In re Hilton)*, 544 B.R. 1, 8 (Bankr. N.D.N.Y. 2016). Contrary to the mandate of FRE 602, Mr. Man is stating a conclusion based upon data derived from emails he was not a party to regarding transfers he was not involved in, taking place at a point in time when he did not work for Celsius. *See* Man Declaration, ECF No. 36 ¶¶ 7, 16, 20. That is not personal knowledge, and the related portions of the Man Declaration are not competent evidence.

44.     Far from any evidence that could take the Plaintiff's case "over the hump,"[8] the balance of the Man declaration is just smoke, and does nothing more than purport to substantiate documents, including those evidencing conversations between third parties; recite what other players in the liquid staking market might do (which has no bearing on the contracts CNL actually signed), and recite what's already been pled in the complaint.  Nothing in the Man Declaration makes it more likely than not that dissipation of assets is about to occur, or that the native tokens belong to CNL.  In short, the Man Declaration does not establish a sufficient basis for the injunctive relief requested by CNL.

45.     The Plaintiff also submits the Dasser Declaration to set out the legal standards it believes should be applied under Swiss law and then argues, under those standards, that it has a likelihood of success on its Swiss-law governed contract claims.  Leaving aside that the necessity of such an exegesis on Swiss law serves only to underscore that these claims should be heard in the agreed Swiss forum, the Dasser Declaration does nothing more than to underscore that Plaintiff *cannot* prevail on its breach of contract claims—as the first principle of Swiss law contract interpretation as stated by Mr. Dasser is that "the objective interpretation of a contract always starts with its wording. As a rule, a written declaration can be taken at face value."  As stated above, the plain language of the user agreements at issue here favors StakeHound's position.

46.     Finally, the Plaintiff submits the declaration of Mitchell Hurley, their counsel at Akin Gump.   Mr. Hurley's declaration discloses the contents of confidential settlement communications in the public record in flagrant disregard of Rule 408 of the Federal Rules of Evidence.  As the Court is aware, FRE 408 excludes evidence of settlement negotiations that is

---

[8] *See* Aug. 7 H'rg Tr., 11:20–25 ("So it is with respect to preservation of assets while the case is ongoing and having an opportunity to present to Your Honor what we think would be evidence that could persuade and get you over the hump with respect to the issue that was clearly troubling you at the last hearing. We think we can do that….").

intended to provide liability for a claim.  The purpose of this prohibition is to prevent the threat of admission into evidence of settlement offers from inhibiting settlement discussions and interfering with the effective administration of justice.  *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827–828 (2nd Cir. 1992).  By prohibiting such evidence, settlement parties are assured of the secrecy of their negotiations.  *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2007 WL 1836599. *4 (Bankr. S.D.N.Y. June 26, 2007) (citing *Morse/Diesel, Inc. v. Fidelity & Depsoite Co. of Maryland*, 122 F.R.D. 447 (S.D.N.Y 1988).  Mr. Hurley should not be permitted to deploy settlement negotiations as evidence in support of the Plaintiff's requested TRO.  Not only does the Hurley Declaration violate FRE 408, it also discloses information that StakeHound has made clear it considers confidential both to Mr. Hurley personally and on the record before the Court.  *See* Aug. 7 H'rg Tr., 21:25–22:1.  These actions are wrong, and should not be permitted or condoned.

47.     But putting aside these Rule 408 and confidentiality violations, there are bigger problems with the Hurley Declaration—and these are the faulty assumptions and logic on which this declaration is based.  Because StakeHound and its counsel sought to negotiate carveouts from the proposed asset freeze and tied those carveouts to expected expenditures during the standstill period, Mr. Hurley assumes that StakeHound will dissipate assets in amounts necessary to fund these expenditures.  In essence, Mr. Hurley presumes that, having failed to negotiate agreed carveouts, StakeHound will now move forward to liquidate its assets in these amounts—on the eve of a long-threatened injunctive hearing.

48.     To put it kindly, this line of thinking doesn't make much sense.  Why would a party that tried so hard to negotiate carveouts suddenly change course, and start dissipating assets without agreement or court order?  Isn't it more likely that a party placed in this position would turn to the Court, and ask the Court to approve reasonable carveouts where CNL was unwilling to

do so?  That, of course, is precisely what has happened.  StakeHound has continued to abide by its informal standstill commitment, and now asks the Court to deny the requested TRO based on the ongoing standstill and carveout terms set forth in StakeHound's supporting Declaration.  Mr. Hurley's assumptions of imminent dissipation have no foundation in fact, and should be stricken for their lack of evidentiary basis.[9]

49.     The facts are these: notwithstanding the overwhelming record evidence that StakeHound is entitled to the Staked Tokens and related rewards, it has nevertheless made reasonable proposals to hold those assets while the Court determines where this dispute should ultimately be heard, even going as far as to pause the Swiss arbitration while this Court makes its threshold procedural determinations.  If Mr. Hurley or his client were so inclined they could view the publicly-accessible blockchain to see that no dissipation has occurred.  And StakeHound made its commitment to the Swiss arbitrator the day it joined in the joint letter with the Plaintiffs, despite the parties not yet having concluded a standstill agreement with carveouts.

50.     The Castellana Declaration substantiates StakeHound's need for access to appropriate carve-outs and the necessary amounts of such carve-outs, all of which can be tied to legitimate expenses, including those necessitated by having to litigate this matter before the Court. *See Castellana Declaration*, ¶¶ 35–42.

---

[9] Not to belabor the point, but we also note that permitting Rule 408 communications to be used in this way is bad policy, and not conducive to the beneficial goal of promoting settlement negotiations.  It is difficult to negotiate productively with a party that uses settlement correspondence in this manner.  And it is more than a little ironic for CNL to complain, under these circumstances, that StakeHound is not fulfilling its "meet and confer" obligations.

## CONCLUSION

For these reasons, Defendant StakeHound S.A. respectfully requests that the Court deny the Motion in its entirety, and grant such other relief as the Court may deem proper.

Dated: August 25, 2023
New York, New York

*Respectfully,*

*/s/ Stephanie Wickouski*
**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted pro hac vice)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A*