**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted *pro hac vice*)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CELSIUS NETWORK LLC, *et al.*,[1]<br><div align="right">Debtors.</div> | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |
| CELSIUS NETWORK LIMITED,<br><div align="right">Plaintiff</div><div align="center">v.</div>STAKEHOUND SA,<br><div align="right">Defendant</div> | Adversary Proceeding<br>No. 23-01138 (MG) |

**DEFENDANT STAKEHOUND, S.A.'s**
**SUPPLEMENTAL MEMORANDUM ADDRESSING UNAVAILABILITY OF**
**<u>FREEZING INJUNCTION IN FAVOR OF PLAINTIFF</u>**

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

SUPPLEMENT TO OBJECTION..........................................................................................2

   **I.**    This Court May Not Issue an Asset-Freezing Injunction on Plaintiff's Purely
Contractual Claims. ........................................................................................................2

    **A.**   *Grupo Mexicano* Bars the Plaintiff's Requested Freezing Injunction, and
Plaintiff's Supposed Bankruptcy Exception Does Not Change that Result.................2

    **B.**   The Plaintiff's Alleged Equitable Claims Do Not Avoid *Grupo Mexicano's*
Prohibition on a Freezing Injunction in this Case.......................................................7

      a.   Plaintiff's Claims are Insufficiently Pled Under Swiss Law. ....................................8

      b.   Even if U.S. Law Applied, CNL's Equitable Claims Fail. ........................................10

    **C.**   Even if CNL's Equitable Claims Were Adequately Pled, CNL's Claims are
Primarily for Legal Relief, so *Grupo Mexicano* Applies..........................................20

      a.   The Majority of Plaintiff's Equitable Claims are Duplicative of its Breach of
Contract Claims. ........................................................................................................20

      b.   Plaintiff's Sole Claim for Ultimate Non-Monetary Relief, an Accounting of
Profits, Also Fails to Support the Preliminary Injunctive Relief Sought...............22

   **II.**   CNL Must Post a Bond. ................................................................................................23

CONCLUSION.....................................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Comm's Corp.*,
  2007 WL 2403553 (Bankr. S.D.N.Y. Aug. 17, 2007) ............................................................15

*Adelphia Commc'ns Corp. v. Rigas*,
  No. 02 Civ.8495 GBD, 02-41729 ..........................................................................................6

*In re Allou Distribs., Inc.*,
  387 B.R. 365 (Bankr. E.D.N.Y. 2008)...................................................................................15

*Amusement Indus., Inc. v. Stern*,
  693 F.Supp.2d 327 (S.D.N.Y. 2010) (Kaplan, J.)..................................................................16

*In re Andrew Velez Const., Inc.*,
  373 B.R. 262 (Bankr. S.D.N.Y. 2007) (Glenn, J.)................................................................17

*Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*,
  159 F. Supp. 3d 324 (E.D.N.Y. 2016) (Spatt, J.).................................................................13

*Atateks Foreign Trade Ltd. v. Dente*,
  798 F.Supp.2d 506 (S.D.N.Y. 2011).....................................................................................17

*In re Bernard L. Madoff Inv. Sec. LLC*,
  708 F.3d 422 (2d Cir. 2013).................................................................................................13

*Braunstein v. McCabe*,
  571 F.3d 108 (1st Cir. 2009) ................................................................................................18

*Cherotti v. Exphand, Inc., et al.*,
  2023 WL 5526625 (S.D.N.Y. Aug. 28, 2023).......................................................................19

*In re Chowaiki & Co. Fine Art Ltd.*,
  593 B.R. 699 (Bankr. S.D.N.Y. 2018)...................................................................................16

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*,
  709 F.2d 190 (3d Cir. 1983).................................................................................................10

*In re Columbia Sussex Corp., Inc.*,
  2006 WL 305959 (E.D. Mo. Feb. 8, 2006).............................................................................5

*Corp. Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Centers of Am., Inc.*,
  915 F. Supp. 2d 1059 (D. Minn. 2013)..................................................................................21

*In re Corp. Res. Servs., Inc.*,
  Case No. 15-12329 (MG), 2020 WL 1907538 (Bankr. S.D.N.Y. Apr. 15,
  2020) ...................................................................................................................20

*Corsello v. Verizon New York, Inc.*,
  18 N.Y.3d 777 (2012) ..........................................................................................17

*CSI Inv. Partners II, L.P. v. Cendant Corp.*,
  507 F.Supp.2d 384 (S.D.N.Y. 2007)....................................................................14

*In re Dow Corning Corp.*,
  280 F.3d 648 (6th Cir. 2002) .................................................................................4

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
  837 F.Supp.2d 203 (S.D.N.Y. 2011) (Sullivan, J.) ..............................................13

*In re Fairfield Sentry Ltd.*,
  458 B.R. 665 (S.D.N.Y.2011)...............................................................................18

*Gate Techs., LLC v. Delphix Capital Markets, LLC*,
  2013 WL 3455484 (S.D.N.Y. July 9, 2013) .........................................................13

*Geron v. Peebler (In re Pali Holdings, Inc.)*,
  488 B.R. 841 (Bankr. S.D.N.Y. 2013) ..................................................................18

*Grupo Mexicano v. Alliance Bond Fund*,
  527 U.S. 308 (1999)........................................................................................ *passim*

*Gucci Am., Inc. v. Weixing Li*,
  768 F.3d 122 (2d Cir. 2014)..................................................................................22

*Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines,
  Inc.)*,
  198 B.R. 45 (S.D.N.Y.1996).................................................................................18

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
  679 F. Supp. 2d 395 (S.D.N.Y. 2009)...................................................................11

*Int'l Bus. Machines Corp. v. BGC Partners, Inc.*,
  2013 WL 1775367 (S.D.N.Y. Apr. 25, 2013)........................................................19

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
  295 F. Supp. 2d 366 (S.D.N.Y. 2003)...................................................................21

*Kilpsch Grp., Inc. v. Big Box Store Ltd.*,
  2012 WL 5265727 (S.D.N.Y. Oct 24, 2012) .........................................................22

*KJ Roberts & Co. Inc. v. MDC Partners Inc.*,
   2014 WL 1013828 (S.D.N.Y. Mar. 14, 2014), *aff'd*, 605 F. App'x 6 (2d Cir.
   2015) ..............................................................................................................11

*Krock v. Lipsay*,
   97 F.3d 640 (2nd Cir. 1996)......................................................................9

*In re Kwok*,
   2023 WL 186964 (Bankr. D. Conn. Jan. 13, 2023) ...................................5

*Levy v. Young Adult Inst., Inc.*,
   2015 WL 170442 (S.D.N.Y. Jan. 13, 2015) ..............................................8

*In re Lois/USA, Inc.*,
   264 B.R. 69 (Bankr. S.D.N.Y. 2001).........................................................9

*McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*,
   2022 WL 18027555 (S.D.N.Y. Dec. 30, 2022) ......................................19

*Metal Bull. Ltd. v. Scepter, Inc.*,
   192 F. Supp. 3d 377 (S.D.N.Y. 2016).......................................................9

*N. Shipping Funds I, LLC v. Icon Cap. Corp.*,
   921 F. Supp. 2d 94 (S.D.N.Y. 2013).......................................................14

*In re NM Holdings Co., LLC*,
   407 B.R. 232 (Bankr. E.D. Mich. 2009) ...................................................5

*Oak Leaf Outdoors, Inc. v. Double Dragon Int'l, Inc.*,
   812 F.Supp.2d 944 (C.D.Ill. 2011) .........................................................21

*In re Owens Corning*,
   419 F.3d 195 (3d Cir. 2005)..............................................................3, 4, 5

*Pena v. Guzman*,
   2004 WL 253331 (S.D.N.Y. Feb. 11, 2004)...........................................15

*Phillips v. Audio Active Ltd.*,
   494 F.3d 378 (2d Cir. 2007).......................................................................8

*Physicians Mut. Ins. Co. v. Greystone Servicing Corp.*,
   2009 WL 855648 (S.D.N.Y. Mar. 25, 2009) ..........................................14

*Reliance Hosp. LLC v. 5251 S Julian Drive LLC*,
   2023 WL 2601255 (D. Ariz. Mar. 22, 2023) ............................................5

*Roby v. Corp. of Lloyd's*,
   996 F.2d 1353 (2d Cir.1993)......................................................................8

*Ross v. Bernhard*,
    396 U.S. 531 (1970) ............................................................................................................19

*Rubin v. Pringle (In re Focus Media Inc.)*,
    387 F.3d 1077 (9th Cir. 2004) ...........................................................................................4

*Singer v. Xipto Inc.*,
    852 F.Supp.2d 416 (S.D.N.Y. 2012) ..........................................................................15, 16

*In re Soundview Elite Ltd.*,
    2014 WL 2998529 (S.D.N.Y. July 3, 2014) ....................................................................17

*In re Soundview Elite Ltd.*,
    543 B.R. 78 (2016) ..........................................................................................................4, 6

*Starr Intern. Co., Inc. v. American Intern. Group, Inc.*,
    623 F.Supp.2d 497 (S.D.N.Y. 2009) (Rakoff, J.) ............................................................19

*Transcience Corp. v. Big Time Toys, LLC*,
    50 F.Supp.3d 441 (S.D.N.Y. 2014) .................................................................................19

*Turtur v. Rothschild Registry Int'l, Inc.*,
    26 F.3d 304 (2nd Cir. 1994) ..............................................................................................9

*United States v. Inslaw, Inc.*,
    932 F.2d 1467 (D.C.Cir. 1991) .......................................................................................18

*Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*,
    149 F. Supp. 3d 376 (E.D.N.Y. 2016) .............................................................................20

**Statutes and Rules**

Federal Rule of Civil Procedure 64 ...........................................................................................23

Federal Rules of Bankruptcy Procedure Rule 7012.....................................................................2

Federal Rules of Civil Procedure Rule 12 ..................................................................................2

Judiciary Act, 1789 ....................................................................................................................3

Rule 12(b)(6)........................................................................................................................10, 18

Rule 65 .......................................................................................................................................3

Rule 65(c)..................................................................................................................................22

Defendant StakeHound S.A. ("**StakeHound**") hereby files this Supplemental Memorandum in further support of its objection (the "**Objection**") to Plaintiff Celsius Network Limited's ("**CNL**") *Motion for Temporary Restraining Order and Preliminary Injunction* [ECF No. 39] and *Supplemental Brief in Further Support of Motion for Temporary Restraining Order and Preliminary Injunction* [ECF No. 54] (the "**Supplemental Brief**," and collectively, the "**TRO Motion**").

## INTRODUCTION

1.      At the August 29 hearing on the TRO Motion, the Court invited the parties to submit supplemental briefing as to the effect of the Supreme Court's decision in *Grupo Mexicano v. Alliance Bond Fund*, 527 U.S. 308 (1999) upon CNL's entitlement to a freezing injunction in this case. *See* Transcript of Proceedings, *Celsius Network Limited v. StakeHound SA*, Adversary No. 23-01138 (the "**Transcript**"), 19, 26-27, 76-78. The Court stated, with respect to the *Grupo Mexicano* decision, that "I read it as not permitting an asset freeze. It's a collection mechanism in a breach of contract dispute before there's a judgment and a judgment lien attaching." *See* Transcript at 23. The Court then asked the parties to address the impact of the decision on the equitable claims asserted in CNL's amended complaint. *Id*. at 23-29. The Court further cautioned that "I have to be satisfied at a minimum that the elements—the elements of the claim have been adequately pleaded . . ." *Id.* at 28-29.

2.      As the Court correctly noted, the *Grupo Mexicano* decision *does* preclude CNL— at best, an unsecured creditor with a breach of contract claim not yet reduced to judgment—from obtaining an injunction freezing StakeHound's assets. CNL's newly minted equitable claims fare no better. These new claims are insufficiently pled, legally and factually deficient, and wholly fail to establish a foundation for CNL's requested asset freeze. In short, *Grupo Mexicano* remains

controlling legal authority on a nationwide basis, and mandates the denial of CNL's requested injunctive relief.

## JURISDICTION AND VENUE

3.        StakeHound does not consent, expressly or impliedly, to this Court's subject matter jurisdiction over the claims at issue in the *First Amended Adversary Complaint*, filed at ECF. No. 39 (as may be amended from time to time, the "***Complaint***"), or this Court's personal jurisdiction over StakeHound.  By filing this Objection, StakeHound does not waive, and StakeHound hereby expressly preserves, all defenses it may plead pursuant to Rule 12 of the Federal Rules of Civil Procedure (the "***FRCP***") (made applicable to these proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure) prior to answering the Complaint or otherwise, including but not limited to the absence of personal jurisdiction over StakeHound (on which basis StakeHound has moved to dismiss the Complaint pursuant to its *Motion to Dismiss First Amended Adversary Complaint* [ECF No. 45]).  StakeHound does not consent to entry of final orders or judgment by this Court.

## SUPPLEMENT TO OBJECTION

I.     **This Court May Not Issue an Asset-Freezing Injunction on Plaintiff's Purely Contractual Claims.**

A.     ***Grupo Mexicano* Bars the Plaintiff's Requested Freezing Injunction, and Plaintiff's Supposed Bankruptcy Exception Does Not Change that Result.**

4.        The U.S. Supreme Court's controlling decision in *Grupo Mexicano* bars the injunctive relief sought by CNL where CNL's claims, at bottom, are purely contractual in nature. In *Grupo Mexicano*, the plaintiff sought a preliminary injunction preventing the defendant from transferring certain assets without which the defendant would be unable to satisfy a judgment on plaintiff's breach of contract claims.  *See Grupo Mexicano*, 527 U.S. at 312.  Reversing the Second Circuit, the Supreme Court held that the equitable authority afforded a district court could extend only as far as what could have been granted to it "at the time of the adoption of the Constitution

and the enactment of the original Judiciary Act, 1789." *See id.* at 318.  This authority, the Supreme Court held, did not encompass the power "to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *See id.* at 333.  The majority reached this conclusion in part based on the principle that, "before judgment (or its equivalent) an unsecured creditor has no rights at law or in equity in the property of his debtor." *See id.* at 329.  To hold otherwise, the Supreme Court wrote, would be to "radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws—including those relating to bankruptcy, fraudulent conveyances, and preferences." *See id.* at 331.[2]

5.      The holding in *Grupo Mexicano* controls here and warrants denial of the TRO Motion.  In *Grupo Mexicano*, the noteholder seeking the injunction held an essentially undisputed contractual right to the respondent's assets (notes and receivables, or the equivalent value) and there was substantial evidence that respondent was "rapidly disbursing" those assets.  In other words, and as distinguished from CNL, the creditor in *Grupo Mexicano* had actually demonstrated a strong case on the merits and a risk of imminent dissipation.  Yet, despite the creditor's clear entitlement to the funds, the Court still denied an asset freeze.  The Court held—with great resonance for our case—that unsecured creditors with contract-based claims are not entitled to prejudgment attachment by means of a Rule 65 motion.  CNL cannot escape this holding, no matter how many "equitable" causes of action it endeavors to shoehorn into its complaint.

6.      In subsequent decisions, certain lower courts have endeavored to limit *Grupo Mexicano's* holding as inapplicable to bankruptcy courts which, they assert, have equitable powers

---

[2] Importantly, the Court also stated that "[e]ven in the absence of historical support, we would not be inclined to believe that it is merely a question of procedure whether a person's unencumbered assets can be frozen by general-creditor claimants before their claims have been vindicated by judgment.  It seems to us that question goes to the substantive rights of all property owners." *Id.* at 322-23.

not possessed by a district court.  *See In re Owens Corning,* 419 F.3d 195 (3d Cir. 2005) (in *dicta*

on a motion for substantive consolidation, opining that a bankruptcy court could enter the sort of

injunction prohibited by *Grupo Mexicano* because the "extensive history of bankruptcy law and

judicial precedent renders the issue of equity authority in the bankruptcy context different to such

a degree as to make it different in kind" from the equitable authority of the district court); *In re

Soundview Elite Ltd.,* 543 B.R. 78, 121 (2016) (citing *Owens-Corning*) ("Here, where the Trustee

is attempting to marshal the Elite estate's assets for the benefit of its creditors, and to protect those

creditors from efforts to dissipate property that may technically not yet be estate property but will

be imminently, the Third Circuit's analysis in *Owens Corning* makes for a perfect fit.").

    7.    Plaintiff points to these decisions, none of which is controlling in this circuit, to

argue for a sweeping exclusion of *Grupo Mexicano's* application to a grant of pre-judgment

injunctive relief by a bankruptcy court, as opposed to a district court, freezing assets.

*See Supplemental Brief* at 1.  However, upon closer review, an important distinction emerges

between a bankruptcy court exercising the core and inherent powers granted it by the Bankruptcy

Code and a bankruptcy court that is adjudicating non-core claims that could just as well be heard

in a state or Article III court.  In each of the cases CNL cites to urge a bankruptcy exception to

*Grupo Mexicano*, the decision turned on application of a bankruptcy court's injunctive power *in

furtherance of core bankruptcy functions.  See In re Dow Corning Corp.,* 280 F.3d 648, 658 (6th

Cir. 2002) (holding that bankruptcy court's enjoining of a non-consenting creditor's claim against

a non-debtor to facilitate a plan of reorganization was a proper exercise of its equitable powers

under §105 in furtherance of § 1123(b)(6) and that "*Grupo Mexicano* did not preclude such an

injunction."); *Rubin v. Pringle (In re Focus Media Inc.),* 387 F.3d 1077, 1085 (9th Cir. 2004)

(*Grupo* did not bar bankruptcy court's injunction of involuntary corporate debtor's principal

pending resolution of trustee's fraudulent transfer and turnover actions against corporate debtor.);

*EHT US1, Inc.,* No. 21-10036, 2021 WL 3828556, at *2 (Bankr. D. Del. Aug. 27, 2021) (enjoining

sufficient funds of the defendants pending fraudulent conveyance action); *In re Kwok*, No. 22-

50073 (JAM), 2023 WL 186964, at *20 (Bankr. D. Conn. Jan. 13, 2023) (enjoining plaintiff from

social media and protest campaign against chapter 11 trustee to prevent irreparable harm to the

reorganization process and estate); *compare Reliance Hosp. LLC v. 5251 S Julian Drive LLC,* No.

CV-22-00149-TUC-JAS (MSA), 2023 WL 2601255, at *2 (D. Ariz. Mar. 22, 2023) (declining to

enjoin defendant where plaintiff only alleged violation of contractual obligations—a primarily

legal remedy and alleged no UFTA violations ); *In re NM Holdings Co., LLC*, 407 B.R. 232, 270

(Bankr. E.D. Mich. 2009) (holding that *Grupo Mexicano* does not apply to bankruptcy courts

carrying out equitable powers granted by Bankruptcy Code in the context of substantive

consolidation); *In re Columbia Sussex Corp., Inc.,* No. 4:06CV118SNL, 2006 WL 305959, at *4

(E.D. Mo. Feb. 8, 2006) (in analysis of bankruptcy court's subject matter jurisdiction, holding that

"*Grupo Mexicano*…does not deal with the issue of bankruptcy jurisdiction which is statutorily

conferred.").

8.      This distinction makes intuitive sense: as an Article I court, a bankruptcy court may

exercise only those powers granted it by Congress.  Even *Owens-Corning* acknowledges that a

bankruptcy court's equitable powers are exercisable only in service of a power already granted by

the Bankruptcy Code.  *See* 419 F.3d at 208 n.14 ("Even if § 105(a) 'constitutes a direct, fresh grant

of supplemental power to the bankruptcy courts, independent of the judicial power granted to the

federal courts under title 28 [of the United States Code],' it can only implement powers already

expressed in the provisions of the Bankruptcy Code.") (citations omitted).  While StakeHound

disagrees that there is a bankruptcy exception to the rule articulated in Grupo Mexicano, and notes

the non-controlling nature of the decisions holding otherwise, StakeHound observes that the courts

that have chosen not to follow Grupo Mexicano have done so in cases where the bankruptcy courts

in question were vindicating actions at the heart of core bankruptcy jurisdiction.[3]

9.    Here, by contrast, the parties' dispute turns on *non-core contract claims*, which are

not unique to a bankruptcy proceeding, do not directly affect a core bankruptcy function, and are

not matters with which the bankruptcy court would ordinarily be expected to have greater

familiarity or expertise. *See Adelphia Commc'ns Corp. v. Rigas*, No. 02 Civ.8495 GBD, 02-41729

REG., 2003 WL 21297258, at *2 (S.D.N.Y. June 4, 2003).  Where a bankruptcy court is

adjudicating a non-core claim, the distinction made by *Owens-Corning* and other courts citing

*Grupo Mexicano* is rendered meaningless, as the bankruptcy court is exercising no different

powers than would be available outside of the bankruptcy context, and should not have greater

powers than a federal district judge unable to enter a pre-judgment freezing injunction.

10.    For example, in *Soundview*, the court granted a "freezing" injunction where it had

already determined the substantive merit of a trustee's claim to exercise a right of redemption from

a related party; only the quantum of such recovery remained to be decided.  *See* 543 B.R. at 122.

CNL would have this Court believe its "position is similar to the trustee's in *Soundview*."  *See*

*Supplemental Brief,* at 3.  Yet again, and without a scintilla of support in the parties' agreements

and the record evidence, CNL assures the Court that it will prevail on the merits of its claims in

and to the Native Tokens.  But there has been *no* determination that the assets held by StakeHound

are property of the estate; indeed, each and every one of Plaintiff's transfers of Native Tokens,

---

[3] CNL may argue that the administration and protection of bankruptcy estate property is within the bankruptcy court's core jurisdiction.  That argument, if made, suffers from the same infirmity as most of CNL's other merits arguments—CNL continues to beg the ultimate question in this case.  The record evidence demonstrates that the Native Tokens in question are StakeHound's property, and CNL would need to prevail at the Arbitration to establish these disputed assets as estate property.

including every single ETH, DOT, and MATIC token, is governed by the SSTC (and, with respect to the MATIC and DOT, the RSA), which expressly provide that, "[f]or the avoidance of doubt [StakeHound] will have the ownership of the Native Token, as the latter is used to pay the Staking Services of the Company." *See* Castellana Declaration, ¶ 28.[4]  While making the bold presumption that sooner or later it will win, CNL offers no compelling legal or factual basis for that assertion; CNL simply assumes total victory on the disputes that must be arbitrated in Switzerland.  In presuming that the Native Tokens are already property of the estate, CNL essentially assumes away the Arbitration, and resolves all doubts in its own favor.  But these non-core contract claims are yet to be decided, and the record before the Court does not support CNL's bold predictions.

11.    The *Grupo Mexicano* decision is *controlling Supreme Court authority*.  The supposed bankruptcy exception urged by CNL is not supported by any controlling Second Circuit authority, and would make no sense in the context of a non-core, arbitrable dispute governed by Swiss law. To hold otherwise would be to conclude that the injunctive powers of the federal bankruptcy courts are greater than the injunctive powers of the federal district courts.

**B.    The Plaintiff's Alleged Equitable Claims Do Not Avoid *Grupo Mexicano's* Prohibition on a Freezing Injunction in this Case.**

12.    Plaintiff argues that the newly minted equitable claims asserted in the First Amended Adversary Complaint (filed on the eve of the TRO Motion) allow the imposition of injunctive relief free of the limitations and safeguards articulated by the Supreme Court in *Grupo*

---

[4] CNL's counsel continues to argue vociferously that the estate has a direct property interest in the DOT and MATIC tokens, and that StakeHound "never even tried to provide an excuse for withholding the MATIC and the DOT which is worth approximately $40 million."  Transcript at 38.  Counsel takes liberties with the record here.  StakeHound has consistently taken the position that it holds absolute ownership of the MATIC and the DOT, and that the contractual conditions for an exchange of these tokens have not been satisfied.  CNL received actual consideration for the transfer: tokens that it could immediately sell, trade and/or deploy in the DeFi market.  CNL offers indignant argument but no *evidence* on this issue.  And unlike CNL, StakeHound grounds its argument on this point in the plain language of the parties' agreements.  *See* RSA § 2.1 (acknowledging SSTC applies to MATIC and DOT transfers); SSTC § 1, "Staking" ("For the avoidance of doubt, [StakeHound] will have the ownership of the Native Token").

*Mexicano*.  CNL should not be permitted to plead its way around *Grupo Mexicano* in this fashion. *See Levy v. Young Adult Inst., Inc.,* No. 13-CV-2861 (JPO), 2015 WL 170442, at *9 (S.D.N.Y. Jan. 13, 2015) ("The Supreme Court has cautioned that district courts should be wary of allowing plaintiffs to make sweeping, unfounded equitable claims in order to receive this extraordinary relief.").  In any event, CNL's effort to escape the controlling impact of *Grupo Mexicano* fails for at least three reasons.  First, Plaintiff has failed to plead these claims under Swiss law, which governs the parties' present disputes.  Second, even if New York law governed these claims (which it does not), Plaintiff still failed to plead these claims sufficiently.  And finally, Plaintiff is not entitled to equitable relief where it has an adequate remedy at law in the form of its claims for breach of contract.

> a.     *Plaintiff's Claims are Insufficiently Pled Under Swiss Law.*

13.     While Plaintiff appears to have pled its putative equitable claims under New York law, any such claims would arise out of the same operative facts as its contract claims and are governed by Swiss law.  It is undisputed that the contracts at issue in this case—the SSA, RSA and SSTC—all select Swiss law as controlling and provide for mandatory arbitration of all disputes in Switzerland.  *See* SSA §§ 9-10; RSA §§ 9-10; SSTC §§ 3.a, 3.d.  As CNL acknowledged by submitting two declarations from a Swiss lawyer concerning the substance of Swiss contract law, CNL's claims are governed by Swiss law.  Choice-of-law clauses are presumptively valid where, as here, the underlying transaction involves international commerce.  *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1362 (2d Cir.1993)(holding that clauses binding the plaintiffs to arbitrate in England under English law were enforceable, notwithstanding provisions in the United States securities laws making clear Congress's 'intention that the policies in those laws should not be thwarted.'); *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 383 (2d Cir. 2007)("If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties

8

involved in the dispute, it is presumptively enforceable."); *Metal Bull. Ltd. v. Scepter, Inc.*, 192 F. Supp. 3d 377, 381 (S.D.N.Y. 2016)("[I]t is not enough [to rebut the presumption of validity] to show that application of a choice-of-law clause will result in the forfeiture of some claims…or that the foreign law or procedure merely may be different or less favorable than that of the United States.").

14.     Under New York law, a choice-of-law provision applies to tort claims related to the contract when the provision is broad enough to encompass the entire relationship between the contracting parties. *Krock v. Lipsay*, 97 F.3d 640, 645 (2nd Cir. 1996)(citing *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304 (2nd Cir. 1994); *In re Lois/USA, Inc.*, 264 B.R. 69, 98 (Bankr. S.D.N.Y. 2001)("[W]hile a contractual choice-of-law provision will normally be enforced, if it is to cover claims other than those in contract, it must have been drafted sufficiently broadly to say so.").

15.     The contracts at issue in this case—the SSA, RSA and SSTC—all elect Swiss law and Swiss arbitration in connection with the disputes incident to the parties' relationship. The SSA and RSA state that they "shall be construed in accordance with the laws of Switzerland." And the choice of law provision in the SSTC, which is incorporated by reference and attached to the SSA and RSA, is even broader, stating: "These Terms and Conditions shall be governed *in all respects, including as to validity, interpretation and effect*, by the laws of Switzerland…" SSTC § 3.d.

16.     Moreover, CNL has acknowledged that Swiss law governs its claims by submitting two declarations from a Swiss lawyer concerning the substance of Swiss contract law. CNL cannot escape the broad reach of the Swiss choice of law and arbitration provisions by asserting claims under U.S. law:

> It defies reason to suggest that a plaintiff may circumvent forum
> selection and arbitration clauses merely by stating claims under laws

> not recognized by the forum selected in the agreement. A plaintiff simply would have to allege violations of *his country's* tort law or *his country's* statutory law or *his country's* property law in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction. We refuse to allow a party's solemn promise to be defeated by artful pleading.

*See id.* at 1360 (citing *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983).

17.    Under Swiss law, Plaintiff has failed to plead its equitable claims with sufficient factual detail or the required elements.  CNL's purported equitable claims do not provide a sufficient factual or legal basis for relief under Swiss law, and therefore cannot be said to demonstrate the requisite likelihood of success on the merits to support a freezing injunction. Indeed, it is hard to see how these claims could be maintained in their present form in the Swiss Arbitration.

      b.     *Even if U.S. Law Applied, CNL's Equitable Claims Fail.*

18.    Assuming without conceding that U.S. law applied (and it does not), CNL's equitable claims would still be insufficiently pled.  In fact, not only has CNL failed to establish the likelihood of success on the merits of any of its equitable claims, it has failed to state a legally sufficient claim on any of these theories.  As described below, CNL's barebones pleading of its equitable claims, which does little more than parrot the elements of these claims under inapplicable New York law, would not survive a Rule 12(b)(6) motion.  Despite the Court's caution at the August 29, 2023 hearing that equitable claims must be properly and sufficiently pled to avoid the strictures of *Grupo Mexicano*, CNL has failed to articulate colorable or legally sufficient equitable claims.  CNL's inclusion of these skeletal causes of action, on the eve of StakeHound's objection deadline, appears merely to be an attempt to end-run the holding in *Grupo Mexicano*.

**Accounting**

19.     To state a claim for an accounting under New York law, a plaintiff must establish: (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal. *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009).  CNL has not adequately alleged the first three elements.

20.     First, CNL does not allege a confidential or fiduciary relationship between the parties.  This was an arm's length business deal,[5] one in which CNL sought to use StakeHound's liquid staking offerings because CNL saw the value in reaping the rewards of staking Native Tokens, while also possessing liquid tokens it could deploy in the DeFi ecosystem.  Consequently, and as CNL agreed in both the SSA and in the SSTC, StakeHound took **legal ownership and possession** of all the Native Tokens, in exchange for stTokens.  *See* SSA § 1.3; SSTC § 1, "Staking" (emphasis added).  This type of "arm's length business dealing" has been found insufficient to state an accounting claim under New York law. *See KJ Roberts & Co. Inc. v. MDC Partners Inc.*, No. 12-cv-5779 (LGS), 2014 WL 1013828, at *12 (S.D.N.Y. Mar. 14, 2014) ("Under New York law, a 'confidential relationship' in this context refers to a relationship which induced plaintiff to entrust defendant with property or money. Plaintiff has not produced any evidence suggesting that it entrusted Defendant with property or money in a fiduciary capacity, or that its relationship with Defendant consisted of anything other than arm's length business dealings.") (quotations and citations omitted), *aff'd*, 605 F. App'x 6 (2d Cir. 2015).

---

[5] CNL has suggested, at various points in this proceeding, that Albert Castellana of StakeHound did not deal with Jason Stone of Celsius at arm's length.  No legally competent evidence has been offered by CNL in support of this insulting and unsubstantiated characterization.

21.     CNL essentially admits it has no special relationship with StakeHound[6] but argues that it can still state this claim if it can show that the account is of a "complicated character." Supplemental Brief at 5-6.  First, it is unclear whether that is the law in the state of New York. The New York state cases supporting that proposition were decided in 1914 and 1898, and they do not square with far more recent decisions holding that a special relationship is an element of an accounting claim.  Second, CNL has not shown that this is an account of a complicated character. CNL's only argument is that StakeHound has not "documented its activities with any precision" and that counsel did not represent on the record during the TRO hearing how much of StakeHound's staked ETH came from CNL.  *Id*. at 6.  At this stage of the proceedings, CNL has no basis to claim that StakeHound has not documented its account activities, nor does StakeHound's counsel have any obligation to make statements on the record about StakeHound's account activities, particularly without any documentation in front of them.  This is not evidence of a "complicated" account.  In reality, this account is not complicated.  All transfers are documented and visible on the blockchain, as Mr. Man's *three* declarations in support of the TRO Motion make clear.

22.     CNL also fails to allege the second element of an accounting claim because it has not sufficiently alleged that CNL "entrusted" anything to StakeHound.  "Entrusting" means providing property or money to another under a charge or duty, like providing an investment broker

---

[6] CNL asserts in a footnote, without analysis or citation to authority, that it may have a special relationship with StakeHound because it entered into this deal with StakeHound based on a "pre-existing" relationship between Jason Stone and Albert Castellana and StakeHound's purported "repeated assurances" of an exchange of stTokens for Native Tokens.  *See* Supplemental Brief at n. 5.  But CNL cites no authority for the proposition that these allegations amount to anything close to a confidential relationship justifying an accounting obligation.  Moreover, these contentions overstate and mischaracterize CNL's actual allegations, which: (i) do not reflect "repeated assurances" of a 1-to-1 exchange but merely refer to one email from Mr. Castellana, which is taken out of context and is meritless parol evidence (FAC ¶ 41); and (ii) merely allege that Stone and Castellana "were on friendly terms" and had "discussed potential dealings." FAC ¶ 31.  None of this evidences a confidential or fiduciary relationship between the parties sufficient to support equitable relief.

with money with which the broker would make investments. *See In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422, 425-26 (2d Cir. 2013) (appellants could not establish they "entrusted" cash or securities to broker where appellants invested *in* the company, not *through* the company). The express terms of the SSA and SSTC defeat CNL's conclusory allegations that it "entrusted" the Native Tokens to StakeHound. CNL did not "entrust" StakeHound with the Native Tokens. To the contrary, CNL conveyed complete legal ownership and possession of the Native Tokens to StakeHound in exchange for stTokens. *See supra n. 2.* CNL had no right of redemption of the Native Tokens. It had only limited rights to exchange stTokens for Native Tokens on specified terms and conditions, and certainly no right to receive back the *same* Native Tokens it sold to StakeHound. Accordingly, there was no entrustment here.

23.     Finally, and most importantly, CNL cannot allege the absence of an adequate remedy at law. Indeed, CNL admits it has a legal remedy, and seeks to recover the Native Tokens or their equivalent value as a remedy related to every other (non-automatic stay related) claim it alleges, including its breach of contract claim. *See, e.g.,* FAC ¶¶ 78, 92, 97, 101-102, 108-109. New York courts have repeatedly held "an equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter." *Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*, 159 F. Supp. 3d 324, 340 (E.D.N.Y. 2016) (Spatt, J.) (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 203, 207 (S.D.N.Y. 2011) (Sullivan, J.). That is because CNL would be able to obtain the information and damages through discovery of its breach of contract claim, giving it an adequate remedy at law. *See Gate Techs., LLC v. Delphix Capital Markets, LLC,* No. 12 CIV. 7075(JPO), 2013 WL 3455484, at *8 (S.D.N.Y. July 9, 2013) ("'Plaintiff[s] ha[ve] sought money damages in [their] breach of contract claim, and because discovery as to the measure of damages would be available to [them] if [they] were to

prevail on that claim, [they] can obtain all the information [they] seek[ ] in [their] existing claim at law.'"); *Physicians Mut. Ins. Co. v. Greystone Servicing Corp.*, No. 07 CIV. 10490(NRB), 2009 WL 855648, at *11 (S.D.N.Y. Mar. 25, 2009) ("[T]his cause of action still arises from the same operative facts as plaintiffs' contract breach claim. As such, Count VII is likewise dismissed."); *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F.Supp.2d 384, 425 (S.D.N.Y. 2007) ("An accounting claim is not proper where money damages are recoverable under alternative causes of action for the same injury."). CNL's breach of contract claim and equitable claims all cover the same subject matter: the parties' relationship *vis a vis* the Native Tokens.

24.    CNL tries to rescue its equitable claims by contending that the termination of the SSA renders these claims non-duplicative of the breach of contract claim. This argument misses the mark. First, whether the SSA is terminated is an arbitrable question that should be decided by the arbitrator in the first instance. Second, even if the SSA is terminated, under its terms any transactions thereafter are expressly governed by the SSTC, which also contains a provision that the user of StakeHound's services acknowledges that StakeHound has sole legal possession of the Native Tokens. *See* SSA § 1.8. Consequently, any claim related to the Native Tokens either is covered by the SSA or SSTC, and is in the nature of a contract claim. The breach of contract claims remains pending and of record in this adversary proceeding. And the existence of that contract claim defeats a simultaneous claim for an accounting.

**Unjust Enrichment and Constructive Trust**

25.    CNL also has failed to state claims for unjust enrichment and constructive trust. Courts in this district routinely dismiss unjust enrichment and constructive trust claims at the pleading stage when those claims "arise from the same operative facts as [the] plaintiff's contract breach claim." *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 107 (S.D.N.Y.

2013) (quoting *Physician Mutual Insurance Co. v. Greystone Servicing Corp.*, No. 07 Civ. 10490, 2009 WL 855648, at *11 (S.D.N.Y. March 25, 2009); and citing *Pena v. Guzman*, No. 03 Civ. 5130, 2004 WL 253331, at *2 (S.D.N.Y. Feb. 11, 2004) ("In order to establish a claim for constructive trust, the plaintiff must make an allegation that is not merely duplicative of the breach of contract claim but instead must allege ... distinct harm or actions giving rise to a[ ] separate claim [for a] constructive trust.")).

26.    CNL's unjust enrichment and constructive trust claims entirely duplicate its claim for breach of contract.  All of these claims and arguments rely on the same factual predicate: that CNL either owns the Native Tokens or has a contractual right to a one-to-one exchange of stTokens for Native Tokens.  FAC ¶¶ 88-90, 96-97, 105-107.  As remedies for its unjust enrichment and constructive trust claims, CNL seeks disgorgement in a value equal to the Native Tokens plus rewards and a constructive trust over the Native Tokens plus rewards.  FAC ¶¶ 97, 108.  These are the same remedies, or of equal value to the remedies sought in connection with CNL's breach of contract claims.  FAC ¶¶ 92.  Here, CNL simply does not allege any unique or separate facts supporting the unjust enrichment and constructive trust claims that do not also support its breach of contract claim.

27.    CNL's cases to the contrary are distinguishable.  For instance, in *Matter-of-Kossof PLLC*, the court permitted alternative pleading of unjust enrichment and *fraudulent transfer* claims, not breach of contract claims.  *See Matter-of-Kossof PLLC*, 2023 WL 3404907, at * 1 (S.D.N.Y. Mat 11, 2023).  There also appeared to be a question as to whether the contract at issue in the unjust enrichment claim was also relevant to the fraudulent transfer claims.  The same is true of *In re Allou Distribs., Inc.*, 387 B.R. 365, 412 (Bankr. E.D.N.Y. 2008) (permitting unjust enrichment claim to be plead alternatively to fraudulent transfer claim).  In *Singer v. Xipto Inc.*,

the court permitted alternative pleading of unjust enrichment and contract breach claims because the parties disputed whether a contract existed. *See Singer v. Xipto Inc.*, 852 F.Supp.2d 416, 426 (S.D.N.Y. 2012) (denying motion to dismiss unjust enrichment claim because "it is not settled that an enforceable contract exists which would preclude equitable remedies such as unjust enrichment"). And in *In re Adelphia Comm's Corp.*, No. 03-AP-4942(REG), 2007 WL 2403553 (Bankr. S.D.N.Y. Aug. 17, 2007), the court dismissed an unjust enrichment claim for failure to state a claim because the court already had determined that the defendant had performed its contractual obligations entitling it to the benefit that formed the basis of the unjust enrichment claim. *See In re Adelphia*, 2007 WL 2403553, at * 7. As set forth above, there is no dispute here as to whether a contract governs the subject matter of this cause of action. Even if the SSA terminated, that termination would only result in the RSA and SSTC governing the transactions at issue in this case. And the SSTC, like the SSA, contain provisions giving ownership of the Native Tokens to StakeHound, and limiting CNL's rights to exchange stTokens for Native Tokens.[7]

28.    CNL's claim for a constructive trust also fails because "constructive trust is a remedy, not a cause of action." *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 719 (Bankr. S.D.N.Y. 2018) (Vyskocil, J.) (citing *Amusement Indus., Inc. v. Stern*, 693 F.Supp.2d 327, 357 (S.D.N.Y. 2010) ("[A constructive trust] is not an independent cause of action but a device by which property may be recovered if the person holding the property was unjustly enriched.") (Kaplan, J.)).

---

[7] As to ownership of the Native Tokens, *see* SSA § 1.3 ("StakeHound will have the legal ownership of those Locked ETH"); SSTC § 1 "Staking" ("For the avoidance of doubt, [StakeHound] will have the ownership of the Native Token"). The RSA incorporates the SSTC by reference and attaches it. As to limitations on transfer rights, *see, e.g.,* SSTC §§ 1 "Purchasing Native Tokens" (conditioning purchase of Native Tokens on, *inter alia,* completion of KYC/AML due diligence and operation of the Platform, and limiting exchange of stTokens to Native Tokens "at the same value in the equivalent cryptocurrency" and subject to all of the other terms and conditions of the SSTC).

29.    Moreover, CNL has failed to plead even a *prima facie* entitlement to this remedy. To obtain the remedy of a constructive trust, a party must establish: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment." *Id.* (quoting *Atateks Foreign Trade Ltd. v. Dente*, 798 F.Supp.2d 506, 507 (S.D.N.Y. 2011)).  The remedy of constructive trust is applicable "only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* (quoting *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790–91 (2012)).  And bankruptcy courts should be "generally reluctant to impose constructive trusts without a substantial reason to do so." *Id.* at 720 (quotation omitted).

30.    CNL has not plausibly pled its entitlement to a constructive trust.  As demonstrated above, CNL and StakeHound have an arm's length business relationship, not a confidential or fiduciary one.  Nor has StakeHound been unjustly enriched.  It was contractually permitted to receive the benefit (the Native Tokens) that forms the basis of the unjust enrichment and constructive trust claims.  That contractual entitlement—which StakeHound has amply established in the record—defeats the equitable claims that CNL tries to assert.

**Turnover**

31.    CNL also has failed to state a claim for turnover.  As StakeHound argued in its brief supporting its motion to compel arbitration, turnover is unavailable to CNL because the ownership of the Native Tokens is disputed. *See In re Andrew Velez Const., Inc.*, 373 B.R. 262, 273 (Bankr. S.D.N.Y. 2007) (Glenn, J.) ("it is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.").

32.     CNL cites extensively to *Braunstein v. McCabe*, 571 F.3d 108 (1st Cir. 2009) to support the proposition that turnover claims are equitable, seeking equitable remedies. Supplemental Brief at 11-12.   However, courts in this district analyzing *Braunstein* have determined that its holding applies only to "true" turnover claims.   *See In re Soundview Elite Ltd.*, 2014 WL 2998529, at * 3 (S.D.N.Y. July 3, 2014).   Courts here acknowledge that "not every proceeding styled as a turnover action properly seeks to collect a matured debt."   *Id.*   Specifically:

> "[T]he turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable. It is well established that the turnover power may not be used for such purposes."

*Id.* (emphasis added)(quoting *Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 852 n. 39 (Bankr. S.D.N.Y. 2013)); *see also In re Fairfield Sentry Ltd.,* 458 B.R. 665, 683 (S.D.N.Y.2011) ("Numerous courts have [ ] held that an action is non-core when property which is the subject of a significant dispute between the parties is sought to be recovered through a turnover action.") (quotation marks omitted); *Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*, 198 B.R. 45, 50 n. 7 (S.D.N.Y.1996) (same as *In re Andrew Velez Const., Inc.*) (quoting *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C.Cir. 1991)).

33.     In other words, turnover proceedings are equitable and can justify equitable remedies only when they are not disguised contract claims.   When turnover claims are just disguised contract claims, "such an action can only constitute, at the most, non-core rather than core proceedings, given that such actions **are not true turnover actions**."   *Id.* (emphasis added). And the "turnover power may not be used for such purposes."   *Id.* This means that pretextual turnover proceedings (like the claim asserted by CNL here) do not involve the equitable remedy

of turnover at all, but merely seek damages at law for breaches of contract, as CNL's turnover claim does.

**Conversion**

34.    CNL's inclusion of a conversion claim also does not justify an injunction.  First, conversion is a legal claim, not an equitable one.  *See Starr Intern. Co., Inc. v. American Intern. Group, Inc.*, 623 F.Supp.2d 497, 501 (S.D.N.Y. 2009) (Rakoff, J.) ("it is settled law that conversion is 'unmistakably [an action] at law triable to a jury') (citing *Ross v. Bernhard*, 396 U.S. 531, 533 (1970)).  Accordingly, it is subject to the *Grupo Mexicano* rule prohibiting injunctions.[8]

35.    Second, CNL's conversion claim is duplicative of its contract claim and would not survive a Rule 12(b)(6) motion.  *See Cherotti v. Exphand, Inc., et al.*, No. 20 CIV. 11102 (SLC), 2023 WL 5526625, at *12 (S.D.N.Y. Aug. 28, 2023) ("[C]onversion claims are routinely dismissed ... where duplicative of breach of contract claims.") (quoting *Transcience Corp. v. Big Time Toys, LLC,* 50 F.Supp.3d 441, 456 (S.D.N.Y. 2014) (collecting cases)); *see also McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, No. 1:22-CV-1138-GHW, 2022 WL 18027555, at *6 (S.D.N.Y. Dec. 30, 2022) (dismissing conversion claim as "impermissively duplicative of Plaintiffs' breach of contract claims").  In anticipation of this argument, CNL points out that conversion claims can survive dismissal if they are based on post-contract termination conduct or conduct outside the four corners of the contract.    *See Supplemental Brief* at 15-16.    Those

---

[8] CNL's request for "replevin" as a remedy does not alter this conclusion.  First, CNL has not stated a claim for replevin.  "To establish a claim for replevin, the plaintiff must prove two elements: (1) that plaintiff has a possessory right superior to that of the defendant; and (2) that plaintiff is entitled to the immediate possession of that property." *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 CIV. 128 PAC, 2013 WL 1775367, at *9 (S.D.N.Y. Apr. 25, 2013) (citation omitted).  CNL does not expressly plead these elements.  But even if it had, they would not be plausible.  The express terms of the contracts governing these transactions would defeat any allegation that (i) CNL has any possessory right to the Native Tokens, let alone one that is superior to StakeHound's; and (ii) that CNL is entitled to immediate possession of the Native Tokens—the essential predicate of a clam for replevin.

exceptions do not help CNL here.  First, it is undisputed that *some* contract between the parties

governs the Native Tokens.  Even if the SSA is terminated (and that is a question for the arbitrator),

the parties' rights relating to the assets at issue here would then be governed by the RSA and SSTC.

Consequently, there is no "post-termination" conduct here.  Secondly, there is no extracontractual

conduct either.    CNL argues that StakeHound's temporary suspension of its platform is

extracontractual.  *See Supplemental Brief* at 16.  Not so.  Under the SSTC, which governed the

transfers of the ETH, MATIC and DOT, StakeHound has the express right to suspend its platform

temporarily and for any reason.  *See, e.g.,* SSTC § 2 "Termination and access restriction."

Consequently, its suspension of the platform is not "extracontractual" conduct.  And any dispute

on this point must be resolved through the Swiss Arbitration.  Moreover, as Mr. Castellana testified

in his declaration, the suspension *is* temporary; StakeHound will lift the suspension after it has

completed its attempt to recover the value of the lost ETH from Fireblocks.  CNL has not stated a

claim for conversion that differs in any material way from its contract claim.

> **C.**  **Even if CNL's Equitable Claims Were Adequately Pled, CNL's Claims are Primarily for Legal Relief, so *Grupo Mexicano* Applies.**
>
> > *a.*  *The Majority of Plaintiff's Equitable Claims are Duplicative of its Breach of Contract Claims.*

36.    Plaintiff's hastily-added equitable claims, even if they were adequately pled (which

they are not), do not escape application of *Grupo Mexicano* because they are not primarily

equitable in nature; indeed, they are entirely duplicative of their breach of contract claims.  *See In*

*re Corp. Res. Servs., Inc.,* Case No. 15-12329 (MG), 2020 WL 1907538, at *8 (Bankr. S.D.N.Y.

Apr. 15, 2020); *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.,* 149 F. Supp. 3d 376, 394

(E.D.N.Y. 2016) ("However, the Court finds that although some of the Plaintiff's claims sound in

equity, those claims are entirely duplicative of the Plaintiff's breach of contract claims....The

Plaintiff's entitlement to relief on both its contract and equitable claims is based on interpreting

the Note and SPA and not based on the principles of equity, such as unjust enrichment."); *see also Corp. Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Centers of Am., Inc.,* 915 F. Supp. 2d 1059, 1063 (D. Minn. 2013) ("In the Court's view, the better reading of *Grupo Mexicano* and *Deckert* focuses on the essence of the action and the strength of the alleged equitable interest.); *Oak Leaf Outdoors, Inc. v. Double Dragon Int'l, Inc.,* 812 F.Supp.2d 944, 947–48 (C.D.Ill. 2011) (injunction denied because movant's "'equitable claims' of promissory estoppel, unjust enrichment, and claim for injunctive relief all derive from the same occurrence, namely, a breach of contract").

37.    CNL's equitable claims all presume that it has already prevailed on its breach of contract claims: namely, that it owns the Native Tokens.  CNL's claims have not been litigated, much less decided.  And such claims fly in the face of the plain language of the applicable agreements.  Absent a ruling on those claims in CNL's favor, CNL has no interest in the Native Tokens.  *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,* 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003) ("The equitable relief that the plaintiff seeks, including the setting aside of alleged fraudulent conveyances, is incidental to, and indeed contingent upon the success of, the plaintiff's alter ego action. Before the plaintiff can seek equitable relief in enforcing the prior judgment, it must prove the legal liability of Reich and Jossem as alter egos.").  In other words, CNL's equitable claims are merely a repackaging of its flawed breach of contract claims.  All of these claims share a common factual nucleus.  And all of these claims suffer from the same fundamental defects—CNL has no present ownership interest in the Native Tokens, no contractual entitlement to redemption of the Native Tokens, and no legal or factual basis to rescind or reform the agreements.  Whether viewed through a legal or equitable lens, CNL's claims lack substance,

and it has not come close to demonstrating a likelihood of success on the merits sufficient to support the requested injunctive relief.

        b.     *Plaintiff's Sole Claim for Ultimate Non-Monetary Relief, an Accounting of Profits, Also Fails to Support the Preliminary Injunctive Relief Sought.*

38.     The *only* relief that Plaintiff seeks in the Complaint that differs from what it seeks on account of its contract claims is Count 10 for an "Accounting of Profits," no doubt in response to the Second Circuit's decision in *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014). In *Gucci America*, the plaintiff sought to enforce an asset-freezing injunction against defendants it alleged were using its intellectual property in violation of the Lanham Act by producing counterfeit bags. *See* 767 F.3d at 126. The Second Circuit, distinguishing *Grupo Mexicano*, held that the district court had the authority to issue the injunction "where the plaintiff is pursuing a claim for final equitable relief and the preliminary injunction is ancillary to the final relief," in that case, an accounting of profits, which the Second Circuit held allows plaintiffs to seek return of "ill-gotten gains" received through infringement of plaintiff's intellectual property. *See id.* at 131–32.

39.     The facts here are plainly distinguishable. First, it is inappropriate for CNL to point the Court to an equitable claim and say that single claim provides a basis to freeze or enjoin assets that are the subject of a legal claim. *Kilpsch Grp., Inc. v. Big Box Store Ltd.*, No. 12-CV-6283, 2012 WL 5265727, at *3 (S.D.N.Y. Oct 24, 2012). Second, StakeHound has no "ill-gotten gains" because there have been no allegations of wrongdoing, and indeed there is none. Finally, staking rewards, paid in the form of newly-created cryptocurrency, are different in kind from profits because they are entirely traceable on the blockchain. Even if CNL were entitled to an accounting of profits, they can access that information from the blockchain and other available information services—without the need for a court-sponsored accounting.

## II.    CNL Must Post a Bond.

40.    For all the reasons stated above, CNL is not entitled to a temporary restraining order or any other preliminary injunctive relief.  However, were the Court to grant injunctive relief, a bond is necessary under Rule 65(c).  Rule 65(c) provides, in relevant part, that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  StakeHound has demonstrated with competent evidence its need to continue paying ordinary course expenses and legal fees.  *See* Castellana Declaration, ¶¶ 35–42.[9]  An overbroad asset freeze—without reasonable, necessary carveouts—has the potential to destroy StakeHound's business.[10]

41.    In the event that a TRO or preliminary injunction is issued without a carve-out sufficient to cover the amounts necessary to continue funding these expenses, and StakeHound is unable to maintain its nodes or recover its losses from Fireblocks, StakeHound would be damaged by any corresponding loss in the value of its remaining assets.  Consequently, CNL should be required to post an injunction bond in an amount that sufficiently protects StakeHound from any damages resulting from a wrongful freeze of its assets.

---

[9] During the August 29 hearing, CNL argued that the Court should freeze all of StakeHound's assets as an "incentive" to "bring the parties together and make some kind of a deal."  *See* Transcript at 50-51.  As StakeHound has detailed exhaustively to the Court, StakeHound has tried in good faith to reach a consensual resolution of the TRO Motion with CNL.  CNL's admission that it wants the Court to freeze all of StakeHound's assets as a means of exerting pressure is unseemly and shocking.  To put it mildly, this supposed benefit has no place in the Court's TRO analysis.
[10] At virtually every juncture in this case, CNL insists on conflating the suspension of its trading platform (which StakeHound does not dispute) with the closure of StakeHound's business (which StakeHound vehemently disputes). Perhaps CNL believes that if StakeHound were truly defunct (a proposition that CNL urges with *no* evidence), there would be no consequences to CNL's wrongful efforts to freeze substantially all of StakeHound's assets.  To be clear, StakeHound continues to operate a business—now primarily focused on maintaining its nodes and recovering the substantial losses occasioned by Fireblocks' conduct.  If CNL is ultimately found to have wrongfully frozen StakeHound's assets, and if that freeze results in the destruction or devaluation of StakeHound's operating assets, CNL would face potential liability for all resulting damage and loss.  Such claim could reach hundreds of millions of dollars in damages, and would be entitled to administrative priority status.

42.    In *Grupo Mexicano*, the Supreme Court described the damage that can arise when an unsecured creditor (like CNL), in furtherance of a pre-judgment breach of contract claim, seeks to freeze substantially all of the assets of its litigation adversary (like StakeHound):

> [t]he remedy sought here could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available? More importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws—including those relating to bankruptcy, fraudulent conveyances, and preferences. Because any rational creditor would want to protect his investment, such a remedy might induce creditors to engage in a 'race to the courthouse' in cases involving insolvent or near-insolvent debtors, which might prove financially fatal to the struggling debtor."

*See Grupo Mexicano*, 227 U.S. at 330-31.[11]

39.    The agreements and declarations that have been placed into evidence demonstrate that all of the Native Tokens are presently the property of StakeHound.  CNL holds at most an unliquidated, unadjudicated breach of contract claim for present value of its staked tokens, and an accompanying set of supposed equitable claims that are legally and factually insufficient.  As this Court noted, CNL is free to seek injunctive relief from the Swiss Arbitrator.  But CNL should not be permitted to lock up substantially all of StakeHound's assets, to strip StakeHound of the ability to defend and prosecute pending litigations, and to maintain the nodes that are essential to the preservation of its assets—particularly on the deficient factual and legal record CNL has offered.

---

[11] While the defendant in *Grupo Mexicano* had been proven to be insolvent, no such finding has been made here.  In fact, CNL has not come close to demonstrating StakeHound's insolvency.  A sufficient solvency analysis would require current valuations of all digital and litigation assets.  An effective insolvency analysis would need to consider all of these elements and complexities.  By contrast, CNL seeks to compare the value of the Native Tokens and the corresponding stTokens, and to assume insolvency based on the spread between the two.

The Supreme Court in *Grupo Mexicano* warned against permitting breach of contract claimants to seize the assets of their litigation adversaries in this fashion.

## **<u>CONCLUSION</u>**

For these reasons, Defendant StakeHound S.A. respectfully requests that the Court deny the TRO Motion in its entirety, and grant such other relief as the Court may deem proper.

Dated:  September 1, 2023          *Respectfully,*
New York, New York

                                         */s/ Stephanie Wickouski*
                                         **LOCKE LORD LLP**
                                         Stephanie Wickouski
                                         Jeffrey Kramer
                                         Sean A. Feener
                                         200 Vesey Street, 20th Floor
                                         New York, New York 10281
                                         Tel: (212) 415-8600
                                         Fax: (212) 303-2754
                                         swickouski@lockelord.com
                                         jkramer@lockelord.com
                                         sean.feener@lockelord.com

                                         Jonathan W. Young (admitted pro hac vice)
                                         111 Huntington Avenue, 9th Floor
                                         Boston, MA 02199-7613
                                         Tel: (617) 239-0367
                                         Fax: (617) 227-4420
                                         jonathan.young@lockelord.com

                                         *Attorneys for StakeHound S.A*