Mitchell P. Hurley
Dean L. Chapman Jr.
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
mhurley@akingump.com
dchapman@akingump.com

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas R. Lombardi (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
edscott@akingump.com
nlombardi@akingump.com

*Special Litigation Counsel for Debtors and Plaintiff Celsius Network Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | Jointly Administered |
| CELSIUS NETWORK LIMITED, | |
| Plaintiff, | Adversary Proceeding |
| v. | No. 23-01138 (MG) |
| STAKEHOUND SA, | |
| Defendant. | |

### CELSIUS' OPPOSITION TO STAKEHOUND'S MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, FOR ABSTENTION

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ................................................................................................................... 8

I.     STAKEHOUND'S MOTION TO COMPEL ARBITRATION SHOULD BE
DENIED ................................................................................................................. 8

      A.     StakeHound Offers No Evidence of an Arbitration Agreement Governing
the February 2021 Staked ETH ................................................................. 9

      B.     This Court Should Not Compel Arbitration of the Core Claims Relating to
the November 2020 Staked ETH, Matic, and DOT ................................. 10

           1.     Core Claims Implicate "Core Bankruptcy Functions" That Should
Not Be Subject to Arbitration .................................................... 11

           2.     Turnover Actions Are Substantively Core Proceedings That
Unquestionably Fulfill Core Bankruptcy Functions ................. 12

           3.     Celsius Has Asserted a Non-Arbitrable Turnover Claim that is Not
Merely Duplicative of Non-Core Claims .................................... 13

           4.     The Turnover Claim Seeking Recorded Information Related to
Celsius' Financial Affairs Is Not Arbitrable ............................. 18

           5.     The Enforcement of the Automatic Stay and Disallowance under
502(d) Are Undoubtedly Not Arbitrable ................................... 18

      C.     This Court Should Stay Arbitration of the Non-Core Claims Concerning
the November 2020 Staked ETH, MATIC, and DOT Pending Resolution
of the Core Claims ................................................................................. 19

      D.     StakeHound's Request to Lift the Automatic Stay as to the Swiss
Arbitration is Grossly Inadequate ......................................................... 20

II.     THIS COURT SHOULD DECLINE TO ABSTAIN ...................................... 21

III.     STAKEHOUND'S REQUEST TO DEFER PERSONAL JURISDICTION
MOTION ............................................................................................................ 25

CONCLUSION ............................................................................................................. 26

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re 11 E. 36th LLC*,
  No. 13-11506 (JLG), 2015 WL 2445075 (Bankr. S.D.N.Y. May 20, 2015) ..........................14

*In re A2P SMS Antitrust Litig.*,
  972 F. Supp. 2d 465 (S.D.N.Y. 2013) ....................................................................................3

*In re Bethlehem Steel Corp.*,
  390 B.R. 784 (Bankr. S.D.N.Y. 2008) ..................................................................................12

*In re Cardali*,
  No. 10-11185 SHL, 2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18, 2010) ..........................17

*Doctor's Assocs., Inc. v. Alemayehu*,
  934 F.3d 245 (2d Cir. 2019).....................................................................................................9

*In re E &G Waterworks, LLC*,
  571 B.R. 500 (Bankr. Mass. 2017) ...........................................................................13, 16, 19

*Hines v. Overstock.com, Inc.*,
  380 F. App'x 22 (2d Cir. 2010) ...............................................................................................9

*In re Huffman*,
  486 B.R. 343 (Bankr. S.D. Miss. 2013)...............................................................13, 16, 18, 19, 20

*In re Killmer*,
  513 B.R. 41 (Bankr. S.D.N.Y. 2014) ....................................................................................21

*In re Koreag, Controle et Revision S.A.*,
  961 F.2d 341 (2d Cir. 1992)...................................................................................................25

*Lismore v. Societe Generale Energy Corp.*,
  No. 11 CIV. 6705 AJN, 2012 WL 3577833 (S.D.N.Y. Aug. 17, 2012)...................................3

*MasterCard Intern. Inc.*,
  No. 01 CIV. 3027 (JGK), 2002 WL 432379..........................................................................23

*In re MF Glob. Holdings, Ltd.*,
  464 B.R. 619 (Bankr. S.D.N.Y. 2012) ..................................................................................25

*In re MF Glob. Holdings Ltd.*,
  561 B.R. 608 (Bankr. S.D.N.Y. 2016) ..................................................................................21

*MF Glob. Holdings Ltd. v. Allied World Assur. Co. (In re MF Glob. Holdings
Ltd.)*,
571 B.R. 80 (Bankr. S.D.N.Y. 2017) .......................................................9, 11, 12, 19

*In re MF Glob. Inc.*,
531 B.R. 424 (Bankr. S.D.N.Y. 2015) .................................................................14

*In re Nat'l Bank of Anguilla (Private Banking Tr.) Ltd.*,
580 B.R. 64 (Bankr. S.D.N.Y. 2018) ...................................................................23

*Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
549 B.R. 56 (S.D.N.Y. 2016)................................................................................24

*Palm Bay Int'l., Inc. v. Marchesi Di Barolo S.P.A.*,
659 F. Supp. 2d 407 (E.D.N.Y. 2009) ..................................................................22

*In re Relativity Fashion, LLC*,
696 F. App'x 26 (2d Cir. 2017) ............................................................................12

*Ronar, Inc. v. Wallace*,
649 F. Supp. 310 (S.D.N.Y. 1986) .......................................................................22

*Royal and Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
466 F.3d 88 (2d Cir. 2006)........................................................................21, 22, 23

*In re S.W. Bach & Co.*,
425 B.R. 78 (Bankr. S.D.N.Y. 2010) ..............................................................11, 20

*In re Sklar*,
626 B.R. 750 (Bankr. S.D.N.Y. 2021) .................................................................20

*In re Soundview Elite Ltd.*,
543 B.R. 78 (Bankr. S.D.N.Y. 2016) ...................................................................14

*In re Springer-Penguin, Inc.*,
74 B.R. 879 (Bankr. S.D.N.Y. 1987).....................................................................24

*Thomson-CSF, S.A. v. Am. Arb. Ass'n*,
64 F.3d 773 (2d Cir. 1995)......................................................................................9

*In re TP, Inc.*,
No. 10-01594-8-SWH, 2013 WL 865982 (Bankr. E.D.N.C. Mar. 7, 2013)...........19

*In re Try The World, Inc.*,
No. 18-11764-JLG, 2021 WL 3502607 (Bankr. S.D.N.Y. Aug. 9, 2021)..........12, 18, 19

*In re U.S. Lines, Inc.*,
197 F.3d 631 (2d Cir. 1999).............................................................................11, 12

*In re Uchitel*,
  No. 20-11585 (JLG), 2022 WL 3134217 (Bankr. S.D.N.Y. Aug. 4, 2022) ...........................21

*In re WorldCom, Inc.*,
  325 B.R. 511 (Bankr. S.D.N.Y. 2005) ....................................................................................21

*In re Xiang Yong Gao*,
  No. 1-14-42722-NHL, 2017 WL 2544132 (Bankr. E.D.N.Y. June 12, 2017) .......................18

**Federal Statutes**

11 U.S.C. § 304 ..............................................................................................................................25

11 U.S.C. § 362 ................................................................................................................................8

11 U.S.C. § 502(d) ......................................................................................................................8, 19

11 U.S.C. § 542 ..........................................................................................................................13, 18

11 U.S.C. § 542(b) ................................................................................................................1, 2, 8, 13

11 U.S.C. § 542(e) ......................................................................................................................8, 18

28 U.S.C. § 157(b)(2)(A) and (O) ................................................................................................12

28 U.S.C. § 157(b)(2)(E) ..........................................................................................................2, 12

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................................3

Celsius[1] respectfully submits this memorandum of law in opposition to Defendant StakeHound's *Motion to Compel Arbitration or, in the Alternative, for Abstention* [ECF No. 46] (the "Motion to Compel") and states as follows:

## PRELIMINARY STATEMENT

Celsius' amended complaint sets forth multiple causes of action against StakeHound arising under the Bankruptcy Code related to StakeHound's unlawful refusal to turn over estate property. Celsius seeks to bring this property—approximately $150 million worth of Native Tokens—into the estate so that it can distribute, in accordance with the priority scheme under the Bankruptcy Code, the assets to its creditors in its ongoing Chapter 11 restructuring.

Critically, tokens representing nearly half of that value—the approximately 35,000 ETH provided by Celsius in February 2021—are not subject to any arbitration agreement at all. Indeed, StakeHound expressly admits Celsius' transfer of these tokens was not governed by the SSA or RSA, and offers no evidence that Celsius ever agreed to the SSTC by using the StakeHound platform or otherwise. On the contrary, and as discussed below, the February 2021 Staked ETH was transferred directly from Celsius ERC 20 wallets to StakeHound ERC 20 wallets at the direction of Albert Castellana and his team, and StakeHound offers no evidence that Celsius ever interfaced with StakeHound's platform, or any click wrap terms of use at all. It goes without saying that StakeHound cannot compel arbitration absent proof that the February 2021 Staked ETH are subject to an arbitration clause.

Regarding the balance of the property at issue—the November 2020 Staked ETH, MATIC, and DOT—Celsius' primary claim is for turnover under Section 542(b) of the Bankruptcy Code,

---

[1] Capitalized terms undefined herein have the meaning ascribed in the *First Amended Adversary Complaint* [ECF No. 31] (the "Amended Complaint").

which arises only in bankruptcy and is specifically designated as a "core" proceeding under 28 U.S.C. § 157(b)(2)(E). A bankruptcy court's turnover power often involves the debtor's contractual rights, but that does not make it somehow "less core," as StakeHound argues. On the contrary, turnover of matured debts—including StakeHound's unconditional obligation to transfer to Celsius the MATIC, DOT and ETH—is essential to the bankruptcy process, including by enabling the adjudication in a centralized forum of the debtor's interest in property, recovery of such property, and ratable distribution to creditors. This Court should determine the fate of Celsius' rights to the Subject Property, not an arbitrator based in Paris with no knowledge of the United States Bankruptcy Code (and certainly no responsibility for managing this highly complex Chapter 11 restructuring) in a private proceeding entirely walled off from Celsius' creditors.

Alternatively, StakeHound argues that if the Section 542(b) claims are core, they should be stayed while the non-core claims asserted by Celsius are arbitrated. But permitting arbitration would be wasteful and unnecessary, since resolution of the core claims could result in Celsius declining to pursue claims allegedly subject to arbitration and unnecessary, and especially where, as here, there is no basis to compel arbitration or stay litigation of *any* of the claims concerning the February 2021 Staked ETH.

To the extent the Court determines any of Celsius' claims are arbitrable, it should instead (i) deny the Motion to Compel, (ii) stay  allegedly arbitrable claims, and (iii) adjudicate the core claims (including turnover) asserted by Celsius concerning November 2020 Staked ETH, MATIC, and DOT, as well as all claims concerning the February 2021 Staked ETH (which are not subject to an arbitration clause), on an expedited basis. Such an outcome would be fully consistent with the twin public policy interests at issue in this case: the general preference to enforce arbitration

provisions and the competing preference to resolve all matters concerning a bankrupt entity in a centralized public proceeding.

## STATEMENT OF FACTS

StakeHound is a private limited company that was engaged in the business of staking its customers' Native Tokens.[2]  Specifically, customers provided their Native Tokens to StakeHound for staking and in exchange StakeHound would issue stTokens for the customer to use as liquidity.[3] The only customer that Celsius ever had of any significance was Celsius.[4]  During their commercial relationship, Celsius entrusted Native Tokens worth in excess of $150 million to StakeHound to stake and earn rewards.[5]

First, Jason Stone, then CEO of Celsius KeyFi LLC, staked 24,960 ETH owned by Celsius by transferring the ETH to an ETH2 depositor address to accrue staking Rewards (the "November 2020 Staked ETH").[6]  The ETH2 depositor address was controlled by Staked.US.[7]  At the time, all such ETH was locked and unavailable for withdrawal pending completion of an ongoing upgrade to the Ethereum blockchain (the "Upgrade").[8]

---

[2] *See* ECF No. 35-1 (Notice of Arbitration) at ¶¶ 10–13; Am. Compl. ¶ 28. Like a motion to dismiss under Rule 12(b)(6), on a motion to compel arbitration, all facts pled in a plaintiff's complaint are to be accepted as true. *See In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 473 (S.D.N.Y. 2013) citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012) (when considering a motion to compel arbitration "this Court accepts as true factual allegations in the plaintiffs' complaint that relate to the underlying dispute between the parties"); *see also Lismore v. Societe Generale Energy Corp.*, No. 11 CIV. 6705 AJN, 2012 WL 3577833, at *1 (S.D.N.Y. Aug. 17, 2012) (same). In light of the substantial submissions in this case relating to the other motions pending with this Court, Celsius largely cites herein to materials filed with the Court, including sworn statements and documents, but has also included parallel citations to the Amended Complaint in certain places in reliance on the case law requiring that the allegations contained therein be accepted as true.

[3] *See* Am. Compl. ¶ 28; ECF No. 35-1 (Notice of Arbitration) ¶¶ 10–13.

[4] See Am. Compl. ¶ 29; ECF No. 35-1 (Notice of Arbitration) ¶ 21 (Celsius is StakeHound's largest customer).

[5] *See* Am. Compl. ¶ 11; Declaration of Richard Man in Support of Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 40) (the "Man Declaration") ¶ 8.

[6] *See* Declaration of Richard Man in Support of Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 40) (the "Man Declaration") ¶ 9.

[7] *See* Man Declaration ¶ 9.

[8] *See* Man Declaration ¶ 9.

The parties' January 20, 2021 Staking Services Agreement ("SSA") was required specifically for the November 2020 Staked ETH, because it already had been staked by Celsius, and required a transfer of "nodes," not just coins themselves.[9]   To facilitate the transaction, the private keys were transferred from Celsius to StakeHound, and StakeHound transferred stETH in the same number as the number of November 2020 Staked ETH (plus Rewards) to Celsius.[10]   StakeHound and Celsius then asked Staked.us to assign the nodes for the November 2020 Staked ETH to StakeHound, and Staked.US complied on or around January 26, 2021.[11]   StakeHound and Celsius further agreed that when the November 2020 Staked ETH became unlocked, StakeHound would "transfer the [November 2020 Staked] ETH plus the staking rewards and fees . . . to a new wallet setup" on StakeHound's appointed custodian,[12] at which time Celsius would be able to exchange its stETH for native ETH.[13]   The SSA expressly applies only to the "Locked ETH" – the November 2020 Staked ETH – and even includes a 15 paged, single-spaced exhibit identifying the specific nodes associated with that ETH.[14]

Second, in February 2021, Celsius provided an additional approximately 35,000 native ETH (the "February 2021 Staked ETH") to StakeHound.[15]   StakeHound offers no evidence that Celsius ever agreed to the SSTC or any other written agreement with respect to those coins.[16]   For example, StakeHound offers no evidence that Celsius ever interacted with StakeHound's platform,

---

[9] The SSA is attached as Exhibit B (ECF No. 40-2) to the Man Declaration.

[10] *See* Man Declaration ¶ 12.

[11] *See* Man Declaration ¶ 12.

[12] *See* SSA § 1.5.

[13] *See* SSA § 1.8.

[14] *See* Am. Compl. ¶¶ 35-36; ECF No. 43 (Castellana Declaration) ¶¶ 22-24; *See* SSA at 1, Ex. A

[15] Nolan Decl. ¶ 10. After gas and transaction fees, StakeHound received 34,999.99 ETH, as reflected on Etherscan with a transaction hash of 0x00da5666820701c9a849129e7944c0267e9cea489ebff4fcc471e37330dcf44a. StakeHound then funded 1,093 validators with 34,976 ETH. *See* Fourth Man Decl. at 3 n.2.

[16] *See* ECF No. 43 (Castellana Declaration) ¶ 30.

or any "click wrap" terms of use, in February 2021, or ever.  Instead, via Slack communication, StakeHound directed a Celsius employee in New Jersey to transfer the ETH to StakeHound from a Celsius ERC 20 wallet to a StakeHound ERC 20 wallet.[17]  StakeHound sent back the same number of stETH, also in a direct wallet-to-wallet transfer, with the understanding that Celsius could recover native ETH by tendering stETH on a 1:1 basis.[18]

Third, on April 21, 2021, Celsius and StakeHound entered into the Revenue Sharing Agreement ("RSA"), which provided that Celsius "may from time to time, in its sole discretion, provide StakeHound with Native Tokens in order for StakeHound to stake them and operate the nodes on the Platform" and "[i]n exchange StakeHound will issue stTokens to [Celsius]."[19]  The RSA provided that "[t]he delivery of any Native Tokens by [Celsius] to StakeHound shall be pursuant to both Parties executing a term sheet . . . setting out the type and number of Native Tokens to be transferred to StakeHound," and that "[i]n the absence of any specific lockup period (during which the stTokens cannot be exchanged into Native Tokens), ***such exchange shall be available to [Celsius] at any time***."[20]  In other words, the RSA expressly provided that StakeHound could tender its stTokens to StakeHound and receive back Native Tokens at any time, subject only to the running of any "lockup period" designated in the term sheets.[21]  The RSA does not authorize

---

[17] Nolan Decl. ¶¶ 11–12.

[18] *See* Am. Compl. ¶ 38; Pl.'s Mem. in Support for TRO and Prelim. Inj. [ECF No. 39] at 19 (citing to websites and videos posted by StakeHound representing that StakeHound customers could exchange stTokens for native Tokens on a 1:1 basis at any time).

[19] *See* RSA § 2.2.  The RSA is attached as Exhibit D (ECF No. 40-4) to the Man Declaration.  The MATIC and DOT Term Sheets are attached as Exhibits E (ECF No. 40-5) and G (ECF No. 40-7) to the Man Declaration.

[20] *See* RSA § 2.7 (emphasis added).

[21] This conclusion is corroborated by an April 19, 2021 email from StakeHound's founder in which he stated that, after the expiration of the lockup period, Celsius "could send MATIC and get stMatic at a 1 to 1 ratio anytime" and that "[y]ou can do viceversa also[.]" Man Declaration ¶ 16.

even a temporary suspension of Celsius' right to exchange, and while the RSA incorporates terms of the SSTC, the RSA's terms expressly prevail in the event of any inconsistency.[22]

On April 21, 2021, Celsius and StakeHound entered into the MATIC Term Sheet, pursuant to which Celsius transferred 40,000,000 native MATIC tokens to StakeHound and StakeHound issued 40,000,0000 stMATIC to Celsius; the MATIC Term Sheet provided a lockup period of nine days.[23]  On April 27, 2021, Celsius and StakeHound entered into the DOT Term Sheet, pursuant to which Celsius transferred 66,000 native DOT tokens to StakeHound and StakeHound issued 66,000 stDOT tokens to Celsius; the DOT Term Sheet provided a lockup period of 28 days.[24]

On or about May 2, 2021, certain private keys associated with the February 2021 Staked ETH were lost by StakeHound and/or its agent Fireblocks, rendering that Staked ETH inaccessible.[25]  StakeHound blames Fireblocks for the loss, and Castellana implies that Celsius somehow is responsible for StakeHound's engagement of Fireblocks.[26]  But Celsius had no right to require StakeHound to appoint Fireblocks, and StakeHound does not contend (much less offer proof) otherwise.  In any case, Fireblocks was indisputably engaged by StakeHound, and cannot evade liability to Celsius for any errors Fireblocks may have committed.[27]

On April 10, 2023, Celsius sent a demand to StakeHound to transfer the November 2020 Staked ETH to a new wallet immediately after it became unlocked and then transfer the native

---

[22] *See* RSA § 2.1.

[23] *See* MATIC Term Sheet.

[24] *See* DOT Term Sheet.

[25] *See* ECF No. 43 (Castellana Declaration) ¶ 33; Man Declaration ¶ 19.

[26] ECF No. 43 (Castellana Declaration) ¶ 18.  Fireblocks claims StakeHound was responsible for the loss. StakeHound Event, FIREBLOCKS (June 22, 2021), https://www.fireblocks.com/blog/stakehound-eth-2-0-event/.

[27] Notably, outside of this litigation, StakeHound freely and regularly referred to Fireblocks as *StakeHound's* security provider.  *See, e.g.,* Fireblocks ETH 2.0 Key Management Incident, STAKEHOUND (June 22, 2021), https://stakehound.com/blog-post/fireblocks-eth-2-key-management-incident/ (referring to Fireblocks as "*our* custody provider[]") (emphasis added).  Similarly, StakeHound's CEO Mr. Castellana referred to "*our* Fireblock's TX policy for MATIC" in an email to Celsius personnel dated April 19, 2021.  *See* ECF No. 40-6 (emphasis added).

ETH tokens to Celsius "in exchange for the stETH previously provided by StakeHound to Celsius."[28]  In response, StakeHound rejected Celsius' demand, but confirmed that StakeHound had "executed the transfer procedure," i.e., that the November 2020 Staked ETH had become unlocked and transferred to a StakeHound wallet.[29]  As noted, those were the predicate steps necessary for Celsius' absolute right to transfer stETH for ETH to mature.[30]

StakeHound thereafter commenced an arbitration against Celsius in Switzerland (the "Swiss Arbitration") in violation of the automatic stay, despite receiving repeated notice of Celsius' bankruptcy filing.[31]  In the Swiss Arbitration, and in this proceeding, StakeHound argues it is only required to return native ETH to Celsius of the same value as the stETH held by Celsius, and not on a 1:1 basis.[32]  Because stETH is virtually worthless, StakeHound effectively seeks to retain the November 2020 Staked ETH for itself.[33]  StakeHound's position is counter to the SSA,[34] and counter to representations it made that its stTokens would be exchangeable on a 1:1 basis, and would result in an unconscionable and unjust enrichment to StakeHound and Castellana, based on their own catastrophic loss of the February 2021 Staked ETH, at the expense of Celsius' creditors.[35]

---

[28] *See* ECF No. 10-3 (exhibit to Hurley Decl.). StakeHound admits in its void arbitration that Celsius made due demand for its ETH. *See* ECF No. 35-1 (Notice of Arbitration) ¶ 26.

[29] *See* ECF No. 10-4 (exhibit to Hurley Decl.).

[30] In fact, the Upgrade to the Ethereum blockchain occurred April 12, 2023.  *See* Am. Compl. ¶ 48.

[31] *See* ECF Nos. 10-3 & 10-5 (exhibit to Hurley Decl.) (providing notice of Celsius' bankruptcy); ECF No. 53 (finding that filing of Swiss Arbitration to be a violation of the automatic stay).

[32] *See* ECF No. 35-1 (Notice of Arbitration) ¶¶ 28 (StakeHound "has no obligation to exchange ETH for the Respondent's stETH") and 29 ("[A]n exchange occurs depending on the *value* of the relevant cryptocurrency, not the *number* of tokens.  [Celsius] would thus not necessarily be entitled to 1 ETH in exchange for 1 stETH."); ECF No. 42 ¶ 1 (Celsius "ha[s] no right under the relevant agreements to recover these native tokens, or to be paid the current value of such native tokens.").

[33] *See id.*

[34] *See* SSA § 1.8 ("Celsius shall be entitled to exchange, upon availability, its stETH against ETH").

[35] *See* Pl.'s Mem. in Support for TRO and Prelim. Inj. [ECF No. 39] at 19.

In furtherance of its rights under the RSA and Term Sheets, on May 25, 2023, Celsius demanded return of all its native MATIC and DOT including rewards.[36]  StakeHound ignored Celsius' demand entirely.  In its September 1, 2023 *Grupo Mexicano* submission, for the first time StakeHound claimed that its withholding of MATIC and DOT is justified because "conditions" to the transfer supposedly remain unfulfilled.[37]  StakeHound does not identify any of the alleged conditions, however, because they do not exist.  The RSA provides unequivocally that Celsius has the right to exchange stMATIC and stDOT "at any time."  The RSA does not permit even a temporary suspension of that right, the native MATIC and DOT is available for transfer to Celsius at the push of a button, and StakeHound never has contended otherwise.[38]  There can be no question StakeHound's obligation to transfer the MATIC and DOT is absolute and mature.

Celsius commenced this action on July 11, 2023 and filed its *First Amended Adversary Complaint* [ECF No. 31] on August 22, 2023 (the "Amended Complaint").  In the Amended Complaint, Celsius asserts claims for (i) violation of the automatic stay under Section 362 of the Bankruptcy Code, (ii) turnover under Section 542(b) of the Bankruptcy Code, (iii) turnover and accounting under Section 542(e) of the Bankruptcy Code, (iv) disallowance under Section 502(d) of the Bankruptcy Code, (v) breach of contract, (vi) unjust enrichment, (vii) conversion, (viii) constructive trust, and (ix) common law accounting.

## ARGUMENT

## I.   STAKEHOUND'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED

A bankruptcy court faced with a motion to compel arbitration must apply a four-part test:

---

[36] *See* Man Declaration ¶ 21; ECF No. 40-9 (May 25, 2023 letter).

[37] *See* Def.'s Suppl. Mem. Addressing Unavailability of Freezing Inj. in Favor of Pl. [ECF No. 56] at 7 n.4 (noting "that the contractual conditions for an exchange of [MATIC and DOT] have not been satisfied").

[38] *See* RSA § 2.7 ("In the absence of any specific lockup period . . . such exchange shall be available to Client at any time.").

> [F]irst, it must determine whether the parties agree to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*MF Glob. Holdings Ltd. v. Allied World Assur. Co. (In re MF Glob. Holdings Ltd.)*, 571 B.R. 80, 89–90 (Bankr. S.D.N.Y. 2017).  None of these factors support StakeHound's motion.

### A.    StakeHound Offers No Evidence of an Arbitration Agreement Governing the February 2021 Staked ETH

It is axiomatic that arbitration is a creature of contract, and contract alone, and that a party seeking to compel arbitration has the burden to prove the existence of an arbitration agreement. *See Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ("Arbitration is contractual by nature—'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'") (internal citations omitted); *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (noting that when moving to compel arbitration, "[t]he party seeking . . . arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made"). There is no question that this Court, not the arbitrator, should determine whether the parties agreed to arbitrate.  *See Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250–51 (2d Cir. 2019) ("[P]arties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place.").

StakeHound fails to carry its burden as to the existence of any such agreement regarding February 2021 Staked ETH.  StakeHound admits that the February 2021 Staked ETH was not governed by the SSA, which expressly and solely applies to the "Locked ETH" provided by Celsius to StakeHound to fund the specified validator nodes—the November 2020 Staked ETH.[39]

---

[39] *See* SSA at 1 (whereas clause B).

Indeed, the SSA includes 15 pages of single-spaced text identifying the specific nodes at issue—nodes that are associated solely with the November 2020 Staked ETH.[40]  Nor does the RSA apply to the February 2020 Staked ETH.  Apart from the fact that it was entered into months *after* the February transaction, the RSA expressly applies only to Native Tokens delivered pursuant to a separate Term Sheet.[41]  The only Term Sheets ever executed relate to the MATIC and DOT.[42]

StakeHound alleges in conclusory fashion that the February 2021 Staked ETH was transferred "pursuant to the SSTC," but StakeHound admits that "no separate agreement" was entered into and offers no proof that Celsius ever agreed to the terms of the SSTC.[43]  Among other things, StakeHound offers no proof that Celsius agreed to any "click wrap" terms on StakeHound's platform, and the evidence indicates that never happened.  On the contrary, according to the Celsius personnel who actually carried out the February transaction, the transfers were made directly from Celsius' wallet to StakeHound's wallet, without interfacing with StakeHound's platform at all.[44]  In the absence of any proof that Celsius agreed to the SSTC, or any other agreement containing an arbitration clause, StakeHound's motion to compel arbitration of Celsius' claims concerning the February 2021 Staked ETH must be denied.[45]

### B.    This Court Should Not Compel Arbitration of the Core Claims Relating to the November 2020 Staked ETH, Matic, and DOT

Celsius' core claims relating to the November 2020 Staked ETH, the MATIC and the DOT implicate the fundamental purposes of bankruptcy, the marshalling and administration of the

---

[40] *See* SSA, Ex. A ("List of Ethereum version 2.0 validator nodes).

[41] *See* RSA § 2.7.

[42] Moreover, the RSA incorporates in and attaches the SSTC.  If the SSTC already governed any transactions between Celsius and StakeHound, as StakeHound appears to argue in respect of the February 2021 Staked ETH, the incorporation and attachment of the SSTC would have been entirely unnecessary.

[43] ECF No. 43 (Castellana Declaration) ¶ 30.

[44] Nolan Decl. ¶¶ 11–13.

[45] Nolan Decl. ¶ 13 (noting that StakeHound did not ask Celsius to sign the SSTC for the February 2021 Staked ETH).

debtors' estates for the benefit of creditors, and should be determined by this Court.  To the extent the Court concludes other claims are subject to arbitration, they should be stayed pending the Court's adjudication of Celsius' (non-arbitrable) February 2021 Staked ETH claims, and Celsius' turnover and other core claims relating to the November 2020 Staked ETH, MATIC and DOT.

      1.    Core Claims Implicate "Core Bankruptcy Functions" That Should Not Be Subject to Arbitration

The United States Supreme Court has unequivocally held that, "[l]ike any statutory directive," the Federal Arbitration Act's preference for arbitration "may be overridden by a contrary congressional command." *In re S.W. Bach & Co.*, 425 B.R. 78, 89 (Bankr. S.D.N.Y. 2010) (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226–227 (1987)).  That command may be found in a "statute's text or legislative history . . . or from an inherent conflict between arbitration and the statute's underlying purposes."  *Id.*  The Bankruptcy Code "exerts an inexorable pull towards centralization," in conflict with the "decentralized approach" of arbitration.  *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999).  Core claims are more likely to "present a conflict sufficient to override by implication the presumption in favor of arbitration" than non-core claims. *In re MF Glob. Holdings Ltd.*, 571 B.R. at 93 (citations omitted).  However, courts may stay the arbitration of non-core claims pending the disposition of core claims to advance the policies of the Bankruptcy Code and to avoid "a risk of inconsistent results and arguments about claim preclusion. *In re S.W. Bach & Co.*, 425 B.R. at 83.

Courts should not compel arbitration of core claims where any underlying purpose of the Bankruptcy Code would be adversely affected by" doing so.  *In re U.S. Lines, Inc.*, 197 F.3d at 640 (citation omitted).  Some courts have applied a framework of refusing to compel "substantively core" claims but compelling the arbitration of "procedurally core" claims.  *In re MF Glob. Holdings Ltd.*, 571 B.R. at 80.  Claims aimed at "placing the property of the bankrupt,

wherever found, under the control of the court, for equal distribution among the creditors, and administering all property in the bankrupt's possession" serve the primary functions of bankruptcy and are typically deemed substantively core. *In re U.S. Lines, Inc.*, 197 F.3d at 637. Such treatment advances "the goal of centralized resolution of pure bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *In re Relativity Fashion, LLC*, 696 F. App'x 26, 30 (2d Cir. 2017) (quoting *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006)).

While not dispositive, courts have also considered whether a claim is defined as a "core proceeding" under the Judiciary Code, rejecting as "non-core" the "catch-all" provisions of 28 U.S.C. § 157(b)(2)(A) and (O), but determining that other subsections designating actions as core (and that concern causes of action that are possible only under the Bankruptcy Code) to be substantively core. *Compare In re MF Glob. Holdings Ltd.*, 571 B.R. at 95 *with In re Bethlehem Steel Corp.*, 390 B.R. 784, 793 (Bankr. S.D.N.Y. 2008).

2.   Turnover Actions Are Substantively Core Proceedings That
Unquestionably Fulfill Core Bankruptcy Functions

Section 157(b)(2)(E) defines turnover actions as core proceedings. As claims that only exist in the context of bankruptcy and belong exclusively to the debtor in possession (or trustee), turnover actions fulfill many of the "core bankruptcy functions of particular import" as defined by the Second Circuit. They facilitate and accomplish the centralized resolution of bankruptcy issues and administration of the estate; they protect debtors and creditors from piecemeal litigation; and any order issued by the Court ordering a turnover is undeniably enforceable by this same court.

Courts have specifically recognized the central function and importance of the turnover power under the Bankruptcy Code and as a result have refused to compel the arbitration of turnover claims. *See*, *e.g.*, *In re Try The World, Inc.*, No. 18-11764-JLG, 2021 WL 3502607, at *13 (Bankr.

12

S.D.N.Y. Aug. 9, 2021) ("[A] turnover claim is core" and is purely "a creature of bankruptcy law[.]").  In *Try The World*, Judge Garrity was faced with a motion to compel arbitration of, among other claims, a claim for turnover and an accounting under section 542 of the code.  He found that arbitration would not be appropriate in light of the central function of the turnover power:

> [C]ompelling arbitration of a chapter 7 trustee's turnover claim conflicts with important policies under the Bankruptcy Code that support the trustee's function to marshal, liquidate and distribute estate assets to creditors holding allowed claims.  Accordingly, even if [the accounting and turnover claim] was subject to the Arbitration Clause, the Court would not compel the Trustee to arbitrate the claim.

*Id.* (citing *In re Hagerstown Fiber Ltd. Partnership*, 277 B.R. 181, 210 (Bankr. S.D.N.Y. 2002)).

This principle has been applied directly to turnover under Section 542(b) of the Bankruptcy Code:

> One of the specifically enumerated powers of a trustee in bankruptcy is to demand turnover, from any entity, of 'a debt that is property of the estate and that is matured [and] payable on demand.' . . .  [T]his power is a core bankruptcy function and does not exist independent of the bankruptcy case . . . .  Bankruptcy courts are ideally suited and well equipped to address turnover demands, including any defenses thereto.  As such, § 542(b) is integral to the bankruptcy case administration process.

*In re E &G Waterworks, LLC*, 571 B.R. 500, 508-09 (Bankr. Mass. 2017) (declining to compel arbitration of 542(b) claim); *see also In re Huffman*, 486 B.R. 343, 359 (Bankr. S.D. Miss. 2013).

### 3.    Celsius Has Asserted a Non-Arbitrable Turnover Claim that is Not Merely Duplicative of Non-Core Claims

Celsius has asserted claims for turnover under Section 542(b) of the Bankruptcy Code that are substantively core, and it should not be compelled to arbitrate them in Switzerland. Section 542(b) provides, "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . ."  11 U.S.C. § 542(b).  Notably, "[s]ection 542(b) contains no requirement that the debt be

undisputed or liquidated."  5 Collier on Bankruptcy ¶ 542.04 (16th ed. 2023) (citing cases).  This

Court has explained:

> Because the Trustee has established that Sonson is ***unconditionally
> obligated to pay*** MFGI the amount of this debit balance ***under the
> Customer Agreement***, the debt is "matured" within the meaning of
> section 542(b) of the Bankruptcy Code.  ***Matured debt refers to
> debts that are presently payable,*** as opposed to those that are
> contingent and become payable only upon the occurrence of a
> certain act or event.  In order for a claim to be considered a matured
> debt, ***it must be specific in its terms as to amount due and date
> payable.  For an action to be a turnover proceeding, it is not
> relevant that the defendant dispute the existence of the debt by,
> perhaps, denying the complaint's allegations, as long as these
> allegations state the existence of a mature debt.***

*In re MF Glob. Inc.*, 531 B.R. 424, 438 (Bankr. S.D.N.Y. 2015) (emphasis added).  Although some

courts have stated that "disputed" debts cannot be turned over, those cases do not speak about

"disputes" in terms of liability being contested, but about whether the debt has matured or whether

the amount claimed is wholly unliquidated and unknown.  *In re 11 E. 36th LLC*, No. 13-11506

(JLG), 2015 WL 2445075, at *11 (Bankr. S.D.N.Y. May 20, 2015) (explaining that "an action to

determine ***the amount of a claimed debt*** to the estate that is, as yet, ***wholly disputed and

unliquidated*** cannot properly be styled an action to turnover estate property" and "[w]here the

court must resolve ***whether or not the debt claimed is due***, the action to collect the disputed funds

cannot be regarded as a turnover proceeding") (collecting cases) (emphasis added).  Specifically,

for the plaintiff to allege a *prima facie* turnover claim, the plaintiff must allege "***the existence,

magnitude, and identity of the res***."  *Id.* (emphasis added).[46]

---

[46] This turnover claim in this case is distinguishable from the claim in *In re Soundview Elite Ltd.*, 543 B.R.
78 (Bankr. S.D.N.Y. 2016).  In that case all of defendant's assets were due to the debtor "after the payment [by the
defendant] of any senior third-party creditor claims, which are not yet known with precision."  *Id.* at 82.  Here, all of
the assets at issue allegedly have been staked, and have been earning rewards.  While an accounting from StakeHound
is required to undertake a precise calculation of accrued rewards, their does not require the resolution of third-party
creditor claims potentially subject to dispute as to amount and validity, as appeared to be the case in Soundview.

Here, there is **no dispute** about the existence, magnitude, and identity of what StakeHound

owes Celsius in respect of the November 2020 Staked ETH, MATIC, and DOT:[47]

- First, the **24,960 ETH** that was staked by Celsius with StakeHound under the SSA and that is identifiable in Exhibit A to the SSA and associated Rewards that became matured, due and owing as of April 12, 2023 when the November 2020 Staked ETH became unlocked and transferred to a wallet controlled by StakeHound; Celsius has an unequivocal right to exchange its stETH for ETH since the occurrence of those events in April of this year, and this right remains fully matured;[48]

- Second, the **40,000,000 MATIC** that was staked by Celsius with StakeHound pursuant to the RSA and MATIC Term Sheet and associated Rewards and that was payable on demand after the nine-day lockup period expired on or about April 30, 2021;[49]

- And third, the **66,000 DOT** that was staked by Celsius with StakeHound pursuant to the RSA and DOT Term Sheet and associated Rewards and that was payable on demand after the 28-day lockup period expired on or about May 25, 2021.[50]

In response to these largely undisputable facts, StakeHound argues that the turnover claim

is arbitrable because: (1) ownership of the Native Tokens is disputed; and (2) the claim mirrors

contract claims.  These arguments fail.  First, with respect to the MATIC and DOT, StakeHound

argues that it need not pay its debt now because some unspecified "conditions" to the transfer

supposedly remain unfulfilled.[51]  But StakeHound does not even bother to identify the alleged

unsatisfied "conditions," because there are none.  The RSA provides StakeHound the unfettered

right to exchange its tokens "at any time," and does not permit even a temporary suspension of

that right, and StakeHound admits that Celsius made due demand for these tokens, and does not

---

[47] For avoidance of doubt, there is also no dispute about the existence magnitude, and identity of what StakeHound owes Celsius in respect of the February 2021 Staked ETH, i.e., the approximately 35,000 ETH that was staked by Celsius, together with associated Rewards.

[48] *See* discussion *supra* at Statement of Facts.

[49] *See* discussion *supra* at Statement of Facts.

[50] *See* discussion *supra* at Statement of Facts.

[51] *See* Celsius' *Grupo Mexicano* Reply Brief [ECF No. 57] at 16–18 (discussing the illegitimate excuses StakeHound has offered for holdings the MATIC and DOT hostage).

dispute that they all are available and could be transferred at the press of a button. [52]  With respect

to the November 2020 Staked ETH, while StakeHound has manufactured a spurious dispute of its

*liability* to turn over the full amount of the November 2020 Staked ETH in its possession, it does

not dispute that the underlying debt itself is fully matured following the transfer of the November

2020 Staked ETH to StakeHound's wallet after the completion of the Upgrade.   Thus, it is

undisputed that there are no future or contingent events that must occur to render this debt payable.

With respect to the allegation that the turnover claim mirrors contract claims, StakeHound

overstates the legal relevance of the contractual overlap.  *Of course*, the property at issue is subject

to certain governing contracts. It would be unusual indeed for a fully matured debt to have no

relation at all to a contract.  But that does not mean that a turnover claim will necessarily duplicate

a breach of contract claim and be subject to arbitration.  For example, in *Huffman*, an individual

debtor sued a debt relief agency to recover funds the debtor had provided under a contract.

*Huffman*, 486 B.R. at 349-51.   The court rejected the agency's argument that the trustee had

"mislabel[ed] his state-law contract claims in order to disguise them as core," citing to an

analogous case for the proposition that "arbitration of these disputes would seriously disturb the

objectives of the Bankruptcy Code" to protect creditors.   *Id.* at 361.   Similarly, in *E & G

Waterworks*, the debtor was owed $79,950 under a contract for the services performed as of the

petition date.  *E & G Waterworks,* 571 B.R. at 502-03.  The court refused to compel arbitration,

holding that, unlike "a non-core, run-of-the-mill state-law breach of contract claim" (*id.* at 503),

"[a] turnover demand is a simple, efficient mechanism to collect matured debts currently due to

the bankruptcy estate; it is not the equivalent of a breach of contract action." *Id.* at 509.

---

[52] *See* RSA § 2.7.

StakeHound cites only a single case in support of its contract argument, and that case is readily distinguishable.  In *In re Cardali*, two siblings (Robert and Joanne) jointly owned a law firm that had been dissolved.  *In re Cardali*, No. 10-11185 SHL, 2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18, 2010).  In 2009, Joanne commenced an arbitration proceeding and the parties filed statements of claim and counter-claims.  *Id.* at *2.  Approximately a year later, Robert filed for bankruptcy "***in large part to stay . . . the Arbitration***."  *Id.* (emphasis added). Joanne subsequently filed a motion to lift the automatic stay to permit the pending arbitration to proceed and Robert in turn filed a complaint against Joanne asserting claims arising out of "the various acts, conduct, and ensuing litigation," including a claim for turnover.  *Id.*  Robert demanded turnover of "duplicate paychecks" that Joanne had purportedly embezzled,[53] but Joanne had been denying these allegations and asserting similar allegations of misconduct against Robert in arbitration for a year, including that Robert wrote payroll checks to himself for amounts higher than she had authorized, wrote duplicate checks to himself, and wrote checks to himself for personal items.[54]  Because the bankruptcy was filed "in large part" to avoid arbitration and because "the alleged debt . . . is clearly disputed," Judge Lane "refused to allow the bankruptcy court to entertain the forum shopping of a plaintiff who sought to avoid the plain meaning of the arbitration agreement."  *Id.* at *11–12 (internal citation omitted).

These facts are plainly distinguishable.  The timing and purpose of the bankruptcy filing in *Cardali*, as well as the years of prior litigation between the parties, indicate there was substantial reason to conclude that, unlike here, the defendant had a *bona fide* dispute to turnover.  Also, Celsius did not file this case for the purpose of avoiding an arbitration forum; indeed, StakeHound

---

[53] *See* Doc. No. 48, *In re Cardali*, No. 10-11185 SHL, at ¶¶ 57-60 (Bankr. S.D.N.Y. Aug. 31, 2010).
[54] *See* Doc. No. 36-4, *In re Cardali*, No. 10-11185 SHL at ¶¶ 14-50 (Bankr. S.D.N.Y. July 30, 2010).

filed its arbitration *after* this case was filed, in rank violation of the automatic stay. And unlike in *Cardali*, there is no disputing that the Native Tokens represent a fully matured debt. Finally, unlike *Cardali*, the interests of hundreds of thousands of claimants, for whose benefit the debtor-in-possession is marshalling assets, are relevant to this dispute.

    4.    <u>The Turnover Claim Seeking Recorded Information Related to Celsius' Financial Affairs Is Not Arbitrable</u>

Celsius has also asserted a claim for turnover and accounting of recorded information under Section 542(e) that is substantively core and should not be subject to arbitration. Celsius has alleged that StakeHound is in the possession of information concerning the amount and location of the native ETH, MATIC and DOT transferred to its control by Celsius, including operative wallets and reward information. As property of Celsius' estate, Celsius has an interest and need for this information. Celsius therefore asserted an equitable claim for turnover of the records, documentation and recorded information under section 542(e). *See In re Xiang Yong Gao*, No. 1-14-42722-NHL, 2017 WL 2544132, at *3 (Bankr. E.D.N.Y. June 12, 2017) (noting that documents and records do not have to belong to the debtor as long as they relate to property of the estate).

StakeHound does not dispute that 542(e) is a core claim, nor can it. Section 542(e) plainly is substantively core given it is part and parcel of the administration of estate property. *See In re Huffman*, 486 B.R. at 359 (finding a claim for accounting under section 542 core because it "stems from a Trustee's statutory powers under 11 U.S.C. § 542"); *In re Try The World, Inc*, 2021 WL 3502607, at *13 (finding an accounting claim core and declining to compel arbitration of that claim). The court should not grant the motion to compel arbitration of Celsius' 542(e) claim.

    5.    <u>The Enforcement of the Automatic Stay and Disallowance under 502(d) Are Undoubtedly Not Arbitrable</u>

Finally, Celsius asserts two core claims under the Bankruptcy Code that StakeHound concedes are substantively core claims that should not be arbitrated: violation of the automatic

stay and disallowance under Section 502(d).  StakeHound does not even attempt to argue that these

claims should be subject to arbitration, and thus at a minimum this Court will retain jurisdiction

over these claims.  It is well-understood that the bankruptcy court should adjudicate and decide

matters concerning the automatic stay, even if the broader dispute is ultimately arbitrated.  *See In*

*re MF Glob. Holdings Ltd.*, 571 B.R. at 97 (noting that the court had awarded sanctions for

violation of the *Barton* doctrine and reserving the right of the trustee to seek additional sanctions

after arbitration).  So too here.

### C.     This Court Should Stay Arbitration of the Non-Core Claims Concerning the November 2020 Staked ETH, MATIC, and DOT Pending Resolution of the Core Claims

Celsius' core claims seeking turnover of fully-matured debts comprise the primary form of

relief sought by Celsius.  Staying these claims in favor of arbitration, or requiring that they proceed

at the same time as claims allegedly subject to arbitration, would conflict with central purposes of

the Bankruptcy Code—including "the goal of centralized resolution of purely bankruptcy issues,

[and] the need to protect creditors and reorganizing debtors from piecemeal litigation."  *In re*

*Huffman*, 486 B.R. at 362.  Otherwise, the Court could risk impeding the bankruptcy case waiting

for an arbitral decision or cause "the bankruptcy and arbitration [to] proceed apace" and "bring

about an evident waste of resources, drain the debtor's estate," or even possibly "introduce

competitive overtones."  *In re TP, Inc.*, No. 10-01594-8-SWH, 2013 WL 865982, at *3 (Bankr.

E.D.N.C. Mar. 7, 2013) (finding clear and compelling grounds on which to stay arbitration of non-

core claim pending adjudication of core claims); *see also In re E & G Waterworks, LLC*, 571 B.R.

at 509 (staying arbitrable claims while proceeding with adjudication of core claims to avoid

"waste[] of estate resources" and "the risk of inconsistent ruling"); *In re Try The World, Inc*, 2021

WL 3502607, at *17 ("[C]ompelling the arbitration of the non-core claims first, or simultaneously

with the litigation of the core claims, would waste the potential for judicial economy and narrowing

the scope of the issues in dispute."); *In re S.W. Bach & Co.*, 425 B.R. at 83  (staying arbitration of non-core claims pending the resolution of a federal bankruptcy fraudulent conveyance claim).  This is particularly true here were the totality of the claims concerning the February 2021 Staked ETH are non-arbitable and thus will go forward in this forum regardless.

Prioritizing the core claims in this bankruptcy proceeding has other advantages as well. Unlike a private arbitration, the Creditors' Committee can be involved as a party-in-interest, and creditors will retain visibility into the adjudication of core claims that ultimately impact them directly.  *Cf. In re Huffman*, 486 B.R. at 364–65 (denying arbitration because "protecting the creditors of the debtor is one of the chief objectives of the bankruptcy process" and "legal, practical, and equitable considerations convince the Court that the creditors would not be adequately protected by arbitrating this proceeding.").  Moreover, allowing the arbitration to proceed prior to the prosecution of the core claims, would be tantamount to granting StakeHound retroactive relief from the automatic stay, effectively sanctioning its violation of the automatic stay when it commenced the Swiss Arbitration.  *Cf. In re Sklar*, 626 B.R. 750, 763 (Bankr. S.D.N.Y. 2021) ("[A] request for retroactive relief from the automatic stay should be granted sparingly" because "[i]f retroactive relief becomes commonplace, creditors—anticipating post facto validation—will be tempted to pursue claims against bankrupts heedless of the stay, leaving debtors with no choice but to defend for fear that post-petition default judgments routinely may be resuscitated.") (quotation marks and citations omitted).

D.    **StakeHound's Request to Lift the Automatic Stay as to the Swiss Arbitration is Grossly Inadequate**

In its Motion to Compel, StakeHound alludes multiple times to a request to "lift the stay."[55] To the extent this request is to lift the stay as to the void Swiss Arbitration, StakeHound has failed

---

[55] Mot. to Compel at Introduction, ¶¶ 26, 29, 33.

to make any argument as to why such relief is warranted, and thus any such request should be denied.  Moreover, lift stay relief is not warranted.  Retroactive relief from the stay is a rare occasion even for unintentional violations of the stay, let alone the blatant misconduct of StakeHound here.  *See In re Uchitel*, No. 20-11585 (JLG), 2022 WL 3134217, at *19–20 (Bankr. S.D.N.Y. Aug. 4, 2022) (refusing to retroactively lift the stay to permit arbitration, even where the violation was in good faith, and citing *Sklar* for the proposition that retroactively lifting the stay here "plainly runs afoul of Judge Glenn's caution that a request for retroactive relief from the automatic stay should be granted sparingly"); *In re WorldCom, Inc.*, 325 B.R. 511, 523 (Bankr. S.D.N.Y. 2005) (Gonzalez, J.) (finding intentional violation of the stay warranted barring pursuit of claim); *In re Killmer*, 513 B.R. 41, 50–51 (Bankr. S.D.N.Y. 2014) (finding "an honest mistake of law" did not excuse the stay).

## II.    <u>THIS COURT SHOULD DECLINE TO ABSTAIN</u>

StakeHound's alternative request that the Court abstain from hearing this case in deference to principles of international comity also fails.  Where there is personal and subject matter jurisdiction, "a federal court's 'obligation' to hear and decide cases within its jurisdiction is 'virtually unflagging.'"  *In re MF Glob. Holdings Ltd.*, 561 B.R. 608, 617 (Bankr. S.D.N.Y. 2016); *see also Royal and Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) ("The mere existence of parallel foreign proceedings does not negate the district courts' 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976))).  Against this background, the Second Circuit has identified eight factors[56] to consider in deciding whether to

---

[56] The factors are "[1] the similarity of the parties, [2] the similarity of the issues, [3] the order in which the actions were filed, [4] the adequacy of the alternate forum, [5] the potential prejudice to either party, [6] the convenience of the parties, [7] the connection between the litigation and the United States, and [8] the connection between the litigation and the foreign jurisdiction." *Royal and Sun All. Ins. Co.*, 466 F.3d at 94.

abstain from a decision where a foreign jurisdiction is implicated but the list is "not exhaustive, and a district court should examine the 'totality of circumstances.'" *Royal and Sun All. Ins. Co.*, 466 F.3d at 94 (citation omitted).

Here, the reasons this Court should decline to abstain are largely similar to the reasons why it should decline to refer Celsius' core claims to arbitration. The core claims arise under the Bankruptcy Code, and their prompt adjudication by this Court is consistent with the Bankruptcy Code's fundamental goal of marshaling all estate property for equitable distribution to creditors in a centralized forum. Abstaining from adjudicating these core claims would lead to adjudication of the rights of StakeHound in and to estate property being decided entirely by the arbitrator in a private forum, which is entirely inconsistent with the goals and purpose of the Bankruptcy Code. And because the claims concerning the February 2021 Staked ETH are non-arbtirable, abstention is particularly inappropriate. Furthermore, the eight factors collectively weigh against arbitration.

***Factors 1 and 2. Similarity of the Parties and Issues.*** These factors strongly favor Celsius, because while the parties are the same in both proceedings, the issues are not. This adversary proceeding involves claims not covered by the Swiss Arbitration, including all of the core claims. *See Ronar, Inc. v. Wallace*, 649 F. Supp. 310, 319 (S.D.N.Y. 1986) (claims that are "ultimately distinct" favor denying stay even if based on common facts). Moreover, the Swiss Arbitration only concerns the November 2020 Staked ETH, not the February 2021 Staked ETH, MATIC, or DOT at issue in the adversary proceeding. *Cf. Palm Bay Int'l., Inc. v. Marchesi Di Barolo S.P.A.*, 659 F. Supp. 2d 407, 414 (E.D.N.Y. 2009) ("[B]ecause one of the princip[al] issues in this litigation will not be addressed in the Italian action, this factor weighs against dismissal."). Indeed, the Swiss Arbitration expressly *cannot* cover the claims concerning the February 2021 Staked ETH given the lack of any evidence that Celsius agreed to arbitration concerning those coins.

22

*Factor 3. Order in Which the Actions Were Filed.*    The Swiss Arbitration was filed first,

but in contempt of the automatic stay and was suspended by this Court before it advanced

substantively.    *See In re Nat'l Bank of Anguilla (Private Banking Tr.) Ltd.*, 580 B.R. 64, 100–01

(Bankr. S.D.N.Y. 2018) (finding the order of filing to be "neutral" where a foreign proceeding

commenced months earlier but with no substantial activity).    StakeHound does not contest this

point, claiming only that this factor is "neutral."  Motion to Compel ¶ 58.

*Factors 4, 5, and 6. Adequacy of the Alternate Forum, Potential Prejudice and*

*Convenience of the Parties.*    These factors also favor Celsius.  In deciding whether an alternative

forum is adequate, courts may consider the public and private interests at stake.  *MasterCard Int'l.*

*Inc.*, No. 01 CIV. 3027 (JGK), 2002 WL 432379, at *7 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S.

501, 508–09 (1947)).  The public interests include "(1) the local interest in having local disputes

settled at home; (2) the avoidance of problems in applying foreign law; and (3) the potential burden

to jurors if they have to decide a case that has no impact on their community," and the private

interests include "(1) the ease of access to evidence; (2) the cost of obtaining witnesses to attend

trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or

make it less expensive."  *Id.*

Public Interests: Switzerland's interest in this matter is virtually nonexistent.    The

proceeding there is not in a Swiss Court but instead in Swiss arbitration, and for that reason the

cases StakeHound cites are inapposite because they all involve foreign proceedings in "the courts

of a sovereign nation," not a private arbitral tribunal.  *See, e.g.*, *Royal and Sun All. Ins. Co*, 466

F.3d at 94 (Canadian civil suit). By contrast, *private* foreign arbitrations should not be entitled to

abstention based on comity, because "the full faith and credit that must be accorded State court

judgments is not implicated when dealing with an arbitration proceeding." *In re Springer-Penguin, Inc.*, 74 B.R. 879, 882 (Bankr. S.D.N.Y. 1987).

Private Interests, Prejudice, and Convenience: Switzerland is an inconvenient forum given Celsius' fact witnesses are located in the United States and StakeHound's witness is located in Spain. To Celsius' knowledge there are no relevant documents or business operations in Switzerland. Even the arbitrator selected in the void arbitration, Raed Fathallah, is based in Paris, and does not appear to have ever arbitrated a matter involving Swiss law.[57] And it is decidedly in the interest of Celsius' creditors for the action to proceed in a public forum where they have the right to observe and participate through the Creditors' Committee. *See Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 71 (S.D.N.Y. 2016). Moreover, StakeHound is not prejudiced or inconvenienced by appearing in this Court through competent counsel, which it has done many times already.[58]

***Factors 7 and 8. The Litigation's Connection to the United States and Switzerland.*** The final two factors also favor Celsius. While it is true StakeHound is a Swiss entity and the certain contracts that apply to the November 2020 Staked ETH, MATIC, and DOT (though not the February 2021 Staked ETH) contain Swiss arbitration provisions and a very narrow Swiss choice-of-law provision, there are no other compelling connections to Switzerland. Indeed, StakeHound's own CEO is based in Spain, and as described at great length in Celsius' opposition to StakeHound's motion to dismiss for lack of personal jurisdiction, StakeHound has substantial contacts with the United States concerning the subject matter of the dispute.[59] By contrast, Celsius' operations are

---

[57] A copy of Dr. Fathallah's CV provided by the Swiss Arbitration Centre is attached hereto as Exhibit A. The CV is impressive in many respects, describing 61 prior matters in which Dr. Fathallah has served as an arbitrator, but none of those matters appears to have involved Swiss law (or, for that matter, U.S. bankruptcy law).

[58] *See* Order Enforcing Automatic Stay at 1 [ECF No. 53] (noting that there were five hearing in August).

[59] *See generally* Celsius' Brief in Opp'n. to Def. StakeHound SA's Mot. to Dismiss.

based in the United States, its witnesses are here, a huge number of its creditors are U.S. citizens, and most importantly, it is subject to this Chapter 11 proceeding.  Abstention is not warranted.[60]

## III.   STAKEHOUND'S REQUEST TO DEFER PERSONAL JURISDICTION MOTION

StakeHound asks that its personal jurisdiction motion be deferred until after the September 27, 2023 hearing on the parties' other motions.  To be sure, the Court has the "inherent authority to control disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants," *In re MF Glob. Holdings, Ltd.*, 464 B.R. 619, 623 (Bankr. S.D.N.Y. 2012) (internal quotation omitted), and already has determined that StakeHound has made a *prima facie* showing of personal jurisdiction over StakeHound in this case.  *See* September 8, 2023 Order Granting TRO [ECF No. 59].  Celsius notes, however, that bifurcating the motions into separate hearings could increase the estates' costs, and result in extensive delay, particularly in light of the many other pressing matters before the Court.  Certainly, it should not be permitted to interfere with relief to which Celsius may be entitled.  *See*, *e.g.*, Hr'g Tr. at 37:7-24 (Aug. 29, 2023) (observing that "[i]n order to impose contempt sanctions, I have to -- the Court must have personal jurisdiction to be able to do that. . . . I view [StakeHound's] motion to dismiss for lack of personal jurisdiction as [its] effort at a defense to the violation of the automatic stay.").

---

[60] StakeHound—inexplicably—places great weight on *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 343 (2d Cir. 1992), arguing that it "requires abstention."  This is a peculiar statement as the decision nowhere discusses the concept of abstention, nor does it use the word "abstention" or "abstain."  Rather it discusses former section 304 of the Bankruptcy Code, which previously authorized a foreign representative in a foreign bankruptcy proceeding to commence a case ancillary to that proceeding in a U.S. bankruptcy court to protect the administration of the foreign proceeding.  *Id.*  This section of the Code was repealed in 1995 and replaced with Chapter 15, which now fulfills this function.  The Second Circuit held that in such a proceeding, the U.S. Bankruptcy Court must first make a threshold finding as to whether the assets in question are "property" of the foreign debtor's estate by reference to "local law" before ordering turnover; in so holding, it reversed lower court opinions that ordered turnover of claimed assets without first performing such an analysis and instead deferring to foreign bankruptcy law.  *Id.* at 350.  Celsius is at a loss in trying to determine how *Koreag* applies to this case in any meaningful fashion.

## **CONCLUSION**

For the foregoing reasons, Celsius respectfully requests that the Court (i) deny the Motion

to Compel and (ii) grant such other and further relief as the Court may deem proper.

Dated:      September 8, 2023
             New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

By:   */s/ Mitchell P. Hurley*
      Mitchell P. Hurley
      Dean L. Chapman Jr.
      One Bryant Park
      New York, New York 10036
      Telephone: (212) 872-1000
      Facsimile: (212) 872-1002
      mhurley@akingump.com
      dchapman@akingump.com

      Elizabeth D. Scott (admitted *pro hac vice*)
      Nicholas R. Lombardi (admitted *pro hac vice*)
      2300 N. Field Street, Suite 1800
      Dallas, TX 75201
      Telephone: (214) 969-2800
      Facsimile: (214) 969-4343
      edscott@akingump.com
      nlombardi@akingump.com

      *Special Litigation Counsel for Debtors and*
      *Plaintiff Celsius Network Limited*