**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey S. Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted *pro hac vice*)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CELSIUS NETWORK LLC, *et al.*,[1]<br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |
| CELSIUS NETWORK LIMITED,<br>　　　　　　　Plaintiff<br>　　　　v.<br>STAKEHOUND SA,<br>　　　　　　　Defendant | Adversary Proceeding<br>No. 23-01138 (MG) |

**DEFENDANT STAKEHOUND, S.A.'s SUPPLEMENTAL OBJECTION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

# TABLE OF CONTENTS

I.    *GRUPO MEXICANO* PROHIBITS ENTRY OF AN INJUNCTION FREEZING
STAKEHOUND'S ASSETS ......................................................................................... 8

II.   CNL HAS FAILED TO PLEAD SUFFICIENTLY ANY EQUITABLE CLAIMS OR
REQUESTS FOR RELIEF. .......................................................................................... 10

   1.   CNL Has Failed to Plead Sufficiently Equitable Claims Under Swiss Law. ................... 11

   2.   CNL Has Failed to State These Claims Under New York Law. ..................................... 12

   3.   CNL's Legal Claims Prohibit Entry of a Freezing Order. ............................................. 16

III.  CNL HAS NOT DEMONSTRATED IRREPARABLE HARM. ..................................... 18

IV.   AN INJUNCTION SHOULD INCLUDE A SUFFICIENT CARVEOUT FOR
LEGITIMATE BUSINESS EXPENSES AND BE LIMITED IN DURATION. ......................... 20

V.    CNL MUST POST A BOND. ............................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009)...................................................................14

*Arch Ins. Co. v. Sierra Equipment Rental, Inc.*,
  20123 WL 5897327 (E.D. Cal. Nov. 13, 2012).......................................11

*In re Dairy Mart Convenience Stores, Inc.*,
  351 F.3d 86 (2d Cir. 2003)......................................................................6

*Dart Brokerage Corp. v. Am. Commerce Ins. Co.*,
  2013 WL 5966901 (S.D.N.Y. Nov. 7, 2013).............................................7

*EMA Financial, LLC v. NFusz, Inc.*,
  444 F.Supp.3d 530 (S.D.N.Y. 2020).........................................................6

*Freckles, Ltd. v. Manufacturers Hanover Trust Co. (In re Freckles, Ltd.)*,
  60 B.R. 6 (Bankr. E.D.N.Y. 1986)..........................................................20

*KDH Consulting Group LLC v. Iterative Capital Mgmt. L.P.*,
  No. 20 Civ. 3274 (VM), 2020 WL 2554382 (S.D.N.Y. May 20, 2020)...........................15, 17

*Krock v. Lipsay*,
  97 F.3d 640 (2d Cir. 1996).......................................................................7

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*,
  402 B.R. 571 (Bankr. S.D.N.Y. 2009)....................................................20

*Meyer v. Uber Technologies, Inc.*,
  868 F.3d 66 (2d Cir. 2017)......................................................................10

*Monroe Staffing Serv's, LLC v. Whitaker*,
  20-CV-1716 (GBD) (BCM), 2023 WL 4285292 (S.D.N.Y. June 9, 2023)...........................7

*In re Soundview Elite Ltd.*,
  543 B.R. 78 (Bankr. S.D.N.Y. 2016).........................................4, 5, 8, 9

*In re UAL Corp.*,
  412 F.3d 775 (7th Cir. 2005) ...........................................................19, 20

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*,
  2000 WL 1610790 (S.D.N.Y. Oct. 26, 2000) (Martin, J.)...................12, 13

**Other Authorities**

Fed. R. Bankr. P. 7065 .......................................................................................................20, 21

Rule 65 ........................................................................................................................4, 11, 20

Rule 65(c)...................................................................................................................2, 3, 17, 20

Defendant StakeHound S.A. ("***StakeHound***") hereby files this Supplemental Objection in further opposition to Plaintiff Celsius Network Limited's ("***CNL***") *Motion for Temporary Restraining Order and Preliminary Injunction* [ECF No. 39] (the "***Motion***").[2]

## PRELIMINARY STATEMENT

1.      By its Motion, CNL seeks to freeze StakeHound's assets for the foreseeable future based on CNL's unsupported (and incorrect) assertions that StakeHound is insolvent or either dissipating or threatening to dissipate the Native Tokens.  But the standard for demonstrating insolvency is high, and CNL has failed to offer evidence sufficient to meet it.  And, as StakeHound has demonstrated by the sworn testimony of StakeHound's CEO, it has not dissipated, nor does it intend to dissipate, the at-issue assets.  To the contrary, StakeHound has voluntarily preserved its assets while the Court has considered the pending motions in this Adversary Proceeding. StakeHound opposes the Motion because, unless a preliminary injunction contains a carveout sufficient for StakeHound to pay necessary business expenses and is sufficiently limited in duration, the freezing of its assets will damage the going concern value of its business, and could potentially destroy that business.

2.      Moreover, as this Court discussed at length during the TRO Hearing, the Supreme Court's decision in *Grupo Mexicano* prohibits courts from entering preliminary injunctions that serve as prejudgment asset freezes in cases primarily involving legal claims to disputed assets. And that is precisely what CNL's Motion seeks to accomplish—*a prejudgment freeze of assets that, under the plain language of the parties' agreements, belong to StakeHound.*  Without either the facts or the law on its side, CNL is seeking relief that amounts to a far reaching pre-judgment

---

[2] StakeHound incorporates by reference its arguments contained in its Objection to CNL's TRO Motion and Supplemental Memorandum in further support of its Objection to the TRO Motion.

attachment of StakeHound's assets—a form of relief expressly prohibited by the Supreme Court's decision in *Grupo Mexicano*.

3.      As CNL's original complaint correctly noted, CNL's claims (and the disputes in this case) arise out of and relate to three contracts between the parties: the SSA, the RSA and the SSTC.  This is a prepetition contract dispute.  At the eleventh hour, in what appears to be a rushed attempt to plead around the restrictions set forth in *Grupo Mexicano*, CNL filed an amended complaint alleging new, barebones "equitable claims" that are entirely derivative of its contract claims.  Now, CNL's focus has shifted to trying to convince this Court that its entire case sounds in equity, not law.  In other words, CNL is running away from the contracts governing the parties' relationship.  But these purported equitable claims are deficient on their face.  CNL has not submitted any competent evidence that negates or refutes the plain meaning of those contracts' terms.  Nor has CNL articulated any equitable grounds to support rescission of the contracts.  And CNL cannot point to any well-pled allegations or extracontractual conduct that would support equitable relief, or provide a basis to supersede legal obligations with new equitable terms.  In sum, CNL's newly minted equitable claims do not provide a basis to depart from the holding of *Grupo Mexicano*, and that binding Supreme Court authority mandates denial of CNL's request for a preliminary injunction.

4.      Alternatively, assuming without conceding that some form of preliminary injunction is necessary or appropriate, the Court should condition that relief upon CNL posting a bond pursuant to Rule 65(c) in an amount that would sufficiently compensate StakeHound for the harm and damage to its business that a wrongful injunction would cause.  From the beginning, CNL aggressively has sought to freeze StakeHound's assets and thereby impede its ability to defend itself in this lawsuit, to prosecute other litigations, and to pay its business expenses in the

ordinary course.  And CNL persists in seeking this far reaching and damaging relief with a weak
case on the merits—factually and legally—and in the face of a total failure to produce any
admissible evidence that StakeHound has or imminently will dissipate assets.

5.      As a showing of good faith, StakeHound has agreed since August 8, 2023 to a
voluntary asset freeze.  That asset freeze already has damaged StakeHound's business.  On
September 9, 2023, the Court issued a temporary restraining order freezing StakeHound's assets
through "the outcome of the preliminary injunction hearing" on September 27, 2023.  The entry
of a preliminary injunction that, in essence, would continue that asset freeze for weeks, or even
months, would cause material and potentially irreversible harm to StakeHound.  The evidence of
that harm is not uncorroborated statements of counsel (as CNL relies on).  Rather, StakeHound
submits two declarations from its principal Albert Castellana describing in detail StakeHound's
necessary costs and expenses and the injury that would flow from continuation of the asset freeze.
If such an injunction issued and were later determined to be improper, CNL would be liable for
the resulting damages.  If CNL's bold and unsubstantiated allegations and arguments are ultimately
proven wrong, and if a wrongful restraint issues on the basis of these contentions, CNL should be
made to answer for any resulting damage to StakeHound's business.  This is precisely the sort of
case where the far reaching injunctive relief sought by CNL should be conditioned upon the
posting of a substantial bond in accordance with Rule 65(c).  Or of course, the Court could moot
the issue of the bond by denying the Motion altogether.

### STATEMENT OF FACTS

6.      StakeHound incorporates herein by reference the statement of facts in its objection
to CNL's TRO motion and the facts contained in the declarations of Albert Castellana, submitted
in opposition to the TRO Motion and this Motion.

**ARGUMENT**

I.   ***GRUPO MEXICANO* PROHIBITS ENTRY OF AN INJUNCTION FREEZING STAKEHOUND'S ASSETS**

7.     In previous submissions, StakeHound demonstrated that the holding in *Grupo Mexicano* prohibits entry of a freezing injunction in this case because CNL's claims are legal and contractual in nature. *See StakeHound's Supplemental Memorandum in Further Support of its Objection to the TRO Motion* ("**Supp. Mem.**") at 2-7. Specifically, *Grupo Mexicano* prohibits unsecured creditors with contract-based claims from obtaining prejudgment attachment by means of a Rule 65 motion. At most, CNL is an unsecured creditor with a hotly disputed contract-based claim to the original value of the Native Tokens and associated rewards. StakeHound has demonstrated in great detail and with competent evidence that (i) the terms of the parties' agreements accurately memorialize the business deal reached consistent with the parties' intentions and (ii) the plain language of those agreements defeats the position CNL now seeks to take in this Adversary Proceeding. On this record, the binding authority of *Grupo Mexicano* bars CNL from freezing StakeHound's assets.

8.     In response to this argument, CNL makes a far reaching argument—without foundation in the Supreme Court decision itself—that *Grupo Mexicano* does not apply to bankruptcy courts. *See Celsius' Grupo Mexicano Reply Brief* ("**TRO Reply**") at 2-5. In support of this contention, CNL relies primarily on Judge Gerber's decision in *In re Soundview Elite Ltd.* ("*Soundview*"), 543 B.R. 78, 83 (Bankr. S.D.N.Y. 2016). However, *Soundview* does not support entry of preliminary injunctive relief against StakeHound. It is completely factually different than this case. And the portions of *Soundview* that are relevant to this case support denial of a freezing injunction here.

9.      In *Soundview*, the Trustee sought to freeze assets to which the Debtor undisputedly was entitled to by virtue of a contractual redemption right contained in the relevant agreement, the validity of which all parties acknowledged.  *See Soundview* at 82 ("Composite's position—*i.e.,* Mr. Fletcher's position—is inexplicable, and offensive to the Court. It is obvious that once any existing senior Composite liabilities have been satisfied, the entire remaining balance of Composite's assets rightfully belongs to Elite.").   However, Composite's principal, who was on both sides of the transaction the Trustee essentially sought to rescind, attempted to stymie the Trustee's attempts to exercise the Debtor's redemption right by taking indefensible legal positions and stonewalling on discovery.   In other words, Judge Gerber was dealing with a situation where the assets were not legitimately disputed (they undisputedly would belong "imminently" to the estate) and he was attempting to negate attempts by a bad actor to frustrate the legitimate powers of the bankruptcy court.   That is not the situation here.   Quite the opposite, it is CNL that has no legitimate claim to the "disputed" assets.   And StakeHound has not attempted to frustrate the quick and efficient resolution of this dispute.

10.      Moreover, Judge Gerber's grounds for issuing the freezing order distinguish *Soundview*.   First, he issued the freezing order "to protect those creditors **from efforts to dissipate property that may technically not yet be estate property but will be imminently**." *Id.* at 121. (emphasis added).   On the record before him, Judge Gerber found that Composite had no legitimate claim to the assets and that there was evidence of a risk of dissipation by the bad actor.   Neither of those things are true here.   Second, the Court held that the Trustee sufficiently had pled a claim for the equitable remedy of an accounting because the contractual relationship in *Soundview* (in which the bad actor was on both sides of the transaction) was "decidedly not at arms' length." *Id.* at 123.

The nature of that relationship gave rise to the type of fiduciary or confidential relationship from which the right to an accounting springs. *Id.* No such relationship is even alleged here.

11.    In sum, *Soundview* does not stand for the proposition that *Grupo Mexicano* does not apply to bankruptcy courts. In fact, it supports StakeHound's position that CNL is not entitled to a freezing injunction because CNL's claims are purely legal and CNL has not sufficiently pled any equitable claims.

12.    CNL also briefly argues that it is entitled to a freezing injunction under Section 105(a). However, this argument fails because Section 105(a) does not create independent rights or remedies. *See In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003). Section 105(a) only provides a bankruptcy court authority to issue orders necessary to provide relief under other sections of the Code. *Id.* CNL is not entitled to an asset freeze under any provision of the Code and therefore cannot obtain such relief under Section 105(a) independently. *Id.*

## II.    CNL HAS FAILED TO PLEAD SUFFICIENTLY ANY EQUITABLE CLAIMS OR REQUESTS FOR RELIEF.

13.    CNL has failed sufficiently to plead any of its so-called equitable claims or requests for relief under Swiss and New York law—principally because those claims are derivative and duplicative of CNL's legal claims. Because CNL has not sufficiently pled its equitable claims, it cannot rely on them to obtain a freezing injunction otherwise prohibited by *Grupo Mexicano*. In response, and despite the controlling choice of Swiss law found in each of the parties' agreements, CNL argues that Swiss law does not apply to its purportedly extracontractual claims. CNL argues instead—without any principled reason or explanation—that New York law applies, and that CNL has sufficiently pled its equitable claims under New York law. These arguments fail.

1.      **CNL Has Failed to Plead Sufficiently Equitable Claims Under Swiss Law.**

14.      Swiss law applies to CNL's equitable claims because those claims arise out of or relate to the parties' contracts, which all contain Swiss choice of law provisions.  New York courts favor enforcement of the parties' agreement to apply the laws of their choice.  *See, e.g., EMA Financial, LLC v. NFusz, Inc.*, 444 F.Supp.3d 530, 540 (S.D.N.Y. 2020) ("Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.") (citation omitted).  Here, the parties, one of whom is a Swiss company, chose Swiss law in every contract that regulated their relationship.  Consequently, Swiss law bears a reasonable relationship to the parties and this transaction.

15.      CNL argues that the choice of law provisions in the parties' contracts are too narrow to cover CNL's purported equitable claims.[3]  Certainly, that is not true of the choice of law provision in the SSTC, which is broad: "These Terms and Conditions shall be governed i**n all respects, including as to validity, interpretation and effect**, by the laws of Switzerland…" SSTC § 3.d.  This clause is broad enough to govern non- or quasi-contractual claims that clearly relate to the same subject matter governed by the contract.  *See, e.g., Monroe Staffing Serv's, LLC v. Whitaker*, 20-CV-1716 (GBD) (BCM), 2023 WL 4285292, at * 12 (S.D.N.Y. June 9, 2023).  Recognizing that the SSTC choice of law provision is a problem for it, CNL argues in a footnote that the SSTC choice of law provision does not apply because the SSA and RSA contain provisions resolving inconsistencies between the parties' contracts in favor of the SSA and RSA.  *See* TRO Brief, n. 4.  That argument fails because CNL has not identified any conflict or inconsistency

---

[3] CNL misquotes *Dart Brokerage Corp. v. Am. Commerce Ins. Co.*, 2013 WL 5966901, at *2 (S.D.N.Y. Nov. 7, 2013).  *Dart* did not hold that the language "shall be interpreted under the laws of the State of Ohio" is not "sufficiently broad as to encompass the entire relationship between the contracting parties."  That second quoted phrase comes from *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996).  *Dart* cited that language as part of the legal standard for analyzing choice of law questions, not as part of its holding.

among the SSA, RSA and SSTC with respect to choice of law.  There is no inconsistency; all three agreements select Swiss law.

16.     Moreover, even if the governing law provisions are narrow, which they are not, Swiss law would still govern CNL's claims because, for the reasons set out below and in StakeHound's prior submissions, CNL's "equitable" claims are merely duplicative of its contract claims and thus arise out of and relate to those agreements.  Under Swiss law, CNL has failed to state any factual or legal basis entitling them to relief.  A Swiss court analyzing CNL's equitable claims would not grant any relief to CNL on these claims as pled.

### 2.    CNL Has Failed to State These Claims Under New York Law.

17.     CNL's equitable claims fare no better under New York law, even if it did apply. As StakeHound demonstrated in its previous briefs, CNL has failed to state its equitable claims under New York law.  In its supplemental brief on the *Grupo Mexicano* issue, CNL attempted to cure or explain away the deficiencies in its putative equitable claims.  Those attempts fail.

### Accounting

18.     CNL has failed to state a claim for an accounting because it has not alleged any special relationship between CNL and StakeHound beyond a simple arms-length commercial relationship.  CNL misstates StakeHound's argument by suggesting that StakeHound contends that CNL must "prove" the existence of a special relationship.  *See* TRO Reply at 8.  Not so. StakeHound merely contends, consistent with applicable law, that CNL must plausibly allege that relationship, which CNL has failed to do.

19.     CNL concedes its failure to allege anything more than an arms-length business relationship with StakeHound, but contends that it can state an accounting claim without alleging a special relationship because of certain language in *Soundview*.  This argument fails for several

reasons.  First, as discussed above, *Soundview* is completely distinguishable on the facts.  Second, CNL misperceives this portion of *Soundview*.  In *Soundview*, the Court *did* find that the parties had a fiduciary and confidential relationship.  *See Soundview*, 543 B.R. at 123 ("And it is at least arguable, if not obvious, that Mr. Fletcher's failure to complete the redemption when he was still at the helm of Elite was a breach of the fiduciary duties he owed to Elite").  Moreover, CNL cites Judge Gerber as writing that a defendant "cannot rely on a general rule that no confidential or fiduciary relationship exists" to defeat an accounting claim, but CNL leaves off the critical remainder of that sentence, which continues "between the sellers and buyers of corporate stock when dealing at arm's length."  *Id.*  Reading that statement in context, it is clear that the "no fiduciary relationship" exception (to the extent there is one) is limited to "cases dealing with ordinary buyer and seller relationships *in the securities market*."  *Id.* (emphasis added).  Here, this is not a case about securities and therefore CNL cannot rely on this limited exception to escape its pleading requirements.

20.    Next, again conceding that it has not alleged the requisite special relationship between CNL and StakeHound, CNL contends that it has stated an accounting claim because this account is "of a complicated character."  But CNL has failed to *allege* the purportedly complicated character of this account.  All CNL has alleged is that this "account" involves cryptocurrencies.  There are no other allegations *in the complaint* that support the position CNL now argues in its briefs that this account is complicated.  Of course, CNL's briefs offer unpled, unsupported and uncorroborated assertions as to the complicated nature of cryptocurrency transactions but those are not pled and therefore cannot be considered on this motion.

21.    Moreover, even if the Court did consider those unpled assertions of counsel (which it should not), it still should find that CNL has not alleged an account of a complicated character.

In sum, CNL contends that cryptocurrency accounts are "complicated" because you cannot always tell who owns a wallet and because the rewards that have accrued on the Native Tokens accrue at variable rates of return.  *See* TRO Reply at 8-9.  How does that distinguish cryptocurrency accounts from any other type of traditional account?  Outsiders looking at bank or investment fund accounts may not readily be able to identify the account's owner, let alone the owner of any accounts that traded or interacted with the at-issue account.  And invested funds generate interest at varying rates of return.  There is nothing special about cryptocurrency in this instance *except for* the added visibility that all transactions occur on-chain and are therefore visible to everyone.  That makes these accounts less complex, not more.

22.    Finally, CNL contends that its accounting claim is not duplicative of the contract claim because the SSA terminated and CNL cannot be bound by the SSTC (which expressly governed the parties' transactions post-termination) because it "never agreed to be bound" by the SSTC.  TRO Reply at 10.  Except CNL *did* expressly agreed to be bound by the SSTC in both the SSA and RSA.  Indeed, the SSTC were attached as exhibits to both contracts, and both contracts also expressly incorporated the SSTC by reference.  Additionally, CNL backhandedly refers to the SSTC as "clickwrap" as if that term makes them unenforceable, but it is quite the opposite.  Courts in this Circuit "routinely uphold clickwrap agreements."  *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).  Courts even enforce so-called "browsewrap" terms and conditions (which are distinguishable because they do not require user assent) if the user "has actual or constructive knowledge of [the] website's terms and conditions."  *Id.* (citation omitted).  CNL had actual knowledge of StakeHound's terms and conditions because they were attached to and incorporated into the contracts.  Consequently, even if the SSTC were clickwrap or browsewrap, which they are not, CNL still would be bound by them.

**CNL's Other So-Called Equitable Claims and Remedies**

23.     CNL has failed to plead sufficiently its other equitable claims.

24.     With respect to unjust enrichment, CNL incorrectly contends that StakeHound "does not dispute" that CNL adequately pleads the elements of that claim.  That flat out ignores StakeHound's arguments that CNL has failed to state this claim because unjust enrichment claims cannot duplicate contract claims or allege as the unjust enrichment assets to which a party was entitled under a contract.

25.     With respect to constructive trust, CNL admits that it has not pled the elements necessary to obtain that relief.[4]  Instead, it argues there are no pleading elements and that courts can impose constructive trusts whenever conscience and equity demands. *See* TRO Reply at 11-12.  That analysis underscores StakeHound's point from its last brief: constructive trust is a *remedy*, not a claim.  CNL must adequately plead an equitable *claim* to be entitled to the equitable relief of a constructive trust.  It has not done so.  Moreover, CNL has not alleged with any specificity *why* good conscience and equity requires the drastic remedy of imposing a constructive trust over another party's assets—in derogation of the plain language of the parties' agreements.  All CNL alleges, as it does for every claim, is that it owns the Native Tokens and it wants them back.  Not only do those allegations contradict the plain meaning of the contracts, they simply do not evidence a level of unconscionability (or CNL's entitlement to the assets) sufficient to warrant imposition of a constructive trust.[5]

---

[4] CNL ignores StakeHound's meritorious argument that under New York law "constructive trust" is not a cause of action.  It is a form of equitable relief that only can be provided if a party adequately pleads some other equitable cause of action.  Because CNL has failed to state its equitable claims, its request for constructive trust relief fails too.
[5] CNL also confusingly argues that it cannot adequately be compensated by money damages because its purported damages exceed what it asserts (without competent evidence) is the total value of StakeHound's assets.  *See* TRO Reply at 12.  In other words, CNL *can* be made whole by money damages, but it doesn't think StakeHound has enough.  That is not what the law means by the "inadequacy" of money damages.  CNL must have an injury *incapable* of being satisfied by the payment of money.  CNL has alleged no such injury.

26.     Finally, CNL asserts that the Court can issue a freezing order based on its *breach of contract* claim simply because CNL seeks specific performance.  TRO Reply at 12-13.  This is foreclosed by *Grupo Mexicano*, which held that legal claims cannot be the basis for prejudgment asset freezes under Rule 65.  CNL cites an unreported Eastern District of California case for the proposition that *Grupo Mexicano* does not apply to legal claims as long as equitable relief is sought.  *Arch Ins. Co. v. Sierra Equipment Rental, Inc.*, 20123 WL 5897327, at * 4 (E.D. Cal. Nov. 13, 2012).  This Court can and should safely disregard that case.  First, it is not binding, or even persuasive, authority here.  Second, that case relies for its holding on: (i) an 1873 Supreme Court case that merely acknowledged that "specific performance" is an equitable remedy and (ii) a California mid-level state appellate court decision from 2012 that merely stated that "promissory estoppel is a doctrine which employs equitable principles."  Neither case deals with or mentions *Grupo Mexicano*, or the issues *Grupo Mexicano* analyzed.  Third, the conclusion that a breach of contract claim can support a freezing injunction in violation of *Grupo Mexicano* merely by seeking specific performance is illogical and would open a loophole large enough to swallow *Grupo Mexicano* completely.  Any unsecured creditor with contractual claims could freeze the assets of a debtor by seeking both damages *and* specific performance in the form of turning over money or assets.  Consequently, CNL's request for specific performance cannot justify an injunction.

**3.   CNL's Legal Claims Prohibit Entry of a Freezing Order.**

27.     CNL is not entitled to a freezing injunction, despite alleging equitable claims, because its well-pled claims are purely legal.  CNL attacks this conclusion by citing this Court's decision in *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, 2000 WL 1610790, at * 1 (S.D.N.Y. Oct. 26, 2000) (Martin, J.) for the proposition that CNL can obtain an asset freezing injunction because it alleges equitable claims.  But that misunderstands the analysis of *Wishnatzki*.

In *Wishnatzki*, this Court recognized that the Supreme Court in *Grupo Mexicano* "made a distinction between general, unsecured creditors and those possessing a lien or equitable interest in the property at issue." *Id.* at * 1.  Secured creditors that have a true equitable interest in the property *can* obtain freezing injunctions. *Id.*  This Court then granted a freezing injunction because the goods at issue were in a PACA trust, and under PACA, "a statutory trust is created on sale proceeds of perishable agricultural products in order to protect the security interests of sellers. This has the effect of elevating unsecured general creditors to the status of trust beneficiaries who have rights superior to secured creditors in the trust funds."  Consequently, plaintiff there was more than an unsecured creditor and *Grupo Mexicano* did not apply to that motion for injunctive relief. *Id.* at 2.

28.     Moreover, StakeHound demonstrated that CNL's equitable claims merely are duplicative of its legal claims, and therefore cannot justify an asset freeze.  CNL argues that StakeHound's cited case, *Northern Shipping*, is inapt because the equitable claims there were "merely duplicative of the breach of contract claim" and did not allege "any distinct harm giving rise to a separate claim" for constructive trust.  TRO Reply at 14.  But that quoted language is precisely why *Northern Shipping* applies here.  CNL has not alleged any extracontractual or distinct harm or conduct that is not also alleged in its legal and contractual claims.  As StakeHound has repeatedly argued: all of CNL's claims are based on the same nucleus of common facts.  Those facts give rise to contract claims, not equitable ones.

**Turnover**

29.     In the interest of time and conservation of resources, StakeHound will not repeat in full its argument that CNL's "turnover" claims are not true turnover claims because ownership of the assets are disputed.  StakeHound will, however, respond to CNL's incorrect contention that

StakeHound has no contractual basis to claim ownership of the MATIC and DOT.  *See* TRO Reply at 16-17.  First, even if this were true, and it is not, it would not justify freezing all StakeHound's assets, as CNL admits this argument does not apply to the ETH.  Second, the argument fails to account for terms of the RSA.  As StakeHound noted, the RSA attached and incorporated by reference the SSTC.  *See* RSA Ex. B and § 2.1.  While the RSA contemplated the parties' ability to exchange stTokens for Native Tokens and vice versa, those exchanges required use of StakeHound's platform and were subject to the terms and conditions of such use, as set forth in the SSTC.  As StakeHound identified in its brief, the SSTC contain multiple conditions to the use of the Platform – not the least of which being KYC/AML due diligence.  In other words, CNL is simply wrong in claiming that it had an unconditional right to redeem its stTokens for Native Tokens under the RSA.  The parties contemplated exchanges, but ones conditioned on the terms and conditions set forth in the SSTC.

30.    All of this is to say that no portion of the Native Tokens contractually belong to CNL, such that they would be "property of the estate" at this time.  CNL, however misguided, is entitled to dispute StakeHound's ownership of those tokens.  But that is all this is: a dispute over assets.  That dispute renders CNL's turnover claims unripe and improperly pled.

## III.    CNL HAS NOT DEMONSTRATED IRREPARABLE HARM.

31.    Respectfully, CNL has not demonstrated irreparable harm sufficient to justify entry of a preliminary injunction.  CNL has not submitted "competent evidence" sufficient to meet the high bar of demonstrating that StakeHound is insolvent, nor any evidence that StakeHound has dissipated or intends imminently to dissipate assets.

32.    To establish irreparable harm, CNL must demonstrate that, absent a preliminary injunction, it will suffer an injury that is neither "remote nor speculative," but actual and imminent,

and one that cannot be remedied if a court waits until the end of trial to resolve the harm.  *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  Damages compensable by a money judgment are not irreparable.

33.    CNL admits its damages are economic but contends that StakeHound is insolvent because, due to the inability to access some ETH because of the Key Loss Event, StakeHound does not have assets sufficient to satisfy Celsius' claims.  The Court cited this reasoning in granting CNL the TRO, finding that the Key Loss Event apparently leaves StakeHound unable to "satisfy its obligations to Celsius."  TRO at 9.

34.    Respectfully, that reasoning puts the cart before by the horse by presuming that CNL is correct in its interpretation of the agreements that it is entitled to a one-to-one exchange of stTokens for Native Tokens.  But that issue is arbitrable and must be decided by the arbitrator in Switzerland before it can be the basis for any orders here.  In fact, the entire contest in the arbitration turns on that question of contract interpretation.

35.    "The standard for demonstrating insolvency is high" and requires "more than allegations of the defendant's weak financial condition."  *KDH Consulting Group LLC v. Iterative Capital Mgmt. L.P.*, No. 20 Civ. 3274 (VM), 2020 WL 2554382, at * 8 (S.D.N.Y. May 20, 2020).  CNL cannot meet that high standard with conclusory allegations about its entitlement a one-to-one exchange of tokens that *presume* its ultimate victory in the case.  CNL's math also entirely omits the value of StakeHound's claim against Fireblocks.  Other than those conclusory allegations, CNL has not submitted any competent evidence sufficient to show that StakeHound is insolvent.  StakeHound will demonstrate at the hearing that it is not.

36.    Secondly, CNL has not shown that StakeHound has dissipated or will dissipate its assets.  CNL failed to submit any competent evidence of dissipation.  In the TRO, the Court found

that StakeHound's statements that it intends to pay operating costs, expenses and legal bills is

evidence of dissipation.  But StakeHound has not dissipated or threatened to dissipate assets, and

merely requests that the Court provide a carveout from any injunctive relief to permit the payment

of ordinary course business expenses.  StakeHound respectfully submits it would be appropriate

under the circumstances to authorize StakeHound to continue paying its own creditors from its

own assets, particularly given that the plain language of the parties' agreements favors

StakeHound's position.

## IV.    AN INJUNCTION SHOULD INCLUDE A SUFFICIENT CARVEOUT FOR LEGITIMATE BUSINESS EXPENSES AND BE LIMITED IN DURATION.

37.    StakeHound does not believe that a preliminary injunction should be issued and

asks the Court to modify the TRO in light of the arguments and evidence presented here.  However,

to protect StakeHound from the existential threat of a long-term total asset freeze, StakeHound

contends that if a preliminary injunction were to be issued, that injunction must: (1) include a

carve-out sufficient to cover the amounts necessary for StakeHound to pay ordinary course

business expenses, including legal fees and costs; and (2) be limited in duration to the date on

which the Swiss arbitrator rules on CNL's application for injunctive relief in the arbitration.

38.    With respect to duration, any preliminary injunction that issues should expire upon

the date the Swiss arbitrator decides CNL's request for an injunction in the Arbitration.  This is so

for at least two reasons.  First, the limited duration protects StakeHound from the damages of a

long-lasting asset freeze, which are detailed in Mr. Castellana's second declaration submitted with

this brief.  Second, any preliminary injunction that issues should expire upon the date the Swiss

arbitrator decides CNL's request for an injunction in the Arbitration.  That is because the claims

that form the basis of the injunction are arbitrable.  In the TRO, the Court linked its temporary

injunction to CNL's request for an accounting.  That claim (or request for relief) arises out of the

same subject matter that is governed by the parties' contracts. As set forth above, the same is true of the rest of CNL's equitable claims, so that no matter which claim gives rise to an injunction (and StakeHound believes none should), that claim may properly be determined by the arbitrator. Consequently, whether injunctive relief flows from those claims is itself arbitrable. As the Court has suggested in several hearings, this Court is empowered to deliver the claims to the Swiss arbitrator "intact" and to, if the Court feels it is necessary, preserve the assets until the arbitrator takes jurisdiction over the case. Ultimately, then, the Court should treat this motion as a bridge to the arbitration and, if an injunction issues, it should last only as long as it takes for the arbitrator to resolve whether the arbitrable claims justify an injunction that should last longer.

39.     Second, and as the Court suggested during the TRO hearing, there should be a carve-out in any preliminary injunction and that carve-out should be a dollar figure—one high enough that StakeHound need not ask CNL, who is likely to simply deny them, or repeatedly be obliged to petition the Court with requests to pay simple, ordinary course business and legal costs. As set forth in the declaration of Albert Castellana submitted with this brief, the carveout should be greater than $1.5M USD.

40.     As detailed in the Second Castellana Declaration, StakeHound expects that expenses in the total amount of $1,310,229 will be due and owing by October 4, 2023 (or the date that is 7 days following the September 27th hearing, during which period StakeHound would anticipate receiving a ruling on the pending motions). As of the date hereof, StakeHound has cash on hand in the amount of $518,729.95, significantly less than the amount of its expenses, even with the $200,000 carve-out provided by the TRO. *See* Second Castellana Decl., p. 5, 6. StakeHound maintains that the Plaintiff has put forth nothing more than mere allegations of StakeHound's insolvency to date, which is an insufficient showing for purposes of freezing a

defendants' assets and should not be a basis for imposing a preliminary injunction.  *See KDH Consulting Group LLC*, at * 8.  It may well, however, prove to be a self-fulfilling prophesy, and the resulting harm to StakeHound's business is exactly the kind of damage that necessitates a bond.

## V.    CNL MUST POST A BOND.

41.    If a preliminary injunction is to be issued that does not contain a carveout sufficient to permit StakeHound to pay its necessary business expenses and pursue its claim against FireBlocks, or which is not sufficiently limited in duration, then the Court should compel CNL to post a bond under Rule 65(c) to obtain the injunction.  A bond is required to protect StakeHound from the catastrophic damages to its business that would flow from being wrongfully enjoined.  A bond is critical here because a preliminary injunction could last far longer than a TRO, drastically increasing the damage to StakeHound's business.

42.    StakeHound's earlier submissions—including its supplemental brief in opposition to the TRO and the accompanying declaration of Albert Castellana—demonstrated the harm that the voluntary asset freeze and a TRO would cause to its business, specifically by cutting off StakeHound's ability to pay legal fees and ordinary course expenses, like those required to maintain the nodes.

43.    StakeHound has submitted a second declaration from Mr. Castellana detailing with additional specificity the harms to StakeHound's business that have been caused by the voluntary asset freeze and which would flow from a total asset freeze in a preliminary injunction.  If such an injunction were to extend beyond October 4, the potential damage and risks for the company could be substantial.  As detailed in the Castellana declaration, depending on its duration, a preliminary injunction could jeopardize StakeHound's ability to maintain the Native Tokens and Staking Rewards and continue its litigation against FireBlocks. *See* Second Castellana Decl., p. 7-11.

44.     As this demonstrates, the entry of a preliminary injunction extending that asset freeze by several weeks or months, could compromise StakeHound's liquidity, and jeopardize the company's ability to continue as a going concern.  In the event that StakeHound were forced to liquidate, the resulting loss of enterprise value would result in substantial damages.  The Plaintiff should be required to post a bond in an amount to be determined following a hearing on the Motion.

45.     A bond is essential here because of the relative weakness of CNL's claims on the merits, and the substantial damage that could be caused to StakeHound through an asset freeze premised on such a flimsy foundation.  As Judge Easterbrook put it in *In re UAL Corp.*, 412 F.3d 775, 778-79 (7th Cir. 2005): "[t]he weaker the claim behind the injunction, the greater the [enjoined party's] uncompensated risk of injury."  In *In re UAL Corp.*, the bankruptcy court entered an injunction forbidding stockholders from selling certain stock and did not require the debtor to post a bond.  While that injunction was in place, the price of the stock fell by about 30%.  After the injunction ended, parties allegedly injured by the price drop during the injunction sued for damages.  The Seventh Circuit held that, in the absence of a bond, the parties could not recover any damages or other reimbursement for their injuries.  Judge Easterbrook lamented the bankruptcy court's decision not to require security, particularly in light of the weakness of the debtor's claims on the merits.  *Id.* at 778-79 ("Lack of security is doubly regrettable because the bankruptcy judge's injunction is problematic on the merits.").  *In re UAL Corp.* serves to underscore the importance of requiring security when issuing an injunction on a record as problematic as this one, even if the party seeking the injunction is a debtor.

46.     CNL made two arguments against requiring a bond to obtain a TRO, and neither warrants the Court excusing CNL from the requirement to post a bond to obtain a TRO or preliminary injunction.

47.    First, CNL argued that Bankruptcy Rule 7065 exempts debtors and debtors in possession from complying with the bond requirement of Rule 65(c).  *See* TRO Reply at 1.  That is wrong.  Bankruptcy Rule 7065 makes Rule 65 applicable in adversary proceedings except that a temporary restraining order or preliminary injunction *may* be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c).  *See* Fed. R. Bankr. P. 7065 (emphasis added).  In other words, Rule 7065 allows bankruptcy courts to relieve the debtor, trustee, or debtor in possession of the security requirement but does not prohibit such requirement in an appropriate case.  *See Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 595 (Bankr. S.D.N.Y. 2009) (noting that the effect of 7065 is to simply make the requirement for posting a bond optional rather than mandatory); *Freckles, Ltd. v. Manufacturers Hanover Trust Co. (In re Freckles, Ltd.)*, 60 B.R. 6, *7 (Bankr. E.D.N.Y. 1986) (ordering merchant debtor to deposit $4,000 bond as security for damages that may result against creditor bank from the imposition of an injunction, and if "[creditor] from time to time during the pendency of the adversary proceeding believes the bond needs to be increased, the court will entertain its requests.").[6]  For the reasons described above and in StakeHound's previous submissions, this is an appropriate case for a bond.

48.    Second, CNL argues that StakeHound has not demonstrated that a complete asset freeze would harm its business.  *See* TRO Reply at 1-2.  In so arguing, CNL simply ignores StakeHound's sworn declarations filed in this case.  Specifically, StakeHound has submitted two declarations from Mr. Castellana describing in detail: (i) the harm to StakeHound's business that has been caused by the asset freeze, and (ii) the imminent harm to the business from an injunction

---

[6] In a footnote in its opening brief on this motion, CNL cites the correct standard and admits that debtors and debtors in possession are not automatically exempt from posting a bond.  Instead, CNL requests waiver of the bond requirement, consistent with Rule 7065.  *See* Opening Brief at n. 57.

continuing that freeze for the foreseeable future.  Moreover, CNL's argument does not pass muster.

CNL cannot seriously contend that a *total asset freeze* that could last months would do no harm to

StakeHound's business.  To the contrary CNL knows better, as evidenced by its repeated (and

unsupported) assertions that the assets CNL seeks to freeze are StakeHound's *only* assets (or, at

least, a significant portion of its total assets).  Simply put, not only is it obvious from the sweeping,

draconian nature of CNL's requested injunction that entry of such an injunction would harm

StakeHound's business, but StakeHound has submitted competent evidence proving that to be true.

## CONCLUSION

For these reasons, Defendant StakeHound S.A. respectfully requests that the Court deny the Motion in its entirety, and grant such other relief as the Court may deem proper.

Dated: September 8, 2023
New York, New York

*Respectfully,*

*/s/ Stephanie Wickouski*

**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey S. Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted pro hac vice)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A*