**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey S. Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted *pro hac vice*)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CELSIUS NETWORK LLC, *et al.*,[1]<br>　　　　　　　　　Debtors. | Chapter 11<br>Case No. 22-10964 (MG)<br>Jointly Administered |
| CELSIUS NETWORK LIMITED,<br>　　　　　　　　　Plaintiff<br>　　　　v.<br>STAKEHOUND SA,<br>　　　　　　　　　Defendant | Adversary Proceeding<br>No. 23-01138 (MG) |

**DEFENDANT STAKEHOUND, S.A.'s**
**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL**
**ARBITRATION OR, IN THE ALTERNATIVE, FOR ABSTENTION**

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

134642149v.4

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTS ............................................................................................................................................2

ARGUMENT ..................................................................................................................................6

    I.      THE COURT SHOULD COMPEL ARBITRATION............................................66

            A.      The SSTC Govern the February 2021 Staked ETH......................................6

            B.      The Arbitrator Should Decide Whether the Arbitration Provisions Govern the February 2021 Staked ETH Transaction..................................8

            C.      CNL's Turnover Claim is Non-Core and Arbitrable. .................................9

            D.      The Non-Arbitrable Claims Should be Stayed Pending Arbitration. ........12

    II.     THE COURT SHOULD ABSTAIN ON COMITY PRINCIPLES.......................13

CONCLUSION.............................................................................................................................14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 11 East 36th LLC*,
  No. 13-11506 (JLG), 2015 WL 2445075 (Bankr. S.D.N.Y. May 20, 2015)..........................11

*In re Andrew Velez Const., Inc.*,
  373 B.R. 262 (Bankr. S.D.N.Y. 2007) (Glenn, J.)...............................................................11

*Doctor's Assocs., Inc. v. Alemayehu*,
  934 F.3d 245 (2d Cir. 2019)...............................................................................................8, 9

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*,
  815 F.2d 840 (2d Cir.1987)....................................................................................................12

*Green Tree Fin. Corp.-Ala. v. Randolph*,
  531 U.S. 79 (2000)..................................................................................................................6

*In re Hagerstown*,
  277 B.R. ..........................................................................................................................12, 13

*Hirsch v. London S.S. Owners Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*,
  198 B.R. 45 (S.D.N.Y. 1996)..................................................................................................11

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
  412 F.3d 418 (2d Cir. 2005)....................................................................................................13

*In re MF Glob. Inc.*,
  531 B.R. 424 (Bankr. S.D.N.Y. 2015)...................................................................................11

*Olin Holdings Ltd. v. State*,
  F.4th 92 (2d Cir. 2023) 73 .......................................................................................................9

*Oppenheimer & Co., Inc. v. Neidhardt*,
  56 F.3d 352 (2d Cir. 1995)......................................................................................................6

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012)....................................................................................................6

*In re Soundview Elite Ltd.*,
  WL 2998529 (S.D.N.Y. July 3, 2014) 2014 .........................................................................12

**Statutes**

11 U.S.C. § 542............................................................................................................................9

**PRELIMINARY STATEMENT**

CNL concedes that: (i) most of its case—five of nine claims, concerning three of four transactions—is non-core and arbitrable; and (ii) the SSA, the RSA and the SSTC all contain broad Swiss arbitration provisions. These concessions eliminate any doubt as to the arbitrability of this dispute. Yet in the face of this compelling record, CNL continues to resist arbitration, contending for the first time (and in direct opposition to the testimony of its own corporate representative), that the parties' second transaction was not governed by *any* contract. CNL also incorrectly argues that its unripe and premature turnover claim, which seeks to short circuit a live contract dispute, is core and non-arbitrable. From these two factually and legally flawed premises, CNL proposes that this Court *stay the majority of this case, which is indisputably arbitrable*, while the parties litigate peripheral issues like claim disallowance, automatic stay violation and turnover of papers.

In taking this position, CNL turns the governing arbitrability analysis on its head. Faced with overwhelming evidence that the parties' disputes are governed by contracts with binding arbitration provisions, CNL tries to run away from those contracts, and to reframe the dispute as either outside the scope of the parties' agreements or subject to resolution under the Bankruptcy Code. These arguments simply cannot be squared with the record of this case. CNL's claims raise two key *contractual* issues: who owns the Native Tokens and what rights does CNL have to exchange tokens. The Swiss arbitrator must decide those issues because they relate to the contracts. Further, CNL is wrong about the second ETH transaction and the arbitrability of its turnover claim. StakeHound's terms and conditions govern the second ETH transaction because that was the parties' intention and CNL accepted these terms through its conduct. And CNL's turnover claim is an arbitrable, non-core dispute over a prepetition contract. Finally, comity abstention is warranted because: (i) this is a Swiss law contract case between two foreign entities, (ii) the balancing factors weigh in favor of it, and (iii) the issue of who owns the tokens is a question

1

of local (Swiss) law antecedent to the distributive rules of bankruptcy. For these reasons, the parties' pending contract and property ownership disputes should be resolved in the Arbitration.

## FACTS

CNL is a U.K. company that approached StakeHound about using StakeHound's liquid staking services.[2] In November 2020, StakeHound began negotiating the terms of its relationship with CNL, through Jason Stone and Roni Pavon.[3] By this time, the parties were determining the terms pursuant to which CNL would stake ETH and potentially other tokens with StakeHound.[4]

On November 16, 2020, at Mr. Pavon's request, Albert Castellana provided Mr. Pavon and Mr. Stone with a copy of StakeHound's Services Terms and Conditions (the "*SSTC*"), which was then nearly identical to the terms today.[5] The SSTC, then and now, define StakeHound's "Services" as (i) sending Native Tokens as payment to StakeHound, which will upon receipt instantly mint and issue Staked Token(s) and operate the nodes, and (ii) "buy[ing] upon availability Native Tokens with…Staked Token(s), at the same value in the equivalent crypto currency."[6]

On November 30, 2020, CNL began onboarding with Altcoinomy, StakeHound's compliance partner.[7] On December 7, 2020, CNL completed the KYC/AML process with Altcoinomy, which StakeHound understood required the user to consent to the SSTC.[8] On December 21, 2020, StakeHound, through counsel, **again** sent CNL a copy of the SSTC.[9]

---

[2] *See* First Castellana Decl. ¶¶ 13-16.
[3] Third Declaration of Albert Castellana ("Third Castellana Decl.") at ¶ 5.
[4] *Id.*
[5] *Id.*
[6] *See* SSTC, "Definitions." (subject to applicable terms and conditions, including completion of KYC/AML due diligence).
[7] *See* Third Castellana Decl. ¶ 8.
[8] *Id.*
[9] *Id.* ¶ 9.

2

On January 19, 2021, one day before the parties would enter into the SSA, CNL's counsel attempted to change the agreement to give CNL a lien on the Native Tokens.[10] StakeHound rejected that change and insisted that its ownership of the Native Tokens was a necessary condition for any deal with CNL. CNL then expressly accepted that StakeHound would solely own the ETH, which acceptance is memorialized in the SSA in Section 1.3.[11]

The parties executed the SSA, effective January 20, 2021. The purpose of the SSA was to define the terms under which CNL would exchange Locked ETH tokens for stETH, and the mechanism for transferring the Locked ETH, because it was not StakeHound's standard practice to accept already-staked tokens.[12]

The SSA does not provide CNL with an unconditional right to redeem the native ETH at a one-to-one rate. Section 1.8 of the SSA, which governs exchange of stETH for ETH, does not say "one-to-one" or "unconditional" or any similar language.[13] In fact, it conditions that exchange "upon availability" of the ETH and on compliance with the SSTC.[14] The SSA attached and expressly incorporated by reference the SSTC.[15] StakeHound expressly incorporated the SSTC into the SSA because StakeHound considered and intended for the SSTC to govern *all* transactions.[16] The SSTC contain numerous conditions to exchange of stTokens for Native Tokens, including: (i) agreement to be bound by the SSTC; (ii) completion of the KYC/AML due diligence process; (iii) limitation on the rate of exchange to "the same value in the equivalent crypto currency" (in other words, *not* one-to-one); and (iv) operation of the Platform.[17]

---

[10] *Id.* at ¶ 10.
[11] *Id.*
[12] *Id.* at ¶ 11.
[13] *See* SSA § 1.8.
[14] *Id.* ("in accordance with the StakeHound Services Terms and Conditions").
[15] SSA § 1.1, Ex. B; Third Castellana Decl. ¶ 11.
[16] *See* Third Castellana Decl. ¶ 11.
[17] *See* SSTC, Preamble, "Services of the Company," "Staking," "Purchasing Native Tokens."

3

On January 21, 2021, per Celsius' request, Staked.us transferred control of the Locked ETH to StakeHound and on January 23, 2021, StakeHound minted stETH corresponding to the number of Locked ETH.[18]

During and after the negotiation of the SSA, StakeHound intended for its relationship with CNL to extend beyond the SSA and its associated transfer of Locked ETH.[19] CNL clearly expressed the same intent. For example, on January 22, 2021, Ms. Urata-Thompson, CIO of Celsius, acting on behalf of CNL, emailed StakeHound that she was "one of the two authorized personnel **as per agreement**" and that CNL "would like to initiate creating stETH and start taking."[20] Then again on January 22 and January 25, 2021, Mr. Pavon emailed that he and Ms. Urata-Thompson were the only people at CNL authorized to direct StakeHound under "**the agreement**," which applied to both an NDA and "the business relationship."[21]

StakeHound clearly understood these references to the "agreement" to refer to the SSA, because Mr. Pavon and Ms. Urata-Thompson were the two CNL individuals listed as authorized to receive notices for CNL under Section 8.2 of the SSA.[22] And on January 24, 2021, Mr. Stone contacted StakeHound and said "we need more stETH issued ASAP."[23]

On February 1, 2021, Fernando Dreyfus, of Celsius, created a Slack channel titled "#authorizations-celsius-StakeHound."[24] According to Ms. Urata-Thompson, the purpose of the channel was to "talk about staking ETH" because she and Mr. Pavon were "the only authorized personnel" to do so. On February 2, 2021, Ms. Urata-Thompson wrote that the Slack channel was "the one and only channel to do this business…under [her] direct command, there [would] be

---

[18] *See* Third Castellana Decl. ¶ 13.
[19] *Id.* ¶ 14.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.* ¶ 15.

4

people on the coin deployment desk that will be touching the coins." After that, Mr. Stone messaged the channel requesting two separate mintings of stETH following an exchange of a total of 35,000 ETH, to be sent to two separate addresses. On February 3, 2021, Connor Nolan, on behalf of CNL, confirmed that the 35,000 ETH had been sent to StakeHound, at which time StakeHound completed the minting of the corresponding stETH and sent the same to CNL.[25]

In subsequent correspondence, StakeHound made clear to CNL that the SSTC apply to all coin exchanges with StakeHound.[26] On September 1, 2021, Mr. Castellana received an email from Ron Sabo in which he requested to "redeem [CNL's] stZEN holdings." In response, Mr. Castellana clarified twice that "***according to StakeHound's terms and conditions*** this is not a redemption, but a trade of stZEN for ZEN" and "***our agreements*** make clear that there is no right of redemption." In response, Mr. Sabo said "thanks for the clarification…we would like to proceed with the purchase of ZEN vs stZEN based on a 1:1 price."[27]

The SSTC also apply to the RSA. Section 2.1 of the RSA states that the SSTC "fully apply to this Agreement" and therefore the conditions to exchange in the SSTC also apply to the MATIC and DOT.[28] Moreover, Section 2.7 of the RSA *does not say* the exchange is on a one-to-one basis or unconditional or any such language.[29] Rather, it conditions such exchange on "the absence of any specific lockup period" in addition to the conditions contained in the SSTC.[30] Finally, the RSA contains a merger clause that identifies it and its exhibits (including the SSTC) as the entire agreement, irrespective of any prior understandings, agreements or undertakings.[31]

---

[25] *Id.*
[26] *Id.* ¶ 16.
[27] *Id*.
[28] *See* RSA § 2.1.
[29] *Id.* at § 2.7.
[30] *Id*.
[31] *Id*. at § 8.5.

5

**ARGUMENT**

**I.    THE COURT SHOULD COMPEL ARBITRATION.**

CNL, as the party resisting arbitration, "bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). A threshold question is "whether the parties have indeed agreed to arbitrate." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012). "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co., Inc. v. Neidhardt,* 56 F.3d 352, 358 (2d Cir. 1995).

**A.    The SSTC Govern the February 2021 Staked ETH.**

CNL argues, for the first time, that the parties' second ETH transaction was not governed by *any* contract because: (i) the SSA applied only to the first ETH transaction and (ii) CNL never "agreed to" the terms of the SSTC.[32] CNL transparently tries to characterize this single transaction as (i) not governed by *any* agreement and (ii) not arbitrable, and then to use that single transaction as a platform for persuading this Court to retain and decide all of the pending disputes between the parties. In addition to badly misreading the applicable arbitrability authorities, CNL takes liberties with the record in suggesting that the SSTC do not govern the second ETH transaction.

For starters, this ill-founded position *is directly contradicted by the testimony of CNL's primary corporate representative, Richard Man.* In his first declaration *submitted in this Adversary Proceeding*, Richard Man stated that "in February 2021, Celsius provided an additional approximately 35,000 native ETH (the "February 2021 Staked ETH") to StakeHound. In return, StakeHound provided Celsius with the same number of stETH. *The February 2021 Staked ETH*

---

[32] CNL's Opposition Brief (the "***Opp.***") at 10.

6

*was governed by the standard StakeHound Terms and Conditions.*"[33]   Similarly, in its First Amended Complaint, CNL alleges that it "provided StakeHound with the Native Tokens…including the November 2020 Staked ETH, **the February 2021 Staked ETH**, MATIC and DOT…**in connection with agreements entered into with StakeHound**…."[34]   CNL's desperate attempt to argue that the second ETH transaction was not governed by any agreement is refuted by CNL's own operative pleading.

Second, CNL's dispositive admissions on this point are wholly consistent with the other evidence in this case—which demonstrates that the parties intended for the SSTC to govern the second ETH transaction, and that CNL accepted the SSTC through its conduct. By their terms, the SSTC apply to every StakeHound transaction.[35]   Further, by the time of the second ETH transaction, StakeHound had twice sent the SSTC to CNL, and the SSA attached and incorporated the SSTC.[36]   Thus, CNL was aware of the SSTC and that it applied to all transactions with StakeHound. StakeHound's attachment of the SSTC to the SSA demonstrates its intent to apply the SSTC to *every* transaction.

Further, CNL's subsequent conduct demonstrates it understood the SSA to define the terms of the parties' relationship generally, not just as to the first ETH transaction. Right after the first ETH transaction, CNL communicated with StakeHound about staking more ETH.[37]   CNL's personnel repeatedly referred to "the agreement" and being "authorized" under it, which could only refer at that point in time to the SSA.[38]   And, StakeHound expressed to CNL in subsequent communications that the SSTC applied to all transactions with StakeHound.[39]

---

[33] First Declaration of Richard Man, ¶ 13 (emphasis added).
[34] FAC ¶ 88.
[35] *See* SSTC at p. 2.
[36] *See* Third Castellana Decl. ¶¶ 5, 9.
[37] *Id.* at ¶¶ 14-15.
[38] *Id.*
[39] *Id.* ¶ 18.

7

Moreover, CNL's new position that *no contract* governed the second ETH transaction is illogical and implausible. Why would the parties ensure that three of their four exchanges were governed by contracts but leave ungoverned the second of those four transactions? Why would StakeHound adopt terms and conditions that expressly apply to all customer transactions, and repeatedly send those terms and conditions to CNL, but carveout this *one* transaction from the terms and conditions (without any correspondence acknowledging that fact)? And, if no contract governed this transaction, what *were* the terms? CNL has not submitted any evidence even suggesting what terms purportedly apply to this transaction if the contracts do not.[40] And in the absence of any governing contract, how can CNL purport to own the Native Tokens or demand a 1:1 exchange of stTokens for Native Tokens? CNL's claims fail in the absence of a governing contract. And the evidence demonstrates the SSTC applied to the parties' relationship.

**B.    The Arbitrator Should Decide Whether the Arbitration Provisions Govern the February 2021 Staked ETH Transaction.**

CNL contends, in a single, conclusory sentence, that "[t]here is no question that this Court, not the arbitrator, should determine whether the parties agreed to arbitrate."[41] But it is the arbitrator who should decide in the first instance whether the parties' arbitration agreements apply to CNL's claims arising out of the February 2021 Staked ETH transaction. CNL incorrectly frames the issue as whether the parties "agreed to arbitrate" claims arising out of the February 2021 Staked ETH. However, there is no question that the parties entered a general agreement to arbitrate: the applicable contracts all contain the same broad arbitration provision.[42] The issue is the *scope* of those clauses, *i.e.* whether they govern the parties' dispute over the February 2021 Staked ETH.

---

[40] CNL repeatedly cites an out-of-context email from Mr. Castellana regarding a supposed "one to one" exchange. But that email is from April 2021, several months after the February 2021 ETH exchange, and concerns the RSA. It is not evidence of the parties' intentions concerning the second ETH transaction.
[41] Opp. at 9 (citing *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250-51 (2d Cir. 2019).
[42] *See* SSA § 10; SSTC § 3.a; RSA § 10.

8

The scope of an arbitration provision is an arbitrability issue that should be resolved by the arbitrator. *See Doctor's Assocs.*, 934 F.3d at 251 (presumption that court resolves arbitrability "may be overcome where the parties 'clearly and unmistakably' agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute.")

When an arbitration provision incorporates arbitration rules that "empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Olin Holdings Ltd. v. State*, 73 F.4th 92, 105 (2d Cir. 2023). The arbitration provision here incorporates the Swiss Rules of International Arbitration. Article 23 of those rules empowers the arbitrator to rule on "any objections to its jurisdiction, including regarding the existence, validity or scope of the Arbitration Agreement."[43] The Second Circuit recently held that parties whose arbitration agreement incorporates arbitration rules containing nearly identical language have "clearly and unmistakably" agreed to send questions of arbitrability to the arbitrator in the first instance. *See Olin Holdings*, 73 F.4th at 106.

### C.    CNL's Turnover Claim is Non-Core and Arbitrable.

CNL hopes to avoid its promise to arbitrate by reframing the parties' pending contractual disputes as a matter of Bankruptcy Code turnover. But no matter how hard it tries, CNL cannot demonstrate that the dispute over the Native Tokens can be resolved under the Bankruptcy Code's turnover statute.[44] That is because turnover is wholly inappropriate remedy for resolving deeply disputed contractual issues. CNL boldly suggests that it has a contractual right to the Native Tokens and that there is no "dispute" over them because StakeHound's interpretation of the contract and contractual defenses are "manufactured." But StakeHound has cited to provisions of

---

[43] *See* Swiss Rules of International Arbitration, art. 23, https://www.swissarbitration.org/wp-content/uploads/2023/08/Swiss-Rules-2021-EN.pdf.
[44] *See* 11 U.S.C. § 542.

the parties' contracts demonstrating ownership of the Native Tokens and related assets.[45] It is CNL's counterargument that is "manufactured," and in substantial conflict with the terms of the governing agreements.

By CNL's own admission, this is a fight over property entitlements *relating to the parties' agreements*. CNL's belief in the merits of its contractual interpretation does not change the nature of this dispute. The turnover claim arises out of, relates to and turns on interpretation of the agreements, which contain broad, mandatory Swiss arbitration provisions. The Swiss arbitrator, not this Court, must decide the merit of CNL's claims.

Perhaps mindful of the deficiencies of its claim of outright ownership, CNL now tries to contend that its exchange rights under the agreements afford it a property interest in the Native Tokens. CNL now argues that it has an unconditional, immediate right to redeem stTokens for Native Tokens on a one-to-one basis. The contracts demonstrate that CNL has no such right:[46]

- With respect to the November 2020 Staked ETH, CNL cites Section 1.8 of the SSA as evidence of its redemption right. But Section 1.8 does not say "one-to-one" or any similar language, and expressly conditions the exchange "upon availability" of the ETH and compliance with the SSTC.[47]

- With respect to the February 2021 Staked ETH, CNL claims that transaction was not subject to any contract. Thus, it is unclear from where CNL believes it obtained its right to an immediate, one-to-one redemption. In any event, this transaction was governed by the SSTC, which contains the conditions discussed elsewhere herein.

- Regarding the MATIC and DOT, CNL cites Section 2.7 of the RSA and an email from Mr. Castellana to support its supposed entitlement to an unconditional, one-to-one redemption

---

[45] *See* SSA § 1.3 ("StakeHound will have the legal ownership of those Locked ETH and will operate the nodes on the Platform as stETH"); *see* SSTC, Services of the Company, Staking ("For the avoidance of doubt, [StakeHound] will have the ownership of the Native Tokens."); RSA § 8.1 ("In particular and for the sake of clarity, StakeHound is not acting as a custodian or managing funds of third parties, as it is the owner of the Assets.")

[46] In fact, the SSTC expressly prohibit and disclaim any right to redemption: "[t]he Native Tokens or the Staked Tokens…does not provide you with rights of any form with respect to the Company or its revenues or assets, **including, but not limited to…redemption**…or other financial or legal rights." SSTC § 1 "No Rights Created" (emphasis added)

[47] The SSTC contain numerous conditions to exchange of stTokens for Native Tokens, including: (i) agreement to be bound by the SSTC; (ii) completion of the KYC/AML due diligence process; (iii) limitation on the rate of exchange to "the same value in the equivalent crypto currency" (in other words, *not* one-to-one); and (iv) operation of the Platform.

10

right. But Section 2.7 does not say the exchange is on a one-to-one basis. And it conditions such exchange on "the absence of any specific lockup period." Moreover, the RSA states that the SSTC "fully apply to this Agreement," and therefore the conditions to exchange in the SSTC also apply to the MATIC and DOT. Mr. Castellana's email is parol evidence that cannot be used to interpret the RSA, particularly because the RSA contains a merger clause.[48]

Moreover, in subsequent communications StakeHound made clear to CNL that the SSTC apply to *all coin exchanges with StakeHound* and that there is no right to immediate redemption.[49] Thus, CNL has pointed to no contractual language, or anything else whatsoever, that establishes an entitlement to an unconditional, immediate, one-to-one redemption. And the provisions StakeHound cites prove the opposite: CNL's exchange rights were conditioned and limited, and CNL had no uncontested, undisputed right to an immediate exchange.

Accordingly, this turnover claim is not like the one in *In re MF Glob. Inc.*, in which this Court found a turnover proceeding ripe because the trustee had "established that [defendant] is ***unconditionally obligated to pay***." *In re MF Glob. Inc.*, 531 B.R. 424, 438 (Bankr. S.D.N.Y. 2015) (emphasis added). Rather, this case falls squarely into the line of cases (cited in CNL's opposition) holding that debtors "cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute." *See, e.g., In re 11 East 36th LLC,* No. 13-11506 (JLG), 2015 WL 2445075, at *11 (Bankr. S.D.N.Y. May 20, 2015).[50] Courts here acknowledge that "not every proceeding styled as a turnover action properly seeks to collect a matured debt." *Id*. Specifically:

---

[48] *See* RSA § 8.5 ("This Agreement together with appendices constitute the whole and only agreement between the Parties and supersedes and extinguishes any prior agreements, undertakings and arrangements of any nature whatsoever whether or not in writing relating thereto.").

[49] Third Castellana Decl., ¶ 16. On September 1, 2021, CNL requested to "redeem [CNL's] stZEN holdings."[49] StakeHound twice clarified that "***according to StakeHound's terms and conditions*** this is not a redemption, but a trade of stZEN for ZEN" and "***our agreements*** make clear that there is no right of redemption." Mr. Sabo responded "thanks for the clarification…we would like to proceed with the purchase of ZEN vs stZEN based on a 1:1 price." *Id.*

[50] *See also Hirsch v. London S.S. Owners Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*, 198 B.R. 45, 50 n.7 (S.D.N.Y. 1996); *In re Andrew Velez Const., Inc.*, 373 B.R. 262, 273 (Bankr. S.D.N.Y. 2007) (Glenn, J.).

11

> "[T]he turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable. It is well established that the turnover power may not be used for such purposes."[51]

The Native Tokens *are not already property of the estate*. CNL's turnover claim is arbitrable.

### D.    The Non-Arbitrable Claims Should be Stayed Pending Arbitration.

Despite admitting that most of its case is arbitrable, CNL seeks to stay those claims and litigate the core bankruptcy claims it believes are still pending. However, because CNL's turnover claim for the Native Tokens is *not* core and must be arbitrated, the core claims CNL seeks to litigate[52] are tertiary and have no relation to the contract dispute at the heart of this case. CNL's request gets the order of operations backwards. The Court should compel arbitration of the arbitrable claims and stay the remaining, non-arbitrable claims, to allow the Swiss arbitrator to determine the parties' rights under the contracts. Only then can the rest of the claims be resolved.

The court has broad decision to stay non-arbitrable claims. *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir. 1987). For the reasons described above, staying these proceedings is appropriate because the arbitrable claims predominate in this Adversary Proceeding and a stay would promote judicial economy. *See In re Hagerstown*, 277 B.R. at 199. Further, compelling arbitration and staying the non-arbitrable claims will promote efficiency. As the Court recognized during the September conference, the Swiss arbitration is in its infancy and presently stayed pending further order of the Court. As the Court also recognized, if at least some of CNL's claims are arbitrable (and CNL concedes they are), then it would be efficient to compel arbitration

---

[51] *In re Soundview Elite Ltd.*, 2014 WL 2998529, at * 3 (S.D.N.Y. July 3, 2014) (quoting *Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 852 n. 39 (Bankr. S.D.N.Y. 2013)).
[52] They are (i) violation of the automatic stay; (ii) disallowance of a future claim by StakeHound; and (iii) turnover of papers related to the account.

12

and lift or modify the stay to permit resumption of the pending arbitration, instead of forcing StakeHound to discontinue the arbitration only to recommence another, identical one.[53]

## II.     THE COURT SHOULD ABSTAIN ON COMITY PRINCIPLES.

CNL also bases its argument that the Court should not abstain on comity grounds on the contentions that the turnover claim is core and the claims related to the February 2021 Staked ETH are non-arbitrable.[54] Consequently, if the Court rejects those contentions, which it should, then the Court should abstain. CNL does not meaningfully address *In re Koreag*, except to mention in passing that it involves a now-supplanted section of the Bankruptcy Code.[55] This misses the point. The holding of *In re Koreag*, which creates an exception to the general deference U.S. courts give to foreign bankruptcy proceedings, survives today, even after the 1995 repeal of former section 304. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 420 (2d Cir. 2005) (limiting *In re Koreag* to *bona fide* disputes over ownership of the property). StakeHound's argument based on *In re Koreag* goes to the heart of international comity: providing a foreign court with the same rights and deference an American court takes for itself (or would expect to receive from a foreign tribunal). This is a *bona fide* property dispute over foreign assets, subject to a foreign choice of law clause in a foreign proceeding; it is a question "antecedent to the distributive rules of bankruptcy" and should be decided by the foreign tribunal in the first instance.[56] The alternative would be for this Court to decide issues of Swiss law in a non-core dispute between parties that chose mandatory arbitration to resolve such dispute.

---

[53] CNL's contention that StakeHound's request to modify the stay is "grossly inadequate" misperceives the standard. As StakeHound discussed in its opening brief, when the Court is faced with a motion to compel arbitration, the traditional *Sonnax* balancing test for modifying the stay gives way to the four-part test both parties applied here. *See In re Hagerstown*, 277 B.R. at 204.
[54] *See* Opp. at 21-22.
[55] *See* Opp. at 25, n. 60.
[56] StakeHound reiterates its position from its opening brief that the eight factors weigh in favor of abstention. CNL's arguments about those factors have been addressed elsewhere in this brief and nothing in CNL's factor analysis warrants retaining jurisdiction over these foreign contract claims.

## CONCLUSION

For the reasons stated herein and in StakeHound's opening brief, StakeHound respectfully requests that the Court grant its motion, and compel CNL to participate in the Swiss Arbitration for purposes of resolving the outstanding contract claims and property disputes between the parties.

Dated: September 15, 2023
New York, New York

*Respectfully,*

*/s/ Stephanie Wickouski*
**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey S. Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted pro hac vice)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A*

14