**<u>EXHIBIT B</u>**

**Free translations of legal exhibits**

- **Judgement of the Swiss Federal Supreme Court of 6 August 2012, 4A_119/2012, BGE 138 III 681 E. 4.4**:

  […] If an arbitration agreement is worded in such a way that it is also intended to cover disputes arising "in connection with" the contract, this must be understood in good faith as meaning that the parties did not wish to litigate the claims arising from their contractually regulated relationship under different legal titles before the arbitral tribunal on the one hand and before state courts on the other. Rather, in the sense of the presumed intention of the parties, it must be assumed that the parties wanted to refer all claims arising from or directly affecting the facts concerned by the contract to the exclusive jurisdiction of the arbitral tribunal.

- **Judgement of the Swiss Federal Supreme Court of 12 November 1991, BGE 117 II 609 E. 6c/bb**:

  If, as here, two terms which fall under a common generic term (occupants) clearly have a distinguishing function, it cannot be lightly assumed that the general term (occupant) and not the specific term (fellow passenger) was intended at a certain point, because the wording is the primary indication of intention. […]

- **HAUSHEER/AEBI-MÜLLER, Berner Kommentar zum schweizerischen Privatrecht, 2012**

  - **Art. 2 ZGB N 1**:

  According to its margin, Art. 2 CC deals with the "**content of legal relationships**" ("*Etendue des droits civils*", "*Limiti dei rapporti giuridici*"). It combines two related orders that are however clearly distinguishable from each other from several points of view: the duty to act in good faith (paragraph 1: see below, N 31 et seqq.) and the prohibition of manifest abuse of rights (paragraph 2: see below, N 41 et seqq.).

  - **Art. 2 ZGB N 31**:

**C. The Duty to Act in Good Faith**

**1. General Rule of Conduct for the Purpose of Mutual Legal and Ethical Reliability and Fairness**

The idea of the indispensability of mutual trust in social coexistence does not in itself lead to legal protection of trust. This requires legal recognition in the same way as the common business intention only becomes a binding legal transaction of the parties based on the legal consequences specifically provided for it. It therefore remains of particular importance how the legal system (*i.e.* first and foremost the law) legally implements the idea of trust, which is fundamental to social interaction, and in particular how it determines the extent of the protection of trust/legitimate expectations in concrete **mutual duties of conduct**.

-      **Art. 2 ZGB N 41:**

**D. The Prohibition of Abuse of Rights**

**1. Content**

Art. 2 para. 2 CC places a general limit on the exercise of rights by prohibiting the "manifest abuse of a right" and, in this respect, also relativises legal claims objectively prescribed by the legal system in their enforcement vis-à-vis fellow legal persons from the point of view of fairness (on the fairness rules domesticating the private autonomous shaping of law, see also above, n. 34). Paragraph 2 of Art. 2 of the Civil Code, in contrast to paragraph 1, only applies to the exercise or enforcement of a specific right, i.e., even without a pre-existing special relationship having become the source of certain trust-related duties of conduct (see above, n. 4 ff. and then n. 13 ff.).

-      **Art. 2 ZGB N 58**:

In the first period after the enactment of the Civil Code, the **mirror image** of the two norms was emphasized above all: both contain one and the same basic idea, expressed **positively** in paragraph 1 as a duty of loyal conduct, and **negatively** in paragraph 2 as a prohibition of disloyal conduct. This view is also found in federal court practice, in which abuse of rights is regularly described as a violation of the requirement of good faith.

*Examples*:

- BGE 86 II 221, E. 6: "However, according to case law, the formal invalidity of a contract is irrelevant if the invocation thereof constitutes a manifest abuse of rights, *i.e.* violates good faith."

- BGE 113 II 31, E. 2c on the problem of piercing the corporate veil in corporate law: "The lower court correctly assumes from the case law of the Federal Supreme Court, according to which the legal independence of a legal entity must in principle be respected unless it is invoked in an individual case in an abuse of rights, contrary to good faith."

- BGE 125 III 257, E. 2 concerning contradictory conduct: "Art. 2 para. 2 CC sanctions acts which, although in accordance with the corresponding legal norm or a private autonomous contractual provision, objectively constitute a violation of the principle of good faith and thus disappoint the trust of the legal comrades in honest and appropriate conduct."

Today's **prevailing doctrine**, on the other hand (as already indicated: above, N 48 et seq.), takes up the ultimately **different function** of the two paragraphs.

- The requirement to act in good faith in **paragraph 1** thus refers to the interpretation and supplementation of the law and legal transactions (confirmatory or **interpretative and supplementary** or relativizing function).

- The object of the prohibition of abuse of rights in **paragraph 2**, on the other hand, is the (individual case-related, but in the indirect effect equally generalizing) "correction" of a statutory or contractual rule on the occasion of its application (**norm-correcting** function in the sense explained: above, N 51 and 55 et seq.).

- **Art. 2 ZGB N 198 et seq.**:

Art. 2 para. 2 of the Civil Code does not provide a means for correcting every norm that the court somehow finds problematic. As a rule, the principle of "***dura lex, sed lex***" applies: the right is enforceable even if it is hard on the obligor. Only the "manifest" abuse of rights allows the exercise of a formally valid subjective right, the scope of which is in itself undisputed, to be exceptionally denied legal protection. Thus, a **strict standard of assessment** applies to the correction of norms on a case-by-case basis as well as on a generalized basis.

Particular restraint in the assumption of abuse of rights is required where the legislature has enacted mandatory legal provisions to protect a weaker party to the contract. Invoking them, for example in relation to an unlawful contractual agreement, requires special circumstances. This is the case, for example, in labor law (e.g. BGE 135 III 162, E. 3.3.1; 129 III 618, E. 5.2; BGer 4C.42/2005 E. 5.1) and in tenancy law (BGE 133 III 61, E. 4).

- **Judgement of the Swiss Federal Supreme Court of 16 December 2008, 4A_319/2008, BGE 135 III 162 E. 3.3.1**:

Under Art. 2 para. 2 of the Civil Code, manifest abuse of a right is not protected by law. The rule prohibiting abuse of rights allows the court to correct the effects of the law in certain cases where the exercise of an alleged right would create a manifest injustice (BGE 134 III 52 E. 2.1, p. 58 and references). The existence of an abuse of rights is determined according to the specific circumstances of the case, drawing on the various categories highlighted by the case law and doctrine (BGE 129 III 493 E. 5.1, p. 497 and the decisions cited). The use in the legal text of the qualifier "manifest" shows that abuse of rights must be accepted restrictively. Typical cases are the absence of an interest in exercising a right, the use of a legal institution contrary to its purpose, a manifest disproportion of the interests involved, the ruthless exercise of a right

or a contradictory attitude (BGE 129 III 493 E. 5.1, p. 497; BGE 127 III 357 E. 4c/bb, p. 364). In the latter category, the conduct of a person who first agrees to enter into an agreement and who then, in consideration of mandatory rules, argues that the agreement is invalid, only constitutes an abuse of rights if specific conditions have been met (BGE 133 III 61 E. 4.1, p. 76; BGE 129 III 493 E. 5.1, p. 497). Such a limitation is particularly necessary in the case of an employment contract. Otherwise, the protection afforded to the employee by mandatory provisions may prove illusory (BGE 129 III 493 E. 5.1, p. 497; BGE 129 III 618 E. 5.2, p. 622). It is up to the party claiming an abuse of rights to establish the particular circumstances that allow this exception to be applied (BGE 133 III 61 E. 5.1, p. 76 and references).



Lizenziert für: nadine.wipf@swlegal.ch, 14.09.2023 16:20:30

| Titel | **International Arbitration** |
| | **Comparative and Swiss Perspectives** |
| Buchautoren | **Daniel Girsberger, Nathalie Voser** |
| Auflage | **Fourth Extended Edition** |
| Jahr | **2021** |
| Seiten | **391-422** |
| ISBN | **978-3-7255-8145-0** |
| Verlag | **Schulthess Juristische Medien AG** |

391

# Chapter 6 The Law Applicable to the Merits of the Case

393

## A. Choice of law by the parties

### I. Comparative overview

#### 1. Introductory comments

1343    In arbitration, the parties entrust the arbitral tribunal with the resolution of their dispute. In order to do this, the arbitral tribunal must determine the facts and apply the law to those facts. In certain instances, the arbitral tribunal may be entitled to rule *ex aequo et bono* or as "*amiable compositeur*."[1715]

1344    This chapter addresses the manner in which the law governing the merits of a dispute is determined (as to the rules governing procedure, see paras. 889 ff.).

#### 2. Application of the conflict of laws rule of the *lex arbitri*

*Lex arbitri usually contains rules to determine the applicable law*

1345    Arbitral tribunals do not have a *lex fori*[1716] and are not automatically subject to the private international law of the seat that would be applicable to state courts. The *lex arbitri* usually contains its own rules on the determination of the substantive law applicable to the dispute. In other words, the substantive law applicable to the merits of the dispute is determined by methods specific to international arbitration as provided for by the *lex arbitri*, not on the basis of the conflict of laws rules contained in the private international law statute of the *lex fori*.[1717] As the seat of arbitration determines the *lex arbitri*, the choice of the seat of the arbitral tribunal is an indirect choice of the law applicable to the merits of the dispute or at least of the method to determine that law.

#### 3. Party autonomy as the most prominent and widely accepted international conflict of laws rule

*Lex arbitri*

1346    Under all modern arbitration laws, the parties are free to determine the law or the rules of law applicable to the merits of the dispute submitted to arbitration. For example, Art. 28(1) UNCITRAL Model Law, states that *"[t]he arbitral tribunal shall decide the dispute in accordance with such rules of law as are chosen by the*

---

[1715] See Blackaby/Partasides/Redfern/Hunter, paras. 3.192–3.197; Born, 19.08.

[1716] See Blackaby/Partasides/Redfern/Hunter, paras. 3.211–3.213; Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 154.

[1717] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 154.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

*parties as applicable to the substance of the dispute"* (see also Sec. 46(1) English Arbitration Act, Art. 187(1) SPILA, § 1051(1) German Code of Civil Procedure and Art. 2 Hague Principles[1718]).

**394**

### Arbitration rules

1347   Most arbitration rules also contain provisions dealing with the law applicable to the merits of the case. All of them respect the parties' autonomy to determine the applicable law. For example, Art. 21(1) ICC Rules provides that *"[t]he parties shall be free to agree upon the rules of law to be applied by the arbitral tribunal to the merits of the dispute"* (see also Art. 35(1) Swiss Rules as revised in 2021, Art. 35(1) UNCITRAL Arbitration Rules, Art. 22.3 LCIA Rules, Art. 31(1) ICDR and Art. 61(a) WIPO Rules).

### Most prominent and widely accepted international conflict of laws rule

1348   Party autonomy is the most prominent and widely accepted international conflict of laws rule.[1719] This rule, first developed by academic writers and then adopted by state courts, can also be found in international conventions, such as the Rome I Regulation. The Rome I Regulation is applicable to contractual obligations within the European Union and also gives the parties to a contract the right to choose the law governing their contractual relationship. According to Art. 3(1) Rome I Regulation, first sentence, *"[a] contract shall be governed by the law chosen by the parties."* The same principle is enshrined in the Hague Principles on Choice of Law in International Commercial Contracts. Art. 2(1) Hague Principles reads: *"A contract is governed by the law chosen by the parties."*[1720]

### Applicability of Rome Regulations

1349   For arbitral tribunals seated in the European Union, it is disputed whether the Rome I Regulation and the Rome II Regulation[1721] apply to international arbitration proceedings in addition to, or in lieu of, the member state's *lex arbitri*. While the still prevailing view rejects their mandatory application,[1722] a growing number of authors (and some courts) suggest that EU-seated arbitral tribunals should or even must apply the Rome Regulations in the same manner that national choice of law rules are applied by state courts.[1723] If the Rome Regulations were to apply, this would have material effects mainly wherever their rules on mandatory provisions differ from the framework the arbitral tribunal finds applicable based on the *lex arbitri*. For instance, if an arbitration between two German companies has its seat in France, the arbitration would qualify as international from a French *lex arbitri* perspective, but if

**395**

Art. 3(3) Rome I Regulation were applicable, the parties could not derogate from German internal mandatory law even if the parties had chosen Swiss law to apply to their dispute. If the Rome I Regulation were not applicable in this example, Swiss law would apply as chosen by the parties without regard to the internal mandatory provisions of German law.

---

[1718] Hague Principles on Choice of Law in International Commercial Contracts as adopted by the Hague Conference on 19 March 2015, available at <https://www.hcch.net>.

[1719] See, e.g. Blackaby/Partasides/Redfern/Hunter, para. 3.97; Lew/Mistelis/Kröll, para. 17–10; Poudret/Besson, para. 679; Rubino-Sammartano, 632.

[1720] See the Commentary to the Hague Principles on Choice of Law in International Commercial Contracts, paras. 2.1, 2.14, available at <https://www.hcch.net>. For further details, see also Pertegás/Marshall, Brook. J. Int'l L. 3/2014, 975–1003 and Girsberger, SRIEL 2014, 545–552.

[1721] Regulation (EC) No. 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (Rome II).

[1722] See, e.g. Grimm, SchiedsVZ 4/2012, 189–200; Nueber, SchiedsVZ 4/2014, 186–190; Busse, Arbitration in Europe, 23; Martiny, in: Kommentar BGB, Vorbemerkungen zu Art. 1 Rom I-VO, para. 102; Babi , JPIL 2017, 71; Paulus, in: BeckOGK-BGB, Rom I-VO Art. 1, para. 65.

[1723] McGuire, SchiedsVZ 5/2011, 262–267; Czernich, 701; Mankowski, 1, with numerous references to both opinions in fn. 3 (contra applicability of Rome I) and 4. For a profound study of these topics, see Sebastian Gössling, Europäisches Kollisionsrecht und internationale Schiedsgerichtsbarkeit, Tübingen 2019.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

*Advantages of a choice of law by parties*

1350    A choice of the applicable substantive law by the parties reduces the risk of a potential dispute concerning the law applicable to the merits and allows the parties, to a certain extent, to better predict the result of its interpretation and application. Thus, a choice of law by the parties provides certainty and predictability.[1724] Further, by applying the law or rules of law chosen by the parties, the arbitral tribunal is relieved of the difficult task of determining the applicable substantive law.

*Express or implicit choice*

1351    The parties' choice as to the law applicable to the merits may be made either expressly (e.g. in the written contract or in written or oral submissions before the arbitrators) or implicitly (e.g. words or conduct which show the intentions and expectations of the parties that a particular law governs their contract or legal relationship).[1725] Indeed, it is a widely accepted rule that no form requirement applies to the parties' choice of law.[1726] In any event, the parties' choice of the applicable substantive law must be demonstrated with reasonable certainty, i.e. the arbitral tribunal must establish that the parties made an actual choice.[1727] An implied choice may exist where the parties argue their case on the basis of the same law even though they did not expressly agree on its application.[1728] As a rule, the choice of an arbitral seat in itself is not sufficient to be considered a choice of law regarding the substance of the dispute.[1729]

*Clear determination is advisable*

1352    It is generally in the parties' interest to specify the applicable law as clearly as possible in their arbitration agreement or contract in order to avoid difficulties.[1730]

*Indirect choice of applicable substantive law by referring to arbitration rules*

1353    The parties may also agree indirectly on the applicable substantive law, for example, by referring to a set of arbitration rules. As already indicated above, many arbitration rules contain provisions dealing with the law that must be applied by the arbitrators to resolve the dispute. Thus, if the parties have not made a direct choice as to the

**396**

applicable substantive law but have chosen a set of arbitration rules with provisions for determining the applicable law, the arbitrators will apply such rules. It should, however, be pointed out that these rules are usually not more specific than those in the *lex arbitri*.

## 4. Choice of a national law

*Advantages of choice of national law*

1354    In practice, parties most often agree on a national system of law. This offers a number of advantages, including:[1731]

–an interconnected and interdependent body of rules designed to address all legal situations that may arise (either directly or through interpretation methods);

–an existing system of law able to be reasonably accurately interpreted (including by reference to case law); and

---

[1724] See Born, 19.01; Poudret/Besson, para. 681; Commentary to the Hague Principles on Choice of Law in International Commercial Contracts, Introduction para. 3, available at <https://www.hcch.net>.

[1725] See Blackaby/Partasides/Redfern/Hunter, paras. 3.201–3.202; Born, 19.04. See also Art. 4 Hague Principles.

[1726] See, e.g., Art. 5 of the Hague Principles on Choice of Law for International Commercial Contracts.

[1727] Blackaby/Partasides/Redfern/Hunter, para. 3.202.

[1728] See Garth Bouwers, Tacit Choice of Law in International Commercial Contracts – A Global Comparative Study (forthcoming).

[1729] See, e.g. Commentary to the Hague Principles on Choice of Law in International Commercial Contracts, para. 4.12, available at <https://www.hcch.net>.

[1730] See Blackaby/Partasides/Redfern/Hunter, para. 3.204.

[1731] See Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 158–159; Poudret/Besson, para. 681.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

–an organized and easily accessible legal system.

### Almost unlimited freedom for parties

1355   The parties' freedom to choose a national system of law is almost unlimited (see, e.g. Art. 2 Hague Principles). The parties may, for example, agree upon the national law of one of the parties to the arbitration or upon another law having only a connection to the subject matter of the relationship between the parties (e.g. the law of the place of performance of the contractual obligations). The parties may also choose a neutral law (i.e. a law with no connection to the subject matter of the contract or to the parties).[1732]

### Dépeçage

1356   The parties may also choose several laws which govern different aspects of their relationship or their dispute (i.e. using the technique of "*dépeçage*").[1733] Some arbitration rules have expressly recognized that parties may choose several laws by requiring the arbitrators to apply "the law(s)" chosen by the parties (e.g. Art. 2(2)(b) Hague Principles, Art. 31(1) ICDR Rules and Art. 22.3 LCIA Rules). However, the fact that the parties may agree to "*dépeçage*" does not mean that it is necessarily appropriate in practice (e.g. unnecessary disputes may arise regarding the scope of each of the laws chosen).

### "Renvoi" is generally excluded

1357   In international arbitration, the parties' choice of the law applicable to the merits of the case is generally understood to be a choice of substantive law.[1734] This means that the

**397**

legal system chosen normally applies without its choice of law rules; in other words, a "*renvoi*" is normally excluded. This approach is, for example, expressly stated in Art. 28(1) UNCITRAL Model Law, second sentence, which provides that "*[a]ny designation of the law or legal system of a given State shall be construed, unless otherwise expressed, as directly referring to the substantive law of that State and not to its conflict of laws rules.*" However, according to Art. 28(1) UNCITRAL Model Law, as under other laws, the parties are free to agree that the arbitral tribunal will apply the chosen law including its conflict of laws rules (e.g. Art. 8 Hague Principles). Arbitration laws and institutional rules often contain only a basic conflict of laws rule. Some mention that the reference is to substantive law only (§ 1051(1) German Code of Civil Procedure, Sec. 46(2) English Arbitration Act; Art. 31(1) ICDR Rules, Art. 35(1) HKIAC Rules, Art. 27(2) SCC Rules), while others do not contain such a specification (Art. 1054(2) Dutch Code of Civil Procedure, Art. 1511 French Code of Civil Procedure, Art. 21(1) ICC Rules, Art. 22(3) LCIA Rules, Art. 33(1) Swiss Rules).

### Effects and scope of parties' choice of law in general

1358   Except where otherwise provided, the choice of a national law by the parties is normally understood to refer to all of the substantive law provisions of that law, irrespective of whether the provisions relate to public law or private law, including all international conventions which form part of the national law in question.[1735] However, it has also been suggested that the choice of a particular national law does not automatically include, for example, the CISG. It is necessary to interpret the choice of law clause, as with any other contractual clause, in light of the contract and the circumstances. Where, for example, Swiss law has been chosen as the applicable substantive law because it is the law of a neutral or third country and the contract at issue has no connection to Switzerland, an interpretation of the parties' intent may lead to the conclusion that the parties wanted to apply the Swiss Code of Obligations to the exclusion of the CISG.[1736]

---

[1732] Fouchard/Gaillard/Goldman/Savage, para. 1435. See also Commentary to the Hague Principles on Choice of Law in International Commercial Contracts, para. 2.14, available at <https://www.hcch.net>.

[1733] Born, 19.06[B][2]; Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 159–160; Fouchard/Gaillard/Goldman/Savage, para. 1436; Poudret/Besson, para. 684. See also Art. 2(2)(b) Hague Principles, which states that "*[t]he parties may choose different laws for different parts of the contract*".

[1734] See Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 159; Fouchard/Gaillard/Goldman/Savage, para. 1429.

[1735] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 159; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 33; Göksu, Schiedsgerichtsbarkeit, para. 1732; Berger, BSK IPRG, Art. 187 paras. 76–77.

[1736] Tercier/Bieri/Carron, para. 1311; Veturi/Zen-Ruffinen, CR CO-I, Intro. Art. 184–215 para. 12. See also DSC of 16

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

*Non-contractual claims*

1358a    It may generally be assumed that the parties agreed on an all-encompassing reference to the chosen substantive law, i.e. such reference includes not only contractual claims in the strict sense of the term but also, for example, tort claims arising out of and in connection with the relevant contract or claims resulting directly from the law chosen.[1737] However, this could lead to the question as to whether a particular claim falls within the scope of the arbitration agreement by the parties (see para. 397).

**398**

*Contractual relationship*

1359    In the context of a contractual relationship, the substantive law chosen governs all the main issues connected to contractual claims such as the interpretation of the contract, its performance, the consequences of breach of the contract (including the determination of damages), the various ways of extinguishing obligations, limitation periods, the consequences of nullity of the contract and the adaptation and amendment of the contract.[1738] This is, for example, expressly stated in Art. 12 Rome I Regulation or Art. 9(1) Hague Principles.

*Issues outside the law chosen by parties*

1360    A number of specific issues fall outside of the autonomy of the parties because they are preliminary issues on which the validity of the choice of law depends, such as, in particular, the capacity of a party to enter into a contract or the power of a person to represent a company (see, e.g. Art. 1(3)(a) Hague Principles). Such issues are not governed by the chosen law, but rather by the law determined by using the method applicable in the absence of a choice of law by the parties.[1739]

*"Stabilization" or "freezing" clause*

1361    The parties are free to agree on a so-called "stabilization" or "freezing" clause, i.e. they can agree that a certain national law as it exists at a particular point in time will govern their relationship.[1740] This means that any subsequent modifications or enactments of that law are not applicable. Especially when doing business with a state, a private party might want to protect itself from the legislative power of its contractual party as the state usually insists on submitting the contract to its own law. The private party thus sometimes agrees to a compromise according to which the contract is submitted to the law of the state party as it stands at a particular moment in time (generally the date when the contract is signed).[1741] For further details regarding arbitration with state parties, see para. 329.

*Waiver of application of rules of law*

1362    One question that arises is whether the party may stipulate that the contract is self-sufficient and not governed by any rules of law. Such a choice aims to ensure that the validity and scope of the contract will be examined without any reference to rules that would prevail over the contract. Under the prevailing view, the parties' autonomy regarding the choice of law does not extend so far as to enable them to stipulate that their contract is not governed by rules of law at all.[1742] Arbitrators faced with a contractual provision excluding the application of any rules of law to the contract or to the dispute arising out of such a contract may apply the rules of law they consider appropriate, just as if the parties had expressed no choice of law at all. This is not to be confused with the situation where the parties have decided not to submit their

---

December 2009, 4A_240/2009, reason 2.1, where the Swiss Supreme Court confirmed that the choice of Swiss law, which according to the agreement was to be applied as if the parties were domestic, could be interpreted as a valid exclusion of the CISG.

[1737] See Berger/Kellerhals, para. 1401; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, paras. 34 and 35.

[1738] See Blackaby/Partasides/Redfern/Hunter, para. 3.93; Born, 19.04[A][6][b]. For Swiss law, see Berger/Kellerhals, para. 1402.

[1739] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 163–164.

[1740] Born, 19.06[B][5]; Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 159; Lew/Mistelis/Kröll, para. 18–37.

[1741] Fouchard/Gaillard/Goldman/Savage, para. 1437; Lew/Mistelis/Kröll, para. 18–38.

[1742] Fouchard/Gaillard/Goldman/Savage, para. 1441.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

**399**

contract to any national law but agreed upon the application of general principles of law or transnational rules (see paras. 1363 ff.).

## 5. Choice of non-national rules of law as governing law

*Non-national law*

1363    The parties may decide that their relationship should be governed by other rules of law other than national laws, such as general principles of law, transnational law, international trade law or *lex mercatoria*.[1743] The freedom of the parties to choose non-national rules of law is signaled in international arbitration by the use of the words "rules of law" as opposed to "the law" or "laws" when describing the rules that the parties are free to select. Art. 3 Hague Principles, for example, states that "*[t]he law chosen by the parties may be rules of law that are generally accepted on an international, supranational or regional level as a neutral and balanced set of rules, unless the law of the forum provides otherwise.*"[1744] (see also Art. 28(1) UNCITRAL Model Law).

*Lex mercatoria*

1364    Probably the most important development in the field of transnational law is that of the *lex mercatoria*.[1745] In the following sections, the term *lex mercatoria* will be used as a description of rules of transnational law developed by the international business community to regulate commercial activities within that community. The rules of the *lex mercatoria* are founded on usages developed in international trade, standard clauses or contracts proposed by international organizations, uniform laws, general principles of law and international instruments.[1746]

*Sources for lex mercatoria*

1365    Sources for the *lex mercatoria* may be found, for example, in international conventions such as the CISG or in internationally accepted principles and standards such as the UNIDROIT Principles or Incoterms, which are considered to reflect a general consensus.[1747]

*UNIDROIT Principles of International Commercial Contracts*

1366    The UNIDROIT Principles of International Commercial Contracts 2016 set out general rules for international commercial contracts, i.e. their goal is to reflect existing international contract law. The decisive criterion in the preparation of the Principles was not only which rules had been adopted by the majority of countries but also

**400**

which of the rules had the most persuasive value or appeared to be best suited for cross-border transactions.[1748]

*Incoterms*

1367    *Incoterms* are standard trade definitions most commonly used in international sales contracts. Among the best-known Incoterms are EXW (Ex Works), FOB (Free on Board) and CIF (Cost, Insurance and Freight). The ICC introduced the first version of Incoterms in 1936. Since then, ICC expert lawyers and trade practitioners have updated these terms eight times to keep pace with the development of international trade.

---

[1743] See, e.g. Blackaby/Partasides/Redfern/Hunter, paras. 3.156–3.191; Poudret/Besson, paras. 690–704.

[1744] As to the history and purpose of Art. 3 Hague Principles, see, e.g. Saumier, Brook. J. Int'l L. 1/2014, 1–29.

[1745] See also Blackaby/Partasides/Redfern/Hunter, para. 3.161.

[1746] For additional materials on the definition of *lex mercatoria*, see also Blackaby/Partasides/Redfern/Hunter, paras. 3.161–3.176; Born, 19.06[C][4]; Fouchard/Gaillard/Goldman/Savage, para. 1447; Poudret/Besson, paras. 695–704; Rubino-Sammartano, 664–673. See also Carbonneau Thomas E. (ed.), Lex Mercatoria and Arbitration, 2nd ed., Boston 1998.

[1747] See Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 162; Lew/Mistelis/Kröll, para. 18–55.

[1748] On the UNIDROIT Principles, see, e.g. Eckhart Brödermann, UNIDROIT Principles of International Commercial Contracts: An Article by Article Commentary, Brödermann, Alphen aan den Rijn 2018.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

Most contracts made after 1 January 2020 will refer to the latest edition of Incoterms, which came into force on that date (the correct reference is to "Incoterms 2020").[1749]

### Content of lex mercatoria

1368    The following main principles are *inter alia* considered to be part of the *lex mercatoria* (and most of them even of international public policy):[1750]

–*Pacta sunt servanda* (i.e. the binding force of the contract).[1751]

–*Clausula rebus sic stantibus* (i.e. inapplicability or unenforceability due to a fundamental change in circumstances).

–Contract interpretation in good faith (a party interprets a contract in bad faith where the interpretation it espouses at the time of the dispute does not coincide with what the parties genuinely intended when they signed the contract).

–Force majeure ("*vis major*," "greater force"), which essentially frees one or both parties from liability or obligation when an extraordinary event or circumstances beyond the control of the parties, such as war, strike or crime prevents one or both parties from fulfilling their obligations under the contract. However, it is not intended to excuse negligence or the failure of performance of a party, for example, where non-performance is caused by the usual and natural consequences of external forces (e.g. foreseeable drought) or where the intervening circumstances are specifically contemplated in the contract.

–Performance in good faith.

–Prohibition of inconsistent behavior, i.e. the principle that no one may act in direct contradiction to his or her own previous conduct (also known as the prohibition of *venire contra factum proprium*).

**401**

### Open-ended catalog of principles

1369    No conclusive or comprehensive list of *lex mercatoria* rules has been established. A useful open-ended catalog listing the rules and principles of the *lex mercatoria* that have been accepted in international arbitral and contract practice along with comprehensive comparative references is available online.[1752] It is continually revised and updated, providing arbitration practitioners with a convenient reference of transnational commercial principles.

### Advantages of choosing non-national law

1370    In choosing non-national law to govern their contract, parties have the advantage that these rules, at least the *lex mercatoria,* are adapted to the needs of modern international commerce and are of uniform application.

### Disadvantage of choosing non-national law

1371    However, the exact content of the *lex mercatoria* is not clearly established,[1753] which means that parties who designate the *lex mercatoria* as the applicable substantive rules are not able to determine precisely which provisions will be applied by the arbitral tribunal.

---

[1749] On the Incoterms 2010, see, e.g. Grüske Werner, Incoterms 2010 – A Practical Guide: Practical know-how for the users of the Incoterms 2010 official rules.

[1750] With regard to further comments on the content of the *lex mercatoria*, see also Fouchard/Gaillard/Goldman/Savage, paras. 1459–1499.

[1751] Fouchard/Gaillard/Goldman/Savage, para. 1460.

[1752] Available at <https://www.trans-lex.org/principles>, last visited on 30 September 2020. See also Berger, Lex Mercatoria, 371–406.

[1753] Born, 19.06[C][4]; Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 162; Lew/Mistelis/Kröll, para. 18–47.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

## 6. Timing of the choice of law by the parties

*Choice generally possible at any time*

1372   The parties are free to determine the law applicable to their relationship at the time of entering into a contract or also at a later point in time (i.e. the parties may agree on the applicable law to their relationship at any time before or even after a dispute arises).[1754] It is generally accepted that a choice or modification made after the contract has been concluded cannot prejudice its formal validity or the rights of third parties (see Art. 2(3) Hague Principles).

## 7. Limitations on party autonomy regarding choice of law

### a) "*Lois de police*" or "*lois d'application immédiate*"

*Mandatory rules in general*

1373   A "*loi de police*" or "*loi d'application immédiate*" is a mandatory rule of a national law governing certain international situations.[1755] Such mandatory rules may limit the parties' autonomy in choosing the law applicable to the merits of the case.

*Hague Principles on Choice of Law in International Commercial Contracts*

1373a   The principle is stated in Art. 11 of the Hague Principles on Choice of Law in International Commercial Contracts. While these Principles themselves do not define the term "overriding mandatory provisions" (as opposed to Art. 9(1) Rome I

**402**

Regulation),[1756] according to the official commentary to the Principles, this term, which can be found in several regional and national instruments, is generally understood to refer to provisions of law that must, according to their proper construction, be applied to the determination of a dispute between contracting parties irrespective of the law chosen to govern the contract. They are mandatory provisions in the sense that it is not open to the parties to derogate from them by the terms of their contract or otherwise, and they are overriding provisions in the sense that a court must apply them even if the parties have chosen a law other than that of the forum to govern their contractual relationship. The presence of these two characteristics serves to emphasize the importance of the provision within the relevant legal system, and to narrow down the category of provisions to which the Principles will apply. Overriding mandatory provisions are likely to be limited to those that are regarded as important for safeguarding the public interests of the forum.[1757]

1373b   In state court proceedings, there has been no unified global approach regarding the method of applying (overriding) mandatory rules. Also, there are various approaches but a minimal common denominator has begun to emerge (see paras 1374 ff.).[1758]

---

[1754] Blackaby/Partasides/Redfern/Hunter, paras. 3.101–3.103; Born, 19.06[D]; Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 163.

[1755] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 164; Fouchard/Gaillard/Goldman/Savage, para. 1515; Rubino-Sammartano, 726–727. See also Born, 19.04[B][1].

[1756] Art. 9 Rome I Regulation reads as follows: "Overriding mandatory provisions are provisions the respect for which is regarded as crucial by a country for safeguarding its public interests, such as its political, social or economic organization, to such an extent that they are applicable to any situation falling within their scope, irrespective of the law otherwise applicable to the contract under this Regulation." See <https://www.hcch.net/en/instruments/conventions/full-text/?cid=135>, last visited 30 September 2020. As to the difference between "overriding" and "simple" mandatory provisions under the Rome I Regulation, see, e.g., Hemler, Die Methodik der "Eingriffsnorm" im modernen Kollisionsrecht, Tübingen 2019, 2 ff.

[1757] See Commentary to the Hague Principles on Choice of Law in International Commercial Contracts, para. 11.16, available at <https://www.hcch.net>.

[1758] For a detailed analysis, see Girsberger/Kadner Graziano/Neels, General Comparative Report, in: Girsberger Daniel/Kadner Graziano Thomas/Neels Jan (eds.), Choice of Law in International Commercial Contracts: Global Perspectives on the Hague Principles, Oxford 2021, Art. 11, paras. 1.464 ff.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

### Mandatory rules of lex causae

1374    It is important to distinguish the situation where the "*loi d'application immédiate*" is part of the *lex causae* from the situation where the "*loi d'application immédiate*" is part of the law of a third country. In the first situation, the "*loi d'application immédiate*" is part of the law governing the merits of the case, i.e. it is part of the *lex causae*.[1759] According to a majority of commentators, the arbitral tribunal must automatically apply the "*loi d'application immédiate*" as part of the national system of law governing the dispute, subject only to compliance with international public policy requirements.[1760] International public policy will be addressed below in this Chapter (see paras. 1378 ff.).

**403**

### Mandatory rules of third countries

1375    In the second situation, the "*loi d'application immédiate*" is part of the law of a third country, i.e. it is part of a law other than the law applicable to the merits of the case. Pursuant to the traditional view, an arbitral tribunal is not obliged to apply such a third country "*loi d'application immédiate*."[1761] This view has been challenged by legal scholars for many years. A landmark decision was the *Mitsubishi Motors Corporation vs. Soler Chrysler-Plymouth,* rendered in 1985, where the arbitral tribunal applied US anti-trust law (the Shearman Act) although the contract was governed by Swiss law.[1762] It is generally recognized that arbitral tribunals, under certain circumstances, must apply mandatory rules of third countries in the overall interest of arbitration since not doing so would lead in the longer term to states or a community of states such as the EU reducing the scope of arbitrable disputes.[1763] Today, some authors are of the opinion that arbitrators must take into account "*lois d'application immédiate*" of laws other than the *lex causae* when the relevant law has a strong connection with the dispute and when the objective it seeks to achieve appears to be worthy of protection in the view of the arbitrators.[1764] Such a view has been put forward by Swiss scholars (see para. 1394). Others do not go as far and suggest that the arbitral tribunal should take into account at least the mandatory rules of the law of the place of performance of the contract or of the enforcement of the award (in order to ensure the effectiveness of the award).[1765]

### State court approach

1376    Especially in Europe, it is widely accepted that the state courts must apply the mandatory rules of the forum and the mandatory rules of the law chosen by the parties to govern the merits of the dispute, provided that those rules are not contrary to international public policy. It is also widely recognized that the state courts may take into account the mandatory rules of a law other than the *lex fori* or the *lex causae*, provided that those mandatory rules are closely connected to the subject matter of the dispute. This approach is reflected in Art. 9(1) Rome I Regulation and Art. 19 SPILA.

### No lex fori

1377    With regard to international arbitration, it is important to note that – because arbitrators have no forum – the mandatory rules of the law of the seat of the arbitral tribunal are on the same level as the mandatory rules of third states.[1766]

**404**

---

[1759] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 164. See also Fouchard/Gaillard/Goldman/Savage, paras. 1516–1517.

[1760] In favor of including them: Born, 19.04[B][5] fn. 527; Poudret/Besson, para. 706 fn. 186, each with further references. Against an automatic inclusion: Voser, Am. Rev. Int'l Arb. 1996, 339–340.

[1761] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 164.

[1762] *Mitsubishi Motors Corp vs. Soler Chrysler-Plymouth, Inc.* 473 U. S. 614 (1985).

[1763] Voser, Am. Rev. Int'l Arb. 1996, 337, with reference to Mayer, Arb. Int. 4/1986, 286, who stated that arbitrators have to apply mandatory rules "*out of a sense of duty to the survival of international arbitration as an institution.*"

[1764] See Geisinger/Bärtsch/Raneda/Ebere, IBLJ 4/2012, 423–424; Voser, Am. Rev. Int'l Arb. 1996, 345–347.

[1765] See also Born, 19.04[B][5][c].

[1766] See Born, 19.03[D][2].

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

### b) International public policy

*Public policy as limit in general*

1378    It is internationally recognized that arbitrators are entitled to disregard provisions of the law chosen by the parties if they find such rules to be contrary to international public policy (e.g. Art. 11(5) Hague Principles) .[1767] Moreover, in most countries an award may be set aside (e.g. Art. 190(2)(e) SPILA, § 1059(2)(2)(b) German Code of Civil Procedure and Sec. 68(2)(g) English Arbitration Act) or its recognition and enforcement may be refused if it is contrary to international public policy (Art. V(2)(b) New York Convention).

*Content of international public policy*

1379    The content of international public policy is very much disputed.[1768] The majority view is that it consists of a narrow range of values widely recognized as fundamental in the international community. A rule does not have to be adopted in all jurisdictions worldwide for it to be considered part of international public policy. Included are *inter alia* the prohibition of arrangements to smuggle goods into or out of a particular country, the prohibition of agreements regarding the supply of illicit drugs and the prohibition of expropriation without compensation.[1769]

*Bribery and corrupt practices*

1379a    In practice, particularly important aspects of international public policy are the prohibition of bribery and corrupt practices. One of the first cases recognizing that corruption and money laundering are relevant in arbitration is *World Duty Free Company Limited vs. Republic of Kenya (2006).*[1770] A further well-known case is *Metal-Tech Ltd. vs. Republic of Uzbekistan,* heard in 2013.[1771] After certain facts emerged during the examination of the claimants' main witness in the first hearing regarding the tasks of "consultants," the arbitral tribunal decided to apply its *ex officio* powers under Art. 43 ICSID Convention to request further information from the parties and called for additional testimony and further evidence.[1772] Ever since, there has been an ongoing discussion as to when arbitral tribunals (including

**405**

those in non–ICSID arbitrations) have *ex officio* powers to ask parties to produce further evidence and when they should use such powers. Generally speaking, this will only be the case where public policy violations are at stake (see para. 980a).

*Toolkit*

1379b    In 2019, the Competence Centre Arbitration and Crime published a toolkit for arbitrators with the aim of assisting arbitrators who suspect, or are confronted with, alleged corrupt practices and money laundering, and which addresses these issues in a methodical manner. The toolkit covers both investment and commercial arbitration.[1773]

---

[1767] Fouchard/Gaillard/Goldman/Savage, para. 1533; Lew/Mistelis/Kröll, paras. 17–32.

[1768] For a detailed analysis, see Girsberger/Kadner Graziano/Neels, General Comparative Report, in: Girsberger Daniel/Kadner Graziano Thomas/Neels Jan (eds.), Choice of Law in International Commercial Contracts: Global Perspectives on the Hague Principles, Oxford 2021, Art. 11, paras. 1.474 ff.

[1769] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 165–166; Fouchard/Gaillard/Goldman/Savage, para. 1535; Lew/Mistelis/Kröll, para. 17–36.

[1770] *World Duty Free Company Limited v. Republic of Kenya*, ICSID Case No. ARB/00/7, Award, 4 October 2006., para. 157 ("In light of domestic laws and international conventions relating to corruption, and in light of the decisions taken in this matter by courts and arbitral tribunals, this Tribunal is convinced that bribery is contrary to the international public policy of most, if not all, States or, to use another formula, to transnational public policy. Thus, claims based on contracts of corruption or on contracts obtained by corruption cannot be upheld by this Arbitral Tribunal").

[1771] *Metal-Tech Ltd. v. Republic of Uzbekistan,* ICSID Case No. ARB/10/3, Award, 4 October 2013.

[1772] *Metal-Tech Ltd. v. Republic of Uzbekistan,* ICSID Case No. ARB/10/3, Award, 4 October 2013, paras. 240, 241.

[1773] See "Corruption and Money Laundering in International Arbitration: A Toolkit for Arbitrators," available at <https://arbcrime.org/a-toolkit-for-arbitrators>, last visited on 30 September 2020.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

## II. Swiss law

### 1. Introductory comments

*Art. 187 SPILA*

1380    Chapter 12 SPILA contains a specific provision concerning the determination of the applicable substantive law: Art. 187 SPILA states that *"[the arbitral tribunal] shall decide the dispute according to the rules of law chosen by the parties or, in the absence thereof, according to the rules of law with which the case has the closest connection."*

*Principles of Art. 187 SPILA*

1381    Swiss arbitration law is expressly based on the principle of party autonomy. Art. 187 SPILA unequivocally reflects this principle with regard to a choice of substantive law. Art. 187 SPILA is a conflict rule specifically applying to Swiss international arbitration proceedings (as opposed to Art. 116 SPILA, which only applies to state court proceedings).

*Conflict of laws system applicable to international arbitration in Switzerland*

1382    Art. 187 SPILA applies to all international arbitral tribunals seated in Switzerland within the meaning of Art. 176(1) SPILA. It is generally recognized that in international arbitration the conflict of laws rules of the SPILA (Chapters 1–11) do not determine the law applicable to the substance of the dispute (see paras. 1343 ff.). Rather, Art. 187(1) SPILA constitutes the entire body of conflict of laws rules applicable to international arbitral tribunals seated in Switzerland.[1774]

### 2. Party autonomy

#### a) General comments

1383    As stated above, under all modern arbitration laws and arbitration rules, the parties are free to determine the applicable law or the rules of law governing their contract. Art. 187(1) SPILA codifies this fundamental principle by providing that the law applicable to the merits of the case is primarily to be determined by the parties *("according to the rules of law chosen by the parties")*. Only in the absence of a choice

**406**

of law by the parties will the arbitral tribunal determine and apply the rules with which the case has the closest connection (Art. 187(1) SPILA).

*Domestic arbitration*

1384    In domestic arbitration, according to Art. 381(1) SCCP*, "[t]he arbitral tribunal decides (a) according to the rules of law chosen by the parties; or (b) based on equity, if the parties have authorised it to do so."* Therefore, contrary to the provisions of the former Concordat, the parties are free to choose either a national law or non-national rules of law (e.g. the UNIDROIT Principles). In the absence of a choice of law by the parties, the arbitral tribunal pursuant to Art. 381(2) SCCP, will apply the law which would be applied by a state court. This means that it will determine the *lex causae* according to the conflict rules of the SPILA, Chapters 1 to 11, if the dispute presents an element of "internationality" within the meaning of Art. 1(1) SPILA or, in the absence of such an element, Swiss law.[1775]

*Requirements of validity*

1385    The question of the requirements for the validity of a choice of law agreement is not explicitly addressed by the Swiss *lex arbitri* (in particular Art. 187(1) SPILA) and has not yet been clearly resolved by Swiss courts or in legal commentary. One view supports that Art. 116(2) SPILA (concerning choice of law agreements in

---

[1774] Berger/Kellerhals, para. 1380; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 4; Berger, BSK IPRG, Art. 187 para. 13.

[1775] Dasser, KUKO ZPO, Art. 381 para. 16; Girsberger, BSK ZPO, Art. 381 para. 25. Contra: Courvoisier, SHK ZPO, Art. 381 para. 4.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

state court proceedings) should apply by analogy.[1776] According to another opinion, the validity of the choice of law agreement is governed by the law referred to in that agreement, i.e. the *lex causae*, not Art. 116(2) SPILA.[1777]

*Art. 116(2) SPILA*

1385a  Art. 116(2) SPILA requires a sufficient level of certainty as to the parties' choice-of-law agreement, namely that the choice must be made expressly or clearly demonstrated by the terms of the contract or the circumstances of the case. In the authors' view, this is a sensible requirement which, in the interest of legal certainty, should also be valid for choice of law agreements in arbitration.

### b) Formal validity

1386  In practice, most choice of law clauses are included in an agreement containing the arbitration clause, which normally must be recorded in writing. However, in Switzerland, as elsewhere (para. 1351), a choice of law by the parties does not have to follow any form requirements, as it may be made expressly or impliedly.[1778]

**407**

*Substantive validity*

1387  With regard to substantive validity, in Switzerland as elsewhere, the arbitral tribunal has to establish that a law has been chosen by agreement of all parties, i.e. that there is consent among the parties as to the law or rules of law applicable to the merits of the case. Consent must be established by the party relying on the choice of law agreement.[1779] If the arbitral tribunal cannot determine the actual and common intent of the parties regarding the applicable substantive law, it is not entitled to refer to a hypothetical intent of the parties.[1780] In such cases, the arbitral tribunal must simply conclude that the parties have not made a choice of law and determine the applicable law by applying the "closest connection" test under Art. 187(1) SPILA.[1781]

*Unilateral legal acts and articles of association*

1387a  According to Art. 178(4) SPILA, Art. 187 SPILA is – at least by analogy – also applicable to arbitration clauses in unilateral legal acts and in articles of association. Commentators agree that the party who drafts the unilateral legal act or the articles of association may also – unilaterally – choose the law applicable to the merits, and that no consent from the beneficiaries of the unilateral legal act or, in case of articles of association, the shareholders, is needed.[1782]

*Content of choice of law by parties*

1388  As noted before, pursuant to the wording of Art. 187(1) SPILA (*"according to the rules of law chosen by the parties"*), the parties are free not only to choose a national law but also non-national rules, such as, for example, the UNIDROIT Principles[1783] (with regard to the choice of non-national rules of law, see paras. 1363 ff.). While the French version of Art. 187(1) SPILA was always worded in a way that clearly allowed such a choice (*"règles de droit"*), the German (*"Recht"*) and the Italian (*"diritto"*) versions seemed to refer only to state law. Since the 2020 revision of Chapter 12 SPILA, the German and the Italian texts of Art. 187(1)

---

[1776] Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 16; Berger, BSK IPRG, Art. 187 para. 56; Oetiker, ZK IPRG, Art. 187 para. 14; Poudret/Besson, para. 682.

[1777] Berger/Kellerhals, para. 1389; Kaufmann-Kohler/Rigozzi, para. 7.26.

[1778] Berger/Kellerhals, para. 1387; Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 156; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 16; Courvoisier, Anwendbares Recht, 428; Oetiker, ZK IPRG, Art. 187 para. 14; Berger, BSK IPRG, Art. 187 para. 56.

[1779] Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 17; Berger, BSK IPRG, Art. 187 para. 56; Oetiker, ZK IPRG, Art. 187 para. 14.

[1780] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), para. 157; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 17; Berger, BSK IPRG, Art. 187 para. 57; Oetiker, ZK IPRG, Art. 187 para. 15; Poudret/Besson, para. 682.

[1781] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 157.

[1782] Picht/Chrobak, Teil II, 234; Haas/Brosi, 344; Schlumpf, para. 387. Regarding corporate disputes, see Chapter 2 paras. 392 ff.

[1783] Dasser, KUKO ZPO, Art. 381 para. 6; Göksu, Schiedsgerichtsbarkeit, para. 1727; Berger, BSK IPRG, Art. 187 para. 70. But see: Courvoisier, Anwendbares Recht, 421.

© Schulthess Juristische Medien AG, Zürich · Basel · Genf 2021

SPILA have been amended to now use the terms *"Rechtsregeln"* and *"regole di diritto"* and, therefore, they now conform with the French. Under Swiss law, as under most modern arbitration laws, the parties are also free to choose different laws to apply to different aspects of their relationship or their dispute (*"dépeçage"*) [1784]

**408**

### Domestic arbitration "Renvoi" is excluded

1389    The same applies in domestic arbitration pursuant to Art. 381(1) SCCP.[1785]

1390    In Switzerland as elsewhere, the parties' choice of law is understood to be a choice of all of the substantive law provisions of the law chosen, excluding its rules of private international law (i.e. no "*renvoi*") (see para. 1357).[1786]

### Effects and scope of parties' choice

1391    With regard to the effects and the scope of the parties' choice of law, the general comments above (see para. 1358) also apply under Swiss law.

## c) Limitations on party autonomy regarding choice of law

### "Loi de police" or "lois d'application immédiate"

1392    Under Swiss law, the question arises as to whether the parties' autonomy to choose the applicable law to the merits of the case may be defeated by the application of so-called "*lois de police*" or "*lois d'application immédiate*."[1787]

### Rule under SPILA

1393    Chapter 12 SPILA does not contain express rules on mandatory norms or other limits to the parties' choice of substantive law. Beyond Chapter 12, Art. 18 and Art. 19 SPILA contain express rules limiting the parties' choice of law to govern their contract. This is an indication that any limitations to the principle of party autonomy in arbitration must be considered with caution, in particular where the parties have expressly chosen the law applicable to the substance of their dispute.[1788] It has been suggested that this interpretation is corroborated by both the wording and the history of Art. 187 SPILA[1789] as well as by the fact that the parties, unlike in state court proceedings, may authorize the tribunal to decide *ex aequo et bono* (Art. 187(2) SPILA), thereby dispensing it from considering any specific law.[1790]

---

[1784] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 160; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 25; Berger, BSK IPRG, Art. 187 para. 100. For a discussion of further issues, such as the parties' freedom to agree on a "stabilization" clause or on no rules at all, see paras. 1361 ff.

[1785] Girsberger, BSK ZPO, Art. 381 paras. 16–17.

[1786] Besson/Thommesen, Swiss Rules Commentary, Art. 33 para. 9; Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 159; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 32; Berger, BSK IPRG, Art. 187 para. 76; Poudret/Besson, para. 684.

[1787] For a definition of such overriding mandatory rules, see paras 1353 ff.

[1788] See, e.g. Commentary to the Hague Principles on Choice of Law in International Commercial Contracts, para. 11.17, available at <https://www.hcch.net>: "*The exceptional nature of the Article 11 [on public policy and overriding mandatory rules] qualifications to party autonomy should caution against the conclusion that a particular provision is an overriding mandatory provision in the absence of clear words to that effect.*"

[1789] Courvoisier, Anwendbares Recht, 372 and 181–190.

[1790] Courvoisier, Anwendbares Recht, 372.

[1791] In favor of including them: Berger/Kellerhals, para. 1424; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 51; Lazopoulos, BK-III ZPO, Art. 381 paras. 19 and 21, each with further references. Against an automatic inclusion: Courvoisier, Anwendbares Recht, 454–455; Schnyder, RabelsZ 1995, 299; Vischer/Widmer Lüchinger, ZK IPRG, Art. 19 para. 6.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

*Mandatory norms of the lex causae*

1394    The majority of Swiss authors are of the view that the arbitral tribunal must in any event apply mandatory provisions of the law governing the contract *(lex causae)* because they are necessarily included in the parties' choice of law.[1791] The core of the debate among Swiss scholars is whether the arbitral tribunal is obliged to apply the "*lois d'application*

**409**

*immédiate*" of a third country.[1792] Some authors are of the opinion that under certain limited circumstances the arbitral tribunal is obliged to do so.[1793] Others suggest applying by analogy the test in Art. 19 SPILA, which requires that the relevant disputes have a strong connection with such a law and that the goals which the law of the third country seeks to achieve appear to be worthy of protection to the arbitral tribunal.[1794] The Swiss Supreme Court has not yet issued a clear opinion; nor have arbitration tribunals sitting in Switzerland.[1795]

*Mandatory norms of a third state*

1395    If and to the extent a mandatory norm of a third state fulfills the requirements of an internationally applicable mandatory norm, the arbitrators, under Swiss law, must decide whether, and if so how, to take it into consideration. Arbitrators in Swiss arbitration proceedings are accorded considerable flexibility. This has been corroborated by the legislator in creating the limited grounds for a challenge of

**410**

arbitral awards (as opposed to the possibility of an appeal of state court decisions).[1796] The Swiss Supreme Court has refused to set aside an award regarding the allegedly wrong application of EC competition law (see para. 1398).[1797] This practice confirms that Swiss arbitral tribunals have greater flexibility than state court judges.[1798]

*Applicable rules*

1396    The methodology and rules arbitrators in Switzerland should apply and the question whether arbitrators are obliged to apply foreign mandatory law irrespective of the parties' choice of law, have been dealt with abundantly in Swiss legal writing.[1799]

---

[1792] See Blessing, J. Int. Arb. 2/1997, 60–66.

[1793] Berger, BSK IPRG, Art. 187 para. 147; Oetiker, ZK IPRG, Art. 187 paras. 79–81; Vischer/Widmer-Lüchinger, ZK IPRG, Art. 19 SPILA para. 61. See also Berger/Kellerhals, para. 1429, who stress the fact that ultimately an issue is to be determined by the arbitral tribunal with discretionary power. Similarly Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 165.

[1794] Oetiker, ZK IPRG, Art. 187 para. 81; Kaufmann-Kohler/Rigozzi, paras. 7.96–7.101.

[1795] Vischer/Widmer Lüchinger, ZK IPRG, Art. 19 SPILA, paras. 60 ff. See, e.g., ICC Award No. 6294 (1991), Journal de Droit International (Clunet) 1991, 1050–1052 (Swiss place of Arbitration, choice of Swiss law – German Federal Republic public employment protection law leading to invalidity of the contract not applied by the arbitral tribunal in view of Art. 19(2) SPILA); *Celtic Plc vs. Union of European Football Associations (UEFA),* Award, CAS 1998/O/201, 7 January 2000, in: Matthieu Reeb (ed.), Digest of CAS Awards II 1998–2000 (2002), 106–121, 110 (European competition law considered); Similarly, Final Award in ICC case No. 8528 of 1996, in: YCA XXV, 2000, 341–354, 346–348 (Turkish tax law considered); *AEK Athens and Slavia Prague vs. UEFA,* CAS 98/2000 of 20 August 1999, in: Matthieu Reeb (ed.), Digest of CAS Awards II 1998–2000 (2002), 38–105, 46. See also the award in *ad hoc* proceedings in Switzerland, Madame X vs. Madame Y of 19 June 2005, in: ASA Bulletin 3/2006, 471–481, 476: "Les parties ayant choisi de soumettre leur convention au droit suisse, c'est à la lumière de ce droit que les diverses clauses doivent être examinées, ce d'autant plus que l'interdiction des pactes sur succession future est critiquée dans les pays qui la maintiennent et que la tendance est plutôt de revoir ou d'assouplir ces interdictions. Dans ces conditions, il n'y a pas d'intérêts légitimes ou manifestement prépondérants pour exiger de prendre en compte une disposition impérative de droit étranger [footnote 20, referring to Art. 19 SPILA]." Société K. Ltd. vs. Société M. SA, ICC proceedings (1989) under Swiss substantive law, in: ASA Bull. 2/1993, 216–250, 231 (referring to Art. 19 SPILA in the context of bribes). For a more detailed analysis of these issues, see Girsberger, Foreign Mandatory Norms in Swiss Arbitration Proceedings: An Approach Worth Copying?, in: Shaughnessy Patricia/Tung Sherlin (eds.), The Powers and Duties of an Arbitrator, Liber Amicorum Pierre A. Karrer, Alphen aan den Rijn 2017, 113–121.

[1796] Schnyder, RabelsZ 1995, 307–308.

[1797] DSC of 8 March 2006, 132 III 389, reason 3.3.

[1798] Lazopoulos, BK-III ZPO, Art. 381 paras. 21–22.

[1799] See, e.g., Stacher, ZZZ 44/2017, 301 ff.; Girsberger, Liber Amicorum Pierre Karrer, 113–121, each with numerous further references.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

*Requirements for consideration of foreign mandatory law*

1397    Notwithstanding the dispute in Swiss doctrine and the silence of the Swiss Supreme Court (para. 1394), it can be safely said that the cumulative requirements required for the consideration of foreign mandatory provisions by a Swiss arbitral tribunal are as follows:

> (1) The provision in question must be considered mandatory in the state of origin and that state must have given it an extra-territorial reach.
>
> (2) There is close connection between the subject matter of the contract and/or dispute and the state that stipulates the mandatory provision.
>
> (3) The result must be acceptable in light of the concept of truly international public policy or commonly accepted international standards ("content check"):
>
> > a) rules with transnational public policy character, *or*
> >
> > b) a universally recognized and legally protected interest, *or*
> >
> > c) a strong public interest of the state concerned.
>
> (4) The result must appear reasonable and appropriate under the overall circumstances ("reality check").

Similar views have been expressed by other authors in Switzerland.[1800]

*Competition law in particular*

1398    The issue of application of mandatory provisions of a law of a third country is especially relevant in competition law, particularly that of the EU. It is widely recognized that an arbitral tribunal seated in Switzerland has to apply the competition law of a third country where the alleged violation of fair competition has had an impact in the country of the law in question.[1801] The Swiss Supreme Court ruled accordingly and

**411**

set aside, based on Art. 190(2)(b) SPILA, the award of an arbitral tribunal that had refused to consider EU competition law despite the request of a party.[1802] However, the Swiss Supreme Court has also found that EU competition law cannot be treated as a part of (international) public policy as referred to in Art. 190(2)(e) SPILA.[1803]

*Trade sanctions*

1399    The issue of overriding mandatory rules has become even more relevant in the context of politically motivated trade sanctions against certain states issued in the aftermath of the Arab Spring in the Middle East and North Africa or, more recently, against Russia in the aftermath of the Ukraine crisis. Such sanctions are imposed by the United Nations, the European Union or national legislators in order to put pressure on misbehaving governments and/or particular individuals.[1804] The difficulties arbitrators are faced with are those of mandatory rules in general. This means that if the trade sanctions are part of the law applicable to the contract itself, the sanctions will be applied as part of the *lex causae* (see para. 1394) and, if they are part of a third law, the principles described above apply (see para. 1397). In the context of trade sanctions, these principles lead to the following approach from the point of view of a tribunal in Switzerland: If Switzerland has not adopted the trade sanctions the violation of which is at issue in the arbitration, the award would most likely not be set aside by the Swiss Supreme Court based on a violation of international public policy as provided for in Art. 190(2)(e) SPILA.[1805] However, this does not mean that the arbitrators cannot consider the trade sanctions anyway if the requirements elaborated above (see para. 1397) are met. It follows that, on the one hand, trade sanctions that have only been issued by one or a small number of

---

[1800] See, e.g. Blessing, J. Int. Arb. 4/1997, 30–32; Brunner, 269–270; Geisinger/Bärtsch/Raneda/Ebere, IBLJ 4/2012, 424; Kaufmann-Kohler/Rigozzi, para. 7.98; Girsberger, Liber Amicorum Pierre Karrer, 113–121.

[1801] Berger/Kellerhals, para. 1430. DSC of 13 November 1998, 4P.119/1998, reason 1a.

[1802] DSC of 28 April 1992, 118 II 193, reason 5 (criticized by Berger/Kellerhals, para. 230); confirmed *obiter* in DSC of 8 March 2006, 132 III 389, reason 3.3, with references to several authors.

[1803] DSC of 8 March 2006, 132 III 389, reason 3.2.

[1804] Geisinger/Bärtsch/Raneda/Ebere, IBLJ 4/2012, 405.

[1805] Geisinger/Bärtsch/Raneda/Ebere, IBLJ 4/2012, 423.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

countries are not likely to be considered. On the other hand, trade sanctions issued by a large number of countries and, in particular, sanctions implementing a United Nations Security Council resolution may be considered rules of transnational public policy character.[1806]

### International public policy

1400    In Switzerland as elsewhere, arbitrators may refuse to apply provisions of the substantive law chosen by the parties where they consider these provisions to be contrary to international public policy. Under Art. 190(2)(e) SPILA, an award may be set aside if it does not comply with international public policy, and, in addition, the recognition and enforcement of a foreign award may be refused based on the public policy defense of Art. V(2)(b) New York Convention. With regard to the content of international public policy, see the comments above (see paras. 1379 ff.). The specific grounds on which an award may be set aside (Art. 190 SPILA) will be addressed in Chapter 7, and recognition and enforcement of an award in Chapter 8.

**412**

### Bribery and corrupt practices

1400a    With regard to bribery and corrupt practices, the Swiss Supreme Court has constantly held that these issues relate to international substantive public policy. However, in order for an award to be set aside on this basis, clear proof of such practices is required, and, in addition, the arbitral tribunal must have ignored the bribery and corruption in its award (see para. 1636c).[1807] According to the Swiss Supreme Court, the party challenging the award must base its allegations either on facts established in the contested award or on general knowledge (see para. 1636d).[1808] The Swiss Supreme Court suggests in its decisions a balanced approach between, on the one hand, the unwanted influence of corruption and, on the other, the risks of abuse of unsupported corruption allegations for the purpose of derailing arbitration. So far, no award has been set aside on this basis by the Swiss Supreme Court.

### Prohibition of circumvention of mandatory provisions

1401    In addition to the potential limitation by the mandatory norms of the *lex causae*, mandatory provisions or third countries and international public policy, arbitral tribunals in Switzerland, like state courts, are also bound by the principle of good faith. They can therefore conclude that parties from the same jurisdiction choosing a foreign law cannot derogate from internal mandatory rules where the choice of the law serves to circumvent such internal mandatory provisions in an abusive manner.[1809] This would, in effect, have the same result as provided for by Art. 3(3) of Rome I Regulation (see para. 1349).

### Succession law: no abuse of rights

1401a    Before state courts, a testator enjoys only very limited freedom with regard to choosing the law applicable to his or her last will (see Art. 90(1) and (2) SPILA). Conversely, if a testator inserts an arbitration clause in his or her last will (see para. 1387a), Art. 187 SPILA overrides Art. 90 SPILA. As a consequence, the testator has a broader choice of laws and rules of law if he or she opts for arbitration. However, some commentators are of the opinion that even in such a case, Art. 90(1) and (2) SPILA should apply, thereby equally limiting the testator's choice.[1810] But others insist that only Art. 187 SPILA should apply. They concede that if a testator chooses a substantive law or rules in order to avoid its mandatory provisions, the testator's choice may constitute an abuse of rights, which would eventually render the choice invalid.[1811] This – questionable – opinion has also been supported by the Federal Council.[1812]

**413**

---

[1806] Geisinger/Bärtsch/Raneda/Ebere, IBLJ 4/2012, 424.

[1807] DSC of 3 November 2016, 4A_136/2016, reason 4, with further references. See also DSC of 2 September 1993, 119 II 380, reason 4.b).

[1808] DSC of 12 December 2019, 4A_244/2019, reason 3.5; DSC of 12 December 2019, 4A_246/2019, reason 3.5.

[1809] Kaufmann-Kohler/Rigozzi, para. 7.30, with further references.

[1810] Piotet, 167.

[1811] Schlumpf, para. 395.

[1812] Report SPILA 2018, 7190.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

# B. Determination of the applicable law by the arbitrators

## I. Comparative overview

*Arbitrators are responsible for determining applicable law*

1402    The arbitrators are responsible for determining the law governing the merits of the case if the parties have not done so. In making such a determination, the arbitrators are not entirely free. They must respect the restrictions of the *lex arbitri* on the requirements of a choice and the content of the choice.

### 1. Arbitrators choose the conflict of laws rules they deem appropriate

*Arbitrators determine applicable/appropriate conflict of laws rules*

1403    One approach leaves it to the arbitrators to first choose the conflict of laws rules they deem "appropriate" or "applicable." They are then obliged to apply the law designated by such conflict of laws rule.[1813] Art. 28(2) UNCITRAL Model Law, for example, adopts this approach stating that "*[f]*ailing any designation by the parties, the arbitral tribunal shall apply the law determined by the conflict of laws rules which it considers applicable." Art. 35(1) UNCITRAL Arbitration Rules follows the same approach. The arbitral tribunal has discretion to decide what is meant by "applicable" or "appropriate" based on the facts and circumstances of each case. In international arbitration practice, arbitral tribunals have applied various different conflict of laws systems including inter alia conflict rules of the place of arbitration, converging conflict of laws rules (cumulative method; see para. 1405), general principles of private international law or transnational conflict rules (see para. 1406). However, it is recognized that arbitrators are not obligated to choose from existing conflict of laws rules but are entitled to establish new ones.[1814]

*Conflict of laws rules of place of arbitration*

1404    Today, it is generally accepted that it is not justified to apply the national conflict of laws rules of the place of arbitration relating to court litigation as there is only rarely a significant connection between the place of arbitration and the dispute. In addition, an international arbitral tribunal is not a body of the state that has to apply national conflict of laws rules.[1815] Nevertheless, the method is still largely followed in England and other common law countries.[1816]

*Cumulative method*

1405    In certain cases, arbitrators rely on a "cumulative" application of the conflict of laws rules of all states with a connection to the parties' dispute. This approach is based on the idea that it is more consistent with the parties' expectations. If the conflict of laws

**414**

rules of all legal systems with a connection to the parties' dispute lead to the same substantive law, the parties can hardly protest that their expectations have not been met when the arbitral tribunal applies such law.[1817]

*General principles of conflict of laws rules*

1406    Another approach frequently followed by arbitrators is to analyze the conflict of laws rules of the jurisdictions connected with the dispute and to establish the existence of universally recognized principles of conflict of laws through a comparative analysis of all the conflict systems.[1818] When establishing general principles of conflict of laws rules, arbitrators often look for such principles in both arbitral case law and in relevant international conventions, irrespective of whether they are in force or not. Such conventions reflect a certain

---

[1813] See Born, 19.03[D][3][a].

[1814] See, e.g. Born, 19.03[D][3][e]; Fouchard/Gaillard/Goldman/Savage, para. 1550.

[1815] Lew/Mistelis/Kröll, para. 17–15; Rubino-Sammartano, 638. For further details, see Born, 19.03[D][2].

[1816] See Born, 19.03[D][1].

[1817] See Born, 19.03[D][3][d]; Fouchard/Gaillard/Goldman/Savage, para. 1547; Lew/Mistelis/Kröll, paras. 17–61 to 17–64.

[1818] See Fouchard/Gaillard/Goldman/Savage, paras. 1548–1549; Lew/Mistelis/Kröll, paras. 17–65 to 17–66.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

consensus and arbitrators have often cited international instruments such as the Rome I Regulation[1819] or the 1955 Hague Convention on the Law Applicable to International Sales of Goods[1820] as sources of general principles of conflict of laws rules.[1821]

### 2. Specific conflict of laws rule provided for by the *lex arbitri* itself

*Rules of lex arbitri*

1407    To the extent that the *lex arbitri* contains a specific conflict of laws provision for arbitration, the arbitral tribunal must apply it. Swiss law and German law, for example, provide that the arbitral tribunal should normally apply the law with which the subject matter of the dispute or the dispute itself has the closest connection (Art. 187(1) SPILA, § 1051(2) German Code of Civil Procedure). The closest connection test as provided for by Art. 187(1) SPILA will be dealt with below (see paras. 1415 ff.). While the closest connection test is a conflict of laws rule, English arbitration law authorizes the arbitral tribunal to first determine the conflict of laws rules it considers applicable (Sec. 46(3) English Arbitration Act, stating that *"[i]f or to the extent that there is no such choice or agreement, the tribunal shall apply the law determined by the conflict of laws rules which it considers applicable"*).

### 3. " *Voie directe*"

*Direct method*

1408    The direct method ("*voie directe*") permits the arbitral tribunal to directly choose the substantive law or rules of law they deem appropriate without reference to specific conflict of laws rules.[1822] A number of arbitration rules and national laws have

> **415**

adopted the direct choice of law method (such as Art. 35(1) UNCITRAL Arbitration Rules, Art. 31(1) ICDR Rules, Art. 21(1) ICC Rules, Art. 22.3 LCIA Rules, Art. 61(a) WIPO Rules and Art. 1511 French Code of Civil Procedure).

*Difference to other methods*

1409    However, the difference between the methods mentioned above (see paras. 1403 ff.), which include a detour via conflict of laws rules, and the "*voie directe*" method, is minimal. Some authors even suggest that the methods are identical. They claim that, even when applying the direct method, the arbitrators are not dispensed from giving reasons for their choice of the applicable substantive law or rules of law.[1823] In any case, arbitrators should carefully justify their choice. In particular, the choice should be predictable, objective, convincing to all the parties and not arbitrary. Consequently, when applying the direct method, the arbitrators are required to base their decision regarding the applicable substantive law on established legal principles rooted in the long-standing doctrine of international conflict of laws (i.e. on the application of principles which are generally accepted in international conflict of laws doctrine and practice). Thus, the reasons which lead the arbitral tribunal to select the appropriate applicable substantive law are similar to the connecting factors used in conflict of laws rules.

### 4. National law or non-national rules?

*Non-national rules permitted*

1410    Some arbitration laws and arbitration rules allow the arbitral tribunal to apply a national law to govern the dispute as well as non-national rules (e.g. rules of the *lex mercatoria*).[1824] This option is signaled by the use of the words "rules of law" as opposed to "the law" or "laws."[1825] This is the case in Switzerland (see wording of the original French text and now also the German and the Italian text of Art. 187(1) SPILA, corrected in the

---

[1819] See Fouchard/Gaillard/Goldman/Savage, para. 1549; Rubino-Sammartano, 641.

[1820] See Fouchard/Gaillard/Goldman/Savage, para. 1549. Available at <https://www.hcch.net>.

[1821] See Born, 19.03[D][3][e].

[1822] Blackaby/Partasides/Redfern/Hunter, para. –.213; Lew/Mistelis/Kröll, para. 17–67; Poudret/Besson, para. 687.

[1823] Berger, Arbitration, 501; Poudret/Besson, para. 687.

[1824] See Born, 19.03[F]; Lew/Mistelis/Kröll, para. 17–18.

[1825] See Blackaby/Partasides/Redfern/Hunter, para. 3.156.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

2020 revision of the SPILA). The same approach is, for example, followed by Art. 1511 French Code of Civil Procedure, Art. 22.3 LCIA Rules and Art. 21(1) ICC Rules.

*Non-national rules excluded*

1411    Other arbitration laws and arbitration rules, however, only authorize arbitrators to choose a national law and not the rules of law of a different nature. § 1051(2) German Code of Civil Procedure, for example, provides that "failing any designation by the parties, the arbitral tribunal shall apply the law of the state with which the subject matter of the proceedings is most closely connected." A similar approach was adopted in Art. 28(2) UNCITRAL Model Law and in Sec. 46(3) English Arbitration Act.

**416**

1412    It should be noted that most of these arbitration laws or institutional rules allow the *parties* to choose both a national law and non-national rules of law (such as Art. 28(1) UNCITRAL Model Law, § 1051(1) German Code of Civil Procedure or Sec. 46(1)(b) English Arbitration Act).[1826]

## II. Swiss law

### 1. Art. 187(1) SPILA

*Determination of applicable law by arbitral tribunal*

1413    Pursuant to Art. 187(1) SPILA, *"[the arbitral tribunal] shall decide the dispute according to the rules of law chosen by the parties or, in the absence thereof, according to the rules of law with which the case has the closest connection."* This sets out the mechanism by which an arbitral tribunal in Switzerland determines the substantive law applicable to the merits of the case for an international arbitration pursuant to Art. 176(1) SPILA. It constitutes a conflict of laws rule and is the only provision that the arbitrators need to consider to determine the applicable substantive law.

*Application other statutory laws by analogy*

1414    Nevertheless, arbitral tribunals seated in Switzerland sometimes refer to other provisions, i.e. outside Chapter 12 SPILA, and apply them by analogy in order to concretize Art. 187 SPILA. This is justified because the closest connection test of Art. 187 SPILA is the basic principle underlying all conflict of laws provisions of the SPILA. The Swiss Supreme Court held in an obiter dictum that this was permissible.[1827]

### 2. The closest-connection test

*Arbitral tribunal may apply rules from various legal systems and non-national rules of law*

1415    By applying Art. 187(1) SPILA, the arbitral tribunal must find those rules of law that have the closest connection with the matter in dispute. The arbitral tribunal is not limited to applying one single national law. Rather, if it finds that two or more legal systems have the closest connections with particular issues of the case, the arbitral tribunal may apply rules from each of these laws to such issues. Art. 187(1) SPILA also allows the arbitral tribunal to choose non-national rules of law, such as the *lex mercatoria*, when it finds that the case does not have the closest connection with a particular state but rather with international commerce in general.[1828]

**417**

*Closest connection test*

1416    When applying the closest connection test of Art. 187(1) SPILA, the arbitral tribunal will establish the law or rules of law with which the dispute has a connection. In order to identify the legal rules with which the dispute has its closest connection, it will weigh the different connecting factors.[1829]

---

[1826] This was also the case under the original UNCITRAL Arbitration Rules (Art. 33(1), but not under the 2010 Rules.

[1827] DSC of 7 August 2001, 4P.124/2001, reason 2d.

[1828] Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 45; Göksu, Schiedsgerichtsbarkeit, para. 1748. See also Berger, BSK IPRG, Art. 187 para. 64. But see: Courvoisier, Anwendbares Recht, 217, who advocates that the applicable rules require a certain degree of specificity for reasons of legal certainty.

[1829] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 167.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

*Most important connecting factors*

1417    The following factors have been found to be particularly relevant in applying the closest connection test:

–The place of business or habitual residence of the parties, particularly of the party carrying out the characteristic performance of the contract (e.g. in a sales contract the place of business or residence of the party delivering the goods). It should be noted, however, that in an arbitration falling within the scope of Art. 176(1) SPILA, the arbitral tribunal is not bound by the legal presumption contained in Art. 117(2) SPILA, which provides that the contract is deemed to have its closest connection with the place where the party performing the characteristic performance of the contract has its place of business or habitual residence. In particular, several authors are of the opinion that the place of habitual residence of the party carrying out the characteristic performance of the contract cannot be regarded as the decisive connecting factor under Art. 117(1) SPILA.[1830]

–The place of performance of the characteristic obligation of the contract, i.e. the obligation for which payment is due (e.g. in a sales contract the place of the delivery of the goods, in a construction contract the place where the construction work is carried out, etc.).

*Factors not relevant in applying closest-connection test*

1418    The following factors are generally not considered relevant in applying the closest connection test because they are rather fortuitous or only have a connection with the place of the arbitral procedure:[1831]

–the place of signature of the contract,

–the place where negotiations were held,

–the nationality of the arbitrators,

–the seat of the arbitral tribunal, and

–the likely place of enforcement of the arbitral award.

418

# C. Proof of the applicable law

## I. Comparative overview

*Civil law and common law approach*

1419    In the context of state court litigation, most civil law systems treat foreign law as a full equivalent to their law.[1832] Further, it is presumed that the state court knows the law (principle of jura novit curia).[1833] In contrast, most common law systems treat foreign law as "fact."[1834] This means that, as is the case for all facts, parties must submit evidence in support of their allegations regarding the content of the foreign law they wish to rely on (usually by written expert opinion and testimony).[1835]

*Arbitration practice*

1420    In international arbitration, it is increasingly common that parties make full legal arguments, in writing or orally, concerning the applicable law(s) or rules of law. They may support their arguments with legal materials and expert reports. The arbitral tribunal will then be free to request further specific details about the applicable law. At the same time, the arbitral tribunal is allowed to conduct its own research regarding the applicable law. In any event, the arbitral tribunal will itself decide which rules are applicable and will not simply rely on the experts or on the legal submissions made by the parties.

---

[1830] See Berger/Kellerhals, para. 1417; Berger, BSK IPRG, Art. 187 paras. 95–98.

[1831] See Berger/Kellerhals, para. 1417.

[1832] See Giovannini, Ex Officio Powers, 64 fn. 20.

[1833] Giovannini, Ex Officio Powers, 63.

[1834] Rubino-Sammartano, 684.

[1835] See Berger/Kellerhals, 1436; Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 169.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

## II. Swiss law

*Principle of jura novit curia*

1421   The Swiss Supreme Court ruled that the principle of *jura novit curia* (i.e. the judge is deemed to know the law and must apply it *ex officio*) not only applies in state court litigation but also in (international) arbitration.[1836] This means that the parties do not have to prove the contents of the applicable law as a fact. In a 2014 decision, the Swiss Supreme Court left open the question of whether the principle of jura novit curia is part of procedural public policy.[1837] However, in 2015, it rejected the challenge of an award based on a surprising application of the law and the right to be heard, noting that the parties may limit the mandate of the arbitral tribunal, in derogation of the principle jura novit curia, to only those legal grounds invoked. This suggests that jura novit curia is not part of public policy.[1838]

419

1422   The arbitral tribunal does not violate public policy if it requires the parties to contribute to the establishment of the law or requests expert opinions on its content.[1839] Moreover, the arbitrators are not limited by the legal submissions made by the parties. Rather, they are free to apply other legal provisions or principles for resolving the dispute. In the event that the arbitrators intend to rely upon legal theories that were not addressed by the parties and were not reasonably foreseeable by them, the arbitrators have to give the parties the opportunity to present their position on these legal issues.[1840] If the arbitral tribunal does not respect the aforementioned right of the parties, its conduct could constitute a violation of the parties' right to be heard.[1841]

*Practical viewpoint*

1423   In any event, from a practical point of view, in Switzerland as elsewhere, it is strongly recommended that the parties establish, present and explain the law or rules of law applicable to the merits of the case, especially in cases where the arbitrators have no particular knowledge of the applicable law and access to that law is difficult, for example for reasons of language.

# D. Arbitration *ex aequo et bono* and "*amiable compositeur*"

## I. Comparative overview

### 1. Arbitration *ex aequo et bono*

*Express authorization*

1424   Many jurisdictions allow the arbitral tribunal to decide *ex aequo et bono*, i.e. according to what is just and good, if the parties have expressly authorized it to do so. This is, for example, the case in Art. 28(3) UNCITRAL Model Law, § 1051(3) German Code of Civil Procedure or Sec. 46(1)(b) English Arbitration Act.

*Formal requirements necessary*

1425   The express authorization may be subject to formal requirements such as under Sec. 5(1) English Arbitration Act (written requirement). In the absence of such a requirement (e.g. in French and Swiss statutory law), it is necessary that the will of the parties be certain and not merely hypothetical or equivocal. Similarly,

---

[1836] DSC of 15 April 2015, 4A_554/2014, reason 2.1; DSC of 2 March 2001, 4P.260/2000, reason 5b, referring to DSC of 19 April 1994, 120 II 172, reason 3a and DSC of 2 October 1990, 116 II 594, reason 3b; confirmed in DSC of 30 September 2003, 130 III 35, reason 5 and DSC of 27 February 2007, 4P.304/2006, reason 5.3.

[1837] DSC of 5 February 2014, 4A_446/2013, reason 6.2.2.3.

[1838] DSC of 15 April 2015, 4A_554/2014, reason 2.2.

[1839] DSC of 27 April 2005, 4P.242/2004, reason 7.3.

[1840] DSC of 26 May 2014, 4A_544/2013, reason 3.2.1; DSC of 20 December 2010, 4A_10/2010, reason 2.2; DSC of 16 December 2009, 4A_240/2009, reason 3; DSC of 2 March 2001, 4P.260/2000, reason 6a; see also DSC of 30 September 2003, 130 III 35, reason 5.

[1841] Berger/Kellerhals, para. 1435; Göksu, AJP 8/2009, 1056–1057; DSC of 15 April 2015, 4A_554/2014, reason 2.1; DSC of 24 February 2015, 4A_544/2014, reason 3.2.1; DSC of 9 February 2009, 4A_400/2008, reason 3; DSC of 30 September 2003, 130 III 35, reasons 5 and 6; DSC of 2 March 2001, 4P.260/2000, reason 6a; DSC of 21 February 2000, 126 I 19, reasons 2c aa and 2d bb; DSC of 3 March 1998, 124 I 49, reason 3c.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

authorization is needed under various institutional rules (e.g. Art. 35(2) UNCITRAL Arbitration Rules, Art. 31(3) ICDR Rules, Art. 21(3) ICC Rules, Art. 35(2) Swiss Rules as revised in 2021

**420**

or R45 CAS Code). Unlike other arbitration rules, Art. 22 LCIA Rules requires the parties to agree in writing.[1842].

*Decision rendered according to arbitrators' perception of justice*

1426    An arbitral tribunal deciding *ex aequo et bono* will not resolve the dispute by applying rules of law to the facts. Instead, the decision will be based on considerations of fairness, not of existing law.[1843]

*Limitations*

1427    Since an arbitral tribunal deciding *ex aequo et bono* is not bound by rules of law, it may potentially arrive at a decision that is not compatible with the rules that would otherwise have been applicable to the case. The only restriction is that the arbitral tribunal respect international public policy. However, the authorization of the arbitral tribunal to decide *ex aequo et bono* does not mean that the arbitral tribunal is completely free from the requirement to justify its decision. In addition, it is also important to note that the authorization of the parties to decide on the basis of general principles of law does not necessarily constitute an authorization to decide *ex aequo et bono*.[1844]

### 2. " *Amiable compositeur*"

*Concept*

1428    Some arbitration laws and arbitration rules refer not only to *ex aequo et bono* but also to the "*amiable compositeur*," a concept originally developed in France.[1845] See, for example, Art. 1512 French Code of Civil Procedure, Art. 28(3) UNCITRAL Model Law, Art. 35(2) UNCITRAL Arbitration Rules, Art. 21(3) ICC Rules and Art. 22.4 LCIA Rules. Here again, arbitrators are only allowed to decide as "*amiables compositeurs*" if the parties have authorized them to do so.

1429    "*Amiables compositeurs*" begin with an analysis of the applicable law as well as of the contract and then moderate the effects of the law if it is too rigorous. The use of "*amiables compositeurs*" is a way of reaching a solution in conformity with equity. The arbitrators will only depart from the law to the extent that it is necessary to obtain an equitable result. In any event, an "*amiable compositeur*" must respect the rules of public policy.

1430    Nowadays, the distinction between the concepts of *ex aequo et bono* and "*amiable compositeur*" is generally seen as artificial since in either case the arbitral tribunal is able to let its understanding of what is just and good prevail over any other, in particular strictly legal, considerations.[1846] However, it is still suggested by some authors that the two concepts differ.[1847]

**421**

## II. Swiss law

1431    Pursuant to Art. 187(2) SPILA, "*[t]he parties may authorize the arbitral tribunal to decide ex aequo et bono.*" With regard to the meaning of *ex aequo et bono*, see the above comments (see paras. 1426 ff.), which also apply under Swiss law. The arbitral tribunal authorized to so decide has no duty to apply law, even mandatory law, subject to certain conditions.[1848] However, although the arbitral tribunal can base its

---

[1842] With regard to Swiss law, see para. 1432.

[1843] Born, 19.08.

[1844] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 170, with further references.

[1845] Burckhardt/Groz, in: Geisinger Elliott/Voser Nathalie (eds.), 170; Poudret/Besson, para. 711; Rubino-Sammartano, 713–716.

[1846] Fouchard/Gaillard/Goldman/Savage, para. 1502. See also Born, 19.08.

[1847] Poudret/Besson, para. 710.

[1848] DSC of 19 December 2001, 4P.114/2001, reason 2c(bb)(aaa).

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021

decision on its own sense of justice under this provision, it must in any event respect the parties' right to be heard and right to equal treatment.[1849]

*No form requirement*

1432    It should be noted that under Art. 187(2) SPILA, the parties' authorization permitting the arbitral tribunal to decide *ex aequo et bono* does not have to be in writing.[1850] It can be made expressly or tacitly.[1851] If the parties have chosen a set of arbitration rules containing a form requirement, as a rule, the authorization, has to comply with these requirements.[1852]

*Domestic arbitration*

1433    The same applies for domestic arbitration pursuant to Art. 381(1)(b) SCCP.

## E. Sanctions for violation of the rules regarding the applicable law

### I. Comparative overview

*Sanctions*

1434    A failure to decide the case in accordance with the substantive law chosen by the parties, an erroneous application of the relevant law or an unauthorized decision *ex aequo et bono* (or a failure to decide *ex aequo et bono* in accordance with an authorization) are generally not grounds to set aside an award under most laws (such grounds are not mentioned, for example, in § 1059 German Code of Civil Procedure or Sec. 67 and Sec. 68 English Arbitration Act) or grounds for refusing recognition and enforcement of the award (the grounds are not mentioned in Art. V New York Convention).

1435    However, it should be noted that there may be non-legal sanctions. An arbitrator who did not properly carry out his or her function as an arbitrator runs the risk of no longer being appointed.

**422**

### II. Swiss law

*Setting aside because of incompatibility with international public policy*

1436    Also in Switzerland, the failure to decide the case in accordance with the applicable law or rules of law, an erroneous application of the relevant law or an unauthorized decision *ex aequo et bono* (or a failure to decide *ex aequo et bono* in accordance with an authorization) are, in principle, not grounds on which an award may be set aside under Art. 190(2) SPILA. In order to set an award aside, a party must establish that the award is incompatible with public policy under Art. 190(2)(e) SPILA.[1853] According to the practice of the Swiss Supreme Court, the actual and concrete outcome of the awards must be incompatible with international public policy for it to be successfully challenged, i.e. it is not sufficient that the reasons for the award are incompatible with public policy.[1854]

---

[1849] DSC of 27 March 2006, 4P.23/2006, reason 3.

[1850] DSC of 19 December 2001, 4P.114/2001, reason 2c(bb); DSC of 13 October 1989, 115 II 404, reason 4b.

[1851] Berger/Kellerhals, para. 1449; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 71; Oetiker, ZK IPRG, Art. 187 para. 90.

[1852] Berger/Kellerhals, para. 1449; Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, para. 71.

[1853] See Burckhardt/Meier, in: Arroyo Manuel (ed.), Ch. 2 Part II, Art. 187 SPILA, paras. 76–79; Berger/Kellerhals, para. 1451; Göksu, Schiedsgerichtsbarkeit, para. 1738; Berger, BSK IPRG, Art. 187 para. 137.

[1854] DSC of 7 March 2003, 4P.250/2002, reason 2.1, with references to earlier cases.

© Schulthess Juristische Medien AG, Zürich - Basel - Genf 2021