**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted *pro hac vice*)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 22-10964 (MG)<br>Jointly Administered |
| CELSIUS NETWORK LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>STAKEHOUND SA,<br><br>Defendant. | Adversary Proceeding<br>No. 23-01138 (MG) |

**NOTICE OF EMERGENCY MOTION**
**OF STAKEHOUND S.A. FOR AMENDMENT OF ORDER GRANTING TRO**

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE NOTICE** that Defendant StakeHound SA ("***StakeHound***") respectfully submits this Notice of Emergency Motion for Amendment of TRO Order (the "***Notice***" of the "***Motion***"). In support of the Motion, StakeHound submits the *Second Declaration of Albert Castellana Lluís* [ECF No. 65].

**PLEASE TAKE FURTHER NOTICE** that a hearing on the relief requested in the Motion will be held before the Honorable Martin Glenn on **September 19, 2023, at 3:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that objections to the Motion, if any, must be filed with the Court and served by no later than **September 19, 2023, at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that at the direction of the Court, this Hearing will take place in a hybrid fashion both in person and via Zoom for Government. The main parties must appear in person. Those wishing to appear in person may appear before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408. For those wishing to participate remotely, in accordance with General Order M-543 dated March 20, 2020, the hearing will be conducted remotely using Zoom for Government.

**PLEASE TAKE FURTHER NOTICE** Parties wishing to appear at or listen to the hearing, whether (a) an attorney or non-attorney, (b) appearing in person or remotely, or (c) making a "live" or "listen only" appearance before the Court, need to make an electronic appearance (an "***eCourtAppearance***") through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. When making an eCourtAppearance, parties must specify whether they

will appear at the hearing remotely or in person and, and if appearing remotely, whether they are making a "live" or "listen only" appearance. Electronic appearances (eCourtAppearances) need to be made by 4:00 p.m., prevailing Eastern Time, the business day before the hearing Hearing (i.e., on Monday, September 18, 2023)**.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius. You may also obtain copies of the Motion filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  September 15, 2023            Respectfully,

*/s/ Stephanie Wickouski*
**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted *pro hac vice*)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound SA*

**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey S. Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted *pro hac vice*)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |
| CELSIUS NETWORK LIMITED,<br>                Plaintiff<br>             v.<br>STAKEHOUND SA,<br>                Defendant | Adversary Proceeding<br>No. 23-01138 (MG)<br><br>**Hearing Date: September 19, 2023 at 3:00 p.m. ET**<br><br>**Objection Deadline: September 19, 2023 at 10:00 a.m. ET** |

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

**EMERGENCY MOTION OF STAKEHOUND SA
FOR AMENDMENT OF ORDER GRANTING TRO**

Defendant Stakehound SA ("*StakeHound*") respectfully files its Emergency Motion for Amendment of Order Granting TRO (the "*Motion*") pursuant to FED. R. BANKR. P. 9023 and FED. R. CIV. P. 59(e), and with respect to this Court's Order Granting TRO entered on September 8, 2023 [ECF No. 59] (the "*TRO Order*"). Based on the Second Declaration of Albert Castellana Lluis [ECF No. 65] (the "*Second Castellana Declaration*") submitted subsequent to entry of the TRO Order, StakeHound asks that the Court modify the TRO Order, including increasing the carveouts, to permit StakeHound to pay necessary operating expenses during the intervening period before the hearing on September 27, 2023.

**INTRODUCTION**

1. StakeHound urgently needs relief from the constraints of the TRO Order to prevent immediate losses to StakeHound's assets, which in turn could lead to substantial liability for the Debtor's estate. The breadth and restrictiveness of the TRO Order drastically impairs StakeHound's ability to run its business, and also threatens to impair the value of CNL's stTokens and any right CNL has to exchange those for StakeHound's Native Tokens.

2. StakeHound seeks relief from this Court on an emergency basis to mitigate these existential threats to its continued operations. As will be explained below, StakeHound needs to be able to spend $500,000 in the next approximately three weeks to maintain the validator nodes that allow Stakehound to stake tokens and earn rewards, and also to cover legal fees related to its defense in this case and its pursuit of its claim against Fireblocks (the loss of which would irreparably harm both StakeHound and CNL). What's more, the TRO Order prohibits StakeHound's use of *all* its assets or property, not just the Native Tokens and Staking Rewards

2

(together, the "***Subject Property***"), which sweeps in cash on hand to which CNL has no entitlement at all.

3. Since suspending its Platform to pursue the claim against Fireblocks, StakeHound has continued to stake tokens to earn rewards. This requires StakeHound to maintain its infrastructure, including the validator nodes that form an essential part of StakeHound's operations.[2] StakeHound needs to spend $60,000 in the next approximately three weeks to maintain the nodes. Forced to choose between maintaining the nodes to generate Staking Rewards the TRO Order prohibits it from using on the one hand, and essential expenses relating to this adversary proceeding and the Fireblocks litigation on the other, StakeHound will of course prioritize the latter, even at the cost of revenue and even potentially permanent damage to its assets. However, even if StakeHound makes this difficult choice, absent immediate and further relief from the TRO Order, its ability to continue as a going concern will be jeopardized, and its value will be decimated. That immediate and material loss of value harms not only StakeHound—which seeks to save its business, but also CNL—which presumably hopes to be able to collect on the amounts it seeks to recover from StakeHound. By granting relief from the TRO Order, this Court will both preserve the value of the remaining Native Tokens, and also maximize the prospects of a successful exchange of the stTokens for the Native Tokens.

4. StakeHound asks, under the authority of FED. R. BANKR. P. 9023 and FED. R. CIV. P. 59(e), that this Court increase the amount of the carveout set forth in the TRO Order, and authorize StakeHound to spend up to a value of $500,000 of the Subject Property between now and the

---

[2] Validator nodes are computer systems that are used to validate transactions submitted to be added to the blockchain, and then to add these transactions to the blockchain if all required parameters have been satisfied. *See* Ahrash Aleshi, *Blockchain 101: What are Validators and Nodes?* January 10, 2020 (available on www.linkedin.com).

3

Court's decision following the September 27 hearing.[3] In granting this further relief, this Court will minimize the harm being caused to StakeHound from what it contends to be a wrongful restraint of its assets, while still leaving the substantial majority of StakeHound's assets intact pending further litigation between the parties.

## RELEVANT FACTS

5. On September 8, 2023, this Court entered its TRO Order.

6. The TRO Order provides, in pertinent part, that:

STAKEHOUND, AND ALL PERSONS ACTING IN CONCERT WITH STAKEHOUND, ARE HEREBY PROHIBITED AND PRELIMINARILY ENJOINED FROM TRANSFERRING ANY ASSETS OR PROPERTY WITHIN STAKEHOUND'S POSSESSION, CUSTODY OR CONTROL TO ANY PERSON OR ENTITY PENDING THE OUTCOME OF THE PRELIMINARY INJUNCTION HEARING, WHICH, WITH THE AGREEMENT OF COUNSEL WILL BE HEARD BY THE COURT ON SEPTEMBER 27, 2023 AT 9:00 AM. Notwithstanding the terms of this TRO, StakeHound shall be permitted to spend $200,000 in money or money's worth of the subject assets between now and the PI Hearing.

See TRO Order, ¶ 4, at 12.

7. The Court did express itself "cognizant of StakeHound's claims that it needs the ability to dissipate some of the assets between now and the PI Hearing." TRO Order at 11. However, as noted above, the Court limited this carveout to $200,000.

8. The Court also denied StakeHound's request for a bond, commenting that StakeHound "has not provided sufficient evidence that it will be harmed in the absence of a bond." *Id.*

9. On September 8, 2023—several hours after the entry of the TRO Order—StakeHound filed its Supplemental Objection to Plaintiff's Motion for a Preliminary Injunction

---

[3] If the TRO is modified to increase the carveout, StakeHound proposes to file a weekly report disclosing its expenditures.

4

[ECF No. 64] (the "**Supplemental Objection**"), as well as the Second Declaration of Albert Castellanas Lluis [ECF No. 65] (the "**Second Castellana Declaration**").

10. In both the Supplemental Objection and the Second Castellana Declaration, StakeHound provided detail—with competent supporting evidence—as to the harm to its business occasioned by the TRO Order, and the ensuing and far reaching restraint of StakeHound's assets.

11. StakeHound noted that it has voluntarily refrained from selling Native Tokens or Staking Rewards[4] since July 26, 2023 and has since that date been has been required to pay its ordinary course operating expenses solely from cash on hand (as of today, fifty-one (51) day period (the "***Voluntary Freeze Period***")), with expenses paid or due and payable in the following amounts (updated as of the date of this Motion): (i) StakeHound's expenses over the Voluntary Freeze Period—which include ordinary operating expenses and also attorneys' fees and costs associated with pending litigation—have totaled $1,602,294, including (A) $972,681 already paid, comprised of $713,590 in legal costs and $259,111 in operational costs, and (B) $602,921 currently due and owing, comprised of $462,793 in legal costs and $140,130 in operational costs, and (ii) this voluntary standstill has depleted StakeHound's available cash, which totals $371,346.50 as of the date of this filing. *See id.*, ¶ 5.

12. StakeHound further noted that (i) the TRO Order imposes a total freeze on StakeHound's use of all its assets through the date of the hearing on September 27, 2023, (ii) assuming that the Court does not rule on the parties' currently pending motions until a week after that date, StakeHound expects to have to spend an additional $525,129 through October 4, 2023, (iii) the amount of StakeHound's expenses currently due and owing are well in

---

[4] Defined terms not otherwise defined herein shall have the meanings ascribed to them in the Supplemental Objection.

5

excess of its available cash and the $200,000 carve-out provided by the TRO, and (iv) that shortfall compromises StakeHound's ability to fund operating expenses and attorneys' fees both in the United States and Israel. *See* Second Castellana Declaration at ¶ 6.

13.     Moreover, the TRO Order is unclear as to whether StakeHound is permitted to use its cash on hand at all in this intervening period—which prohibition essentially eliminates StakeHound's liquidity.

14.     StakeHound further described and substantiated the harm that will flow from its inability to pay its operating expenses. *See* Second Castellana Declaration at ¶ 7. These expenses include (i) $80,000 per month (less applicable discounts and rebates) for maintaining the validator nodes supporting the Native Tokens and Staking Rewards,[5] (ii) other operational expenses, and (iii) accrued and ongoing attorneys' fees in connection with the critical ongoing litigations prosecuted and defended by StakeHound (which, contrary to CNL's contentions, does not include the Arbitration). *Id.* at ¶¶ 7-8.

15.     If StakeHound is prevented from using its assets in the short term to fund its legal counsel, that restriction could permanently prejudice StakeHound. Failure to fund ongoing attorneys' fees and costs, particularly in Israel, could result in StakeHound's assets being permanently depleted and unrecoverable. If StakeHound is unable to pay its attorneys, it risks being unable to prosecute and defend its pending litigation positions. The damages StakeHound claims in the Fireblocks litigation total approximately $190 million. *Id.* at ¶ 8. Moreover, the fact that StakeHound has the need for counsel in this proceeding is self-evident, and the TRO Order should not be used as a sword to cut away StakeHound's representation in this case.

---

[5] The Fourth Declaration of Richard Man filed on September 8, 2023, takes issue with the amount of the necessary expenditure. Micromanaging another company's ordinary course expenditures is not within this debtor's competence, is not informed by the declarant's personal knowledge of the relevant transactions, and is at best an unqualified opinion that should be given no weight.

6

16. Failure to fund and maintain the validator nodes will result in immediate, permanent loss of Staking Rewards. Staking Rewards are StakeHound's revenue. Consequently, StakeHound must be able to continue to make payments to keep the nodes operational to continue generating revenue. Absent sufficient liquidity to pay the costs of maintaining of the nodes, StakeHound will be forced to unstake all unlocked ETH to pay more urgent outstanding costs in order to avoid further loss in value of the ETH. This unstaking—the removal of the tokens from the blockchain—will prevent StakeHound from receiving the associated Staking Rewards, which currently is $200,000 per month. To date, those rewards have more than covered the costs of operating the nodes.

17. Moreover, StakeHound cannot unstake the locked ETH for which Fireblocks lost the keys. If the staking nodes with this ETH are not maintained, the amount of ETH in these nodes will start being slashed until at a certain point they are forced out of the validator pool.[6] Removal of the related nodes being removed from the validator pool, all of which will cause permanent damage in the revenue such nodes can generate, which is $90,000 per month at current prices. *Id.* at ¶ 7.

18. If StakeHound is wrongfully restrained from monetizing its own assets, including by the entry of a preliminary injunction that lasts through a ruling on the merits in this proceeding, that restraint would prevent StakeHound from paying key operating and litigation expenses. The failure to pay these obligations would ultimately lead to further loss of Staking Rewards, the eventual loss of the nodes, and, potentially, the inability to prosecute the claims against Fireblocks. These consequences pose meaningful risks to StakeHound's ongoing business and enterprise value being reduced or potentially destroyed. The damages from this chain of events would total no less

---

[6] "Slashing" is "reducing the token balance of a miner or validator because it violated some part of the blockchain protocol. *See* PC Magazine Encyclopedia, "crypto slashing" (available on www.pcmag.com)(2023).

7

than the $200,000 a month in lost Staking Rewards but will also include a permanent loss of revenue associated with the nodes attributable to the lost ETH, which totals $90,000 a month at current value. In addition, StakeHound could also suffer the loss of the value of its $190 million claim against Fireblocks in Israel if StakeHound is unable to pay its legal bills and the associated court deposit. *Id.* at ¶ 11.

## ARGUMENT

19. The carveout provided in the TRO Order is insufficient to allow StakeHound to maintain ongoing operations. As presently constituted, the TRO Order risks substantial damage to StakeHound's business. The imminent harm to StakeHound is established by the Second Castellana Declaration, which new evidence constitutes cause for the Court to amend its TRO Order to provide additional carveouts to protect StakeHound.

20. Federal Rule of Civil Procedure 59, incorporated into this adversary proceeding by Federal Rule of Bankruptcy Procedure 9023, governs motions to alter or amend a judgment. FED. R. CIV. P. 59(e). Bankruptcy Rule 9023 provides that "[a] motion… to alter or amend a judgment shall be filed… no later than 14 days after entry of judgment." FED R. BANKR. P. 9023; BANKR. S.D.N.Y.R. 9023–1(a). The standards applicable to a motion to alter or amend a judgment and a motion for reconsideration are the same. *See Henderson v. Metro. Bank & Tr. Co.*, 502 F. Supp. 2d 372, 375 (S.D.N.Y. 2007). It is well-settled that the primary grounds justifying reconsideration or amendment of a prior order are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *In re Ditech Holding Corp. No.*, 19-10412 (JLG), 2021 WL 2258291, at *3 (citing *Virgin Atl. Airways Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)(internal quotations omitted).

8

21. As the Court is aware, and as set forth in the Supplemental Objection, StakeHound has raised substantial objections to the injunctive relief requested by CNL. *See generally* Supplemental Objection. In particular, StakeHound submits that CNL has not come close to demonstrating a likelihood of success on the merits, given that (i) the plain language of the parties' agreements refutes CNL's position, and (ii) CNL has offered no competent evidence—by a witness with relevant personal knowledge—to refute the express terms of the agreements. Moreover, CNL's opposition to StakeHound's motion to compel arbitration adds the entirely new argument that *no* contract governed the parties' second exchange of ETH or stETH. As StakeHound will demonstrate in its reply in further support of that motion, CNL's own testimony contradicts its new argument.[7] And StakeHound's evidence will demonstrate that CNL acknowledged and accepted that the SSTC governed all subject transactions.

22. The Court's preliminary findings for purposes of the TRO Order notwithstanding, CNL has failed to show irreparable harm, has failed to offer any competent evidence of insolvency, and has failed to show even a scintilla of evidence of any imminent, wrongful dissipation of assets. StakeHound will address all these issues at the preliminary injunction hearing on September 27th and will not fully argue these points here.

23. By this Emergency Motion, StakeHound seeks relief from a more immediate problem—the TRO Order does not equally balance the hardships between the parties. The relative hardship to StakeHound is catastrophic; the harm to CNL is either non-existent, or at most, a rounding error: **StakeHound's requested carveout of $500,000 represents just .001%, of the total amount of distributable value in this case**.[8] *See Fourth Revised Disclosure Statement*, Ch.

---

[7] *See* First Declaration of Richard Man at ¶ 13 ("The February 2021 Staked ETH was governed by the standard StakeHound Terms and Conditions.").
[8] CNL knows this, of course, and is not motivated merely by the economics. *See infra* fn. 12 and accompanying text.

9

11, ECF No. 3332 at pp. 26-36. The TRO Order creates an existential risk to StakeHound's ongoing business and enterprise value, and these far reaching and draconian restrictions are unnecessary (at best) if not actually harmful (for the reasons explained below) to the Debtor's estate. If the status quo between the parties is to be maintained between now and September 27, some provision must be made to allow StakeHound to make critical payments of operating expenses—*from its own assets*. The TRO, as presently drafted, fails to provide sufficient protection to StakeHound. In short, modification is needed to balance the equities. In these circumstances, as explained herein, the TRO Order potentially damages both parties.

24. The restrictions set forth in the TRO Order apply, on their face, to "ANY ASSETS OR PROPERTY WITHIN STAKEHOUND'S POSSESSION, CUSTODY OR CONTROL." *See* TRO Order, ¶ 4, at 12. This restrictive language is overbroad as it encompasses assets in which CNL does not even claim an interest and to which StakeHound's ownership is undisputed. As noted above, CNL has avoided any reference to the contractual language or other competent evidence establishing a property interest in the Native Tokens themselves (as opposed to a contractual or equitable claim for an exchange of Native Tokens). But even CNL has not argued for a property interest in StakeHound's available cash or assets other than the Native Tokens. StakeHound requests that the Court limit the restrictions of the TRO Order[9] to the Native Tokens, themselves.

25. StakeHound further asks this Court to amend the TRO Order to permit payments from the Subject Property in an amount up to $500,000 (the "***Increased Carveout***"). This Increased Carveout is both justified and necessary to assure that the TRO Order's asset freeze does not cause harm or damage to StakeHound's business and going concern value. The Second

---

[9] Again, StakeHound reserves all defenses, objections and arguments in connection with these restrictions.

Castellana Declaration establishes that StakeHound has a legitimate and established need to maintain its validator nodes, and to pay the attorneys' fees and costs associated with prosecuting and defending its critical ongoing litigation. Moreover, the Second Castellana Declaration demonstrates that the failure to pay these operating expenses will diminish the value of StakeHound's assets, and potentially destroy StakeHound's business as a going concern altogether.

26.    CNL contends that the restricted assets are actually property of the estate, and that any carveout is wrongly diminishing the assets available for distribution to CNL's creditors. *See* CNL's *Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction* (the "**TRO Motion**") at 13-15. That view of the world is not only one sided, but is also disproved by the evidence presented thus far in the case and contradicted by the parties' agreements.

27.    The parties' agreements and competent record evidence demonstrate that the Native Tokens belong to StakeHound. In opposition, CNL can only offer a series of equitable claims—all relying upon a supposed unconditional promise to exchange Native Tokens and stTokens on a 1 to 1 basis. The existence of this supposed promise is refuted by the contractual language requiring any exchange to be for "value."[10] *See* CNL's *Supplemental Brief in Further Support of Temporary Restraining Order and Preliminary Injunction* (the "**Supplemental TRO Brief**") at 4-16.[11] Whether these equitable claims establish a likelihood of success on the merits (and StakeHound strongly contends they do not), they certainly do not come close to adjudicating or

---

[10] StakeHound's pursuit of its claim against Fireblocks is the only way StakeHound can restore value parity.

[11] As StakeHound will demonstrate in its reply brief and at the hearing, CNL's argument completely ignores the provisions in the contracts that: (i) any re-exchange of Native Tokens for stTokens would be at the respective values of those respective currencies, and (ii) there is no "immediate" right to exchange currencies, because such exchange is conditioned on the value of the currencies, availability of the tokens and Platform is at StakeHound's discretion.

11

establishing that these assets are estate property. Much in the same way, there are serious evidentiary and legal deficiencies in CNL's efforts to demonstrate irreparable harm.

28. Any freeze of StakeHound's assets should be limited in nature and must protect StakeHound's ongoing operations and going concern value. Otherwise, CNL could effectively use the asset freeze *offensively*, and as a tactical device to obtain undue leverage. This is not mere speculation as to motive: CNL *stated precisely this intention during a hearing on the TRO and preliminary injunction*. *See* Transcript of August 29, 2023 TRO Hearing at 50:18-51:14.[12] May a Chapter 11 debtor be permitted to gain an advantage in the litigation (of factually and legally disputed claims) by using pre-judgment attachment to drive its litigation adversary out of business? By locking down all of StakeHound's assets for a period that will now span several weeks, CNL appears to seek precisely that objective.

29. At a prior hearing in this Adversary Proceeding, CNL acknowledged that StakeHound holds assets against which CNL does not assert any competing claim, which CNL's counsel thought might be "a couple of million." *See* Transcript of August 22, 2023 Hearing at 15:23-16:1. The proposed Increased Carveout is within this threshold, and thus will not meaningfully diminish CNL's bankruptcy estate even under CNL's view of the merits. The Increased Carveout represents roughly .71% of the $70 million in disputed Native Tokens—a small fraction of the property in dispute, and wholly in proportion to the money that CNL is spending to prosecute its competing claims to this property.

30. The parties' respective interests in funding the Fireblocks litigation are aligned. It is in both the Debtor's and StakeHound's mutual interests for StakeHound to successfully

---

[12] CNL's counsel said to the Court: "[b]ut for there to be a chance for parties to make some kind of an agreement, everybody's got to have an incentive. And under the circumstances here, if there is a possibility that StakeHound could continue to use these assets…that incentive isn't going to be there. And that's really the way we would like to see things move forward."

12

prosecute litigation against Fireblocks, since a recovery in that litigation would increase the assets ultimately available for an exchange. It is not clear why CNL appears to be seeking to prejudice or impair StakeHound's litigation against Fireblocks—particularly since, as this Court has stated, there is no need for CNL's claims against StakeHound to be determined before the emergence of the Debtor from Chapter 11.

31.     The Increased Carveout will in fact *reduce* financial exposure and risk to the estate as compared to the course of action that CNL currently insists on pursuing. StakeHound seeks the Increased Carveout precisely so that it can avoid damage to its business and going concern value, damage which will expose CNL and its bankruptcy estate to liability. Given that the Court has thus far declined to require CNL to post a bond[13], StakeHound will have no choice but to assert an administrative claim for the damage to its business resulting from the wrongful restraint of its assets. Pursuant to 11 U.S.C. § 1129(a)(9), as a condition to confirmation, CNL will need to demonstrate sufficient reserves to pay the full amount of any administrative claim that may be allowed in StakeHound's favor. Absent modification of the TRO Order to provide the immediately needed carveouts, StakeHound anticipates filing an objection to confirmation to protect its rights as an administrative claimant.

32.     Reasonable carveouts to any injunctive relief will permit both parties to maintain the *status quo* while they litigate the outstanding ownership and contract disputes between them. Absent such carveouts, the full amount of StakeHound's enterprise value is being put at risk by a wrongful restraint of the assets. It is hard to understand how that approach, which leaves the estate open to an administrative claim in the hundreds of millions of dollars, would leave the bankruptcy estate better off than the requested carveouts.

---

[13] StakeHound continues to assert that a substantial bond is warranted and appropriate here, and will be renewing that argument at the September 27 hearing.

13

33. CNL will need to answer for any damages caused by a wrongful restraint of StakeHound's assets. CNL has made bold claims in this Adversary Proceeding—asserting ownership rights in substantially all of StakeHound's property, in contravention of the plain language of the parties' agreements. If CNL finally prevails on those claims in a court or tribunal of competent jurisdiction, then it is possible that CNL's position will result in a "no harm, no foul" scenario. But if CNL fails to sustain these claims completely, and, in seeking an overbroad and unwarranted TRO puts StakeHound out of business, CNL will be liable for the consequences of its aggressive litigation positions, and that liability will be a post-petition, administrative priority obligation of the bankruptcy estate.

[*Remainder of Page Intentionally Left Blank*]

For these reasons, Defendant StakeHound S.A. respectfully requests that the Court grant the Motion, amend the TRO Order to restrict its scope to the Subject Property, approve the Increased Carveout, and order such other relief as the Court may deem proper.

Dated: September 15, 2023  
New York, New York

Respectfully,

*/s/ Stephanie Wickouski*  
**LOCKE LORD LLP**  
Stephanie Wickouski  
Jeffrey S. Kramer  
Sean A. Feener  
200 Vesey Street, 20th Floor  
New York, New York 10281  
Tel: (212) 415-8600  
Fax: (212) 303-2754  
swickouski@lockelord.com  
jkramer@lockelord.com  
sean.feener@lockelord.com  

Jonathan W. Young (admitted pro hac vice)  
111 Huntington Avenue, 9th Floor  
Boston, MA 02199-7613  
Tel: (617) 239-0367  
Fax: (617) 227-4420  
jonathan.young@lockelord.com  

*Attorneys for StakeHound SA*

15