**EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>Debtors.<br><br>CELSIUS NETWORK LIMITED,<br>           Plaintiff<br>v.<br>STAKEHOUND SA,<br>           Defendant | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered<br><br>Adversary Proceeding<br>No. 23-01138 (MG) |

## AMENDED DECLARATION OF ALBERT CASTELLANA LLUÍS

I, Albert Castellana Lluís, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.  I am the Chief Executive Officer and a member of the Board of StakeHound S.A. ("***StakeHound***").

2.  I submit this Declaration in support of StakeHound's (i) ~~Motion to Dismiss for Lack of Personal Jurisdiction, (ii)~~) Motion to Compel Arbitration, or in the Alternative, Abstain from Hearing this Case, and (~~iii~~ii) Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (collectively, the "***August 25 Filings***").[2]

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

[2] ~~Capitalized terms used but not defined herein shall have the meanings given such terms in the August 25 Filings.~~ The prior version of this declaration also was filed in support of StakeHound's Motion to Dismiss for Lack of Personal Jurisdiction. On September 15, 2023, StakeHound voluntarily withdrew that motion and does not contest this Court's exercise of personal jurisdiction over StakeHound for purposes of this Adversary Proceeding. Consequently, I submit this amended declaration to remove statements from the prior declaration that related only to the issue of personal jurisdiction. Moreover, in my prior declaration I incorrectly stated that StakeHound had no contacts with the United States. In the course of discovery, I came to learn that StakeHound did have some limited

3. As set forth herein, I am familiar with the factual issues raised by the August 25 Filings. In particular:

    (a) I was in charge of the negotiation of the Staking Services Agreement dated 20 January 2021 ("*SSA*"), a true and correct copy of which is attached hereto as **Exhibit A**, on behalf of StakeHound;

    (b) I was involved in the drafting of the StakeHound Services Terms and Conditions ("*SSTC*"), a true and correct copy of which is attached to the SSA; and

    (c) I was in charge of the negotiation of the Revenue Sharing Agreement dated 21 April 2021 ("*RSA*"), a true and correct copy of which is attached hereto as **Exhibit B** on behalf of StakeHound.

    (d) I am familiar with the transactions and assets referenced and at issue in the August 25 Filings.

4. If called as a witness, I could and would testify competently to the truth of the facts set forth in this Declaration. The facts which I set forth are known to me personally except to the extent otherwise stated.

---

contacts with the United States. Accordingly, those statements have been withdrawn in this amended declaration. A redline showing the changes to my previous declaration is attached hereto as **Exhibit A**.

I. **Information on StakeHound**

5. StakeHound is a private *société anonyme* incorporated under the laws of Switzerland with registered offices at Place de Longemalle 1, c/o MN & Associés SA, 1204 in Geneva, Switzerland. ~~StakeHound has always operated out of Geneva, Switzerland. StakeHound has never been incorporated, headquartered, held offices, or maintained a mailing address in the United States. StakeHound does not conduct business in any state in the United States, nor is StakeHound licensed to do business in the United States. Other than legal counsel retained for purposes of representing StakeHound in these proceedings, StakeHound does not have officers, agents, employees, or other representatives of its business domiciled in the United States.~~

6. StakeHound operates the currently suspended online platform "onboarding.stakehound.com" (the "***Platform***"), which was launched in October 2020. The Platform facilitates liquid staking. Staking is a process in which cryptocurrency holders volunteer to lock their crypto assets ("***Native Tokens***") to support the operation of a Proof of Stake blockchain. Once staked, the Native Tokens are used to validate transactions on the network. In return for staking Native tokens, their holders receive a share of the transaction fees or newly created cryptocurrencies ("***Staking Rewards***"). Essentially, staking is a way of earning passive income from crypto assets.

7. However, when crypto assets are staked, they cannot be traded and therefore a holder may not take advantage of market fluctuations or use the crypto assets as collateral for loans. In other words, the assets are illiquid for the time they are staked. This disadvantage of staking is addressed by liquid staking.

3

8. In the liquid staking process, the service provider or protocol issues a tokenized representation of a particular cryptocurrency, or a wrapped token ("*stToken*") in exchange for that same cryptocurrency (Native Token). The service provider or protocol then stakes the Native Tokens and, in accordance with the applicable terms, distributes Staking Rewards to the holders of stTokens. At the same time, the holders of wrapped tokens can use and trade these wrapped tokens in peer-to-peer financial networks, the so-called decentralized finance ecosystem, thereby minimizing the disadvantages of traditional staking. Hence, these transactions are described as "liquid staking." StakeHound maintained no control over where and how users deployed their wrapped tokens.

9. The legal framework around dealing with crypto assets is constantly evolving. It has always been a priority for StakeHound to ensure that we would be compliant with all existing financial services and banking regulations. As part of these compliance efforts, we structured our transaction model to assure that the stTokens would not be considered as deposits or debt of any kind. StakeHound's terms and conditions define two main services: the possibility for a customer to sell Native Tokens to and buy stTokens from StakeHound; and the possibility for a customer to sell stTokens to and to buy Native Tokens from StakeHound. The terms for these two services are not the same, since they don't have the same implications, for instance, while we can control the creation of the stTokens, we can't control it for the Native Tokens. Although we anticipated that there would be a continuing exchange of Native Tokens and stTokens, our legal framework made clear that StakeHound would not permit redemption of the native tokens, themselves. The native tokens held by StakeHound had to be at all times owned by StakeHound.

10. The absence of mandatory redemption rights for the stTokens is not at all unusual in the cryptocurrency market, where the risks are high, but the opportunities are high as well.

4

Among other things, participants must understand the potential of hacks, loss of keys, smart contract failures and many other possible issues. These risk allocation issues are well disclosed in StakeHound's terms and conditions.

11. In order to remain compliant and in view of the evolving regulatory landscape, StakeHound implemented very strict "know your customer"/anti-money laundering ("**KYC/AML**") requirements from the beginning. These strict requirements are reflected in the SSTC and we took (and continue to take) these requirements very seriously.

12. ~~As part of its business model and consistent with its efforts to assure regulatory compliance, StakeHound does not conduct business with any U.S. persons. Moreover, StakeHound itself does not have any meaningful connection to the United States whatsoever. While the stakehound.com domain name is registered with Namecheap, Inc. located in Phoenix, AZ, and the landing page is hosted on WPEngine, Inc. located in Austin, Texas, the landing page makes clear that StakeHound is a *société anonyme*, and the Platform is hosted directly by Altcoinomy SA, a Swiss-based KYC/AML provider. The welcome page on StakeHound's KYC/AML portal states that StakeHound is governed by Swiss laws. StakeHound's website did not allow customers to register cryptocurrency wallets and ETH; rather, following completion of KYC/AML, the user would be prompted to provide a wallet from which assets would be sent. All of StakeHound's social media, including LinkedIn, Facebook, and Twitter clearly indicates that StakeHound is a Swiss corporation. To my knowledge, StakeHound's main provider of validator nodes, Allnodes, does not host any of StakeHound's nodes in the U.S. As regards StakeHound's assets, these are exclusively crypto assets (tokens) that are located on their respective blockchains. As such, they cannot be said to be in any specific physical location.~~[Omitted]

5

**II.    StakeHound's Relationship with Celsius Network Limited ("*CNL*")**

13.    I was introduced to CNL by Reuben Yap from Zcoin around August/September 2020.  On 3 September 2020, he connected me with Mr Jason Stone who was leading CNL's DeFi department at the time.

14.    Jason Stone understood the concept of and the risks associated with liquid staking as well as DeFi, and my impression was that CNL was very keen to take advantage of StakeHound's liquid staking product.

15.    Based on my interactions with CNL, I understood they were most interested in the ability to hold, trade, lend, "provide liquidity" and "yield farm" with stTokens.  At the same time, CNL would have the opportunity to receive distributions StakeHound made from staking the Native Tokens it acquired.  The success of StakeHound's business relied and still relies upon providing those rewards.

16.    Against this background, StakeHound and CNL explored possible options to work together.  At that time, I was solely interacting with Jason Stone and, on a few occasions, Mr. Roni Cohen-Pavon, a lawyer by training who had been working as CNL's Chief Revenue Officer.  I had no dealings with Richard Man who to my knowledge was not at CNL at the time or otherwise involved with any of CNL's transactions with StakeHound.

17.    CNL, through Jason Stone and Roni Cohen-Pavon, initially asked to remain the owner of any Native Tokens that CNL would transfer to StakeHound.  I explained to them that this would be a deal-breaker: if CNL were to remain the owner of the Native Tokens and, on top of it, to receive stTokens from StakeHound, CNL would have twice the assets without giving StakeHound anything in return.  Such a transaction would not only be devoid of any commercial sense, but not possible from a regulatory and compliance perspective.  Understanding this, CNL

6

expressly agreed that StakeHound would be the sole owner of any Native Tokens transferred by CNL to StakeHound, and that commercial understanding was set forth in the written agreements between the parties.

18. Jason Stone informed me that CNL would only be willing to conduct business with StakeHound if StakeHound used a security provider other than its existing security provider, Copper. CNL exclusively wanted StakeHound to work with Fireblocks, Inc., an Israeli blockchain security provider for moving, storing and issuing digital assets.

19. Jason Stone subsequently introduced StakeHound to Fireblocks. Upon CNL's insistence, StakeHound eventually agreed to enter into a new security custodian agreement with Fireblocks. The integration process was costly and we had to come to a separate agreement for holding "BLS"-type withdrawal keys required for Ethereum 2.0 staking as Fireblocks did not have the possibility of holding these keys on their main platform.

20. Moreover, after multiple conversations where CNL was trying for security reasons to remain in control of the Native Tokens one way or another—which StakeHound did not accept—CNL requested that the storage of the withdrawal key for the Native Tokens be split between StakeHound and Fireblocks, to reduce the risk of theft and lost keys. Again, StakeHound honored CNL's request. Fireblocks was never an agent for StakeHound. Fireblocks had no right to represent StakeHound; it simply held keys and provided secure wallet functionality.

21. Jason Stone also introduced me to other players in the crypto market, as CNL sought to maximize the benefits of its relationship with StakeHound through integration with protocols that CNL wanted to list on their platform or from which it wanted to earn rewards. ~~Among these were Bison Trails and Totle, Inc., with which StakeHound did not ultimately~~

7

~~partner. Stone also made introductions with Horizen Labs, Inc. StakeHound entered into a memorandum of understanding with Horizen on March 9, 2021 and a Token Listing Agreement with the related entity Zen Blockchain Foundation on January 7, 2021 pursuant to which StakeHound agreed to list stakedZEN on the Platform~~.

**III.    Negotiation of the SSA and CNL's Transfer of ETH to StakeHound**

22.     While the initial negotiations between the Parties were ongoing, in late November 2020, the ETH2 locking event occurred, allowing ETH token holders to stake their tokens until the launch of the upgraded blockchain Ethereum 2. CNL was very eager to be among the first to be staking ETH as this early participation was anticipated to achieve a higher monetary yield. Therefore, without my knowledge, CNL decided to stake approx. 25,000 ETH of its own accord on ~~24 November~~ in early December 2020.  At that time, negotiations between StakeHound and CNL had been ongoing for months, but the parties had not yet signed a definitive agreement.

23.     CNL then approached StakeHound and asked to exchange these approx. 25,000 ETH (now locked and accruing staking rewards) (the "***Locked ETH***") for the staked token called staked ETH ("***stETH***") via the Platform so they may be deployed in the DeFi while earning Staking Rewards.

24.     It was not StakeHound's standard practice to accept already staked tokens, but seeing the opportunity to grow StakeHound's business, we decided to explore how to best approach a possible transfer of the Locked ETH.  This led to the negotiation of the SSA. The main issue with respect to the Locked ETH was that the withdrawal keys of these Locked ETH could not be modified. This meant that once the Locked ETH would be unlocked, after the launch of the upgraded blockchain Ethereum 2, CNL would still have access to these (formerly) Locked ETH. In order to ensure the transfer of the Locked ETH to StakeHound's secure

8

accounts, we had to design a complex set-up using a third-party provider. These business issues and resolutions were all reflected in the SSA.

25.     Prior to ~~November 2020~~January 2021, when CNL initiated the transfer of the Locked ETH to StakeHound, StakeHound did not have an account with Staked.us. Because CNL had on their own determined to stake the Locked ETH with Staked.us, in order to receive the transfer of the applicable nodes, StakeHound was required to open an account with Staked.us.

26.     The SSA was negotiated between the ~~end~~beginning of ~~November~~December 2020 and January 20, 2021, when it was signed. Both Parties were represented by lawyers. StakeHound's counsel was Swiss law firm OA Legal; CNL's law firm was an Israeli law firm Herzog Fox & Neeman. On 30 November 2020, CNL performed and passed the necessary KYC/AML with our Swiss-based compliance provider Altcoinomy.

27.     During the negotiations of the SSA, the issue of ownership of and control over the Native Tokens arose again, when Yarden Noy, CNL's outside counsel and later Head of Regulation, proposed a clause 1.9 by which StakeHound would have granted CNL a "*first priority lien in and to the Assets*". StakeHound did not accept this change and the proposed clause was deleted from all further drafts and the executed version of the SSA. Indeed, StakeHound was very firm and repeated several times that it would only conclude the SSA if it would obtain the sole ownership of the Locked ETH, for the same reasons as previously explained to CNL. CNL finally understood this and expressly accepted that StakeHound would be the sole owner of the Locked ETH. This agreement is reflected in the explicit wording of the SSA, which provides in Clause 1.3 that "*StakeHound will have the legal ownership of those Locked ETH.*"

9

28. Apart from the fact that the Native Tokens which StakeHound was to receive under the SSA were already staked, it was the intention of the Parties to apply the standard terms and conditions as they had been discussed among the parties. Accordingly, the StakeHound Services Terms and Conditions were expressly included in the SSA and made an integral part of the agreement. Clause 1.1 of the SSTC states: "*For the avoidance of doubt, [StakeHound] will have the ownership of the Native Token, as the latter is used to pay the Staking Services of the Company.*"

29. On 23 January 2021, CNL shared the private keys with StakeHound which would give access to the Locked ETH pursuant to section 1.2 of the SSA. In return, StakeHound generated, i.e. minted, and issued to CNL stETH at the exchange rate of 1:1 with the Locked ETH pursuant to section 1.3 of the SSA.

30. Subsequently, on 2 February 2021, CNL transferred an additional 35,000 ETH solely pursuant to the SSTC. No separate agreement was necessary, because these 35,000 ETH were not yet staked and therefore no special set-up was necessary. In return, StakeHound minted and issued 35,000 stETH to CNL immediately thereafter.

**IV.    CNL's Transfer of MATIC and DOT to StakeHound**

31. Following the successful transfers of ETH, I discussed with Roni Cohen-Pavon and Ron Sabo ways to expand the relationship between CNL and StakeHound. Together, we prepared a "wish list" of assets for which CNL wanted to transact with StakeHound. The parties also discussed entry of a revenue sharing agreement related to Staking Rewards, which resulted in execution of the RSA. Like the SSA, the RSA incorporated fully the SSTC. Each Party was represented by the same lawyers as during the previous negotiation of the SSA.

32. Under the RSA, on 27 April 2021, CNL transferred 40 million MATIC to StakeHound and in return received 40 million stMATIC. Moreover, CNL transferred 66,000 DOT to StakeHound and in return received 66,000 stDOT on 28 April 2021. As was the case with the Native Tokens for the ETH, StakeHound retained ownership at all times of the Native Tokens for the MATIC and the DOT.

V.    **Fireblocks Key Management Incident**

33. On 2 May 2021, Fireblocks informed StakeHound that 38,178 ETH, or approximately 60% of the total of StakeHound's ETH, may no longer be accessible because Fireblocks failed to secure their crypto-graphic private keys ("**Key Management Incident**"). StakeHound informed CNL about the Key Management Incident ~~the next day~~within 48 hours, and asked for support and assistance in pursuing rights and remedies against Fireblocks. Unfortunately, StakeHound's attempts to resolve the issue with Fireblocks did not lead to an agreed resolution, and StakeHound was compelled to initiate legal proceedings in Israel against Fireblocks in order to restore the balance of the available Native Tokens and stTokens on the Platform. These proceedings are currently ongoing.

34. Due to the Key Management Incident, on 22 June 2021, StakeHound decided to suspend the operation of the Platform in order to devote its full attention to the recovery of the loss. In particular, in view of the severity of the Key Management Incident, StakeHound halted its liquid staking activities with immediate effect (the "**Suspension**") in line with the SSTC, which provide as follows (emphasis added):

> "    2.    ***Termination and access restriction***
> *[…]*

" *The* **Company may suspend** *an account or a transfer of StakedTokens temporarily and* **access to the Platform** *or stop any transaction* **immediately at any time, without notice, at its sole discretion**.*"*

**VI.    Current Operations During Suspension**

35.    The Suspension is ongoing and StakeHound currently does not exchange stTokens such as stETH, stMATIC and stDOT for Native Tokens.  However, this does not mean that StakeHound's business is defunct.  To the contrary, StakeHound generates revenue by staking the Native Tokens it owns and receives Staking Rewards.  Notably, this has been the business model since before the Key Management Incident.

36.    The Native Tokens which StakeHound has staked currently generate Staking Rewards of approximately $300,000 per month, depending on the price fluctuations and activity levels on the networks.  It was with this revenue alone that StakeHound has managed to fund all operations and even legal proceedings over the last two years prior to the initiation of these proceedings.

37.    The costs incurring to StakeHound include the operating costs of staking nodes, which amount to approx. $80,000 per month representing the contract rate before discounts and rebates, plus salaries, and fees for custody, compliance, accounting and other ordinary course business obligations.  If StakeHound were to stop staking the Native Tokens, it would lose out on potential revenue.

38.    In addition to its ordinary course expenses, StakeHound continues to incur necessary legal fees to defend its claims in this proceeding and to prosecute its claims against Fireblocks.  In connection with the Fireblocks proceeding, StakeHound expects it will have to incur substantial court costs in the near term which are a necessary predicate to its continuing its

12

action to recover damages for the loss of access to the ETH which were affected by the Key Management Incident and for damages to the business of StakeHound.

39. Over the period beginning August 8, 2023, when StakeHound first agreed with CNL to a total freeze on its use of Staked Tokens and Rewards, through and including the hearing scheduled for September 27, 2023 (the "**September 27 Hearing**"), StakeHound estimates that its legal fees will total $1,500,000 and ordinary course expenses will total $500,000. In addition, StakeHound must be permitted to incur court costs in the Fireblocks litigation if and as assessed without restriction in order to continue to bring its claims there.

40. On August 11, 2023, the parties sent a joint letter to the Swiss arbitrator requesting that he "*not take or require any further activity in connection with the Arbitration until further order of the Bankruptcy Court, or until jointly instructed by the parties, neither party to unreasonably withhold such instruction.*" A true and correct copy of the joint letter is attached hereto as **Exhibit C**. StakeHound intends to abide by, and has no intention of repudiating, its commitments pursuant to the joint letter until the court rules following the September 27 Hearing.

41. StakeHound's current focus is to recover damages for the loss of access to the ETH which were affected by the Key Management Incident and for damages to the business of StakeHound. The damages sought from Fireblocks are mainly intended to restore the Native Token balance and to fully restore the Platform's operations. I would like to emphasize that StakeHound does not hold any crypto assets "hostage." StakeHound is the legal and beneficial owner of all of the Native Tokens which were transferred to StakeHound from CNL and has no obligation to exchange stTokens for Native Tokens. This was expressly agreed with CNL, namely with Jason Stone ~~and CNL's counsels~~, Roni Cohen-Pavon and CNL's counsel Yarden

13

Noy at the time.

14

42. StakeHound has no intention to dissipate its assets, and seeks only to use its assets for the payment of ordinary course expenses and necessary legal fees and costs. Indeed, as of the date of this Declaration, StakeHound has never used its assets for anything other than its operational and legal costs. StakeHound's digital assets can be tracked on the blockchain and CNL has all the necessary in-formation to be able to do so, as StakeHound has provided it on multiple occasions.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ~~25th~~22nd day of ~~August~~September, 2023
Barcelona, Spain

                                                    */s/ Albert Castellana Lluís*
                                                  Albert Castellana Lluís
                                                  Chief Executive Officer
                                                  StakeHound S.A.