# **EXHIBIT A**

**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted *pro hac vice*)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A.*

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

In re:

CELSIUS NETWORK LLC, *et al.*,[1]

                            Debtors.           Chapter 11

           Case No. 22-10964 (MG)
           Jointly Administered

CELSIUS NETWORK LIMITED,

                            Plaintiff

                  v.

STAKEHOUND SA,

                   Defendant

                   ~~Chapter 11~~

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

~~Case No. 22-10964 (MG)~~
~~Jointly Administered~~
Adversary Proceeding

No. 23-01138 (MG)

### DEFENDANT STAKEHOUND, S.A.'s
### <u>AMENDED</u>[2] MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL
### ARBITRATION OR, IN THE ALTERNATIVE, FOR ABSTENTION

~~[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The Debtors' service address in these Chapter 11 Cases is 121 River Street, PH05, Hoboken, New Jersey (07030).~~

[2] A redline reflecting changes to the memorandum originally filed as ECF No. 46 is attached hereto as **Exhibit A**.

## TABLE OF CONTENTS

ARGUMENT ..................................................................................................................... 9

    I.     The Court Should Decide This Motion as a Threshold Matter 10. ........................ 9

    II.    The Court Should Compel Arbitration. .......................................................... 10

        A.    Legal Standard .................................................................................. 11 10

        B.    The Parties Agreed to Arbitrate. ....................................................... 12

        C.    The Arbitration Provision is Broad and Covers This Dispute. ............ 13

        D.    Congress Did Not Intend to Exclude This Dispute From Arbitration. .... 14

    III.   The Court Should Abstain from  Exercising Jurisdiction on International Comity
         Grounds. ............................................................................................... 19 18

        A.    Legal Standard .................................................................................. 19

        B.    The Abstention Factors Favor Dismissing This Action. ...................... 20

        C.    In re Koreag Requires Abstention in Favor of the Swiss Arbitration. ... 22

    IV.   The Court Should Stay Any Remaining Claims Pending the Arbitration. .......... 24

    V.    CONCLUSION ............................................................................................ 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Koreag, Controle et Revision S.A.*,
    961 F.2d 341, 349 (2d Cir. 1992) ........................................... 21, 22, 23

*In re Andrew Velez Const., Inc.*,
    373 B.R. 262 (Bankr. S.D.N.Y. 2007) (Glenn, J.) ........................ 1615

*Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel)*,
    390 B.R. 784 (Bankr. S.D.N.Y. 2008) ................................. 11, 12, 13

*Bimota SPA v. Rousseau*,
    628 F.Supp.2d 500 (S.D.N.Y. 2009) ..................................... 1817

*In re Cardali*,
    No. 10-11185 SHL, 2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18, 2010) ...... 16

*In re CIS Corp.*,
    172 B.R. ......................................................... 1817

*Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*,
    58 F.3d 16 (2d Cir. 2000) ............................................ 1413

*CT Inv. Mgmt. Co., LLC v. Cozumel Caribe, S.A. de C.V. (In re Cozumel
    Caribe, S.A. S.A. de C.V.)*,
    482 B.R. 96 ........................................................ 20

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*,
    815 F.2d 840 (2d Cir.1987) ......................................... 2524

*Hilton v. Guyot*,
    159 U.S. 113 (1895) ................................................ 19

*In re Maxwell Commc'n Corp. plc by Homan* ("Maxwell II"), 93 F.3d 1036, 1047
    (2d Cir. 1996) ...................................................... 20

*JLM Industries, Inc. v. Stolt-Nielson SA*,
    387 F.3d 163 (2d Cir. 2004) ........................................ 13

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005) ............................... 2019, 23, 24

*Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'Ship)*,
    277 B.R. 181 (Bankr. S.D.N.Y. 2002) .................. 11, 13, 14, 15, 17, 25

*MBNA America Bank, N.A. v. Hill*,
    436 F.3d 104 (2d Cir. 2006) .................................................................................. 11

*In re MF Global Holdings Ltd.*,
    571 B.R. 80 (Bankr. S.D.N.Y. 2017) (Glenn, J.) ............................................... *passim*

*In re National Bank of Anguilla (Private Banking Trust) Ltd.*,
    580 B.R. 64 (Bankr. S.D.N.Y. 2018) (Glenn, J.) ................................................... 20

*Olin Holdings Ltd. v. State*,
    73 F.4th 92 (2d Cir. 2023) .................................................................................. ~~13~~12

*Ramasamy v. Essar Glob. Ltd.*,
    825 F.Supp.2d 466 (S.D.N.Y. 2011) ..................................................................... 10

*In re Residential Capital, LLC*,
    563 B.R. 756 (Bankr. S.D.N.Y. 2016) ................................................... ~~*passim*~~9–13

*Shiboleth v. Yerushalmi*,
    412 B.R. 113 (Bankr. S.D.N.Y. 2009) .................................................................. 18

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ......................................................................................... ~~10~~9

*In re Sonnax Indus.*,
    907 F.2d 1280 (2d Cir. 1990) .............................................................................. 12

*Spinelli v. National Football League*,
    96 F.Supp.3d 81 (S.D.N.Y. 2015) ....................................................................... 17

*In re Taub*,
    413 B.R. 81 (Bankr. E.D.N.Y. 2009) ................................................................... 18

*Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*,
    425 B.R. 78 (Bankr. S.D.N.Y. 2010) .............................................................. ~~13, 17~~13

*In re Winimo Realty Corp.*,
    270 B.R. 108 (Bankr. S.D.N.Y. 2001) .................................................................. 15

**Statutes**

9 U.S.C. §§ 2 & 3 ....................................................................................... ~~11~~10

Federal Arbitration Act ...................................................................................... 10

Defendant StakeHound S.A. ("***StakeHound***"), by its attorneys Locke Lord LLP, respectfully submits this memorandum of law in support of its motion: (i) to lift the automatic stay, compel arbitration and stay this action pending arbitration; and/or (ii) for the Court to abstain from exercising jurisdiction and dismiss or stay this action on international comity grounds.[23]  In support of the Motion, StakeHound also submits the Declaration of Albert Castellana Lluís [ECF No. 43].

## PRELIMINARY STATEMENT

1.    Plaintiff Celsius Network Limited ("***CNL***") has a number of pending disputes with StakeHound as to the parties' rights and claims under the agreements between them.  Those agreements require that such disputes be arbitrated, and there is already a pending arbitration in the Swiss Arbitration Centre (the "***Arbitration Centre***")—where the parties' outstanding claims and arguments are at issue and may be resolved (the "***Arbitration***").  Now, by initiating this adversary proceeding, CNL is attempting to avoid its binding agreement to arbitrate, and to ask this Court to rule on issues that need to be resolved in the Arbitration.

2.    This Court should not permit CNL to avoid its binding agreement to arbitrate in this manner.  Bankruptcy court litigation would defeat the right to Swiss arbitration for which StakeHound (and CNL) expressly contracted and subvert the strong federal policy in favor of enforcing broad, international arbitration clauses.  Because the Arbitration is pending in

---

[3] StakeHound does not consent to the entry of final orders or judgment by the bankruptcy court.  Further, StakeHound filed, contemporaneously with this motion, a motion to dismiss for lack of personal jurisdiction.  StakeHound filed that motion solely to preserve that defense and to avoid a waiver of rights.  For the reasons discussed below, StakeHound respectfully requests that the Court decide this motion before considering StakeHound's motion for personal jurisdiction.

Switzerland, principles of comity also strongly support this Court abstaining from hearing this dispute.  Any of these grounds would be sufficient for this Court to order CNL to arbitration, and

 to stay the balance of the adversary proceeding.  Taken together, these grounds strongly support an order referring the issues in the adversary proceeding to arbitration.

3.      The dispute between CNL, a U.K. limited company, and StakeHound, a company organized under the laws of Switzerland, is governed by three agreements:  (1) the Staking Services Agreement, dated January 20, 2021  (the "**SSA**"); (2) the Revenue Sharing Agreement, dated April 21, 2021 (the "**RSA**"), pursuant to which the parties entered into two term sheets, one relating to 66,000 DOT tokens and the other relating to 40,000,000 MATIC tokens; and (3) StakeHound's Services Terms and Conditions (the "**SSTC**"), attached to the SSA and RSA as Exhibit B.

4.      By their terms, the SSA, SSTC and RSA all are governed by Swiss law and contain exceedingly broad arbitration clauses that require all claims, controversies and disputes arising out of or related to the agreements to be determined by binding arbitration in Geneva with the Arbitration Centre. StakeHound commenced the Arbitration with the Arbitration Centre on April 24, 2023, seeking a resolution of these contractual disputes.[34]  Through its recently filed adversary proceeding, however, CNL now seeks to evade the arbitral forum to which it agreed.

---

1.      3

[4] CNL has taken the position that the commencement of the Arbitration violates the automatic stay applicable to the Chapter 11 proceedings commenced by CNL and its affiliates.  Without admitting liability in connection with any alleged automatic stay violations, StakeHound participated in a joint update to the arbitrator, requesting that activity in the Arbitration be paused while the parties litigate the threshold procedural issues described in this brief.

Even if this Court could exercise jurisdiction over StakeHound or these proceedings, which it cannot, the weight of the caselaw dictates that it should abstain from doing so.

5.      This Swiss law contract dispute is a non-core proceeding that should be adjudicated in the agreed-to Swiss forum, and applicable law counsels this court to compel arbitration of the parties' non-core disputes. Even if these matters were core, as will be described later, the weight of the case law strongly supports the Court's abstention under these circumstances.

6.      As StakeHound demonstrates below, the claims originally pled by CNL hinge upon the parties' rights and claims under the applicable agreements, and the plain language of those agreements as to who owns the Native Tokens.  Those claims are plainly arbitrable under the relevant agreements.  Through its recently filed amended complaint, CNL appears to be making a misguided attempt to transform arbitrable contract claims into (CNL hopes) non-arbitrable, extra- contractual claims. In particular, CNL raises two claims purportedly based on the Bankruptcy Code and four extra-contractual common law claims.  For the reasons discussed below, CNL's attempt to escape the arbitrability of this dispute fails.  Each new claim, like each original claim, is based on the (false) premise that CNL either owns the Native Tokens or is entitled to exchange its tokens for Native Tokens.  Each new claim either turns on the resolution of the parties' contractual disputes in arbitration, or must await such arbitral resolution.  Consequently, each claim in the amended complaint should either be sent to

arbitration or stayed pending the arbitrator's resolution of the predicate issues on which such claims rely.

7.      Critically, the plain language of the parties' agreements establishes that StakeHound alone owns the Native Tokens that CNL seeks to recover.  That is to say, CNL's claims are defeated by the express terms of the governing agreements in this case.  The interpretation of this contractual language is at the heart of every claim CNL has sought to raise in this adversary proceeding.  That issue must be decided in the Arbitration before there can be any finding that StakeHound has acted to exercise control over property of the estate—among other reasons because *the agreements refute CNL's argument that the assets at issue are estate property*.

### FACTS

### The Parties

8.      StakeHound is a *société anonyme* incorporated under the laws of Switzerland with registered offices at Place de Longemalle 1, c/o MN & Associés SA, 1204 in Geneva, Switzerland.  FAC ¶ 14.[45]  StakeHound operates the currently suspended[56] online platform "StakeHound.com," which was launched in October 2020. The Platform facilitates liquid staking. Staking is a process in which cryptocurrency holders volunteer to lock their crypto assets ("Native Tokens") to support the operation of a Proof of Stake blockchain. Once staked, the

---

2.      4

[5] For purposes of this motion, StakeHound refers to allegations in CNL's first amended adversary complaint (the "*FAC*") without any admission as to the truth of those allegations.

3.      5

[6] CNL has sought, at various points in these proceedings, to equate the suspension of StakeHound's platform to a discontinuance of operations.  CNL offers no competent evidence in support of this point, and indeed StakeHound does still engage in certain operating activities.

Native Tokens are used to validate transactions on the network. In return for staking Native Tokens, their holders receive a share of the transaction fees or newly created cryptocurrencies ("Staking Rewards"). FAC ¶¶ 2-3; 28. In certain relationships and transactions, a user will convey its native tokens to StakeHound, and StakeHound will then mint and issue tokenized representations of such native tokens (an "stToken") to the user—in this case CNL. The stToken can be used and traded by its holder, minimizing the disadvantages of staking the native tokens. In addition, StakeHound distributes rewards to holders of the stToken as and when required under the relevant agreements, terms and conditions.

9.StakeHound does not do business in the United States nor with parties located in the United States. In fact, as explained in more detail below, StakeHound's terms and conditions expressly prohibit any person or corporate entity located, domiciled, or established in the United States from using or attempting to use StakeHound's services.

9.    10.CNL is a private limited company incorporated under the laws of England and Wales.  FAC ¶ 13.

**The Contracts**

    **The SSA**

10. ~~11.~~On January 20, 2021, CNL and StakeHound entered into the SSA.  *See* SSA, ECF No. 10-21.  Under the SSA, CNL agreed to transfer ownership of 25,000 native ETH plus accumulated staking rewards that CNL previously had staked in November or December of 2020 (the "***November 2020 Staked ETH***") to StakeHound in exchange for StakeHound minting and issuing to CNL an equivalent amount of wrapped ETH (or "***stETH***").  FAC ¶¶ 32, 38; SSA §§ 1.2, 1.3.

11. ~~12.~~Under Section 1.3 of the SSA, Celsius transferred legal ownership of the November 2020 Staked ETH to StakeHound.  SSA § 1.3.  The parties agreed those tokens would remain locked for about two years and neither party would dispose of the assets until the completion of a major upgrade to the Ethereum blockchain.  *Id.* § 1.4.  After that upgrade, StakeHound would transfer the tokens and associated rewards to a digital wallet owned by StakeHound.  *Id.* § 1.5.  Following the successful transfer into StakeHound's wallet, CNL would be entitled to exchange, "upon availability," its stETH for ETH through StakeHound's platform only "in accordance with StakeHound Services Terms and Conditions."  The SSA incorporates the SSTC by reference and attaches it as Exhibit B.  *Id.* at Ex. B.

12. ~~13.~~The SSA is governed by Swiss law.  *Id.* § 9.  It also contains a broad arbitration clause requiring arbitration in Switzerland of all disputes arising out of or relating to the agreement:

> "**Any dispute, controversy or claim arising out of or in relation to this contract, including the validity, invalidity, breach of termination thereof**, shall be settled by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these Rules."

*Id.* § 10.   (emphasis added)

**The SSTC**

13.    ~~14.~~The SSTC are StakeHound's terms and conditions governing the use of its staking services.  Under the SSTC, StakeHound takes and has ownership of all native tokens provided to it by customers using StakeHound's staking services, like CNL.  *See* SSTC, Services of the Company, Staking, ECF No. 10-21 at p. 27 ("For the avoidance of doubt, [StakeHound] will have the ownership of the Native Tokens.")

14.    ~~15.~~The SSTC also contain the following provisions:

i.     Subject to satisfactory completion of the KYC/AML due diligence process outlined in the SSTC, holders of Staked Token(s) may buy upon availability Native Token(s) with the holder's Staked Token(s), at the same value in the equivalent crypto currency; *Id.* at p. 27

ii.    StakeHound makes no representations or warranties that its platform will always be "available, accessible, uninterrupted, timely, secure, operate without error, or will contain any particular features or functionality;" *Id.*

iii.   StakeHound "may suspend…access to the Platform…immediately at any time, without notice, at its sole discretion;" *Id.* at p. 33, and

iv.    Users in the United States are prohibited from accessing StakeHound's platform.  *Id.* at p. 36.

15.    ~~16.~~The SSTC are governed by Swiss law.  SSTC § 3.d.  They contain the same broad arbitration clause as the SSA, requiring arbitration in Switzerland of all disputes, controversies or claims related to the SSTC or the use of StakeHound's services.  *Id.* § 3.a, *see supra* ¶ 15.

16.    ~~17.~~On February 2, 2021, CNL transferred ownership of another 35,000 native ETH (the "***February 2021 Staked ETH***") to StakeHound under the SSTC.  StakeHound staked the February 2021 Staked ETH and minted and issued to CNL 35,000 stETH.  FAC ¶ 38.

**The RSA**

17.    ~~18.~~On April 21, 2021, CNL and StakeHound entered into the RSA, which governs the parties' sharing of certain rewards generated from StakeHound's staking of native tokens provided to it by CNL.  *See* RSA, ECF No. 10-22, §§ 2.1-2.7.  Specifically, StakeHound agreed to share 25% of the "Net Reward" (as defined in the RSA) generated from staking the native tokens.  *Id.* §§ 1, 2.3.  Revenue share would be paid in stTokens monthly.  *Id.* § 2.5.

18.    ~~19.~~Pursuant to term sheets governed by the RSA, CNL transferred to StakeHound 40,000,000 native MATIC tokens and 66,000 native polka DOT tokens (these together with the November 2020 Staked ETH and February 2021 Staked ETH are the "***Native Tokens***").  FAC ¶¶ 39-40.  In exchange, StakeHound minted and issued to CNL 40,000,000 stMATIC and 66,000 stDOT tokens.  *Id.*

19.    ~~20.~~The RSA incorporates the SSTC by reference and attaches the SSTC as Exhibit B.  RSA § 2.1 and Ex. B.  The RSA is governed by Swiss law.  *Id.* § 9.  It contains the same broad arbitration clause as the SSA and SSTC, requiring Swiss arbitration of all disputes. *Id.* § 10.

**The Arbitration**

20.    ~~21.~~On June 22, 2021, StakeHound suspended operation of its platform following the loss by Fireblocks (a blockchain security service provider recommended to StakeHound by Celsius) of private keys to approximately 60% of StakeHound's staked ETH.  FAC ¶¶ 42-43.  On April 10, 2023, CNL demanded that StakeHound exchange CNL's stETH for a corresponding number of StakeHound's ETH.  *Id.* ¶ 44.  On April 11, 2023, StakeHound responded that, *inter alia*, CNL was not entitled to a one-to-one exchange of stETH for ETH.  *Id.* ¶¶ 47-48.  On April

12, 2023, the Ethereum blockchain upgrade event occurred. *Id.* ¶ 48.  On April 17, 2023, CNL reiterated its demand to exchange its stETH for StakeHound's native ETH. *Id.* ¶ 49.

21.    22. On April 24, 2023, in accordance with the terms of those agreements, and to protect its rights, StakeHound commenced an arbitration in Switzerland seeking declarations that: (i) StakeHound has validly suspended the operation of its platform; (ii) StakeHound has no obligation to exchange stETH for ETH during the suspension of the platform; and (iii) the ratio for any exchange of ETH for stETH is set by the respective values of ETH and stETH at the time of such exchange. *Id.* ¶ 51.  StakeHound commenced the Arbitration because the parties' agreements require resolving disputes through Swiss arbitration.

22.    23. On May 1, 2023, CNL filed an Answer in the arbitration.  On May 25, 2023, CNL demanded the exchange of CNL's stDOT and stMATIC tokens for at least the same number of StakeHound's native DOT and MATIC tokens. *Id.* ¶ 57.  In June 2023, CNL requested that the Arbitration Centre dismiss the Arbitration considering these bankruptcy proceedings.  On July 3, 2023, the Arbitration Centre denied CNL's request and determined it will proceed with the Arbitration, without prejudice to the arbitrator's ability to determine later questions concerning the tribunal's jurisdiction and the arbitrability of the dispute.

**The Adversary Proceeding.**

23.    24. On July 11, 2023, after failing to convince the Arbitration Centre to dismiss the Arbitration, CNL commenced this proceeding.  In its original complaint,[67] CNL asserted three claims, all of which require interpretation of the SSA, RSA or SSTC: (1) violation of the automatic stay based on commencement of the Arbitration; (2) turnover of the Native Tokens on

---

4.    6

[7] StakeHound will abbreviate references to the original complaint as "Compl."

the grounds that they are property of the estate or that StakeHound owes a debt of equivalent value based on StakeHound's purported failure to perform its alleged contractual obligations; and (3) breach of the SSA and RSA for failing to provide CNL with the Native Tokens.  Compl. ¶¶ 50-71.

24.    ~~25.~~During hearings held on August 2 and August 7, 2023, this Court indicated that the arbitrability of CNL's claims was a threshold issue and that it would consider a motion to compel arbitration on an expedited basis.  On August 22, 2023, the Court ordered StakeHound to file this motion by Friday, August 25, 2023.  A few hours later, just three days before the deadline to file this motion and over three weeks after the Court first acknowledged that it would entertain a

 motion to compel arbitration, CNL filed a first amended adversary complaint, adding six new causes of action: (1) turnover of documents related to debtor's property; (2) disallowance of StakeHound's nonexistent claim; (3) unjust enrichment; (4) conversion; (5) imposition of a constructive trust; and (6) a request for an accounting of profits.  Each of these claims assumes— contradicted by the plain language of the parties' agreements—that the Native Tokens are property of the estate.

## **ARGUMENT**

25.    ~~26.~~The Court should lift the stay and compel arbitration of CNL's claims and stay any remaining claims pending resolution of the Arbitration, or abstain from exercising jurisdiction over CNL's claims under principles of international comity.  The basis for relief under both theories is the same: this is a contract dispute between two non-U.S. parties involving pre-petition contracts that, as this Court noted on August 2, 2023, are governed by Swiss law and contain a broad, mandatory arbitration provision requiring dispute resolution by arbitration in Geneva.

26.    27.CNL's claims for breach of contract, unjust enrichment, conversion, turnover, constructive trust and an accounting are arbitrable because they arise out of, and require interpretation of, the parties' agreements.  Resolving those claims requires consideration of the same fundamental questions as resolving StakeHound's claims for declaratory relief in the Arbitration.  Those questions are, among others: the validity and effect of the parties' contracts, who owns the Native Tokens and what are the parties' rights, obligations and entitlements under those contracts?  The question for this Court is who should decide those issues, a New York bankruptcy court or the Swiss arbitrator?  Because the parties broadly and unequivocally agreed to arbitrate all issues related to their contracts, the Swiss arbitrator should answer those questions.

## I.    **The Court Should Decide This Motion as a** Threshold **Matter.**

27.    28.The Court should decide this motion before considering any other pending motion because doing so likely will moot, or at least defer, consideration of the other motions.  A "federal court has leeway to choose among threshold grounds for denying audience to a case on the merits."  *See In re Residential Capital, LLC*, 563 B.R. 756, 766 (Bankr. S.D.N.Y. 2016) (*quoting Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)).  Relying on *Sinochem*, courts routinely consider motions to compel arbitration before addressing issues of personal jurisdiction when resolving the motion to compel would largely moot the other motions or avoid unnecessary discovery.  *See In re Residential Capital*, 563 B.R. at 766; *Ramasamy v. Essar Glob. Ltd.*, 825 F.Supp.2d 466, 467 n. 1 (S.D.N.Y. 2011) (compelling arbitration without reaching defendant's motion to dismiss for lack of personal jurisdiction).

## II.      **The Court Should Compel Arbitration.**

28.      ~~29.~~This Court should lift the automatic stay and compel arbitration of CNL's breach of contract, turnover, unjust enrichment, conversion, constructive trust and accounting claims (the "Arbitrable Claims") in Switzerland because the parties agreed in every relevant contract to resolve all disputes related to those contracts by Swiss arbitration.  The arbitration provision is broad, and applies by its terms to the Arbitrable Claims.  Moreover, the strong federal policy favoring enforcement of arbitration clauses—which is even stronger here because this is an international arbitration clause—outweighs the federal interests embodied in the Bankruptcy Code.  The Arbitrable Claims are non-core, which further establishes strong cause for this Court to compel arbitration.  And even if any of the Arbitrable Claims were core, the Court still should compel them to arbitration because that would not seriously jeopardize the objectives of the Code.

### A.      **Legal Standard**

29.      ~~30.~~The Federal Arbitration Act ("FAA") requires federal courts to enforce arbitration agreements and dismiss or stay litigation that contravenes them. *See In re MF Global Holdings Ltd.*, 571 B.R. 80, 89 (Bankr. S.D.N.Y. 2017) (Glenn, J.) (citing *Burns v. New York Life Ins. Co.*, 202 F.3d 616, 620 (2d Cir. 2000)); *see also* 9 U.S.C. §§ 2 & 3.  The FAA is Congress's "declaration of a liberal federal policy favoring arbitration agreements," and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (*quoting Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'Ship)*, 277 B.R. 181, 197 (Bankr. S.D.N.Y. 2002).

30.      ~~31.~~The "federal policy favoring recognition of arbitration agreements is particularly strong for international agreements." *Bethlehem Steel Corp. v. Moran Towing Corp.*

*(In re Bethlehem Steel)*, 390 B.R. 784, 795 (Bankr. S.D.N.Y. 2008).  Thus, the strong policy in favor of international arbitrations generally trumps a bankruptcy court's interest in adjudicating issues that fall within the scope of the arbitration provision.  *See In re Residential Capital*, 563 B.R. at 767.

31.  ~~32.~~To resolve conflicts between these two public policies, courts "distinguish between claims over which bankruptcy judges have discretion to refuse arbitration and those that they must send directly to arbitration."  *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006).  Generally, bankruptcy courts must compel arbitration of non-core matters or matters merely "related to" bankruptcy cases.  *Id.* (*quoting In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 166 (2d Cir. 2000)).  For core proceedings, bankruptcy courts still must compel arbitration unless "the proceedings are based on provisions of the Bankruptcy Code that 'inherently conflict' with the [FAA] or that arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code."  *Id.* (citing *In re U.S. Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999)).

32.  ~~33.~~Considering these principles, bankruptcy courts analyzing a motion to compel arbitration apply a four-part test:  (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be non-arbitrable; and (4) if some, but not all, claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration.  *See In re MF Global*, 571 B.R. at 89-90 (*quoting In re Bethlehem Steel*, 390 B.R. at 789).  Applying this test, the Court should lift the automatic stay, compel arbitration, and stay the balance of the case.[78]

---

5. ~~7~~

[8] Typically, bankruptcy courts analyzing a request for relief from the automatic stay apply the balancing test set forth in *In re Sonnax Indus.*, 907 F.2d 1280, 1286 (2d Cir. 1990).  However, "[b]ecause of the strong federal policy favoring arbitration," the *Sonnax* balancing test does not apply to motions to compel arbitration.  It is replaced entirely by the four-part test stated above.  *See In re Hagerstown*, 277 B.R. at 204.

**B.**    **The Parties Agreed to Arbitrate.**

33.    ~~34.~~The parties undoubtedly agreed to arbitrate.  The SSA, RSA and SSTC all contain the same broad arbitration provision requiring Swiss arbitration:

> "Any dispute, controversy or claim arising out of or in relation to this contract, including the validity, invalidity, breach of termination thereof, shall be settled by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these Rules."

34.    ~~35.~~CNL is a party to the SSA and RSA, which incorporate by reference and attach the SSTC.  CNL's claims arise out of, relate to and are governed by these three agreements.  Whatever the merits of CNL's demand for turnover of the Native Tokens and related rewards—and we contend that demand is wholly meritless—the issue must be decided with reference to the parties' agreements.  In other words, this is a pure contractual dispute, and the contracts in question each

contain a broad, binding arbitration clause.  Consequently, CNL agreed to arbitrate.  *See In re MF Global*, 571 B.R. at 91-92; *In re Residential Capital*, 563 B.R. at 768.[89]

---

[8]

[9]  StakeHound's argument is not a waiver of its position that the Swiss arbitrator should determine the question of arbitrability in the first instance. When an arbitration provision incorporates arbitration rules that "empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Olin Holdings Ltd. v. State*, 73 F.4th 92, 105 (2d Cir. 2023).  Here, the arbitration provision incorporates the Swiss Rules of International Arbitration.  *See supra* ¶ 16.  Article 23 of those rules empowers the arbitrator to rule on "any objections to its jurisdiction, including regarding the existence, validity or scope of the Arbitration Agreement."  *See* Swiss Rules of International Arbitration, art. 23, https://www.swissarbitration.org/wp-content/uploads/2023/08/Swiss-Rules-2021-EN.pdf.  The Second Circuit recently held that parties whose arbitration agreement incorporates arbitration rules containing similar language have "clearly and unmistakably" agreed to send questions of arbitrability to the arbitrator in the first instance.  *See Olin Holdings*, 73 F.4th at 106.

**C.**    **The Arbitration Provision is Broad and Covers This Dispute.**

35. ~~36.~~The second inquiry is whether the arbitration provision is "narrow" or "broad." *In re MF Global*, 571 B.R. at 92 (*quoting In re Bethlehem Steel*, 390 B.R. at 789-90).  If it is broad, arbitrability is presumed.  *See id.*  The Court should resolve any doubts concerning the scope of arbitrable issues in favor of arbitration.  *See id.* (*quoting Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 425 B.R. 78, 86-87 (Bankr. S.D.N.Y. 2010)).

36. ~~37.~~Here, the arbitration provision unquestionably is broad.  In *In re Residential Capital*, the court described an arbitration provision as "exceedingly broad" because it contained the language: "**[a]ny dispute, controversy or claim arising out of or relating to** this Policy or the breach, termination or invalidity thereof."  563 B.R. at 769 (emphasis in original).  The arbitration provision here contains nearly identical language: "**Any dispute, controversy or claim arising out of or in relation to this contract**, including the validity, invalidity, breach or termination thereof, shall be settled by arbitration."  *See supra* ¶ 15.  And, other courts in this Circuit and District have found similarly worded provisions to be broad.  *See, e.g., JLM Industries, Inc. v. Stolt-Nielson SA*, 387 F.3d 163, 167 (2d Cir. 2004); *In re MF Global*, 571 B.R. at 92-93; *In re Hagerstown*, 277 B.R. at 204-05.

37. ~~38.~~Having established the arbitration provision is broad, CNL's claims fall within that provision if they "arise out of" or "relate to" the agreements.  *See In re Residential Capital*, 563 B.R. at 770.  For that inquiry, courts look to the "allegations in the complaint, not the legal theories espoused," (*id.* (*quoting In re Hagerstown*, 277 B.R. at 198) and compel arbitration when the allegations in the complaint "touch matters covered by the parties~~'…'~~'…agreements." *See Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20-21 (2d Cir. 2000).

38.    ~~39.~~The Arbitrable Claims "touch matters covered by the parties' agreements" and therefore arise out of and relate to those agreements.  The Arbitrable Claims allege that CNL owns the Native Tokens.  FAC ¶¶ 66, 77, 79, 82, 89-90, 96, 99, 105-06, 111.  StakeHound disputes that allegation; the contracts state that StakeHound owns the Native Tokens.  But that is the point: resolution of those claims turns on interpretation of the contracts.  There is no clearer way for the claims to "arise out of" a contract.  These claims also allege that CNL possesses, and attempted to exercise, a contractual right to a one-to-one exchange of its stTokens for StakeHound's Native Tokens.  FAC ¶¶ 77-78, 80, 89-90, 96, 102, 105.  StakeHound also disputes that allegation; the contracts give CNL no right to such an exchange.  Consequently, resolving these claims turns on interpreting the contracts and therefore they arise out of and relate to those contracts.

### D.    Congress Did Not Intend to Exclude This Dispute From Arbitration.

39.    ~~40.~~The third factor requires the court to weigh the strength of the policy in favor of arbitration against the federal interests in the Bankruptcy Code.  *See In re MF Global*, 571 B.R. at ~~93.~~ 93.  This two-step process first asks whether the proceeding is core or non-core.  If it is non-core, the court must compel arbitration.  *See MNBA America Bank*, 436 F.3d at 108; *In re MF Global*, 571 B.R. at 93.  If a claim is core, step two requires the court to enforce the arbitration clause unless that would negatively impact any purpose or objective of the Bankruptcy Code.  *Id.* (*quoting In re Hagerstown*, 277 B.R. at 200-01).  This step "asks whether the underlying dispute concerns rights created under the Bankruptcy Code or non-Bankruptcy Code issues derivative of the debtor's pre-petition business activities."  *Id.* (*quoting In re Hagerstown*, 277 B.R. at 202).  In the former situation, the court can refuse to compel arbitration, but in the latter it cannot.  *Id.*

40.   ~~41.~~The Arbitrable Claims are non-core and must be arbitrated.  However, even if the claims were core, they are still arbitrable because they are derivative of CNL's prepetition business activities and arbitrating them would not undermine the objectives or purpose of the Bankruptcy Code.

Breach of Contract — Fifth Cause of Action

41.   ~~42.~~CNL's breach of contract claim is non-core because a breach of contract claim "by a debtor against a party to a pre-petition contract, who has filed no claim with the bankruptcy court, is non-core." *See In re Winimo Realty Corp.*, 270 B.R. 108, 120 (Bankr. S.D.N.Y. 2001) (*quoting Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095, 1102 (2d Cir. 1993)). CNL alleges (incorrectly) that StakeHound breached the SSA and RSA by not providing CNL with the Native Tokens or their equivalent.  FAC ¶ 89.  The SSA and RSA are pre-petition contracts. StakeHound has not filed a claim with the bankruptcy court.  Thus, this claim is non-core and must be arbitrated.

Turnover of Estate Property and Documents — Second and Third Causes of Action

42.   ~~43.~~CNL's causes of action for turnover are non-core and arbitrable because they are premised on the (incorrect) assumptions that CNL owns the Native Tokens or has a contractual right to exchange its stTokens for the Native Tokens.  FAC ¶¶ 77-80.  The contracts refute those assumptions, so resolving these claims requires interpreting those contracts.  While CNL pled these claims as "turnover" of alleged estate property, they are merely claims for specific performance of the contracts based on StakeHound's purported breaches.

43.   ~~44.~~CNL may contend these claims are core because turnover is a creature of the Bankruptcy Code and because these claims seek return of, and documents related to, alleged estate property.   These arguments would fail.   First, turnover is unavailable because the

ownership of the Native Tokens is disputed. *See In re Andrew Velez Const., Inc.*, 373 B.R. 262,

273 (Bankr. S.D.N.Y. 2007) (Glenn, J.) ("it is settled law that the debtor cannot use the turnover

provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.")

44.   ~~45.~~Second, turnover claims are not core just because they arise out of the Code.

Rather, bankruptcy courts compel arbitration of turnover claims that mirror contract claims.  In

*In re Cardali*, a debtor commenced an adversary proceeding asserting contract claims and

turnover against a creditor, seeking return of fees paid to the creditor under an asset purchase

agreement.  *In re Cardali*, No. 10-11185 SHL, 2010 WL 4791801, at * 2 (Bankr. S.D.N.Y. Nov.

18, 2010). The creditor moved to compel arbitration.  The debtor opposed, arguing that the

turnover claim was core and non-arbitrable because it involved estate property and is unique to

the Code.  *Id.*  The court compelled arbitration of the turnover claim because it did not raise "any

unique bankruptcy issue."  *Id.* at *11.  The court reasoned that:

> "Nearly every issue concerning a debtor in bankruptcy relates to
> the debtor's estate. As the Second Circuit observed in *U.S. Lines*, it
> cannot be that all proceedings involving property of the estate are
> core. … Moreover, **the Debtor's reliance on section 542 is
> facially problematic because that section provides only for the
> turnover of undisputed debts, and the alleged debt here is
> clearly disputed.** … **Despite its bankruptcy gloss, count 6 [for
> turnover] appears to be nothing more than an attempt to
> recover some or all of the same disputed money sought in
> counts 1 through 5.**  Given the underlying nature of the parties'
> disagreements and their disputed nature, nothing in count 6 raises a
> unique bankruptcy issue that counsels against proceeding with the
> pending arbitration."

*Id.* (citations omitted)

45.   ~~46.~~That analysis applies here.  CNL's turnover claims are thinly veiled contract

claims over disputed assets.  Their "bankruptcy gloss" cannot defeat the strong federal policy

favoring enforcement of international arbitration awards.

46.    47.Finally, the Court should compel arbitration of these claims even if they were core because doing so would not undermine the Bankruptcy Code.  These claims rise or fall on the issue of who owns the Native Tokens, which requires interpreting the parties' agreements.  The Swiss arbitral tribunal can and *should* do that.  Arbitration will honor and vindicate the contractual choice of forum selected by the parties in their governing agreements.  In sum, the turnover claims are arbitrable because they are "based on the parties' pre-petition relationship" and not based on any "rights created under the Bankruptcy Code." *In re MF Global*, 571 B.R. at 96 (citing *In re Hagerstown*, 277 B.R. at 203).

Unjust Enrichment — Sixth Cause of Action

47.    48.CNL's claim for unjust enrichment is non-core and arbitrable because it is a common law claim "derivative of the Debtor's rights in prepetition business dealings." *See In re S.W. Bach & Co.*, 425 B.R. at 97-98 (compelling arbitration of unjust enrichment claim based on debtor's prepetition business dealings); *see also Spinelli v. National Football League*, 96 F.Supp.3d 81, 101 (S.D.N.Y. 2015) ("It is well established that unjust enrichment claims fall within the scope of broad arbitration clauses").  It relies on the same assumptions, and seeks the same relief as, the breach of contract claim.  StakeHound has not been unjustly enriched.  This claim is arbitrable even if core because it turns on ownership of the Native Tokens, which must be arbitrated and does not conflict with any purpose of the Bankruptcy Code. *See id.* at 98.

Conversion, Constructive Trust and Accounting - Seventh Through Ninth Causes of Action

48.    49.CNL's claims for conversion, constructive trust and accounting of profits are arbitrable.  The conversion claim, which seeks turnover of the Native Tokens or an equivalent value based on CNL's purported "possessory right and interest in the Native Tokens" (FAC ¶¶

99, 101-102) is non-core.  *See In re CIS Corp.*, 172 B.R. at 758 ("Claims asserting the unlawful conversion of property unquestionably arise under state law and are considered non-core").  It is arbitrable because CNL's purported "possessory right" to the assets relates to the parties' contracts.  *See Bimota SPA v. Rousseau*, 628 F.Supp.2d 500, 505 (S.D.N.Y. 2009) (compelling arbitration of conversion claim where claim was based on alleged violations of contractual conditions).

49.    50.CNL's claim for a constructive trust over the Native Tokens based on StakeHound's purported refusal to perform its promise to exchange tokens with CNL (FAC ¶¶ 103-109) is yet another legal theory merely seeking return of the Native Tokens or their value based on disputed allegations over who owns the tokens.  This claim should be arbitrated because it is a non-core, common-law claim.  *See In re Taub*, 413 B.R. 81, 88-91 (Bankr. E.D.N.Y. 2009) (compelling arbitration of constructive trust claim as non-core).

50.    51.CNL's claim for an accounting of profits also is an arbitrable, non-core, common law claim that turns on the incorrect assumption that CNL owns the assets.  For instance, CNL pleads that it is entitled to an accounting because it "entrusted StakeHound with property."  FAC ¶ 111.[91][0]  Moreover, CNL does not base this claim on any right under the Code and, accordingly, it is non-core and should be arbitrated.  *See Shiboleth v. Yerushalmi*, 412 B.R. 113, 117 (Bankr.

---

[6.]    [9]

[10] The use of the word "entrusted" is wholly tactical, and lacking in any evidentiary foundation.  CNL claims to have "entrusted" the Native Tokens to StakeHound, presumably in support of the contention that CNL still owns these assets.  *But the plain language of the agreements refutes this contention*.  And CNL offers no competent evidence for the existence of any kind of trust agreement, bailment, or other fiduciary undertaking by StakeHound.  All of which is to say, CNL *conveyed* the Native Tokens to StakeHound, and any attempt to recharacterize the nature of that conveyance fails for lack of proof.

S.D.N.Y. 2009) ("the accounting action at issue here is a non-core proceeding. Plaintiffs'

claim for an accounting is based on [state law] and is not a right predicated on title 11").

III.    **The Court Should Abstain from
        Exercising Jurisdiction on International Comity Grounds.**

51.    ~~52.~~The adversary proceeding should be dismissed or stayed in favor of the

Arbitration under the doctrine of international abstention.  Abstention is warranted because the

Arbitration is presently pending in Switzerland in accordance with the parties' agreements and it

includes the same parties and issues as this proceeding.

52.    ~~53.~~Moreover, abstention is proper because the dispositive issue of who owns the

Native Tokens is a contract interpretation question of local (*i.e.* Swiss) law "antecedent to the

distributive rules of bankruptcy administration."  U.S. courts apply that rule when deciding *not* to

defer to parallel foreign bankruptcy proceedings.  In other words, U.S. courts generally defer to

parallel foreign bankruptcy proceedings *except* when confronted with an issue of local law,

antecedent to the distributive rules of bankruptcy administration, *e.g.* determining property

ownership under a contract governed by U.S. law.  Because U.S. courts recognize this exception

to deference to foreign bankruptcy proceedings, our bankruptcy courts should allow foreign

tribunals to determine antecedent issues governed by that sovereign's law.

A.    **Legal Standard**

53.    ~~54.~~Comity is "the recognition which one nation allows within its territory to the

legislative, executive or judicial acts of another nation, having due regard both to international

duty and convenience, and to the rights of its own citizens or of other persons who are under the

protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 163—64 (1895).  Comity "is not just a

vague political concern favoring international cooperation when it is in our interest to do so [but r]ather it is a principle under which judicial decisions reflect the systematic value of reciprocal tolerance and goodwill." *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 555, (1987).

54.    55.Adjudicative comity, or comity of the courts, is "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *In re Maxwell Commc'n Corp. plc by Homan* ("Maxwell II"), 93 F.3d 1036, 1047 (2d Cir. 1996); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005). Applying adjudicative comity, courts "ha[ve] the inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *In re National Bank of Anguilla (Private Banking Trust) Ltd.*, 580 B.R. 64, 94 (Bankr. S.D.N.Y. 2018) (Glenn, J.) (citation omitted). This reflects "the proper respect for litigation in and the court of a sovereign nation, fairness to litigants, and judicial efficiency." *Id.* (*quoting Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006) (collecting cases)). Federal courts generally extend comity "whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of the United States citizens or violate domestic public policy." *CT Inv. Mgmt. Co., LLC. v. Cozumel Caribe, S.A. de C.V. (In re Cozumel Caribe, S.A. de C.V.)*, 482 B.R. 96, 114 (Bankr. S.D.N.Y. 2012) (Glenn, J.).

55.    56.Courts analyzing a request for abstention in deference to foreign proceedings consider at least eight non-exhaustive factors: the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign

jurisdiction.  *See In re National Bank of Anguilla*, 580 B.R. at 95 (*quoting Royal and Sun Alliance*, 466 F.3d at 94).

> **B.**    **The Abstention Factors Favor Dismissing This Action.**

56. 57.Here, seven factors favor abstention, and one factor is neutral.  <u>First</u>, the similarity of the parties favors abstention because the parties in the Arbitration are the same parties in this action: CNL and StakeHound.  <u>Second</u>, the similarity of the issues favors abstention.  As described above, the issues in dispute in the Arbitration are antecedent to and dispositive of CNL's claims.  CNL's claims turn on ownership of the Native Tokens and the nature of the parties' obligations concerning an exchange of stTokens for Native Tokens, both of which issues will be resolved in the Arbitration.

57. 58.Third, the order in which the actions were filed is neutral.  StakeHound commenced the Arbitration before CNL filed this action.  CNL takes the position that the commencement of the Arbitration violated the automatic stay and was void.  This Court needs to determine the optimal court or tribunal to resolve the outstanding claims, and the order in which the proceedings were filed is not a primary consideration.  <u>Fourth</u>, the adequacy of the alternate forum favors dismissal of this case.  In terms of the adequacy of the foreign legal system, nobody can seriously contest that the Swiss legal system and Swiss arbitration is procedurally or substantively inadequate.  Moreover, Switzerland is an adequate forum in terms of convenience.  StakeHound is headquartered there, while CNL retained foreign counsel and already has appeared in the Arbitration.

58. 59.Fifth, the potential prejudice to StakeHound of being compelled to litigate in New York (a forum with which it has no connection) vastly outweighs the prejudice to CNL of litigating in Switzerland (the forum it selected for arbitration of disputes with StakeHound).

StakeHound would be prejudiced by being forced to litigate the merits of this case in a U.S. court. ~~As the SSTC demonstrate, StakeHound has structured its business and platform expressly to prohibit interaction with the United States and United States residents/entities. It could not be clearer that StakeHound~~

~~has sought to avoid interacting with the United States market and jurisdiction.¹⁰~~ On the other hand, CNL is a U.K. entity that chose to do business with a Swiss company and resolve all contract disputes in Switzerland.  CNL already has appeared in the Arbitration.¹¹¹¹

59.    ~~60.~~Sixth, the convenience of the parties favors abstention.  The Swiss forum is the most convenient for these parties.  Neither party is a U.S. entity.  StakeHound is a Swiss company.  CNL already has appeared in the Arbitration in Geneva and has retained counsel overseas to help submit filings in the Arbitration.  Swiss law governs the contracts and should be applied by a tribunal familiar with applying Swiss contract law.

60.    ~~61.~~The <u>seventh</u> and <u>eighth</u> factors (the connection between the litigation and the United States and the connection between the litigation and the foreign jurisdiction) also favor abstention.  Switzerland has the greater interest in having a tribunal under its authority determine these threshold contract issues.  The contracts involve a Swiss company and are governed by Swiss law.  At least some of the conduct underlying the contracts occurred in Switzerland.  On the other hand, the U.S. has a lower interest in resolving these contract disputes in its courts.  While the bankruptcy court has an interest in administering the Bankruptcy Code, as described

---

¹⁰ ~~Indeed, StakeHound contends that personal jurisdiction is lacking in this case, and is contemporaneously~~

~~filing a motion to dismiss the adversary proceeding on this basis.~~

¹¹ Moreover, the estate's creditors are not harmed by the resolution of this property ownership dispute in the proper foreign forum.  *See In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 349 (2d Cir. 1992) ("determin[ing] that the funds are not property of the estate therefore does not improperly affect other creditors of the estate, because they have valid claims only against the estate's *bona fide* assets.")

above, CNL's claims require threshold resolution of issues of Swiss contract law prior to consideration of any subsequent bankruptcy issues between the parties.  The U.S. interest in this case is far lower than in those cases involving true core issues of bankruptcy administration.

**C.**     **In re Koreag Requires Abstention in Favor of the Swiss Arbitration.**

61.     62.International comity abstention also is warranted based on the Second Circuit's recognition in *In re Koreag* of an exception to the rule that U.S. courts generally decline to exercise jurisdiction over disputes involving estate property in pending foreign bankruptcy proceedings.  That exception permits U.S. courts to retain jurisdiction when the issue involves a "property interest [which has] an independent legal source, antecedent to the distributive rules of bankruptcy administration, that determines in the first instance the interests of claimant parties in particular property."  *In re Koreag,* 961 F.2d at 349.  Here, ownership of the Native Tokens is a property interest with an independent legal source (Swiss law), antecedent to bankruptcy administration. Consequently, the Swiss tribunal is the appropriate adjudicative body to determine the antecedent property right of who owns the Native Tokens and this Court should defer to the Arbitration.

62.     63.In *In re Koreag*, Mebco (a Swiss bank) entered into a currency exchange contract with Refco (a New York currency trading corporation), under which Refco would deposit U.S. currency in a Mebco-owned New York bank account and Mebco would exchange the deposited funds for foreign currency.  Refco deposited over $7 million in the Mebco account,

but Mebco failed to exchange it into foreign currency and declared bankruptcy in Switzerland.

Refco sued Mebco in this District, claiming ownership of the $7 million in Mebco's account

because Mebco did not complete the exchange.    Koreag intervened as Mebco's

successor-in-interest and moved to dismiss on international comity grounds, arguing that the

Swiss bankruptcy court should adjudicate claims related to the funds as part of Mebco's estate.

In vacating summary judgment for Koreag, the Second Circuit held that disputes with respect to

the ownership of assets do not always implicate the concerns that ordinarily require deference to

foreign bankruptcy proceedings.  *See In re Koreag,* 961 F.2d at 349; *Altos Hornos*, 412 F.3d at

425.    It held that "[p]roperty interests have an independent legal source, antecedent to the

distributive rules of bankruptcy administration, that determines in the first instance the interests

of claimant parties in particular property" and that "local law" should determine whether the

debtor has a valid ownership interest in that property when the issue is properly posed by an

adverse claimant.  *Id.*  Finally, it observed that Mebco's creditors would not be prejudiced by a

threshold determination of property ownership outside the bankruptcy proceedings. *Id.; see also*

*Altos Hornos*, 412 F.3d at 425 ("Since other creditors only have valid claims against the estate's

bona fide assets, we concluded that Refco's claim was 'antecedent to the distributive rules of

bankruptcy administration' and thus properly adjudicated in a U.S. court")

63.    64.In other words, when the situation is reversed and there is a foreign bankruptcy

trustee seeking to pull a dispute over property rights in a U.S. court into the foreign bankruptcy

proceeding, the Second Circuit says the U.S. court *should not* defer and that it should apply

"local law" to first determine whether the property belongs to the debtor.  Comity requires a U.S.

bankruptcy court to apply the same principles in this case.  Here, the question of who owns the

Native Tokens is governed by Swiss law and should be decided by the Swiss tribunal.  It is only

fair, and in keeping with international comity, that U.S. bankruptcy courts allow foreign tribunals to assert the same rights and authorities that ours do in the face of a foreign bankruptcy proceeding.

## IV. The Court Should Stay Any Remaining Claims Pending the Arbitration.

64. ~~65.~~StakeHound does not contend that CNL's causes of action for violation of the automatic stay or for disallowance of StakeHound's claim should be arbitrated.~~12~~ [12] If the Court compels arbitration of the Arbitrable Claims but retains jurisdiction over the automatic stay and disallowance claims, or if the Court determines any other CNL claims are not arbitrable and retains jurisdiction over them, the Court should stay the prosecution of those claims pending resolution of

~~12 With respect to those claims, StakeHound reserves all rights, defenses, claims and positions. The merits of those causes of action need not be argued here, and need not be resolved now.~~ the Arbitration.  The decision to stay non-arbitrable claims is "committed to the court's discretion." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir.1987).  A broad stay of the bankruptcy proceedings is appropriate if the arbitrable claims predominate the lawsuit or if a stay would promote judicial economy, or avoid confusion and possible inconsistent results without unduly prejudicing the plaintiff.  *See In re Hagerstown*, 277 B.R. at 199.

65. ~~66.~~The Court should stay the non-arbitrable claims because the arbitrable claims predominate, there are common questions of fact among the non-arbitrable and arbitrable claims, and a stay would promote judicial economy.  As described above, all of CNL's claims, including any non-arbitrable claims, turn on the fundamental question of who owns the Native Tokens, and other related questions of contract interpretation.  The Court should stay these and any other remaining non-arbitrable claims until the arbitrator decides the predicate issues of contract interpretation on which all of CNL's claims turn.  Doing so would promote judicial economy and

---

[12] With respect to those claims, StakeHound reserves all rights, defenses, claims and positions.  The merits of those causes of action need not be argued here, and need not be resolved now.

avoid the risk of inconsistent rulings because if the arbitrator decides these issues in StakeHound's favor, CNL likely would have no basis to continue to litigate the non-arbitrable claims in this Court.

[*Remainder of Page Intentionally Left Blank*]

### V.   <u>CONCLUSION</u>

For these reasons, Defendant StakeHound S.A. respectfully requests that the Court grant

the Motion and such other relief as the Court may deem proper.

Dated: August 25, 2023
New York, New York

*Respectfully,*

*/s/ Stephanie Wickouski*
**LOCKE LORD LLP**
Stephanie Wickouski
Jeffrey Kramer
Sean A. Feener
200 Vesey Street, 20th Floor
New York, New York 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
swickouski@lockelord.com
jkramer@lockelord.com
sean.feener@lockelord.com

Jonathan W. Young (admitted pro hac vice)
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Tel: (617) 239-0367
Fax: (617) 227-4420
jonathan.young@lockelord.com

*Attorneys for StakeHound S.A*