**Hearing Date: December 21, 2023, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: December 15, 2023, at 4:00 p.m. (prevailing Eastern Time)**

Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1001
mhurley@akingump.com
dchapman@akingump.com

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas Lombardi (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
edscott@akingump.com

*Special Litigation Counsel for Debtors*[1] *and*
*Plaintiff Celsius Network Limited*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*, | Case No. 22-10964 (MG) |
| Debtors. | Jointly Administered |
| CELSIUS NETWORK LIMITED, | |
| Plaintiff, | |
| v. | Adversary Proceeding |
| STAKEHOUND S.A., | No. 23-01138 (MG) |
| Defendant. | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

### NOTICE OF MOTION TO APPROVE SETTLEMENT AGREEMENT WITH STAKEHOUND S.A. AND RELATED TRANSFERS PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 363(B) OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that Celsius Network Limited ("CNL"), debtor in the above-captioned chapter 11 cases, filed the *Motion to Approve Settlement Agreement with StakeHound S.A. and Related Transfers Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 363(b) of the Bankruptcy Code* (the "Motion").[2]

**PLEASE TAKE FURTHER NOTICE** that simultaneously herewith, CNL is filing a Motion Pursuant to Rule 9006(c) of the Federal Rules of Bankruptcy Procedure to Shorten the Notice Period for the Motion (the "Motion to Shorten Notice").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held before the Honorable Martin Glenn, United States Bankruptcy Judge (the "Court") on **December 21, 2023, at 10:00 a.m. (prevailing Eastern Time)** (the "Hearing"), or as soon thereafter as counsel may be heard. The Hearing will be held in person, in U.S. Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408. With the permission of the Court, only parties in interest, their attorneys, and witnesses may attend hearings by Zoom at which evidence is expected to be presented. Any person or entity that is permitted to attend the hearing by Zoom must certify that they are appearing in a permitted capacity by registering their appearance in the Electronic Appearance portal located on the Court's website at: http://www.nysb.uscourts.gov/ecourt-appearances. Appearances must be entered no later than **4:00 p.m. (prevailing Eastern Time), the business day before the Hearing** (*i.e.*, **Wednesday, December 20, 2023**). The public, including members of the media, may only

---

[2] All capitalized terms used but not defined herein shall have the meaning given to them in the Motion.

attend evidentiary hearings in the courthouse, not remotely.  This change in practice regarding hearings reflects the policies of the Judicial Conference of the United States that became effective on September 22, 2023.

    **PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of any pleadings filed with the Court by visiting the Court's website at https://www.nysb.uscourts.gov and following the procedures and paying any fees set forth therein.

    **PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Motion (the "Objections") shall (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York; (iii) be filed with the Court, together with proof of service, electronically, on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (iv) be served in accordance with the *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [ECF No. 2560] (the "Case Management Order"), so as to be filed and received, if the Motion to Shorten Notice is granted, no later than **December 15, 2023, at 4:00 p.m. (prevailing Eastern Time)**, to (a) the entities on the Master Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius) and (b) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.

Dated:       December 8, 2023
                New York, New York

                            AKIN GUMP STRAUSS HAUER & FELD LLP

                      By:    */s/ Mitchell P. Hurley*
                            Mitchell P. Hurley
                            Dean L. Chapman Jr.
                            One Bryant Park
                            New York, New York 10036
                            Telephone: (212) 872-1000
                            Facsimile: (212) 872-1001
                            mhurley@akingump.com
                            dchapman@akingump.com

                            Elizabeth D. Scott (admitted *pro hac vice*)
                            Nicholas Lombardi (admitted *pro hac vice*)
                            2300 N. Field Street, Suite 1800
                            Dallas, TX 75201
                            Telephone: (214) 969-2800
                            Facsimile: (214) 969-4343
                            edscott@akingump.com

                            *Special Litigation Counsel for Debtors and*
                            *Plaintiff Celsius Network Limited*

**Hearing Date: December 21, 2023, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: December 15, 2023, at 4:00 p.m. (prevailing Eastern Time)**

Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1001
mhurley@akingump.com
dchapman@akingump.com

Elizabeth D. Scott (admitted *pro hac vice*)
Nicholas Lombardi (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
edscott@akingump.com
nlombardi@akingump.com

*Special Litigation Counsel for Debtors[1] and*
*Plaintiff Celsius Network Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*, | Case No. 22-10964 (MG) |
| Debtors. | Jointly Administered |
| CELSIUS NETWORK LIMITED, | |
| Plaintiff, | Adversary Proceeding |
| v. | No. 23-01138 (MG) |
| STAKEHOUND S.A., | |
| Defendant. | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**Hearing Date: December 21, 2023, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: December 15, 2023, at 4:00 p.m. (prevailing Eastern Time)**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

JURISDICTION AND VENUE ................................................................................................3

BACKGROUND ........................................................................................................................4

    A.    The Parties ...................................................................................................4

    B.    The Staking Services Agreement ................................................................5

    C.    February 2021 Staked ETH .........................................................................6

    D.    The Revenue Sharing Agreement and Term Sheets ....................................6

    E.    Loss of the Private Keys to Native ETH Tokens ........................................6

    F.    The Swiss Arbitration ..................................................................................7

    G.    The Adversary Proceeding ..........................................................................7

    H.    The Pending Motions ...................................................................................8

        1.    The TRO and Moton for Injunction .................................................8

        2.    The Motion to Compel ......................................................................9

    I.    Discovery .....................................................................................................9

    J.    Mediation ...................................................................................................10

    K.    The Settlement Agreement .........................................................................10

RELIEF REQUESTED .............................................................................................................16

BASIS FOR RELIEF ...............................................................................................................17

    A.    The Court Should Approve the Settlement Agreement with StakeHound ............17

        1.    The Settlement Agreement Is in the Best Interests of Debtors' Estates, Their Creditors, and Other Stakeholders ......................................19

        2.    Litigating the Adversary Proceeding Would Be Uncertain and Expensive, as Would Collecting Any Litigated Judgment Against StakeHound ......................................................................................24

        3.    The Remaining Factors All Weigh in Favor of Approving the Settlement Agreement ...................................................................25

    B.    Upon Approval of the Settlement Agreement, the Court Should Approve the Transfer to StakeHound of the stTokens and the StakeHound Funding Amount in Accordance with the Terms of the Settlement Agreement ..................26

NOTICE .....................................................................................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ..............................................................................19, 25

*Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere
  Clubs, Inc.)*,
  156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) ........................................17

*In re Ambac Fin. Grp., Inc.*,
  457 B.R. 299 (Bankr. S.D.N.Y. 2011) ....................................................................................24

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..............................................................................25, 26

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983)....................................................................................................18

*Fla. Trailer & Equip. Co. v. Deal*,
  284 F.2d 567 (5th Cir. 1960) ..................................................................................................18

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999)...................................................................................................................2

*In re Hibbard Brown & Co., Inc.*,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998) ......................................................................................17

*In re ISE Corp.*,
  No. 10-14198 MM 11, 2012 WL 1377085 (Bankr. S.D. Cal. Apr. 13, 2012)..........................3

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re
  Charter Commc'ns)*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ....................................................................................26

*In re K.G. IM, LLC*,
  620 B.R. 469 (Bankr. S.D.N.Y. 2020) ....................................................................................26

*In re Lynch*,
  Nos. 19-cv-3837(GRB), 19-cv-388(GRB), 19cv5673(GRB), 19-cv-
  5685(GRB), 19-cv-5687(GRB), 2022 U.S. Dist. LEXIS 91195 (E.D.N.Y.
  May 20, 2022)..........................................................................................................................18

*Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium
  Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007).....................................................................................................25

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994) ..................................................................................17

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ....................................................................................18

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) .................................................................................................17

*In re Purofied Down Prods. Corp.*,
    150 B.R. 519 (S.D.N.Y. 1993) ..........................................................................18, 19

*In re Residential Cap., LLC*,
    504 B.R. 358 (Bankr. S.D.N.Y. 2014) ....................................................................26

*In re Texaco, Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ......................................................................19

*Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert
    Grp., Inc.)*,
    134 B.R. 499 (Bankr. S.D.N.Y. 1991) ..............................................................17, 19

**Statutes and Rules**

11 U.S.C. §§ *et seq* ..............................................................................................................3

11 U.S.C. § 363(b) ..................................................................................................1, 26, 27

11 U.S.C. § 363(b)(1) .......................................................................................................26

11 U.S.C. § 502(d) ..............................................................................................................7

11 U.S.C. § 542 ...................................................................................................................7

28 U.S.C. § 157 ...................................................................................................................3

28 U.S.C. § 157(b) ..............................................................................................................3

28 U.S.C. §§ 1334(a) and (b) ..............................................................................................3

28 U.S.C. §§ 1408 and 1409 ...............................................................................................4

Fed. R. Bankr. P. 6004(h) ......................................................................................17, 27, 28

Fed. R. Bankr. P. 9019 ...................................................................................................4, 18

Fed. R. Bankr. P. 9019(a) ............................................................................................1, 17, 18

Fed. R. Bankr. P. 9023 ........................................................................................................8

Fed. R. Civ. P. 59 ................................................................................................................8

**MOTION TO APPROVE SETTLEMENT AGREEMENT WITH
STAKEHOUND S.A. AND RELATED TRANSFERS PURSUANT TO
RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
AND SECTION 363(B) OF THE BANKRUPTCY CODE**

Celsius Network Limited ("<u>CNL</u>" or "<u>Celsius</u>") hereby files this motion (the "<u>Motion</u>") for

entry of an order approving, pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>") and section 363(b) of the Bankruptcy Code, (i) the settlement

agreement dated December 8, 2023, (the "<u>Settlement Agreement</u>" or "<u>Agreement</u>") between CNL

and StakeHound S.A. ("<u>StakeHound</u>" and, together with CNL, the "<u>Parties</u>") concerning the

claims and causes of action asserted in the above-captioned adversary proceeding (the "<u>Adversary</u>

<u>Proceeding</u>") and the arbitration initiated by StakeHound in Switzerland (the "<u>Swiss Arbitration</u>");

and (ii) CNL's transfer of assets to StakeHound in connection with that Settlement Agreement.  In

support of the Motion, CNL respectfully states as follows.

## PRELIMINARY STATEMENT

1.      The Settlement Agreement that is the subject of this Motion represents a major

victory for Celsius and its creditors, and a significant achievement in these cases.[2]  If the Settlement

Agreement is approved, StakeHound will be required to transfer to CNL virtually all of the assets

in StakeHound's possession, custody or control, comprised of ETH, MATIC and DOT tokens that

collectively are worth ***more than $105 million at recent prices***.

2.      In addition, Celsius will acquire valuable rights with respect to StakeHound's

litigation against Fireblocks, Inc. in Israel, which StakeHound values at $190 million or more (the

"<u>Fireblocks Litigation</u>").  In exchange for providing StakeHound with a litigation funding loan

---

[2] The Settlement Agreement is attached hereto as **Exhibit B**.  To the extent there is any discrepancy between the summary of the Settlement Agreement herein and the terms of the Settlement Agreement itself, the terms of the Settlement Agreement shall govern.  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Settlement Agreement.

(earning interest for CNL at 20%), CNL has the right to, among other things, receive a significant portion of any settlement or judgment against Fireblocks. In other words, between the more than $100 million that will immediately be available for the benefit of Celsius and its creditors, and CNL's interest in the Fireblocks Litigation, the Settlement Agreement could result in CNL recovering all of the coins (or their value) that CNL ever provided to StakeHound, and perhaps substantially more.

3.        Arriving at this juncture has been hard-fought. StakeHound, a Swiss company, rejected CNL's offers last Spring to enter into a standstill and asset freezing agreement to permit the parties to seek to negotiate a resolution. Instead, StakeHound commenced arbitration in Switzerland, relying on Swiss arbitration clauses provided in certain agreements between the parties. When CNL filed a complaint asserting that the Swiss arbitration violated the automatic stay and other claims in the bankruptcy court, StakeHound refused to accept service, argued it was not subject to U.S. personal jurisdiction, and again refused to agree to voluntarily freeze the assets at issue. Substantial motion practice was required before StakeHound agreed not to insist on Hague service – which would likely have taken months – and finally conceded personal jurisdiction for purposes of the adversary proceeding, and before CNL obtained an effective stay of the arbitration.

4.        While the Court entered a temporary restraining order on September 8, 2023 freezing StakeHound's assets, extensive and expensive rounds of briefing were required first, both on the merits, and on the applicability (or not) of *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999). The Court also set a date to hear CNL's motion for a preliminary injunction, and StakeHound's motion to compel arbitration of certain of StakeHound's claims, and the parties embarked on significant discovery. CNL was, and remains, confident in the merits of

its claims and its choice of forum.  It was self-evident, however, that, absent a settlement, very substantial and expensive additional litigation would be required against StakeHound here, and possibly in Switzerland as well.  CNL therefore welcomed StakeHound's request for mediation, which StakeHound made after entry of the TRO.

5.      The mediation too, was hard fought.  Conducted at arm's length over two long, in-person days with Judge Michael E. Wiles, and through the exchange of numerous draft term sheets and phone calls among the parties over a period of weeks, the mediation and ensuing negotiations ultimately resulted in the Settlement Agreement for which CNL seeks the Court's approval. Significantly, the Official Committee of Unsecured Creditors (the "UCC") participated in the mediation and ensuing negotiations directly, and fully supports the Settlement Agreement.  CNL submits that the Settlement Agreement, which provides enormous current value (and significant potential future value) for Celsius creditors, and saves the estates the significant additional time and expense that would be associated with continuing litigation between CNL and StakeHound, is manifestly in the best interests of the estates.  For the reasons discussed below, CNL respectfully asks the Court to grant its motion, and approve the Settlement Agreement.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the Adversary Proceeding pursuant to 28 U.S.C. §§ 1334(a) and (b); and the *Amended Standing Order of Reference* M10-468 of the United States District Court for the Southern District of New York (the "Southern District of New York") filed Feb. 1, 2012 referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under, arising in, or related to a case under title 11 of the United States Code (the "Bankruptcy Code") issued pursuant to 28 U.S.C. § 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  *See, e.g.*, *In re ISE Corp.*, No. 10-14198 MM 11, 2012 WL 1377085, at *4 (Bankr. S.D. Cal. Apr. 13, 2012) (finding approval of a settlement agreement,

3

pursuant to Rule 9019, to be a core proceeding).  Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this Adversary Proceeding arises under, arises in, and relates to cases commenced under the Bankruptcy Code.

## BACKGROUND

### A.  The Parties

7.      CNL is a private limited company incorporated under the laws of England and Wales with its principal place of business located at The Harley Building, 77-79 New Cavendish Street, London, U.K. W1W 6XB.

8.      StakeHound is a private société anonyme incorporated under the laws of Switzerland with its registered offices Place de Longemalle 1, c/o MN Associés SA, 1204 Geneva, Switzerland.

9.      StakeHound launched its business providing liquid staking services in late 2020. Staking is a process by which cryptocurrency holders permit their cryptocurrency assets ("Native Tokens") to be utilized to support the operation of a Proof of Stake blockchain. Once staked, the Native Tokens are used to validate transactions on the network. In return for staking Native Tokens, their holders receive a share of transaction fees and/or newly created cryptocurrencies generated by staked Native Tokens ("Staking Rewards").

10.     Native Tokens are illiquid as long as they are staked.  In liquid staking, the service provider or protocol issues a tokenized representation of a particular cryptocurrency, sometimes called a "wrapped" token ("stToken"), in exchange for the same cryptocurrency (Native Token). The service provider or protocol then stakes the Native Tokens (and/or operates the nodes for staked Native Tokens) and distributes Staking Rewards to the holders of stTokens. Simultaneously, stTokens can be used in decentralized finance networks.

4

11.    StakeHound announced in June 2021 that it suspended operation of its platform. Prior to that, it engaged primarily in the business of providing liquid staking services.  In return for staking Native Tokens, StakeHound's customers received in exchange the same number of stTokens and a corresponding entitlement to receive Staking Rewards as agreed between StakeHound and its customers.

12.    StakeHound provided liquid staking services to CNL and other customers.  CNL was StakeHound's largest customer.  CNL holds approximately 96% of all stETH and 100% of all stMATIC and stDOT ever generated by StakeHound.

**B.  The Staking Services Agreement**

13.    In August or September 2020, CNL was introduced to StakeHound through Jason Stone, the CEO of Celsius KeyFi Inc.

14.    In November 2020, CNL staked approximately 24,960 of its ETH (the "November 2020 Staked ETH") by transferring it to the ETH2 deposit contract (the "Deposit Smart Contract"). At the time, all ETH transferred to the Deposit Smart Contract, including the November 2020 Staked ETH, was locked and unavailable for withdrawal pending completion of an ongoing upgrade to the Ethereum blockchain (the "Upgrade").

15.    On January 20, 2021, CNL and StakeHound entered into the Staking Services Agreement (the "SSA").  Pursuant to the SSA, CNL agreed to transfer the nodes associated with the November 2020 Staked ETH (plus Staking Rewards) to StakeHound in exchange for the same number of stETH (plus stETH associated with Staking Rewards to be earned on the native ETH).

16.    On January 23, 2021, pursuant to section 1.2 of the SSA, CNL transferred to StakeHound the nodes for the November 2020 Staked ETH (plus Staking Rewards).  On the same day, StakeHound caused approximately 25,436 stETH to be minted and transferred to CNL, an

amount equal to the number of ETH associated with the nodes for the November 2020 Staked ETH (plus Staking Rewards).

### C.  February 2021 Staked ETH

17.      On February 2, 2021, CNL transferred approximately 34,999.99 native ETH (the "February 2021 Staked ETH") from a wallet owned by CNL to a wallet identified by StakeHound. On the same day, StakeHound staked 34,976 ETH to fund 1,093 validators.  In exchange, on the same day, StakeHound minted and transferred to CNL 35,000 stETH.  StakeHound contends that the February 2021 Staked ETH transaction was governed by StakeHound Services Terms and Conditions (the "SSTC"); CNL disagrees.

### D.  The Revenue Sharing Agreement and Term Sheets

18.      On April 21, 2021, CNL and StakeHound entered into a Revenue Sharing Agreement (the "RSA").

19.      On April 21, 2021, CNL and StakeHound entered into a term sheet (the "MATIC Term Sheet") pursuant to the RSA.  Pursuant to the MATIC Term Sheet, CNL transferred 40 million native MATIC tokens to StakeHound and received 40 million stMATIC in return.

20.      Also, on April 27, 2021, CNL and StakeHound entered into another term sheet (the "DOT Term Sheet," and together with the MATIC Term Sheet, the "Term Sheets") pursuant to the RSA.  Pursuant to the DOT Term Sheet, CNL transferred 66,000 native DOT tokens to StakeHound and received 66,000 stDOT tokens in return.

21.      StakeHound immediately staked the MATIC and DOT and has been receiving Staking Rewards on those native tokens since.

### E.  Loss of the Private Keys to Native ETH Tokens

22.      On May 2, 2021, private keys relating to the withdrawal of 38,178 ETH, including all of the February 2021 Staked ETH, plus all ETH provided to StakeHound by customers other

than CNL, were lost (the "<u>Key Loss Incident</u>").  StakeHound claims that the blockchain security provider Fireblocks, Inc. is responsible for the Key Loss Incident.  StakeHound claims that, as a result of the Key Loss Incident, StakeHound suspended its platform in May 2021, which it announced in June 2021.  Following the Fireblocks Key Loss, StakeHound initiated legal proceedings against Fireblocks in Israel.  The Fireblocks Litigation remains ongoing.

### F.  The Swiss Arbitration

23.    On April 24, 2023, StakeHound commenced an arbitration in Switzerland against CNL seeking declaratory relief regarding the validity and effect of contracts between StakeHound and CNL, among other things.  The Swiss Arbitration Centre appointed Dr. Raëd Fathallah (the "<u>Arbitrator</u>") as arbitrator in the matter on August 3, 2023.  On August 30, 2023, the Court entered an order finding that StakeHound's prosecution of the Swiss Arbitration was a violation of the automatic stay [ECF No. 53].  And, on September 8, 2023, the Arbitrator issued an order staying the Swiss Arbitration until further notice.

### G.  The Adversary Proceeding

24.    CNL commenced the Adversary Proceeding against StakeHound on July 11, 2023. In its amended complaint dated August 22, 2023, CNL alleged claims for: (i) violation of the automatic stay; (ii) turnover pursuant to section 542 of the Bankruptcy Code; (iii) a declaratory judgment pursuant to section 502(d) of the Bankruptcy Code disallowing any claim by StakeHound as a result of its failure to turnover estate property; (v) breach of contract; and (vi) accounting, unjust enrichment and certain other equitable claims and remedies.  On August 25, 2023, StakeHound moved to dismiss all claims alleged in the Amended Complaint for lack of personal jurisdiction [ECF No. 45].  On September 15, 2023, StakeHound withdrew its motion to dismiss and conceded it is subject to the jurisdiction of the Court for purposes of this Adversary Proceeding [ECF No. 66].

H. **The Pending Motions**

1. **The TRO and Moton for Injunction**

25.    On August 23, 2023, CNL filed the Notice of Motion for Temporary Restraining Order [ECF No. 33] and Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 39] and on August 25, 2023, filed the Notice of Motion for Preliminary Injunction [ECF No. 47] and [Proposed] Order Granting Preliminary Injunction [ECF No. 47-1] (together, the "Injunction Motion").  The Injunction Motion requested a temporary restraining order, and seeks a preliminary injunction, preventing the dissipation of assets, including native ETH, MATIC, and DOT tokens (or their corresponding nodes) plus rewards earned on those tokens, in StakeHound's possession, custody, or control that are sought to be recovered and/or may be required to satisfy any judgment obtained by CNL.

26.    On September 8, 2023, the Court entered the Order Granting TRO [ECF No. 59] (the "TRO").  The TRO (i) granted CNL's request for a temporary restraining order prohibiting and preliminarily enjoining StakeHound, and all persons acting in concert with StakeHound, "from transferring any assets or property within StakeHound's possession, custody or control pending the outcome of the preliminary injunction hearing" (the "Subject Property"); (ii) scheduled a hearing (the "Hearing") on CNL's Injunction Motion for September 27, 2023; and (iii) permitted StakeHound "to spend $200,000 in money or money's worth of the [Subject Property]" pending the originally scheduled Hearing (the "TRO Carveout").

27.    On September 15, 2023, StakeHound filed a motion to amend the TRO pursuant to Federal Rule of Civil Procedure 59 and Federal Rule of Bankruptcy Procedure 9023 [ECF No. 74] (the "Motion to Amend").  The Motion to Amend asked the Court to amend the TRO and increase the total TRO Carveout to $500,000 for the period through the entry of the Court's decision following the originally scheduled September 27 hearing on the Injunction Motion.  On October

9, 2023, the parties filed a joint stipulation (i) adjourning the Hearing until October 25, 2023; (ii) requiring StakeHound to withdraw its Motion to Amend; (iii) extending the TRO through and including the date on which the Court decides the Injunction Motion; and (iv) permitting certain specifically identified expenditures by StakeHound above the initial TRO Carveout.

### 2. The Motion to Compel

28.    On August 25, 2023, StakeHound filed the Notice of Motion to Compel Arbitration or, in the Alternative, for Abstention [ECF No. 46], and on September 22, 2023, StakeHound filed its Amended Memorandum of Law in Support of Motion to Compel Arbitration or, in the Alternative, for Abstention [ECF No. 83] (together, the "Motion to Compel").  The Motion to Compel asks the Court to (i) lift the automatic stay and compel arbitration of CNL's breach of contract, turnover, unjust enrichment, conversion, constructive trust, and accounting claims (the "Subject Claims") and (ii) stay the remaining claims asserted in the Amended Complaint (violation of the automatic stay and declaratory judgment that any claims by StakeHound be disallowed); or, alternatively (iii) to abstain from exercising jurisdiction over CNL's claims under the doctrine of international comity.  A hearing on the Motion to Compel was originally scheduled for September 27, 2023, but was subsequently postponed to October 25, 2023.

### I.  Discovery

29.    CNL and StakeHound engaged in extensive discovery in preparation for the October 25, 2023 hearing on the Injunction Motion and Motion to Compel.  CNL served written discovery requests on StakeHound, including requests for production and interrogatories.  In response to the requests for production, StakeHound produced documents responsive to both specific ad hoc collection requests, as well as ESI collected, reviewed, and produced in response to specific search terms and custodians CNL proposed.  CNL reviewed over 20,000 pages of documents StakeHound produced in response, including documents and pleadings associated with

9

the Fireblocks Litigation.  CNL deposed StakeHound's proposed Swiss law expert.  And CNL reviewed additional documents and information StakeHound produced in connection with diligence requests CNL served during settlement negotiations.

### J.  Mediation

30.    On October 11, 2023, by agreement of the Parties, the Court entered an order appointing the Honorable Michael E. Wiles, U.S. Bankruptcy Judge for the Southern District of New York, to mediate the Adversary Proceeding.  *See* Mediation Confidentiality Agreement and Order [ECF No. 92].  The Parties held Mediation sessions on October 13 and 19, 2023.  Counsel for the UCC participated in both Mediation sessions.  On October 20, 2023, the Parties notified the Court that they had reached a settlement in principle, and on that basis, the Parties and Court agreed to adjourn the pending hearing on CNL's motion for a preliminary injunction and the Motion to Compel to December 6, 2023.

### K.  The Settlement Agreement

31.    On December 8, 2023, the Parties executed the Settlement Agreement, through which they intend to settle fully and discontinue both (i) the Adversary Proceeding and (ii) the Swiss Arbitration.

32.    The key terms of the Settlement Agreement are summarized below:[3]

| | |
|---|---|
| **Initial CNL ETH Exchange** | StakeHound shall transfer all of the ETH (and any accumulated Staking Rewards[4] (in any form) from ETH) in its possession, custody or control as of the date of the transfer (other than the Additional ETH (as defined below) and the Altcoinomy Tokens[5]) to CNL on or before the Effective |

---

[3] The following summary is for illustrative purposes only and is not intended to be comprehensive.

[4] "Staking Rewards" means rewards such as transaction fees and/or newly created cryptocurrencies generated by staked Native Tokens.

[5] The "Altcoinomy Tokens" are amounts StakeHound has outstanding to Altcoinomy SA ("Altcoinomy") in an amount not to exceed ██████████████████████████

| | |
|---|---|
| | Date[6] (the "Initial CNL ETH Transfer").[7] Following the Initial CNL ETH Transfer, CNL shall transfer $10 million (less the U.S. dollar value of the Altcoinomy Tokens as of such transfer) (the "StakeHound Funding Amount") and the same number of stETH to StakeHound as the number of native ETH transferred by StakeHound to CNL pursuant to the Initial CNL ETH Transfer, provided, however, that if the price for ETH at the time of the transfer is less than $1,579, CNL may in its sole discretion terminate the Settlement Agreement, in which event CNL shall have no obligation to transfer the StakeHound Funding Amount, or any stETH, and shall return the ETH transferred pursuant to the Initial CNL ETH Transfer. |
| **Permitted Uses of the StakeHound Funding Amount** | The StakeHound Funding Amount can be used for agreed professional fees and costs of the Fireblocks Litigation consistent with budgets set forth in the Settlement Agreement (the "Fireblocks Litigation Funding").

In addition to the Fireblocks Litigation Funding, the StakeHound Funding Amount can be used solely for certain additional purposes (and up to the amounts) enumerated in the Settlement Agreement.

To the extent, after the date the TRO was modified and prior to the Initial CNL ETH Transfer, StakeHound requests and CNL consents to any use of assets by StakeHound, the value of any assets so used by StakeHound shall be deducted from the $10 million CNL is required to transfer in exchange for the Initial CNL ETH Transfer (i.e., deducted from the StakeHound Funding Amount). |
| **Release or Forbearance Agreements** | Promptly following execution of the Settlement Agreement:

  i.  All Insider customers shall execute such agreements as shall be necessary to secure their forbearance from taking legal action against StakeHound prior to the Final Fireblocks Recovery Date,[8] in each case, in form and substance acceptable to CNL ("Release or Forbearance Agreements").

  ii. StakeHound shall use commercially reasonable efforts to seek Release or Forbearance Agreements from all of its current creditors or putative claimants, including the creditors and claimants enumerated in the Settlement Agreement. StakeHound shall use |

---

[6] "Effective Date" means the date on which this Settlement Agreement is approved by the Bankruptcy Court.

[7] The Initial CNL ETH Transfer shall include all accumulated, accessible Staking Rewards earned through the date of the Initial CNL ETH Transfer and shall be no less than approximately 27,457.98 ETH

[8] "Final Fireblocks Recovery Date" means the date on which StakeHound has received all value due, or that could become due, as a Fireblocks Recovery, and paid to CNL the share of such Fireblocks Recovery to which CNL is entitled in accordance with the Settlement Agreement.

iii. StakeHound may use up to ████ ETH (together with any rewards, interests or other proceeds accruing thereon, and as adjusted as of the date of the Initial CNL ETH Transfer, the "Additional ETH") solely for the purpose of exchanging such ETH for stETH with non-CNL, non-Insider customers and only to the extent such exchanging non-CNL, non-Insider customer executes a Release or Forbearance Agreement. For the avoidance of doubt, CNL shall have no liability for any payment or other obligation to non-CNL, non-Insider customers that is or may become due or payable at any time, which payments or obligations shall be satisfied solely and exclusively from the Additional ETH, any Purchased ETH (as defined below), StakeHound's share of the recovery from Fireblocks, if any, and/or any in kind recovery, as applicable; provided, however, that if first authorized in writing by the Celsius Representative,[9] StakeHound can use the StakeHound Funding Amount for purposes of purchasing sufficient ETH (the "Purchased ETH") to provide (with the Additional ETH) up to a 1:1 exchange for stETH held by non-CNL, non-Insider customers.

iv. If StakeHound has not succeeded in obtaining Release or Forbearance Agreements from all of its creditors or putative claimants, including the creditors and claimants enumerated in the Settlement Agreement by the Effective Date, on the Effective Date, a first priority lien on the StakeHound assets enumerated in Section 6(a) of the Settlement Agreement in favor of CNL shall be deemed granted by StakeHound to CNL with immediate effect in an amount equal to the StakeHound Funding Amount, plus Interest.[10] CNL shall be entitled to exercise remedies as set forth in Section 6(d) of the Settlement Agreement.

v. Any Additional ETH not exchanged by the Effective Date as described above shall continue to be held by StakeHound solely for the purpose of funding exchanges with non-CNL, non-Insider customers. The lien granted to CNL pursuant to this paragraph

---

[9] "Celsius Representative" means one (1) Person designated, from time to time, by CNL (if prior to the effective date of the Plan (as defined in the Settlement Agreement)) and the Litigation Administrator (as defined in the Settlement Agreement) or its successor (if on or after the effective date of the Plan), who may be represented by counsel acting on such Person's behalf and at no expense to StakeHound, ████████████████████████████████████████████████████
████████████████████

[10] "Interest" means interest on the StakeHound Funding Amount (excluding any portion of the StakeHound Funding Amount used to purchase Purchased ETH) at the rate of 20% per annum, compounding annually on December 31 of the calendar year in which the StakeHound Funding Amount is transferred, and then on December 31st each year thereafter until the StakeHound Funding Amount and any accrued interest thereon contemplated hereby is fully repaid.

|  |  |
|---|---|
|  | shall be extinguished upon the date that, with respect to all such creditors and putative claimants, StakeHound has obtained either (i) a Release or Forbearance Agreement or (ii) has paid or otherwise satisfied such non-CNL customers in full. |
| **MATIC Exchange** | No later than three (3) calendar days following the Effective Date, (i) StakeHound shall cause all MATIC (including any accumulated Staking Rewards (in any form) from MATIC, but excluding any Altcoinomy Tokens) in StakeHound's possession, custody or control as of the date of the transfer (which, for the avoidance of doubt, shall equal not less than 47,907,353.07 MATIC) to be transferred to a CNL-owned wallet and (ii) StakeHound shall issue to CNL a number of additional stMATIC so that CNL has a balance of stMATIC equal to the number of MATIC so transferred (the "<u>MATIC and stMATIC Transfer</u>").  Following receipt of the MATIC and stMATIC Transfer, CNL shall transfer all stMATIC in its possession, custody or control to StakeHound. |
| **DOT Exchange** | No later than thirty-one (31) calendar days following the Effective Date (i) StakeHound shall cause all DOT (including any accumulated Staking Rewards (in any form) from DOT, but excluding any Altcoinomy Tokens) in StakeHound's possession, custody or control as of the date of the transfer (which, for the avoidance of doubt, shall equal not less than 90,940.67 DOT) to be transferred to a CNL-owned wallet and (ii) StakeHound shall issue to CNL a number of additional stDOT so that CNL has a balance of stDOT equal to the number of DOT so transferred (the "<u>DOT and stDOT Transfer</u>"). Following receipt of the DOT and stDOT Transfer, CNL shall transfer all stDOT in its possession, custody or control to StakeHound. |
| **Conduct of Fireblocks Litigation** | |

| | |
|---|---|
|  **Fireblocks Litigation** | |
| **Distribution of Fireblocks Recoveries** | Any Fireblocks Recovery[12] shall be distributed as follows: <br><br> i. First, 100% to CNL until CNL receives payment of Fireblocks Recovery proceeds equal to the Cost Threshold.[13] <br><br> ii. Second, 70% to CNL and 30% to StakeHound until such time as CNL receives payment of Fireblocks Recovery proceeds equal to the Pivot Point.[14] |

---

[11] "Mediator" means Judge Michael E. Wiles, sitting United States Bankruptcy Judge for the Southern District of New York, or such successor mediator as may be mutually agreed by the Parties.

[12] "Fireblocks Recovery" means any recovery in any form by StakeHound in connection with the Fireblocks Litigation, including as a result of either (i) entry of a judgment in favor of StakeHound and against either Fireblocks Ltd. or Fireblocks Inc., or (ii) a Fireblocks Settlement. For the avoidance of doubt, the Fireblocks Recovery does not include any in-kind recovery of the ETH associated with the Nodes.

[13] "Cost Threshold" means the StakeHound Funding Amount plus interest accruing at a rate of 20% per annum (compounding annually as provided herein), from the date CNL transfers the StakeHound Funding Amount to StakeHound until the Fireblocks Recovery Date.

[14] "Pivot Point"

| | |
|---|---|
| | iii. Third, value in excess of the Pivot Point shall be shared 30% to CNL and 70% to StakeHound. On the Fireblocks Recovery Date, CNL shall transfer all remaining stETH in its possession, custody or control to StakeHound, but, for the avoidance of doubt, (a) CNL shall nonetheless retain its contractual rights hereunder to its share of recoveries set forth above and (b) the number of stETH in CNL's possession, custody or control shall in no way limit the recoveries to which CNL is entitled or may become entitled hereunder, whether before or after the Pivot Point is reached. |
| ██████████ | ████████████████████████████████ |
| **In Kind Recovery of ETH Prior to Fireblocks Recovery Date** | ████████████████████████████████ |

---

[15] "Nodes" means the series of connected devices generally used to, amongst other things, distribute and store information, as well as verify and record new transactions, for the Ethereum blockchain, that are associated with the Lost ETH, inclusive of any associated rights of every kind or description, including for avoidance of all doubt, the validators that are accumulating Staking Rewards on the Lost ETH.

| | |
|---|---|
| | ███████████████████████████ |
| **No In Kind Recovery of ETH Prior to the Fireblocks Recovery Date** | ███████████████████████████ |
| **Termination of Agreements** | On the Effective Date, the SSA, RSA, and SSTC (as applicable between StakeHound and CNL) shall be deemed terminated; *provided,* that each Party's rights, claims and entitlements against Fireblocks Ltd. and/or Fireblocks Inc. and the Fireblocks Related Parties in connection with the Key Loss Incident shall be expressly preserved. |
| **Dismissal of Proceedings** | Within thirty (30) days of the date (i) the Settlement Agreement is approved by the Bankruptcy Court and no longer subject to any appeal or right of appeal and (ii) the disposition of Native Tokens as set forth in Section 3 of the Settlement Agreement has occurred, StakeHound and CNL shall file appropriate documentation (in each case, reasonably acceptable to the Parties) and take all other steps reasonably necessary to effectuate the withdrawal with prejudice or dismissal with prejudice of the Swiss Arbitration and the Adversary Proceeding, respectively, and to cause the Bankruptcy Court to terminate the TRO and Amended TRO. |

## **RELIEF REQUESTED**

33.     By this Motion, CNL requests entry of the Proposed Order, substantially in the form

attached hereto as **Exhibit A**, approving the proposed Settlement Agreement, and authorizing the

---

[16] "Final Fireblocks Recovery Date" means the date on which StakeHound has received all value due, or that could become due, as a Fireblocks Recovery, and paid to CNL the share of such Fireblocks Recovery to which CNL is entitled in accordance with this Settlement Agreement.

Parties to take any action as may be necessary, appropriate, or advisable to implement, effectuate, and fully perform under the Settlement Agreement, including transferring to StakeHound the stTokens and the StakeHound Funding Amount in accordance with the terms of the Settlement Agreement and waiving for cause any automatic 14-day stay that might apply to those transfers pursuant to Bankruptcy Rule 6004(h).

## BASIS FOR RELIEF

### A.  The Court Should Approve the Settlement Agreement with StakeHound

34.      The Court's approval of the Settlement Agreement is governed by Rule 9019(a) of the Bankruptcy Rules.  Rule 9019(a) provides that, "[o]n motion by the [Debtors] and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a). Rule 9019(a) thus "empowers the Bankruptcy Court to approve compromises and settlements if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (citation omitted).

35.      In determining whether to approve a proposed settlement, a court must find that the settlement is fair and equitable, reasonable, and in the best interests of the debtor's estates and creditors.  *See Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). The decision to approve a particular "compromise and settlement is within the sound discretion of the [Bankruptcy] Court."  *Drexel Burnham*, 134 B.R. at 505 (citations omitted).  That "discretion should be exercised in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citation omitted); *see also Nellis v.*

*Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (citations omitted) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above.").

36.     To approve a settlement under Bankruptcy Rule 9019(a), the Court does not have to decide the numerous issues of law and fact raised by the settlement. Instead, the Court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)) (alteration in original); *see also In re Lynch*, Nos. 19-cv-3837(GRB), 19-cv-388(GRB), 19cv5673(GRB), 19-cv-5685(GRB), 19-cv-5687(GRB), 2022 U.S. Dist. LEXIS 91195, at *8 (E.D.N.Y. May 20, 2022) (citations omitted) (same); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, "the court need not conduct a 'mini-trial' to determine the merits"). Put another way, "[a]ll that [the proponent of the settlement] must do is establish . . . [that] it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).

37.     Courts in the Second Circuit consider the following factors in determining whether a settlement meets the requirements of Bankruptcy Rule 9019:

  a.  the probability of success in litigation, with due consideration for the uncertainty in fact and law;

  b.  the difficulties of collecting any litigated judgment;

  c.  the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay;

  d.  the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement;

  e.  the competence and experience of counsel who support the settlement;

      f.   the relative benefits to be received by members of any affected class;

      g.   the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and

      h.   the debtor's informed judgment that the settlement is fair and reasonable.

*See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) (citing *In re Texaco, Inc.*, 84 B.R. 893, 901-02 (Bankr. S.D.N.Y. 1988)); *see also Purofied Down Prods.*, 150 B.R. at 522; *Drexel Burnham*, 134 B.R. at 506.

38.     Each of these factors weighs strongly in favor of granting the Motion and approving the Settlement Agreement, which is well within the range of reasonableness and in the best interest of Debtors and their creditors.

### 1.  The Settlement Agreement Is in the Best Interests of Debtors' Estates, Their Creditors, and Other Stakeholders

39.     Following substantial discovery and motion practice in the Adversary Proceeding, CNL and the UCC have each determined that the Settlement Agreement is fair, equitable, reasonable, and in the best interests of Debtors and their creditors and other stakeholders.

40.     *First*, with respect to the ETH, DOT, and MATIC currently in StakeHound's possession, custody, or control, the Settlement Agreement provides for the immediate transfer to CNL of the vast majority of those coins.  The Settlement Agreement requires that StakeHound transfer to CNL all MATIC and DOT in its possession, custody, or control (as well as any Rewards or other accumulated revenue in any form from MATIC and DOT), aside from a small amount of MATIC and DOT necessary to pay amounts currently outstanding to a StakeHound vendor.  The transfer to CNL shall equal not less than 47,907,353.07 MATIC and 90,940.67 DOT.  The Settlement Agreement additionally requires that StakeHound transfer to CNL all ETH (and any

rewards, in any form, from ETH) in its possession, custody or control aside from ▮▮▮ ETH,[17]

which shall be used solely for the purpose of exchanging such ETH for stETH with non-CNL,

non-Insider customers[18] who sign agreements in form and substance agreeable to CNL not to take

any legal action against StakeHound prior to the Fireblocks Recovery Date[19] and ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

By itself, this initial ETH, DOT, and MATIC transfer will result in the return to CNL of assets

valued at over $105 million at recent prices.

41.    *Second*, the Settlement Agreement also provides CNL a substantial interest in the

Fireblocks Litigation.  Upon receipt of the Initial CNL ETH Transfer from StakeHound, CNL will

transfer the approximately $10,000,000 StakeHound Funding Amount[20] to StakeHound to fund

the Fireblocks Litigation in Israel, and pay certain other costs, in the form of a loan earning 20%

interest and compounding annually.[21]  The Agreement sets forth specific and narrowly tailored

constraints on how StakeHound may use the StakeHound Funding Amount, which are limited to

payments necessary to fund professional fees and costs associated with the Fireblocks Litigation,

---

[17] Any of this ▮▮▮ Additional ETH that is not exchanged by the Effective Date shall continue to be held by StakeHound solely for the purpose of funding exchanges with non-CNL, non-Insider customers.

[18] The Settlement Agreement additionally provides that Insider customers shall also execute such agreements and that StakeHound shall use commercially reasonable efforts to obtain such agreements from all of its other creditors and putative claimants.

[19] If StakeHound is not able to obtain Release or Forbearance Agreements from all of its creditors and putative claimants, including non-CNL customers and other creditors and claimants enumerated in the Settlement Agreement, on the Settlement Agreement's Effective Date, StakeHound will be deemed to have granted CNL a first priority lien with immediate effect on the assets enumerated in Section 6(a) of the Settlement Agreement, including its claims against Fireblocks, aside from those specifically enumerated in Exhibit A to the Settlement Agreement, in an amount equal to the StakeHound Funding Amount, plus interest compounding annually at 20%.  CNL shall be entitled to exercise remedies set forth in Section 6(d) of the Settlement Agreement.  The lien granted to CNL shall be extinguished only upon the date that, with respect to all such creditors and putative claimants, including all non-CNL customers and other creditors and claimants enumerated in the Settlement Agreement, StakeHound has either (i) obtained a Release or Forbearance Agreement, or (b) has paid or otherwise satisfied all such non-CNL customers in full.

[20] The amount CNL must transfer will be reduced by the U.S. dollar value of the MATIC, DOT, and ETH StakeHound is retaining to pay outstanding amounts owed to StakeHound vendor Altcoinomy.

[21] In the event that the Fireblocks Litigation is discontinued for any reason, any balance of the StakeHound Funding Amount shall be returned to CNL or its delegate within five business days of the decision to discontinue and the Security Interest shall be deemed released.

maintain the nodes associated with the locked ETH, provide reasonable salaries and expenses for StakeHound's co-founders, and pay limited necessary corporate costs, expenses, and outstanding taxes and obligations, as set forth in greater detail in the Settlement Agreement, all of which are reasonable under the circumstances as part of the overall Settlement Agreement.[22]

42.    The Settlement Agreement additionally provides that CNL shall be entitled to share in any recoveries StakeHound achieves in the Fireblocks Litigation █████████████ ████████████████████ Specifically, the Settlement Agreement requires that any Fireblocks Recoveries will be allocated initially 100% to CNL to repay in full the StakeHound Funding Amount, plus accrued interest compounding annually at 20%.  After the StakeHound Funding Amount has been repaid (and to the extent CNL has not already recovered the Lost ETH in kind), 70% of any Fireblocks Recoveries will be distributed to CNL until CNL recovers value equal to the number of the Lost ETH (including all principal tokens and staking rewards earned but not yet paid to CNL through the Fireblocks Recovery Date) plus the Additional ███ ETH left behind with StakeHound to satisfy non-CNL customer claims (to the extent not previously returned to CNL), multiplied by the greatest of the price of ETH on the Settlement Agreement's Effective Date, the Fireblocks Recovery Date, or the In Kind Recovery Date.  Thereafter, CNL will receive 30% of any Fireblocks Recovery.  This allocation ensures that if a recovery is obtained from Fireblocks, to the greatest extent possible, CNL is entitled to the full repayment of the StakeHound Funding Amount, plus 20% interest compounded annually, and thereafter, the vast majority of any recovery is allocated to CNL until it is made whole with respect to the Lost and

---

[22] If first authorized by the CNL Representative, StakeHound may also use the StakeHound Funding Amount for purposes of purchasing sufficient ETH to provide (with the Additional ETH) up to a ██ exchange for stETH held by non-CNL, non-Insider customers.

Additional ETH, with the potential for an additional significant upside as a return on the StakeHound Funding Amount.

43.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

44.    To the extent StakeHound and CNL cannot agree ████████████████

██████████████████████████████████████████████████

the Settlement Agreement provides that the Honorable Judge Michael E. Wiles, as Mediator, shall

resolve the disagreement.    ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████

_____

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

45.    *Third*, the Settlement Agreement provides that beginning on the Settlement's Effective Date and continuing until the Fireblocks Recovery Date, CNL shall receive the majority of the accessible gross Staking Rewards on the Nodes.

46.    ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ ██████████████

████████████████████████████████████████████████████

███████████████████████████████████ ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

---

████████████████████████████████████████████████

[24] Thereafter, StakeHound would be entitled to 100% of any Recovery.

[25] ████████████████████████████████████████████████

██████████████.

**2. Litigating the Adversary Proceeding Would Be Uncertain and Expensive, as Would Collecting Any Litigated Judgment Against StakeHound**

47.    CNL is confident that its claims against StakeHound in the Adversary Proceeding would succeed on the merits, and/or that it would prevail in the Swiss Arbitration should it be required to participate in that matter.  Nonetheless, continuing litigation against StakeHound would be protracted and expensive and could entail multi-year proceedings across multiple jurisdictions.

48.    Indeed, if the Court were to grant StakeHound's pending Motion to Compel, CNL would be required to litigate certain of its claims in a Swiss Arbitration prior to returning to the Bankruptcy Court to litigate the balance of its claims.  This scenario cannot be ruled out, given CNL has asserted certain claims that CNL contends are non-core, and subject to valid and enforceable arbitration agreements.  It is also uncertain whether, in such a scenario, the Arbitrator would keep in place the preliminary restraints put in place by the Bankruptcy Court, and if it does not, whether StakeHound might dissipate assets to frustrate any judgment CNL might ultimately obtain.  Given the complexity of the causes of action and the underlying subject matter, resolution of these gating procedural items is likely to take a substantial period of time, at substantial cost.  And success on the merits of a litigation or arbitration is never guaranteed.

49.    By contrast, if this Motion is granted, the Settlement Agreement will provide CNL with substantial and immediate disbursements reflecting the transfer of most of the assets in StakeHound's possession to CNL, plus an avenue for recovering the value of the StakeHound Funding Amount with interest, and the value of the Lost ETH in connection with the ongoing Fireblocks Litigation.  *See In re Ambac Fin. Grp., Inc.*, 457 B.R. 299, 306 (Bankr. S.D.N.Y. 2011) (finding this factor satisfied where estate received value for releasing claims in connection with settlement).

50. █████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

51.     And even if CNL litigated its claims to a successful judgment against StakeHound, there would be further difficulty, uncertainty, delay, and cost in seeking to enforce that judgment and collect from StakeHound, ██████████████████████████████████

████████████████████████████████████████████

### 3. The Remaining Factors All Weigh in Favor of Approving the Settlement Agreement

52.     With respect to the remaining factors, there can be no dispute that the Settlement Agreement "'is the product of arm's length bargaining'" and was negotiated by competent and experienced counsel in the course of a mediation overseen by a highly respected U.S. Bankruptcy Court Judge. *Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (citations omitted).

53.     Each Party has been represented by experienced litigators in connection with their dispute, as well as throughout all negotiations regarding the Settlement Agreement. This weighs heavily in favor of approving the Settlement Agreement. *See, e.g.*, *In re Adelphia*, 368 B.R. at 226; *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (holding that settlement satisfied the Second Circuit's requirements, in part because "[n]o argument has been made, nor could any argument be made, that the counsel who put the Settlement together were anything less

than highly skilled in their craft, and knowledgeable in the considerations underlying a settlement of this character").

54.      Moreover, the Settlement Agreement is a product of mediation and good-faith negotiations and "represents the considered judgment of economically motivated parties who were negotiating at arm's-length to reach the best settlement that could be achieved under the circumstances." *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009); *see also In re Chemtura Corp.*, 439 B.R. at 608. Finally, the UCC participated in the mediation in-person, and on multiple conferences, and supports approval of the Settlement Agreement as in the best interests of the Debtors' estates and their creditors and other stakeholders.

### B. Upon Approval of the Settlement Agreement, the Court Should Approve the Transfer to StakeHound of the stTokens and the StakeHound Funding Amount in Accordance with the Terms of the Settlement Agreement

55.      Should the Court approve the Settlement Agreement, CNL requests that it approve the transfer to StakeHound of the stTokens and StakeHound Funding Amount pursuant to section 363(b) of the Bankruptcy Code to the extent such further approval is necessary to effectuate those transfers in accordance with the terms of the Settlement Agreement.[26]

56.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "A debtor in possession has broad discretion to use estate property when such use represents a reasonable business judgment on the part of the debtor." *In re K.G. IM, LLC*, 620 B.R. 469, 478 (Bankr. S.D.N.Y. 2020) (citation omitted); *see also In re Residential Cap., LLC*, 504 B.R. 358, 366 (Bankr. S.D.N.Y. 2014) (citation omitted)

---

[26] Should the Court deny approval of the Settlement Agreement for any reason, CNL withdraws in full its request for approval of these transfers, which CNL seeks solely for purposes of effectuating the Settlement Agreement.

("If a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, that use may be approved."). For the reasons set forth in greater detail above, CNL's transfer of the stTokens and the StakeHound Funding Amount represents its reasonable business judgment.

57.     As an initial matter, the stTokens to be transferred to StakeHound are merely tokenized representations of the native ETH, DOT, and MATIC being returned to CNL and have only nominal (if any) value apart from their right of exchange for native tokens on a 1:1 basis. Their return to StakeHound will therefore have no material effect on CNL and is imminently reasonable in the context of the Settlement Agreement.

58.     Concerning the StakeHound Funding Amount, transfer of the StakeHound Funding Amount is integral to the Settlement Agreement and necessary to the effective and successful prosecution of the Fireblocks Litigation, which is in CNL's best interests.  There are narrowly tailored constraints on how StakeHound may use the funds, ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████  Further, the proposed allocation of the Fireblocks Recoveries potentially resulting from the StakeHound Funding Amount will provide CNL with the potential for a full recovery of all relief sought in the Adversary Proceeding as well as a significant potential upside.  As such, transfer of the StakeHound Funding Amount is a reasonable exercise of CNL's business judgment as part of its overall resolution of the dispute with StakeHound and is in the best interests of CNL and its creditors and other stakeholders.

59.     Finally, waiver of Bankruptcy Rule 6004(h) in connection with the transfer of the stETH and the StakeHound Funding Amount is warranted.  Bankruptcy Rule 6004(h) provides

that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). For the reasons set forth above, to the extent necessary to ensure CNL is able to timely complete the transfers set forth in the Settlement Agreement, CNL requests that the 14-day stay as provided in Bankruptcy Rule 6004(h) be waived.

## NOTICE

60.     Notice of this Motion will be provided in accordance with the procedures set forth in the Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief [ECF No. 2560]. Notice will also be provided to all Parties. Further, this Motion will be filed on the public docket and made available to all parties in interest through Stretto at https://cases.stretto.com/celsius. CNL respectfully submits that no further notice is required.

61.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, CNL respectfully requests that the Court (i) enter an order substantially in the form attached hereto as **Exhibit A** and (ii) grant such other and further relief as the Court may deem proper.

Dated:     December 8, 2023
           New York, New York

                         AKIN GUMP STRAUSS HAUER & FELD LLP

                         By:    */s/ Mitchell P. Hurley*
                                 Mitchell P. Hurley
                                 Dean L. Chapman Jr.
                                 One Bryant Park
                                 New York, New York 10036
                                 Telephone: (212) 872-1000
                                 Facsimile: (212) 872-1001
                                 mhurley@akingump.com
                                 dchapman@akingump.com

                                 Elizabeth D. Scott (admitted *pro hac vice*)
                                 Nicholas Lombardi (admitted *pro hac vice*)
                                 2300 N. Field Street, Suite 1800
                                 Dallas, TX 75201
                                 Telephone: (214) 969-2800
                                 Facsimile: (214) 969-4343
                                 edscott@akingump.com
                                 nlombardi@akingump.com

                                 *Special Litigation Counsel for Debtors and Plaintiff Celsius Network Limited*