# EXHIBIT B

*Execution Version*

# SETTLEMENT AGREEMENT

This Settlement Agreement ("**Settlement Agreement**") is made as of December 8, 2023 by and among (i) Celsius Network Limited ("**CNL**"), a Debtor in cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") jointly administered as *Celsius Network LLC, et al.*, case no. 22-10964 (MG) in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and (ii) StakeHound S.A. ("**StakeHound**," and together with CNL, the "**Parties**"), a private *société anonyme* incorporated under the laws of Switzerland with registered offices at Place de Longemalle 1, c/o MN & Associés SA, 1204 in Geneva, Switzerland.

## RECITALS

WHEREAS**,** reference is made to the Swiss Arbitration and Adversary Proceeding initiated in connection with certain disputes between CNL and StakeHound,

WHEREAS, in order to avoid the expense and inconvenience of litigation, the Parties desire to settle and compromise all disputes between them, including all claims that were or could have been alleged in the Notice of Arbitration, Amended Complaint, Swiss Arbitration and Adversary Proceeding, each as defined below,

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties agree as follows:

1. Defined Terms.  As used in this Settlement Agreement, terms not defined herein that are defined in the Uniform Commercial Code (as defined below) shall have the meanings provided therein and the following terms have the meanings specified below:

    a. "**Adversary Proceeding**" means the adversary proceeding captioned *Celsius Network Limited v. StakeHound S.A.*, case no. 23-01138 currently pending before the Bankruptcy Court.

    b. "**Affiliate**" means any Person that controls, is controlled by, or is under common control with another Person.

    c. "**Amended Complaint**" means the First Amended Complaint filed by CNL against StakeHound in the Adversary Proceeding on August 22, 2023 as ECF No. 31.

    d. "**Amended TRO**" means the *Order Amending TRO* entered by the Bankruptcy Court on October 18, 2023 as ECF No. 96.

    e. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

    f. "**Celsius Representative**" means one (1) Person designated, from time to time, by CNL (if prior to the effective date of the Plan) and the Litigation Administrator or its successor (if on or after the effective date of the Plan), who may be represented by counsel acting on such Person's behalf and at no expense to StakeHound, ████

██████████████████████████████████████████████

g. "**Convertible Loan**" means a loan issued to StakeHound pursuant to a Convertible Loan Agreement.

h. "**Convertible Loan Agreement**" means an agreement styled as any convertible loan agreement entered between StakeHound, on the one hand, and an investor, on the other.

i. "**Convertible Loan Holders**" mean any holder of a Convertible Loan pursuant to a Convertible Loan Agreement entered into by StakeHound.

j. "**Cost Threshold**" means the StakeHound Funding Amount plus interest accruing at a rate of 20% per annum (compounding annually as provided herein), from the date CNL transfers the StakeHound Funding Amount to StakeHound until the Fireblocks Recovery Date.

k. ██████████████████████████████████████████████

l. "**DOT**" means native Polka DOT tokens, including, without limitation, any and all Staking Rewards earned on native Polka DOT tokens.

m. "**DOT Term Sheet**" means the Term Sheet entered under the RSA concerning CNL's transfer of 66,000 DOT to StakeHound.

n. "**ETH**" means native Ethereum tokens, including, without limitation, any and all Staking Rewards earned on native ETH tokens.

o. "**Effective Date**" means the date on which this Settlement Agreement is approved by the Bankruptcy Court.

p. "**Event of Default**" means any of the following:

  i. StakeHound shall fail to pay any amount due to CNL hereunder pursuant to Section 9 as and when the same shall become due and payable hereunder;

  ii. StakeHound shall fail to pay any other amount due to CNL hereunder when and as the same shall become due and payable hereunder; and such failure shall continue unremedied for a period of seven (7) business days after written demand for payment thereof from CNL is received by StakeHound;

  iii. Any representation or warranty made or deemed made by or on behalf of StakeHound herein, or in connection with any amendment or modification

hereof or waiver hereunder, shall prove to have been incorrect in any material respect when made or deemed made;

iv. StakeHound shall fail to observe or perform any other covenant, condition or agreement contained herein, and such failure shall continue unremedied for a period of seven (7) business days after written notice of such breach from CNL is received by StakeHound; or

v. StakeHound shall (A) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization or other relief under any U.S. Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in the preceding subclause (A), (C) apply for or consent to the appointment of a receiver, trustee, examiner, custodian, sequestrator, conservator or similar official for itself or a material part of its assets, (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) make a general assignment for the benefit of creditors, (F) admit in writing its inability or fail generally to pay its debts as they become due (other than debts that are being contested in good faith and by appropriate proceedings diligently conducted) or (G) take any action to authorize or effect any of the foregoing.

q. "**February 2021 Staked ETH**" means the 35,000 native ETH that CNL transferred to the wallet identified by StakeHound, 0x607ebC82329D0CAc3027B83d15e4b4E816F131b7, on February 2, 2021.

r. "**Fireblocks Inc.**" means the Delaware corporation specializing in digital asset custody and infrastructure incorporated under the name of Fireblocks Inc. and an affiliate of Fireblocks Ltd.

s. "**Fireblocks Ltd.**" means the Israeli private company specializing in digital asset custody and infrastructure known as Fireblocks Ltd. and an affiliate of Fireblocks Inc.

t. "**Fireblocks**" means, collectively, Fireblocks Ltd. and Fireblocks Inc..

u. "**Fireblocks Litigation**" means the lawsuit captioned *StakeHound SA v. Fireblocks Ltd. and Fireblocks Inc.* under case number CC 49705-06-21 currently pending in the District Court of Tel Aviv, Israel, and all claims and causes of action of any kind that are or could have been alleged in the Fireblocks Litigation or otherwise by StakeHound or any of its Insiders against Fireblocks Ltd. and/or Fireblocks Inc. or any of its Insiders in any forum, jurisdiction or proceeding.

v. "**Fireblocks Recovery**" means any recovery in any form by StakeHound in connection with the Fireblocks Litigation, including as a result of either (i) entry of a judgment in favor of StakeHound and against either Fireblocks Ltd. or Fireblocks Inc., or (ii) a Fireblocks Settlement. For the avoidance of doubt, the Fireblocks Recovery does not include any in-kind recovery of the ETH associated with the Nodes.

w. "**Fireblocks Recovery Date**" means any date on which StakeHound has actually
received value due as a Fireblocks Recovery and paid to CNL the share of such
Fireblocks Recovery to which CNL is entitled in accordance with this Settlement
Agreement.

x. "**Final Fireblocks Recovery Date**" means the date on which StakeHound has received
all value due, or that could become due, as a Fireblocks Recovery, and paid to CNL the
share of such Fireblocks Recovery to which CNL is entitled in accordance with this
Settlement Agreement.

y. "**Fireblocks Related Parties**" means Fireblocks and any other parties, other than
Celsius or StakeHound, associated with the Fireblocks Litigation and the Key Loss
Incident.

z. "**Fireblocks Settlement**" means any Settlement of the Fireblocks Litigation.

aa. ███████████████████████████

bb. "**Insider**" means Albert Castellana, Edgars Nemše, any current or former director,
officer, employee, manager, partner, parent, subsidiary, Affiliate or owner of any
interest in StakeHound or Fireblocks and any of their respective Related Parties.

cc. "**Interest**" means interest on the StakeHound Funding Amount (excluding any portion
of the StakeHound Funding Amount used to purchase Purchased ETH) at the rate of
20% per annum, compounding annually on December 31 of the calendar year in which
the StakeHound Funding Amount is transferred, and then on December 31st each year
thereafter until the StakeHound Funding Amount and any accrued interest thereon
contemplated hereby is fully repaid.

dd. "**Key Loss Incident**" means the incident on May 2, 2021 where cryptographic keys
associated with ETH in StakeHound's possession were lost and is now subject of the
Fireblocks Litigation.

ee. "**Law**" means any federal, state, local, or foreign law (including common law), statute,
code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly
adopted, promulgated, issued, or entered by a governmental authority of competent
jurisdiction (including the Bankruptcy Court).

ff. "**Lost ETH**" means all of the February 2021 Staked ETH, plus all ETH provided to
StakeHound by customers other than CNL, that were associated with the private keys
that were lost or destroyed by the Key Loss Incident, inclusive of all Staking Rewards
earned thereon, whether before or after the Key Loss Incident and the Effective Date
(except for Accessible Lost ETH Staking Rewards); Staking Rewards continue to
accumulate but recently, the total of principal coins and accumulated, non-distributed
Staking Rewards associated with the Key Loss Event amounted to approximately
42,714 ETH.

gg. "**Litigation Administrator**" has the same meaning as defined in the Plan.

hh. "**MATIC**" means native MATIC tokens, including, without limitation, any and all Staking Rewards earned on native MATIC tokens.

ii. "**MATIC Term Sheet**" means the Term Sheet entered under the RSA concerning CNL's transfer of 40,000,000 MATIC to StakeHound.

jj. "**Mediator**" means Judge Michael E. Wiles, sitting United States Bankruptcy Judge for the Southern District of New York, or such successor mediator as may be mutually agreed by the Parties.

kk. "**Native Tokens**" means ETH, MATIC, and DOT in StakeHound's possession, custody or control.

ll. "**Nodes**" means the series of connected devices generally used to, amongst other things, distribute and store information, as well as verify and record new transactions, for the Ethereum blockchain, that are associated with the Lost ETH, inclusive of any associated rights of every kind or description, including for avoidance of all doubt, the validators that are accumulating Staking Rewards on the Lost ETH.

mm. "**Notice of Arbitration**" means the Notice of Arbitration dated April 24, 2023 filed in connection with the Swiss Arbitration with StakeHound as claimant and CNL as respondent.

nn. "**Pivot Point**"



oo. "**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity, or other entity, whether acting in an individual, fiduciary or other capacity.

pp. "**Plan**" means the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [ECF No. 3577], together with any amendments or modifications thereto, as fully and finally approved by the Bankruptcy Court in *Celsius Network LLC, et al.*, case no. 22-10964.

qq. "**Related Parties**" means, with respect to any Person, such Person's Affiliates and the respective relatives, directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

rr.  "**RSA**" means that certain *Revenue Sharing Agreement*, dated as of April 21, 2021, by and between CNL and StakeHound (including the DOT Term Sheet and MATIC Term Sheet related to the RSA).

ss.  "**Settlement**" means the partial or complete satisfaction or resolution of any claim or dispute in exchange for any condition, sum, asset or other consideration provided by agreement of the parties involved in the dispute.

tt.  "**SSA**" means that certain *Staking Services Agreement*, dated as of January 20, 2021, by and between CNL and StakeHound.

uu.  "**SSTC**" means the StakeHound Services Terms and Conditions attached as an exhibit to both the SSA and RSA.

vv.  "**stDOT**" means the StakeHound stDOT tokens transferred by StakeHound to CNL in exchange for DOT pursuant to the RSA, DOT Term Sheet and SSTC, plus related Staking Rewards.

ww.   "**Staking Rewards**" means rewards such as transaction fees and/or newly created cryptocurrencies generated by staked Native Tokens.

xx.  "**stETH**" means the StakeHound stETH tokens transferred by StakeHound to CNL in exchange for ETH, plus related Staking Rewards.

yy.  "**stMATIC**" means the StakeHound stMATIC tokens transferred by StakeHound to CNL in exchange for MATIC pursuant to the RSA, MATIC Term Sheet and SSTC in exchange for MATIC, plus related Staking Rewards.

zz.  "**stTokens**" means stDOT, stETH, stMATIC.

aaa.   "**Swiss Arbitration**" means arbitration case no. 300641-2023 commenced by StakeHound against Celsius currently pending before the Swiss Arbitration Center.

bbb.   "**TRO**" means the *Order Granting TRO* entered by the Bankruptcy Court in the Adversary Proceeding as ECF No. 59.

ccc.   "**Uniform Commercial Code**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

2.  <u>Assets in StakeHound's Possession, Custody or Control</u>. StakeHound shall not transfer, exchange or otherwise dispose of any Collateral (as defined below) or any other property or assets (including, real, personal, tangible, intangible and mixed) in its possession, custody or control (collectively, the "**Assets**") other than as provided herein, and represents that it has not transferred, exchanged or otherwise disposed of any such Assets since September 8, 2023, except as specifically authorized by the TRO and Amended TRO; provided, that the restrictions on transfer, exchange and disposition of this section shall not apply to the assets listed on the attached <u>Exhibit A</u>.

3. Disposition of Native Tokens

    a. **Initial CNL ETH Exchange**. StakeHound shall transfer all of the ETH (including any accumulated Staking Rewards (in any form) from ETH) in its possession, custody or control as of the date of the execution (other than the Additional ETH and the Altcoinomy Tokens) to CNL on or before the Effective Date (the "**Initial CNL ETH Transfer**").[1] Within five (5) business days following the Initial CNL ETH Transfer, CNL shall transfer $10 million (less the U.S. dollar value of the Altcoinomy Tokens (defined below) as of such transfer) (the "**StakeHound Funding Amount**") and the same number of stETH to StakeHound as the number of native ETH transferred by StakeHound to CNL pursuant to the Initial CNL ETH Transfer, provided however, that if the price of ETH at the time of the transfer is less than $1,579, CNL may in its sole discretion terminate this Settlement Agreement, in which event CNL shall have no obligation to transfer the StakeHound Funding Amount, or any stETH, and shall return the ETH transferred pursuant to the Initial CNL ETH Transfer. For the avoidance of doubt, StakeHound shall not exchange the StakeHound Funding Amount from U.S. dollars to any other currency (cryptocurrency or otherwise) except with the express prior written consent of the Celsius Representative.

    b. **MATIC Exchange**. No later than three (3) calendar days following the Effective Date, (i) StakeHound shall cause all MATIC (including any accumulated Staking Rewards (in any form) from MATIC, but excluding any Altcoinomy Tokens) in StakeHound's possession, custody or control as of the date of the transfer (which, for the avoidance of doubt, shall equal not less than 47,907,353.07 MATIC) to be transferred to a CNL-owned wallet, and (ii) StakeHound shall issue to CNL a number of additional stMATIC so that CNL has a balance of stMATIC equal to the number of MATIC so transferred (the "**MATIC and stMATIC Transfer**"). Promptly following receipt of the MATIC and stMATIC Transfer, CNL shall transfer all stMATIC in its possession, custody or control to StakeHound.

    c. **DOT Exchange**. No later than thirty-one (31) calendar days following the Effective Date (i) StakeHound shall cause all DOT (including any accumulated Staking Rewards (in any form) from DOT, but excluding any Altcoinomy Tokens) in StakeHound's possession, custody or control as of the date of the transfer (which, for the avoidance of doubt, shall equal not less than 90,940.67 DOT) to be transferred to a CNL-owned wallet and (ii) StakeHound shall issue to CNL a number of additional stDOT so that CNL has a balance of stDOT equal to the number of DOT so transferred (the "**DOT and stDOT Transfer**"). Promptly following the receipt of the DOT and stDOT Transfer, CNL shall transfer all stDOT in its possession, custody or control to StakeHound.

---

[1] The Initial CNL ETH Transfer shall include all accumulated, accessible Staking Rewards earned through the date of the Initial CNL ETH Transfer and shall be no less than 27,457.98 ETH.

4. <u>Permitted Uses of the StakeHound Funding Amount</u>.  Except with the prior written consent of the Celsius Representative, StakeHound shall be permitted to use the StakeHound Funding Amount solely as expressly set forth in this paragraph 4 and paragraph 5(d).

    a.  The StakeHound Funding Amount shall be used solely for the professional fees and costs of the Fireblocks Litigation described in 4(a) (i) to (v), and up to the amounts identified in 4(a)(i) to (v), (the "**Fireblocks Litigation Funding**"):

        i.  Goldfarb Gross Seligman ("**Goldfarb**"), up to $███████ through trial and exhaustion of all appeals, inclusive of all VAT and any other costs, expenses or fees for which Goldfarb may seek payment;

        ii.  Keystone Law, up to $██████ through trial and exhaustion of all appeals, inclusive of all VAT and any other costs, expenses or fees for which Keystone Law may seek payment;

        iii.  FTI Consulting, Inc. and such other experts as may reasonably be required, up to $██████ through trial and exhaustion of all appeals, inclusive of all VAT and any other costs, expenses or fees for which FTI Consulting, Inc. may seek payment;

        iv.  Israel court fees in the Fireblocks Litigation solely to the extent required by the Court up to a total (inclusive of fees or bonds paid to date) of $███████;

        v.  Such additional court fees or bonds in the Fireblocks Litigation that may be required by the Court and to the extent approved by the Celsius Representative in writing (collectively with items (i)–(iv) immediately above, the "**Permitted Uses**").

    b.  Attached hereto as Exhibit B is a schedule reflecting, on an aggregate line-item basis, all expenses incurred in respect of the Fireblocks Litigation through September 30, 2023, that if incurred after the date hereof, would constitute Permitted Uses.  Within fifteen (15) days following the end of each quarter, beginning with the fourth quarter of 2023, StakeHound shall provide to CNL, organized by the categories set forth above (i) a schedule of aggregate amounts actually incurred during such quarter, for Permitted Uses, (ii) a schedule of aggregate amounts actually incurred from the outset of the Fireblocks Litigation through the end of such quarter in respect of Permitted Uses (and that would have been Permitted Uses if incurred after the date hereof), and (iii) a proposed budget setting forth the amounts it expects to incur on such Permitted Uses in the following quarter for review and approval by the Celsius Representative (the "**Fireblocks Litigation Budget**").

c.  In addition to the Fireblocks Litigation Funding, the StakeHound Funding Amount can be used solely to satisfy the obligations (and up to the amounts) specifically identified below:

  i.  Amounts payable to Allnodes Inc. (not to exceed $█████████████) and other amounts necessary to keep the Nodes staked solely to the extent first approved by the Celsius Representative;

  ii.  Costs and expenses for custody services not to exceed $███████████ unless first approved by the Celsius Representative;

  iii.  Professional fees and costs incurred by Locke Lord LLP, SW Legal, KeyStone Law and any Swiss Law expert retained by StakeHound (solely in connection with their respective representation of StakeHound on or before the Effective Date), not to exceed in the aggregate $████████. Each firm's entitlement to payment pursuant to this Section 4(c)(iii) shall be conditioned upon such firm (individually and not collectively) providing a release to StakeHound and CNL for any claims incurred or accrued on or prior to the Effective Date in a form mutually acceptable to StakeHound and CNL;

  iv.  Paying salaries for Edgars Nemše and Albert Castellana beginning on and after the last date for which Mr. Nemše and Mr. Castellana were paid salaries, an amount not to exceed $████ per month each, prorated for any portion of any such month, plus $████ for travel expenses related to the mediation to the extent documented to the satisfaction of the Celsius Representative;

  v.  Subject to consent of the Celsius Representative, which shall not be unreasonably withheld, amounts necessary to pay (i) accounting and domiciliation services to MN & Associates SA not to exceed ███████ and (ii) Swiss taxes not to exceed ████  ████. For the avoidance of doubt, nothing in this Section 4(c)(v) shall be construed to limit StakeHound's right to pay required tax amounts if and as they are assessed from funds not subject to use restrictions under the terms hereof;

  vi.  Currently outstanding tax obligations owed by StakeHound to governmental authorities, in an amount not to exceed ████████ only to the extent such payment satisfies in full all outstanding taxes owed by StakeHound;

  vii.  Amounts outstanding to Altcoinomy SA ("**Altcoinomy**") in an amount not to exceed █████████████████████████████████████ (the "**Altcoinomy Tokens**"), but only to the extent no further amounts have been or will be incurred without the approval of the Celsius Representative, and Altcoinomy provides a general release with respect to amounts incurred prior to the Effective Date in form and substance acceptable to CNL;

  viii.  Other necessary corporate costs and expenses in an amount not to exceed ██████████; for the avoidance of doubt, the funds contemplated in this

item (viii) shall not be used for any of the other purposes specifically identified herein.

    ix.    Such other amounts as may be agreed between StakeHound and the Celsius Representative.

d.    To the extent, after the date the TRO was modified and prior to the Initial CNL ETH Transfer, StakeHound requests and CNL consents to any use of assets by StakeHound, the value of any assets so used by StakeHound shall be deducted from the $10 million CNL is required to transfer in exchange for the Initial CNL ETH Transfer (i.e., deducted from the StakeHound Funding Amount).

5.    <u>Release or Forbearance Agreements</u>.    Promptly following execution of this Settlement Agreement:

a.    All Insider customers shall execute such agreements as shall be necessary to secure their forbearance from taking legal action against StakeHound prior to the Final Fireblocks Recovery Date, in each case, in form and substance acceptable to CNL (such agreements, in form and substance acceptable to CNL, "**Release or Forbearance Agreements**").

b.    StakeHound shall use commercially reasonable efforts to seek Release or Forbearance Agreements from all current creditors or putative claimants, including all non-CNL customers, ███ and Convertible Loan Holders. ███

c.    StakeHound may use approximately ███████ (together with any rewards, interests or other proceeds accruing thereon, and as adjusted as of the date of the Initial CNL ETH Transfer, the "**Additional ETH**") solely for the purpose of exchanging such ETH for stETH with non-CNL, non-Insider customers and only to the extent such exchanging non-CNL, non-Insider customer executes a Release or Forbearance Agreement.  For the avoidance of doubt, CNL shall have no liability for any payment or other obligation to non-CNL, non-Insider customers that is or may become due or payable at any time, which payments or obligations shall be satisfied solely and exclusively from the Additional ETH, any Purchased ETH, StakeHound's share of the Fireblocks Recovery, if any, and/or any In Kind Recovery.

d.    If first authorized in writing by the Celsius Representative, StakeHound can use the StakeHound Funding Amount for purposes of purchasing sufficient ETH (the "**Purchased ETH**") to provide (with the Additional ETH) up to ███████ for stETH held by non-CNL, non-Insider customers.

e.    Any Additional ETH not exchanged by the Effective Date as described above shall continue to be held by StakeHound solely for the purpose of funding exchanges with

non-CNL, non-Insider customers.  For the avoidance of doubt, the lien granted to CNL pursuant to the following paragraph shall be extinguished upon the date that, with respect to all such creditors and putative claimants, including all non-CNL customers, ███ and all Convertible Loan Holders, StakeHound has obtained either (i) a Release or Forbearance Agreement or (ii) has paid or otherwise satisfied such non-CNL customers in full.

6.  <u>Collateral Matters</u>

a.  **Grant of Security Interest**.  Solely to the extent StakeHound has not succeeded in obtaining Release or Forbearance Agreements from all of its creditors or putative claimants, including non-CNL customers, ███ and all Convertible Loan Holders prior to such date, and subject to the preceding section 5(a), upon the Effective Date, as security for the prompt and complete performance when due of Stakehound's obligation to repay the StakeHound Funding Amount plus Interest, upon Stakehound's receipt of the Fireblocks Recovery (collectively the "**<u>Secured Obligations</u>**"), StakeHound does hereby pledge, assign and transfer unto CNL, its successors and permitted assigns, and does hereby grant to CNL, its successors and permitted assigns, a continuing security interest (the "**<u>Security Interest</u>**") in all of the right, title and interest of StakeHound in, to and under all of the following assets and properties (except for, and expressly excluding, those assets and property listed on Exhibit A and any proceeds earned or exchanged therefrom on and after the Effective Date), whether now owned or hereafter from time to time arising or acquired by StakeHound (collectively, the "**<u>Collateral</u>**"):

    i.  the Nodes;

    ii.  all Accounts;

    iii.  all Chattel Paper;

    iv.  all cash, Deposit Accounts and securities accounts;

    v.  all Letter of Credit Rights;

    vi.  all Documents;

    vii.  all Equipment;

    viii.  all General Intangibles;

    ix.  all Goods;

    x.  all Instruments;

    xi.  all Inventory;

    xii.  all Investment Property;

    xiii.  all books and records pertaining to the Collateral;

    xiv.  all intellectual property;

    xv.  all claims, including any Commercial Tort Claims; and

    xvi.  to the extent not otherwise included, all Proceeds, products, accessions, rents and profits of any and all of the foregoing and all Supporting Obligations, collateral security and guarantees given by any Person with respect to any of the foregoing;

*provided, however*, that notwithstanding any of the other provisions set forth in this Section 6, (x) this agreement shall not constitute a grant of a security interest (A) in any property to the extent that such grant of a security interest is prohibited by any Law of a governmental authority with jurisdiction over the matters herein or (B) the assets identified on Exhibit A, and (y) applications in the United States Patent and Trademark Office to register trademarks or service marks on the basis of StakeHound's "intent to use" such trademarks or service marks will not be deemed to be Collateral unless and until a "Statement of Use" or "Amendment to Allege Use" has been filed and accepted in the United States Patent and Trademark Office, whereupon such application shall be automatically subject to the security interest granted herein and deemed to be included in the Collateral.

b.  **Authorization to File Financing Statements**.  StakeHound hereby irrevocably authorizes CNL and its agents at any time and from time to time to file in any relevant jurisdiction any financing statements with respect to the Collateral or any part thereof and amendments thereto and continuations thereof that (i) indicate the Collateral as "all assets of the debtor, whether now existing or hereafter arising" or words of similar effect as being of an equal or lesser scope or with greater detail and (ii) contain the information required by Article 9 of the Uniform Commercial Code or the analogous legislation of each applicable jurisdiction for the filing of any financing statement or amendment, including whether such Grantor is an organization, the type of organization and, if required, any organizational identification number issued to StakeHound.

c.  **Release of Collateral**.

    i.  Upon payment in full of the Secured Obligations, the Security Interest shall automatically terminate and all rights to the Collateral shall revert to StakeHound all without delivery of any instrument or performance of any act by any Person; *provided however* that upon any such termination, CNL will, at StakeHound's expense, execute and deliver to StakeHound such documents as StakeHound shall reasonably request to evidence such termination.

    ii.  Concurrently with a disposition of Collateral permitted hereunder, the Security Interest in such Collateral other than the proceeds thereof shall automatically terminate and all rights to such Collateral shall be vested in the Person to whom such disposition was made, all without delivery of any instrument or

performance of any act by any Person; *provided however* that upon any such termination, CNL will, at StakeHound's expense, execute and deliver such documents as StakeHound shall reasonably request to evidence such termination.

iii.   In the event (i) StakeHound has obtained either a Release or Forbearance Agreement from all non-CNL customers, (ii) StakeHound has paid or otherwise satisfied such non-CNL customers in full, or (iii) satisfaction of the Cost Threshold in accordance with Section 9(d) below, the Security Interest shall automatically terminate and all rights to the Collateral shall revert to StakeHound all without delivery of any instrument or performance of any act by any Person; *provided however* that upon any such termination, CNL will, at StakeHound's expense, execute and deliver to StakeHound such documents as StakeHound shall reasonably request to evidence such termination.

d.   **Collateral Remedies**.

i.   The occurrence of either of the following shall constitute a default under this Settlement Agreement for the purposes of Part 6 of Article 9 of the Uniform Commercial Code, and upon such occurrence CNL shall have, in addition to all other rights and remedies granted to it in this Settlement Agreement, all rights and remedies of a secured party under the Uniform Commercial Code and other applicable law: (i) StakeHound's failure to satisfy the Secured Obligations within 10 days of the Final Fireblocks Recovery Date, or (ii) the occurrence of an Event of Default, in each case, following the expiration of applicable cure periods and dispute resolution requirements set forth in Section 16 hereof. For the avoidance of doubt, any purchaser at any sale of Collateral in accordance with this Section 6(d) shall hold the property sold absolutely, free from any claim or right on the part of StakeHound, and StakeHound hereby waives all rights of redemption, stay and appraisal which StakeHound now has or may at any time in the future have under any law now existing or hereafter enacted.

ii.   Upon the sale of any of the Collateral by CNL hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of CNL or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to CNL or such officer or be answerable in any way for the misapplication or non-application thereof.

iii.   Any cash proceeds resulting from the sale or other disposition or collection of Collateral shall be paid to CNL until CNL has received an amount equal to the Secured Obligations.

e.   **Limitation on Liens**.  Prior to the release of the Security Interest,  StakeHound shall not, without the prior written consent of CNL, directly or indirectly incur or suffer to exist any mortgage, pledge, hypothecation, assignment, deposit arrangement,

encumbrance, lien (statutory or other), security interest, preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing) (each of the foregoing, a "***Lien***") upon the Collateral other than (a) the Liens incurred in connection with this agreement and (b) tax liens and materialmen's liens, in each case, for amounts not yet due.

f.   **Limitation on Certain Transactions**.   Prior to the release of the Security Interest, StakeHound shall not, without the prior written consent of CNL, directly or indirectly (i) assign, transfer, sell, convey, lease or otherwise dispose of any material portion of the Collateral out of the ordinary course of business or (ii) merge into or consolidate with any corporation or other entity.   Prior to the release of the Security Interest, StakeHound shall not, whether in one transaction or a series of transactions, wind up, liquidate or dissolve its affairs.

g.   **Further Assurances**.   Promptly upon the request of CNL, StakeHound shall duly execute and deliver, or cause to be duly executed and delivered, to CNL such further instruments and do and cause to be done such further acts as may be necessary or advisable in the reasonable opinion of CNL to carry out the intent and purpose of the express provisions of this Section 6.   For the avoidance of doubt, any expenses approved in advance and in a separate writing by the Celsius Representative and incurred in connection with StakeHound's obligations under Section 6 of this Settlement Agreement shall be payable from the StakeHound Funding Amount. Without limiting the generality of the foregoing, StakeHound shall:

 i.   Ensure that CNL's Lien in the Collateral is and will at all times remain a perfected, first priority Lien in such Collateral;

 ii.   from time to time, at its expense, execute, deliver, file and record any statement, assignment, instrument, document, agreement or other paper and take any other action that from time to time may be necessary in order to (i) create, preserve or perfect CNL's first priority Lien in the Collateral and (ii) enable CNL to exercise and enforce any of its rights, powers and remedies with respect to the Collateral; and

 iii.   warrant and defend StakeHound's title in the Collateral, subject to the rights of CNL, against the claims and demands of all persons.

7.   Fireblocks Litigation







    j.  **Distribution of Fireblocks Recoveries**.  Any Fireblocks Recovery shall be distributed promptly upon receipt as follows:

        i.  First, 100% to CNL until CNL receives payment of Fireblocks Recovery proceeds equal to the Cost Threshold.

        ii.  Second, 70% to CNL and 30% to StakeHound until such time as CNL receives payment of Fireblocks Recovery proceeds equal to the Pivot Point.

        iii.  Third, value in excess of the Pivot Point shall be shared 30% to CNL and 70% to StakeHound.

    k.  **Distribution of stETH.**  Promptly following any Fireblocks Recovery Date, CNL shall transfer all remaining stETH in its possession, custody or control to StakeHound, provided, for the avoidance of doubt, that (1) CNL shall nonetheless retain its contractual rights hereunder to its share of recoveries set forth above and (2) the number of stETH in CNL's possession, custody, or control shall in no way limit the recoveries to which CNL is entitled to or may become entitled to hereunder, whether before or after the Pivot Point is reached.

8.  <u>Resolution of Disagreements by the Mediator</u>

    a.  **General**.  To the extent that Parties have exhausted reasonable best efforts to come to a resolution of any disagreement ████████████████████████████████████████████, such disagreement shall be submitted to and resolved by the Mediator, whose decision to resolve such disagreement shall be binding upon the parties.  The following procedures shall apply to any dispute submitted to the Mediator for decision.

    b.  **Preliminary Conference**.  Before sending any written submissions regarding the dispute to the Mediator, the Parties shall reach out to the Mediator by email to schedule a conference, whether by phone, Zoom or in person as the Mediator deems appropriate, by and amongst counsel for the respective Parties and the Mediator, in an effort to resolve any disagreement (the "**<u>Preliminary Conference</u>**") without the need for any written submissions or evidence.  If the Parties and the Mediator are unable to resolve the Parties' disagreement through the Preliminary Conference, then the Mediator shall direct the Parties to submit written submissions regarding their dispute in accordance with the procedures below, or in a form and length and on a schedule that the Mediator directs.

    c.  **Submissions.**  If the Parties cannot resolve their disagreement through the Preliminary Conference, the Parties shall submit their dispute in writing to the Mediator as follows:

        i.  Within **seven (7)** days of the Preliminary Conference, each Party shall submit and exchange a brief no longer than **fifteen (15) pages**, double spaced, not inclusive of any exhibits or evidence attached thereto, setting forth the relevant facts concerning the parties' dispute, the specific issues in dispute, and the

parties' respective positions and proposals as to how to resolve such dispute (the "**<u>Initial Brief</u>**").

ii.   Within **three (3)** days of submission and exchange of the Initial Briefs, the Parties shall each submit a brief no longer than **five (5)** pages, double spaced, in response to the Initial Brief (the "**<u>Response Brief</u>**").

iii.  Upon receipt of the Initial Briefs and the Response Briefs, the Mediator may, at his election, request any additional brief(s) from the Parties, in the form and length and on the schedule as decided by the Meditator, as well as any documents or evidence that the Mediator deems necessary in order to resolve the dispute, including any affidavits, letters or other submissions by Israeli counsel or any other experts in Israeli law.

iv.   For the avoidance of doubt, the form, length and timing of the Initial Brief and Response Brief may be adjusted or waived by agreement of the Parties, or as the Mediator deems fit.

d.  **Failure to Participate.**  Should any Party refuse or neglect to appear for, or participate in, any conference scheduled with the Mediator or fail to submit any brief or any other document or submission pursuant to the applicable deadlines set forth by this section, as agreed upon by the Parties or as requested by the Mediator, the Mediator shall have the authority to decide the dispute based on whatever appearances, documents, or submissions are presented to him.

e.  **Scope of Authority.**  The Mediator's decision will be immediately final and binding upon the Parties without any further action by any Party, and shall not be subject to any further review or challenge by any Court, entity, or person, except on the bases set forth in 9 U.S.C. § 10(a) applicable to arbitral decisions.  In the event of any court proceeding to challenge the Mediator's decision on any such basis, the Parties hereby consent to the exclusive jurisdiction of the Bankruptcy Court; agree to exclusive venue in that jurisdiction; and waive any claims that such jurisdiction is an inconvenient forum.

f.  **Expenses**.  Each Party shall pay its own expenses in connection with the resolution of any dispute subject to the procedures of this Section.  Any expenses incurred by the Mediator shall be paid equally by the Parties.

g.  **Confidentiality**.  All conferences, briefing, and other proceedings necessary to resolve any disputes by the Mediator shall be fully confidential.  Neither Party shall attach to any filing or disclose to any third parties (outside of the Mediator) any communications, documents, briefs or any other submissions that have been sent to the Mediator or exchanged by the Parties in connection with this dispute resolution process, without first obtaining the written consent of the other Party,

████████████████████████████████████████████████
██████████████ The Mediator is authorized to issue binding directives on both
Parties to ███████████████████████████████████████
█████████████████████████ (b) to protect any trade secrets, proprietary
information or other confidential matters shared pursuant to this dispute resolution
process.

9.  Nodes and Related ETH and Staking Rewards





10. <u>9019 Motion</u>.  CNL shall use commercially reasonable efforts to file a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure seeking approval of the Settlement Agreement (the "**9019 Motion**") and to seek Bankruptcy Court approval of the Settlement Agreement on or before December 21, 2023.  If necessary, CNL shall seek to shorten the notice period with respect to the 9019 Motion.

11. <u>Ownership of Native Tokens and stTokens</u>.  Each Party represents and warrants to the other Party that as of the date of this Settlement Agreement it owns Native Tokens and/or stTokens in the amounts and in the wallets set forth on <u>Exhibit C</u> free and clear of all liens, claims and encumbrances.  CNL shall take, and shall cause its debtor Affiliates to take, such steps as are necessary to ensure that CNL continues to own the stTokens at all times and consistent with other terms hereof, prior to any Fireblocks Recovery Date and will promptly notify StakeHound of any change in respect thereof.

12. <u>Pre-Closing Diligence</u>

    a. StakeHound shall supply to CNL (and identify) such information as CNL shall reasonably request concerning StakeHound's business and operations, including, but not limited to, such information as may assist in identifying the source of all assets in StakeHound's possession, custody or control, and the use, transfer or other disposition of any tokens in StakeHound's possession, custody or control at any time, including the use, transfer or other disposition of any Staking Rewards earned on such tokens.  The Parties acknowledge and agree that while due diligence may continue until the Effective Date and is a condition of CNL signing this Settlement Agreement, it shall not be a condition to closing under this Settlement Agreement.

    b. StakeHound will provide CNL and any legal or financial advisors or professionals retained by CNL with reasonable access, and upon reasonable advance notice and during regular business hours, to such information regarding StakeHound's business ████████████████████████████████ in order to consummate the terms of the Settlement Agreement, and the Parties agree that they shall use reasonable best efforts to ensure that such access or disclosure will not waive legal privileges or protections or violate applicable Laws.

13. <u>Termination of Agreements</u>.  On the Effective Date, the SSA, RSA and SSTC (as applicable between StakeHound and CNL) shall be deemed terminated; *provided*, that each Party's rights, claims and entitlements against Fireblocks Ltd. and/or Fireblocks Inc. and the Fireblocks Related Parties in connection with the Key Loss Incident shall be expressly preserved.

14. <u>Dismissal of Proceedings</u>.  Within thirty (30) days of the date (i) the Settlement Agreement is approved by the Bankruptcy Court and no longer subject to any appeal or right of appeal and (ii) the Disposition of Native Tokens as set forth in paragraph 3 has occurred, StakeHound and CNL shall file appropriate documentation (in each case, reasonably acceptable to the Parties) and take all other steps reasonably necessary to effectuate the withdrawal with prejudice or dismissal with prejudice of the Swiss Arbitration and the Adversary Proceeding, respectively, and to cause the Bankruptcy Court to terminate the TRO and Amended TRO.

15. <u>Releases</u>

    a. Upon the last of the dates upon which any of the Initial CNL ETH Transfer, theMATIC and stMATIC Transfer and the DOT and stDOT Transfer occurs, CNL, for itself and for its employees, shareholders, officers, directors, successors, assigns, legal representatives, advisors, Affiliates, and other agents (the "**CNL Entities**"), hereby completely releases, acquits, and forever discharges StakeHound and all of StakeHound's former, present, and future officers, directors, members, administrators, employees, agents, attorneys, insurers, predecessors, successors, assigns, divisions, parent companies, subsidiary companies, affiliates, and any person or entity affiliated with same (the "**StakeHound Entities**") from any and all causes of actions, claims, counterclaims, controversies, liabilities, obligations, demands, damages, costs, and expenses, of every nature, character, and description, in law or equity, whether presently known or unknown, vested or contingent, suspected or unsuspected, which any of the CNL Entities have or may have against any or all of the StakeHound Entities with respect to disputes arising from or relating to the SSA, the RSA, the SSTC or any other facts and circumstances set forth in or relating to the Swiss Arbitration or the Adversary Proceeding, for any reason whatsoever, occurring from the beginning of the world to the date hereof, and further agree that this Settlement Agreement may be pleaded and shall serve as a full defense to any action, suit or other proceeding covered by the terms of this Settlement Agreement which is or may be initiated, prosecuted or maintained; provided, however, that this release shall not apply to (x) the terms and enforcement of this Settlement Agreement or (y) any acts of the StakeHound Entities that constitute fraud or gross negligence (for the avoidance of doubt, this subpart (y) shall not exclude from the releases granted to the StakeHound Entities hereunder any claims brought or that could have been brought (to the extent discovered or discoverable upon reasonably inquiry by CNL) based on, arising from or relating to the facts alleged in the Adversary Proceeding, including all of CNL's pleadings and filings in the Adversary Proceeding).

    b. Upon the last of the dates upon which any of the Initial CNL ETH Transfer, theMATIC and stMATIC Transfer and the DOT and stDOT Transfer occurs, the StakeHound Entities hereby completely release, acquit, and forever discharge the CNL Entities from any and all causes of actions, claims, counterclaims, controversies, liabilities,

obligations, demands, damages, costs, and expenses, of every nature, character, and description, in law or equity, whether presently known or unknown, vested or contingent, suspected or unsuspected, which any of the StakeHound Entities have or may have against any or all of the CNL Entities with respect to disputes arising from or relating to the SSA, the RSA, the SSTC or any other facts and circumstances set forth in or relating to the Swiss Arbitration or the Adversary Proceeding, for any reason whatsoever, occurring from the beginning of the world to the date hereof, and further agree that this Settlement Agreement may be pleaded and shall serve as a full defense to any action, suit or other proceeding covered by the terms of this Settlement Agreement which is or may be initiated, prosecuted or maintained; provided, however, that this release shall not apply to (x) the terms and enforcement of this Settlement Agreement or (y) any acts of the CNL Entities that constitute fraud or gross negligence (for the avoidance of doubt this subpart (y) shall not exclude from the releases granted to the CNL Entities any claims brought or that could have been brought (to the extent discovered or discoverable upon reasonably inquiry by the StakeHound Entities) based on, arising from or relating to the facts alleged in the Swiss Arbitration or the Adversary Proceeding, including all of StakeHound's pleadings and filings in the Swiss Arbitration and Adversary Proceeding).

16. <u>Event of Default Remedies.</u> In the event that CNL alleges that an Event of Default has occurred or otherwise seeks to exercise remedies in accordance with Section 6(d)(i) hereof, CNL shall be required to submit to StakeHound on five (5) days' prior written notice of CNL's intent to exercise its rights and remedies to obtain such relief. If StakeHound files for injunctive relief in the Bankruptcy Court with respect to such action, CNL will not object to a reasonably expedited hearing on such relief in the Bankruptcy Court, to the extent that the court grants such a hearing, but no stay of such relief shall exist or be implied unless ordered by the court. At any such hearing, StakeHound shall bear the burden of establishing all elements necessary to obtain any provisional relief it may seek. For the avoidance of doubt, the burden of proof in any other proceeding between the parties shall be determined in accordance with applicable law.

17. <u>Miscellaneous</u>

   a. <u>Representations and Warranties of CNL</u>. CNL represents and warrants to StakeHound that:

      i. it has all requisite entity power and authority to execute and deliver this Settlement Agreement and to perform its obligations hereunder;

      ii. the execution, delivery and performance by CNL of this Settlement Agreement and each of the transactions contemplated hereby have been duly and validly authorized by CNL and no other act or proceeding on the part of CNL, its affiliates, their respective equity owners or any other person or entity is necessary to authorize the execution, delivery or performance by CNL of this Settlement Agreement, except for the approval of the Bankruptcy Court; and

iii. the execution, delivery and performance by CNL of this Settlement Agreement do not and will not (a) violate, conflict with, result in any breach of, constitute a default under, result in the termination or acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under CNL's certificate of incorporation or bylaws or any law or contract to which CNL is bound or (b) require any authorization, consent, approval, exemption or other action by or notice to any governmental authority under the provisions of any law.

b. <u>Representations and Warranties of StakeHound</u>.  StakeHound represents and warrants to CNL that:

   i. there are no outstanding claims against it and it has no creditors or putative claimants other than unsecured claims asserted by liquid staking customers, ███████████████████████████████████, Convertible Loan Holders, and ███████████████████████████████████████████████████████████████████████ For the avoidance of doubt, StakeHound represents that there are no liens or other encumbrances on any StakeHound property, and StakeHound is aware of no circumstances that could or would give rise to the imposition of such a lien or encumbrance other than as provided in Section 5 of this Agreement;

   ii. it has all requisite entity power and authority to execute and deliver this Settlement Agreement and to perform its obligations hereunder;

   iii. the execution, delivery and performance by StakeHound of this Settlement Agreement and each of the transactions contemplated hereby have been duly and validly authorized by StakeHound and no other act or proceeding on the part of StakeHound, its affiliates, or their respective equity owners or any other person or entity is necessary to authorize the execution, delivery or performance by StakeHound of this Settlement Agreement; and

   iv. the execution, delivery and performance by StakeHound of this Settlement Agreement do not and will not (a) violate, conflict with, result in any breach of, constitute a default under, result in the termination or acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under StakeHound's certificate of incorporation or bylaws or any law or contract to which StakeHound is bound, or (b) require any authorization, consent, approval, exemption or other action by or notice to any governmental authority under the provisions of any law.

c. <u>Entire Agreement, etc.</u>  This Settlement Agreement constitutes the entire agreement with respect to the subject matter addressed herein and supersedes any prior written and/or verbal agreement between the Parties, and shall be binding upon, and inure to the benefit of each and all of the Parties and their respective heirs, successors and assigns.

d.  <u>Amendments</u>. This Settlement Agreement or any provision hereof may not be orally modified or waived. This Settlement Agreement may only be modified in a writing signed by all of the Parties or waived in a writing signed by the Party granting the relevant waiver.

e.  <u>Assignment</u>. Neither this Settlement Agreement nor any of the rights, interests or obligations under this Settlement Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise by any of the Parties without the prior written consent of the other Parties, and any such assignment without such prior written consent shall be null and void.  No assignment shall release the assigning Party of its obligations or liabilities under this Settlement Agreement.  Subject to the preceding sentences, this Settlement Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns.

f.  <u>Governing Law; Submission to Jurisdiction; waiver of jury trial.</u>  The Parties understand and agree that this Settlement Agreement shall be construed and interpreted in accordance with the laws of the State of New York excluding any law that would result in the application of the laws of any jurisdiction other than the state of New York. The Parties shall submit themselves to the exclusive jurisdiction of the Bankruptcy Court, and any appellate court thereof, for the purposes of (and solely for the purposes of) any suit, action or other proceeding arising out of, or relating to, the Settlement Agreement, or any of the transactions contemplated thereby, and agree not to bring any suit, action or other proceeding arising out of, or relating to, the Settlement Agreement, or any of the transactions contemplated thereby in any other court.  Each Party irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court, and any appellate court thereof, for any reason whatsoever, that such suit, action or proceeding is brought in an inconvenient forum, or that the venue of such suit, action or proceeding is improper, or that this Settlement Agreement or the subject matter thereof may not be enforced in or by the Bankruptcy Court.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR OTHER PROCEEDING ARISING OUT OF, OR RELATING TO, THE SETTLEMENT AGREEMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY.

g.  <u>Enforcement</u>.  The Parties understand and agree that money damages would not be a sufficient remedy for any breach of this Settlement Agreement, and that, in the event of a breach of this Settlement Agreement, in addition to all other remedies under applicable law, the non-breaching Party shall be entitled to specific performance and to injunctive or other equitable relief as a remedy for any such breach.  The Party in breach of the Settlement Agreement will not oppose the granting of such relief and will waive any requirement for the posting of any bond or other security in connection with this Settlement Agreement.  In the event of litigation relating to this Settlement Agreement, if the Bankruptcy Court determines that a Party or any of its Representatives has breached the Settlement Agreement, the breaching Party will reimburse the non-breaching Party for its reasonable out-of-pocket costs and reasonable out-of-pocket

expenses (including, without limitation, reasonable legal fees and reasonable out-of-pocket expenses) incurred in connection with such litigation.

h. <u>Required Disclosure</u>.  In the event that either Party or their Representatives are requested or required, by law or regulation, or any governmental, regulatory or self-regulatory authority, to disclose any information concerning the contents or terms of this Settlement Agreement, such requested Party will give the other Party prompt written notice of such request or requirement.  Either Party may then, at their own costs or expense, seek an appropriate order or other remedy protecting the contents or terms of this Settlement Agreement from disclosure or limit the information provided.  In the event that a protective order or other remedy is not obtained, or that the right to seek protection from such disclosure has been waived, the disclosing Party may, without liability under this Settlement Agreement, furnish only that portion of the Settlement Agreement that the disclosing Party is legally required to disclose, provided that the disclosing Party use best efforts to obtain assurances that confidential treatment will be accorded to such information.

i. <u>Publicity</u>.  This Settlement Agreement and resolution of the Adversary Proceeding and Swiss Arbitration are confidential, and neither Party shall disclose or comment upon them in the 9019 Motion (which for the avoidance of doubt shall publicly disclose this Settlement Agreement as appropriately redacted and sealed with respect to privileged or litigation strategy elements) or as may otherwise be first agreed among the Parties.

j. <u>No Admission of Liability</u>.  Nothing in this Settlement Agreement shall be deemed an admission of liability by any Party with respect to any of the claims, interests or causes of action released pursuant to this Settlement Agreement.

k. <u>Waiver of California Civil Code Section 1542</u>:

    i. The Parties hereby expressly waive and relinquish all rights and benefits afforded by California Civil Code section 1542 to the extent California Civil Code section 1542 is applicable and do so understanding and acknowledging the significance and consequences of such specific waiver of California Civil Code section 1542.

    ii. The Parties acknowledge and understand that the Parties are being represented in this matter by counsel, and acknowledge that the Parties' respective counsel are familiar with the provisions of California Civil Code section 1542. California Civil Code section 1542 provides as follows (emphasis added):

        A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

iii. Notwithstanding the provisions of section 1542, the Parties expressly acknowledge and agree that the releases set forth in Paragraphs A and B of Section 15 are intended to include and do include in their effect, without limitation, all such claims that the Parties do not know or suspect to exist at the time of the execution of this Settlement Agreement, and that this Settlement Agreement contemplates the extinguishment of those claims.

l. <u>Captions; Counterparts</u>. The captions in this Settlement Agreement are for convenience only and shall not be considered a part of, or affect the construction or interpretation of, any provision of this Settlement Agreement. This Settlement Agreement may be executed in two counterparts (including by means of facsimile or other electronic transmission, including.pdf, DocuSign or similar format), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

DocuSign Envelope ID: DE978FFC-4445-4DBB-A309-16B50408DFDE

IN WITNESS WHEREOF, and intending to be legally bound hereby, each of the Parties has executed a counterpart of this Settlement Agreement effective upon the date of the last signature below.

**CELSIUS NETWORK LIMITED**

By:

Printed Name:   CHRISTOPHER  FERRARO

Title: Interim CEO, CRO, CFO

Date:   12 /8 /2023

**STAKEHOUND S.A.**

By:   Albert Castellana Lluís

Printed Name:   Albert Castellana Lluís

Title:  Board Member

Date:  December 8, 2023

By:   Edgars Nemše

Printed Name:   Edgars Nemše

Title:  Board Member

Date:  December 8, 2023

[*Signature Page to Settlement Agreement*]

## EXHIBIT A

| | |
|---|---|
| ███ | |
| ██ | ████ |
| | |
| ███ | |
| ███ | ████ |
| █ | ████ |
| ██ | ████ |
| ██ | █████ |
| ███ | ███ |
| | |
| ███ | |
| ███ | ████ |
| | |
| ███ | |
| ██ | ████ |

## **EXHIBIT B**

|  | Up to and including Q3-2023 |
|---|---|
| **Goldfarb** | ███████ |
| **Keystone (Fireblocks Litigation)** | ███████ |
| **FTI** | ███████ |
| **Israel Court Fees** | ███████ |
| **Israel Court Bonds** | ████ |

**EXHIBIT C**

| Celsius stTokens | | |
|---|---|---|
| **Coin** | **Quantum** | **Account Address** |
| stETH | 63,073.229568220740353573 | 0x41318419CFa25396b47A94896FfA2C77c6434040 |
| stMATIC | 45,908,062.322645002070224348 | 0xE08CcaFb94E1dE775bC43Ae927286F16848B8Fc8 |
| stMATIC | 350,035.096875670418481119 | 0x1EB1734796F337E6D45B437E163b4AEaC21b41c6 |
| stdDOT | 77,913.872498332 | 0xE08CcaFb94E1dE775bC43Ae927286F16848B8Fc8 |
| stdDOT | 625.3154495361 | 0x1EB1734796F337E6D45B437E163b4AEaC21b41c6 |

| StakeHound Native Tokens | | |
|---|---|---|
| **Coin** | **Quantum** | **Account Address** |
| ETH (lost) | 42,726.285833182 | 00d1d7d07c93337262bb7e0020d79159d44e43089848dc6ab ab2dd37add3fa16 |
| ETH (staked) | 24,712.557278784 | 0xf272E9AAdC2a082b7AF45ec89faB88f4ae899394 |
| ETH | 3,419.276000000 | 0xf272E9AAdC2a082b7AF45ec89faB88f4ae899394 |
| ETH | 146.337600000 | 0xaB6B4b11378a57933333e4Acfdc45567Dd78F14E |
| ETH | 32.255650000 | 0x2bf05f46D4c25619C388Cf4d0eF84220C28989fe |
| ETH | 16.021840000 | 0x607ebC82329D0CAc3027B83d15e4b4E816F131b7 |
| MATIC (staked) | 138,942.306898277 | 0xD5F1c385E8065aFb253b647322ed591B0370B1fC |
| MATIC (staked) | 148,858.465202083 | 0x0DD7aF540Bd6098DaD090BC71e0e5F5319c6e0B0 |
| MATIC (staked) | 288,863.994390514 | 0x9073caeB1fD241e955FE1E54dA7F89Fcc33A08F5 |
| MATIC (staked) | 286,549.535775319 | 0x1c28e296099e6C23c019BFFB480ddF870FE390Ba |
| MATIC (staked) | 829,900.956935340 | 0x2405c7c6fC041F1352FF139C4F6667E14620063A |
| MATIC (staked) | 1,571,670.255879630 | 0xB5AdD8432770DcB18495FF7A1270528e003b5C62 |
| MATIC (staked) | 3,179,572.181798560 | 0xED3381b548957a918b930AA6f5b644Cc5C86792d |
| MATIC (staked) | 7,108,164.886260090 | 0xA48B32aaDCCF4529F4da6b21E51e42cf40Af8563 |
| MATIC (staked) | 33,417,558.285579000 | 0xDd4586e9470a28D0b4641B5cDD7FC0c01bED622E |
| MATIC | 1,084,946.008053680 | 0xF745B9fFC813C11875F7B503D1157F175b86cA06 |
| DOT (staked) | 66,104.174491705 | 164u9fvdGtDrN6dZm5ZA8wCaKY7i8JFziQ4Zt7oXNPx5A5q3 |
| DOT | 25,440.961297198 | 164u9fvdGtDrN6dZm5ZA8wCaKY7i8JFziQ4Zt7oXNPx5A5q3 |